## APPENDIX OF UNPUBLISHED OPINIONS

1. *Broome v. Am. Fam. Life Assurance Co. of Columbus*, No. 20-2852, 2021 WL 5355937 (3d Cir. Nov. 17, 2021)

2. *Coulter v. Experian Info. Sols., Inc.*, No. 20-1814, 2021 WL 735726 (E.D. Pa. Feb. 25, 2021)

3. *DeVries v. Experian Info. Sols., Inc.*, No. 16-cv-02953-WHO, 2017 WL 733096 (N.D. Cal. Feb. 24, 2017)

4. *Dobbs v. Health IQ Ins. Servs., Inc.*, No. 21-5276, 2022 WL 2974713 (E.D. Pa. July 27, 2022)

5. *In re Ring LLC Privacy Litig.*, No. 19-10899-MFW, 2021 WL 2621197 (C.D. Cal. June 24, 2021)

6. *Kim v. Tinder, Inc.*, No. 18-03093 JFW (AS), 2018 WL 6694923 (C.D. Cal. July 12, 2018)

7. *Kubischta v. Schlumberger Tech Corp.*, No. 25-1338, 2016 WL 3752917 (W.D. Pa. July 14, 2016)

8. *Lloyd v. Retail Equation, Inc.*, No. 21-17057, 2022 WL 18024204 (D.N.J. Dec. 29, 2022)

9. *Noonan v. Comcast Corp.*, No. 16-00458, 2017 WL 4799795 (D.N.J. Oct. 24, 2017)

10. *Pricharda v. Checkr, Inc.*, No. 22-CV-3180, 2022 WL 16749033 (E.D. Pa. Nov. 7, 2022)

11. *Rodriguez v. Experian Servs. Corp.*, No. 15-3553-R, 2015 WL 12656919 (C.D. Cal. Oct. 5, 2015)

12. *Selden v. Airbnb, Inc.*, No. 16-00933, 2016 WL 6476934 (D.D.C. Nov. 1, 2016)

13. *VR Consultants, Inc. v. J.P. Morgan Chase & Co.*, No. 20-cv-6110, 2021 WL 5494373 (D.N.J. Nov. 23, 2021)

1

2021 WL 5355937
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

Reginald BROOME; Chris Salsman, Appellants

v.

AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS;
Continental American Insurance Company

No. 20-2852
|
Submitted July 15, 2021
|
(Filed: November 17, 2021)

On Appeal from the United States District Court for the
District of Delaware (D.C. Civil Action No. 1-19-cv-1967),
District Judge: Honorable Maryellen Noreika

**Attorneys and Law Firms**

Gary W. Aber, Esq., Wilmington, DE, for Appellants.

R. Steve Ensor, Esq., Brooks A. Suttle, Esq., Alston &
Bird, Atlanta, GA, Frederick T. Mickler, IV, Esq., Ashby
& Geddes, Wilmington, DE, for American Family Life
Assurance Co. of Columbus, Continental Inns of America.

Before: McKEE, GREENAWAY, JR., and RESTREPO,
Circuit Judges.

OPINION [*]

RESTREPO, Circuit Judge

**\*1** Appellants brought this action against appellees,
American Family Life Assurance Company of Columbus
("Aflac") and Continental American Insurance Company
("Continental"), seeking an Order vacating an arbitration
award in favor of appellees ("Award"). On appeal, appellants
challenge the District Court's Order granting appellees'
motion to dismiss the Complaint. Because we agree with
the District Court that appellants failed to comply with
requirements of the Federal Arbitration Act ("FAA"), 9
U.S.C. § 1, *et seq.*, with respect to service of process on
appellees, we affirm.

**I.**

Appellants, two former independent contractor insurance
agents, contracted with Aflac and Continental to
sell insurance products. These contracts ("Associate's
Agreements" or "Agreements") required any dispute between
the parties to be submitted for binding arbitration, and that
any arbitration proceeding between the parties "be covered
by, and conducted pursuant to, the FAA." App. 40, 58.
Pursuant to the Agreements, the arbitrators' award "shall be
binding and conclusive upon all parties hereto subject only
to grounds permitted under the FAA for vacating, correcting,
or modifying an award." App. 41, 58. Thus, the arbitration
proceeding between the parties as well as the right to seek to
vacate the arbitrators' Award are governed by the FAA.

Accordingly, after a dispute arose between the parties,
they participated in an arbitration proceeding. At the
commencement of the proceeding, all parties and the
arbitrators executed an Amended Scheduling Order
providing, "The parties agree that this arbitration proceeding
shall be conducted in accordance with the [FAA], the
Arbitration Agreement contained in Paragraph Ten of
[Appellants'] Associate's Agreements and this Amended
Scheduling Order." ECF (D. Del.) No. 6, Ex. D ¶ 4. After
the arbitration hearing, the arbitrators issued an Award on
June 14, 2019, finding in favor of Aflac and Continental and
dismissing appellants' claims.

Appellants filed their Complaint in the Delaware Court of
Chancery on September 12, 2019 seeking to vacate the
Award of the arbitrators. Appellants served the Summons
and Complaint on the Delaware Insurance Commissioner on
September 19, 2019.[1] Aflac and Continental were thereafter
served with process through the Delaware Insurance
Commissioner on September 27, 2019, three-and-a-half
months after the Award was issued.[2] Appellees thereafter
removed the action to the District Court based on diversity
of citizenship. Aflac and Continental subsequently filed a
Motion to Dismiss the Complaint, which the District Court
granted on August 12, 2020.

**II.**[3]

**\*2** The District Court granted appellees' motion to dismiss
on two independent grounds: (1) appellants failed to serve

Broome v. American Family Life Assurance Company of..., Not Reported in Fed....

2021 WL 5355937

process on Aflac and Continental within the 3-month limitation period expressly set forth in the FAA, 9 U.S.C. § 12; and (2) appellants failed to serve Aflac and Continental with process by the Marshal, as also expressly required by the FAA, *id.*

As to the FAA's time limitation on service of process, the FAA provides, "Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." *Id.* Here, it is undisputed that appellants did not serve the Summons and Complaint on the Delaware Insurance Commissioner any earlier than September 19, 2019. [4] Since the Arbitrators issued an Award on June 14, 2019, even assuming arguendo that service of process was complete upon serving the Insurance Commissioner under these circumstances, process was not served within three months after the Award was filed or delivered, and the District Court properly dismissed the Complaint for failure to comply with the FAA. [5] *See Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith*, 477 F.3d 1155, 1158 (10th Cir. 2007).

In addition to the time limitation of service, the FAA provides that where the adverse party is a nonresident of the district within which the award was made, then service "*shall*" be made "*by the marshal* of any district within which the adverse party may be found." 9 U.S.C. § 12 (emph. added). As the District Court noted, "it is undisputed that [appellees] are 'nonresidents' and that [appellants] did not serve either of [appellees] via the United States Marshals Service." App. 5. Thus, the District Court's dismissal of the Complaint was proper based on non-compliance with the FAA. [6]

Appellants spend a significant portion of their brief justifying why they initiated this action in the Delaware Court of Chancery, but in this case, Aflac and Continental do not dispute that the Delaware state courts had jurisdiction. It is clear, in any event, that the District Court had jurisdiction based on diversity of citizenship, and that appellees were well within their rights to remove this case to the District Court on that basis. *See* 28 U.S.C. §§ 1332(a), 1441(a). Further, to the extent appellants argue that they were in compliance with the Delaware Uniform Arbitration Act ("DUAA"), 10 Del. C. § 5701, as explained, under the Associate's Agreements, the arbitration proceeding between the parties as well as the right to seek to vacate the arbitrators' Award are governed by the FAA. [7] Because of appellants' failure to comply with the FAA which governs this action, dismissal of the case is appropriate.

**\*3** For the foregoing reasons, we affirm the Order of the District Court.

### All Citations

Not Reported in Fed. Rptr., 2021 WL 5355937

### Footnotes

[*]   This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

[1]   As the District Court pointed out, under Delaware law, nonresident insurers operating in Delaware, such as appellees, are subject to the Delaware Insurance Code, including its procedures for service of process in a legal proceeding, and "[u]nder Delaware law, Defendants can only properly be served with legal process via service upon the Delaware Insurance Commissioner, which will then mail the process to Defendants' registered agent in the state." App. 6 (citing 18 Del. C. §§ 524, 525).

[2]   Under Delaware law, service upon a nonresident insurer is not complete until three days after the process is mailed by the department of insurance to the insurer. *See* 18 Del. C. § 525.

[3]   The District Court had jurisdiction under 28 U.S.C. § 1332(a), and we have appellate jurisdiction under 28 U.S.C. § 1291. The parties agree that we review de novo the District Court's grant of the motion to dismiss.

2021 WL 5355937

4     Appellants argued in the District Court that "service was properly accomplished ... on September 19, 2019." ECF (D. Del.) No. 10, at 17; App. 6; *see* Appellant's Br. 8 (acknowledging that process "for both [Aflac and Continental] was served on the Delaware Insurance Commissioner on September 19, 2019").

5     The District Court pointed out that, under Delaware law, "it appears that Defendants were not deemed served" on September 19, 2019 "as Plaintiffs assert," since "[t]hat is the date on which the Complaint was served on the Commissioner," and under Delaware law, "service upon a nonresident insurer is not complete until three days after the process is mailed by the department of insurance to the insurer." App. 6, 7; *see supra* note 2. However, the Court correctly concluded, "in any event, even if the Court were to accept Plaintiffs' proffered September 19, 2019 service date, that date is still more than three months after the June 14, 2019 Award being challenged was issued." App. 7.

6     Appellants argue that for them to have had the Marshals serve process, service "might have had to be accomplished in Nebraska, [Aflac's] state of incorporation, Georgia, its principal place of business, and for Continental ... in South Carolina, where it has its principal place of business." Appellant's Br. 34. Thus, appellants do not argue they were somehow unable to serve Aflac and Continental by the Marshals in compliance with the FAA, only apparently that it "might have" been inconvenient.

7     Section 5702(a) of the DUAA provides that the making of an arbitration agreement "*specifically referencing the [DUAA] and the parties' desire to have it apply to their agreement* confers jurisdiction on the [Chancery] Court ... to enter judgment on an award thereunder ..." 10 Del. C. § 5702(a) (emph. added). Absent such an express reference, "any application to the Court of Chancery ... to vacate or enforce an arbitrator's award shall be decided by the Court of Chancery *in conformity with the [FAA], and such general principles of law and equity as are not inconsistent with that Act.*" *Id.* § 5702(c) (emph. added). Here, the Agreements expressly identified the FAA as governing.

---

End of Document        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2

2021 WL 735726

2021 WL 735726
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Ramsey COULTER, individually and on behalf
of all similarly situated consumers, Plaintiff
v.
EXPERIAN INFORMATION
SOLUTIONS, INC., Defendant

CIVIL ACTION NO. 20-1814
|
Filed 02/25/2021

**Attorneys and Law Firms**

Nicholas J. Linker, Zemel Law LLC, Paterson, NJ, for
Plaintiff.

Mohammad A. Ghiasuddin, Margolis Edelstein, Philadelphia,
PA, John A. Vogt, Richard J. Grabowski, Jones Day, Irvine,
CA, William R. Taylor, Jones Day, Houston, TX, for
Defendant.

**MEMORANDUM OPINION**

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C.J.

**INTRODUCTION**

**\*1**  Before this Court is Defendant Experian Information
Solutions, Inc.'s motion to compel arbitration filed pursuant
to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*
[ECF 17]. Plaintiff Ramsey Coulter opposes the motion. [ECF
25]. The issues raised by the parties are fully briefed and ripe
for disposition. For the reasons set forth herein, Defendant's
motion to compel arbitration is granted.

**BACKGROUND**

Plaintiff asserts a putative class action claim against
Defendant for an alleged violation of the Fair Credit
Reporting Act ("FCRA"), 15 U.S.C. § 1681a, *et seq.*
Specifically, Plaintiff avers that Defendant knowingly
reported inaccurate "dates of status" on his and other
consumers' credit card accounts and failed to conduct a
reasonable investigation of the matter, which negatively
impacted their credit scores. Defendant moves to compel
arbitration of this claim pursuant to an arbitration provision

(the "Arbitration Provision") in the Terms of Use Agreement
Plaintiff entered into when he enrolled in Experian
CreditWorks online, the service through which he discovered
the alleged inaccurate dates of status.

The following are the relevant facts in this matter: [1]

On July 17, 2017, Plaintiff enrolled in Experian
CreditWorks, Defendant's credit monitoring service, using
an online form. The online enrollment form included a
disclosure that indicated: "**[b]y clicking 'Submit Secure
Order': I accept and agree to your Terms of Use
Agreement ...**" (Decl. of David Williams, ECF 17-3 at
3) (emphasis in original). The Terms of Use Agreement,
which was available by clicking a highlighted link on the
online form, contains the arbitration provision at issue. This
Arbitration Provision provided, in relevant part:

PLEASE READ THIS CAREFULLY. IT AFFECTS
YOUR RIGHTS...

Arbitration Agreement:

(a) [Experian Consumer Services] and you agree to
arbitrate all disputes and claims between us arising
out of this Agreement directly related to the Services
or Websites to the maximum extent permitted by law,
except any disputes or claims which under governing
law are not subject to arbitration. This agreement to
arbitrate is intended to be broadly interpreted and to
make all disputes and claims between us directly relating
to the provision of any Service and/or your use of
any Website subject to arbitration to the fullest extent
permitted by law. The agreement to arbitrate includes,
but is not limited to: claims arising out of or relating to
any aspect of the relationship between us arising out of
any Service or Website, whether based in contract, tort,
statute (including, without limitation, the Credit Repair
Organizations Act) fraud, misrepresentation or any other
legal theory; claims that arose before this or any prior
Agreement (including, but not limited to, claims relating
to advertising); claims that are currently the subject of
purported class action litigation in which you are not a
member of a certified class; and claims that may arise
after the termination of this Agreement.

**\*2**  (Experian Terms of Use Agreement, Ex. 3 to Decl. of
David Williams, ECF 17-6 at 7). The Arbitration Provision
included a delegation clause, which provided as follows:

(c) ... All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable. However if putative class or representative claims are initially brought by either party in a court of law, and a motion to compel arbitration is brought by any party, then the court shall have the power to decide whether this agreement permits class or representative proceedings.

(Experian Terms of Use Agreement at 8). In addition, the Arbitration Provision contained a clause concerning class action claims:

(f) YOU AND [Experian Consumer Services] AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

(Experian Terms of Use Agreement at 9) (emphasis in original).

At the time of Plaintiff's enrollment, the Terms of Use Agreement contained an FCRA carve-out, which provided that "any dispute you may have with us arising out of the Fair Credit Reporting Act (FCRA) relating to the information contained in your consumer disclosure or report, including but not limited to claims for alleged inaccuracies, shall not be governed by this agreement to arbitrate." (Experian Terms of Use Agreement at 7). However, on August 13, 2020, Defendant published an amended Terms of Use Agreement which removed the FCRA carve-out but otherwise contained provisions identical to those stated herein. (*See* Amended Experian Terms of Use Agreement, Ex. 4 to Decl. of David Williams, ECF 17-7).

## LEGAL STANDARD

When addressing a motion to compel arbitration, the Court must first determine the applicable standard of review; *to wit*: either the motion to dismiss standard under Federal Rule of Civil Procedure ("Rule") 12 or the motion for summary

judgment standard under Rule 56. *Guidotti v. Legal Helpers Debt Resolution, LLC.*, 716 F.3d 764, 771-72 (3d Cir. 2013). "Where the affirmative defense of arbitrability of claims is apparent on the face of a complaint (or documents relied upon in the complaint), the FAA would favor resolving a motion to compel arbitration under a motion to dismiss standard without the inherent delay of discovery." *Id.* at 773-74 (internal citations omitted). Where arbitrability is not apparent on the face of the complaint, "the issue should be judged under the Rule 56 standard." *Id.* Here, the issue of arbitrability is not apparent on the face of the complaint and, therefore, Defendant's motion to compel arbitration is properly reviewed under the Rule 56 summary judgment standard.

**\*3** When applying the Rule 56 standard to a motion to compel arbitration, a court shall grant the motion when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 317 (1986). A fact is "material" if its existence or non-existence may affect the outcome of litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When applying the Rule 56 standard, "the court must draw all reasonable inferences in favor of the nonmoving party." *Guidotti*, 716 F.3d at 772.

The moving party—here, Defendant—has the burden of establishing "the absence of a genuine issue of material fact" by showing that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322-23. The non-moving party must then rebut the claim by "citing to particular parts of materials in the record, including, depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A-B). The non-moving party must show more than "some metaphysical doubt as to the material facts[;]" rather, the non-moving party must "go beyond the pleadings" and "show that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 476 U.S. 574, 586 (1986); *see also Celotex*, 477 U.S. at 324.

## DISCUSSION

Defendant moves to compel arbitration based on Plaintiff's assent to the Terms of Use Agreement, which contains

2021 WL 735726

the Arbitration Provision. Specifically, Defendant argues that the Terms of Use Agreement contains a delegation clause (the "Delegation Clause") that requires an arbitrator, rather than the court, to decide all questions of arbitrability. Defendant further argues that the Arbitration Provision requires arbitration on an individual basis, and not in the form of a class action. In opposing the motion, Plaintiff argues he is not bound by the current terms of the Terms of Use Agreement but, instead, by the terms of the agreement entered at the time of his enrollment, which exempted FCRA claims from the Arbitration Provision. Plaintiff also argues that Defendant waived its right to arbitrate because it waited nearly eight months after commencement of this litigation to move to compel arbitration. This Court will first address the threshold question of whether the Arbitration Provision's Delegation Clause requires all issues—including Plaintiff's arguments against arbitration—to be addressed by the arbitrator.

The FAA "establishes a strong federal policy in favor of compelling arbitration over litigation." *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 104 (3d Cir. 2000). The primary substantive provision of the FAA (§ 2) provides that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (citing 9 U.S.C. § 2). This provision "reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Further, § 2 "places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms." *Id.* (internal citations omitted).

**\*4** Before compelling arbitration, a court must typically determine (1) whether a valid agreement to arbitrate exists, and (2) whether the particular dispute falls within the scope of that agreement. *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). However, when an arbitration provision, by "clear and unmistakable evidence," contains a valid delegation clause, the court's inquiry is limited to the first step: determining whether a valid agreement to arbitrate exists. *Henry Shein, Inc.*, 139 S. Ct. at 530 ("To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."). This "gateway dispute about whether the parties are bound by a given arbitration clause" is for a court to decide. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

Accordingly, "if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Shein, Inc.*, 139 S. Ct. at 530. The "arbitrability issue" presumptively includes "allegations of waiver, delay, or a like defense to arbitrability." *Howsam*, 537 U.S. at 84 (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983)). Additionally, a delegation clause may delegate the issue of whether a particular dispute falls within the scope of the agreement to the arbitrator. *See Singh v. Uber Technologies, Inc.*, 939 F.3d 210, 228 (3d Cir. 2019) (holding that all questions subject to delegation clause were for arbitrator to decide, including whether parties' dispute fell within scope of arbitration agreement).

If the delegation clause includes the enforceability of the arbitration provision, a court cannot consider the question of enforceability "unless a party challenged the delegation clause and the court concludes that the delegation clause is not enforceable." *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 237 (3d Cir. 2020) (internal citation and quotations omitted). A party seeking to avoid arbitration under those circumstances must "challenge the delegation provision specifically[.]" *Id.* (quoting *Rent-A-Center West, Inc.*, 561 U.S. at 72); *see also Kocjancic v. Bayview Asset Management, LLC*, 2014 WL 5786900, \*4 (E.D. Pa. Nov. 6, 2014) (compelling arbitration where plaintiff had "not contested the validity of the delegation provision in particular").

Here, the Arbitration Provision's Delegation Clause provides that "[a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision" and grants the arbitrator "exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable." (Experian Terms of Use Agreement at 8). This provision constitutes a "clear and unmistakable" delegation clause under *Henry Shein* and delegates the exclusive authority to resolve "all issues" to the arbitrator, including the "scope and enforceability" of the Arbitration Provision. Notably, Plaintiff has not specifically disputed the Delegation Clause. Therefore, Plaintiff's arguments as to the scope and enforceability of the Arbitration Provision fall under the arbitrator's authority. [2]

Coulter v. Experian Information Solutions, Inc., Slip Copy (2021)

2021 WL 735726

**\*5** Because the Delegation Clause is valid and uncontested, this Court's inquiry is limited to the issue of whether a valid arbitration agreement exists. To determine whether a valid arbitration agreement exists, courts look to ordinary state law principles of contract formation. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009). Throughout the inquiry, there is a presumption in favor of arbitrability. *Trippe*, 401 F.3d at 529. "Clickwrap" agreements like the one at issue here—where a user's click indicates assent to the terms of use before the user is able to proceed on a website—are evaluated with "traditional principles of contract law and focus on whether the plaintiff[ ] had reasonable notice of and manifested assent to the clickwrap agreement." *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007). *See also HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 334 (W.D. Pa. 2020) ("[C]lickwrap agreements are routinely enforced by the courts."). Here, reasonable notice was provided when Defendant's website advised Plaintiff that "[b]y clicking 'Submit Secure Order': [He] accept[s] and agree[s] to [their] Terms of Use Agreement ..." The full Terms of Use Agreement,[3] readily available to Plaintiff by clicking on the highlighted link, contained the Arbitration Provision entitled "DISPUTE RESOLUTION BY BINDING ARBITRATION." By clicking the "Submit Secure Order" button, Plaintiff manifested his assent to the Terms of Use Agreement.[4] Indeed, Plaintiff's assent is plain from his own declaration: "I have not seen any amended terms of use *beyond the [Terms of Use Agreement] in which I agreed to in July 2017*." (Decl. of Ramsey Coulter, ECF 25-1, at 1) (emphasis added). Because Plaintiff had reasonable notice and manifested his assent, this Court finds the Terms of Use Agreement and the Arbitration Provision therein constitute a valid agreement to arbitrate.

Consistent with the Arbitration Provision's Delegation Clause, this Court may not consider the parties' remaining arguments, including Plaintiff's arguments concerning the terms of the agreement and whether Defendant waived its right to arbitrate. *See Williams*, 965 F.3d at 237; *Kocjancic*,

2014 WL 5786900 at \*4. Those issues are to be resolved by the arbitrator.

Finally, Defendant moves for Plaintiff's claims to be arbitrated on an individual basis only. The sole exception to the arbitrator's authority under the Delegation Clause allows a court to decide "whether this agreement permits class or representative proceedings" if "putative class or representative claims are initially brought by either party in a court of law, and a motion to compel arbitration is brought by any party[.]" (Experian Terms of Use Agreement at 9). Class action waivers are enforceable under the FAA. *See AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 333 (2011); *see also Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221, 232 (3d Cir. 2012) ("[T]he Pennsylvania law prohibiting class action waivers is surely preempted by the FAA"). Defendant's Terms of Use Agreement requires that claims by either party be brought on an individual basis, rather than as a representative of a class. Plaintiff's assent to the Terms of Use Agreement includes assent to the class action waiver. As such, this Court finds that Plaintiff has waived his right to bring claims against Defendant as a class representative. Therefore, Plaintiff must arbitrate his claim on an individual basis.

## CONCLUSION

This Court finds that a valid agreement to arbitrate exists within the Terms of Use Agreement. This Court also finds that the class action waiver in the Terms of Use Agreement requires Plaintiff to arbitrate his claim on an individual basis only, and not as a representative of a class. The parties' remaining disputes are for the arbitrator to decide. Accordingly, Defendant's motion to compel arbitration is granted. An Order consistent with this Memorandum Opinion follows.

## All Citations

Slip Copy, 2021 WL 735726

## Footnotes

1   The facts set forth herein are drawn from the complaint and the exhibits attached to the parties' briefs, including the sworn declarations of David Williams and Plaintiff. For the purposes of this motion, this Court will construe the facts and evidence in the light most favorable to the non-movant—here, Plaintiff.

2   Plaintiff argues that his FCRA claim is exempted from the Arbitration Provision that he agreed to in 2017. Whether Plaintiff's FCRA claim is subject to the Arbitration Provision is a question of the "scope" of the Provision, and thus falls within the arbitrator's authority to decide. Plaintiff's remaining argument, that Defendant waived its right to arbitrate, is an "arbitrability issue" also subject to the arbitrator's authority under the Delegation Clause.

3   The Terms of Use Agreement contained an Arbitration Provision at the time of Plaintiff's enrollment.

4   As Defendant explained, Plaintiff would not have been able to enroll in Experian CreditWorks, a service he first used in 2017 and has used as late as November 2020, unless he first clicked his assent. (*See* Decl. of David Williams at 3.)

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

3

Case 3:22-cv-02077-MEM   Document 13-2   Filed 03/20/23   Page 13 of 102

DeVries v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 733096

2017 WL 733096
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Sean Gilbert DEVRIES, Plaintiff,

v.

EXPERIAN INFORMATION
SOLUTIONS, INC., Defendant.

Case No. 16-cv-02953-WHO
|
Signed 02/24/2017

**Attorneys and Law Firms**

Michael Robert Reese, Reese Richman LLP, New York, NY, James A. Francis, John Soumilas, Francis and Mailman, P.C., Philadelphia, PA, Melissa Weiner Wolchansky, Halunen and Associates, Minneapolis, MN, for Plaintiff.

John Alexander Vogt, Jones Day, Irvine, CA, Kerry Cordill Fowler, Daniel John McLoon, Jones Day, Los Angeles, CA, Alexandra Alford McDonald, Jones Day, San Francisco, CA, for Defendant.

**ORDER GRANTING MOTION TO COMPEL ARBITRATION AND MOTION TO STAY**

William H. Orrick, United States District Judge

**INTRODUCTION**

*1 Plaintiff Sean Gilbert DeVries brings this class action suit under the Fair Credit Reporting Act ("FCRA") and California law against defendant Experian Information Solutions, Inc. ("EIS") for its alleged failure to provide consumers with their annual free credit reports. EIS now moves to compel arbitration on an individual basis and stay this action pending arbitration. I find that DeVries agreed to the 2014 Terms and Conditions, which were later superseded by the 2016 Terms of Use. Although that latter agreement carves out certain claims arising out of the FCRA, the scope and enforceability of the arbitration provision is delegated to the arbitrator. I have jurisdiction to rule that EIS did not waive its right to arbitrate as a result of its litigation activity here. The motions to compel arbitration and stay this action are GRANTED.

**BACKGROUND**

**I. FACTUAL BACKGROUND**

**A. Plaintiff's Allegations**

DeVries alleges that on or around September 3, 2014, he attempted to obtain a free credit report from www.annualcreditreport.com, which is operated jointly by Equifax, Inc., TransUnion LLC, and EIS. Complaint (Dkt. No. 1) ¶ 21. He filled out an online form requiring "his full first name and last name; his middle initial; his current address; a previous address if he had moved within the past two years; his full date of birth ...; any generational information; and his Social Security number." Id. ¶ 22.

DeVries was then routed to www.annualcreditreport.experian.com, which is controlled solely by EIS. Id. There, he was required to answer additional questions, including: "the names of persons he associates with; last four digits of his checking account; names of persons he has lived with in the last ten years; and trick questions regarding non-existent mortgages." Id. ¶ 23. EIS then rejected his request for his free credit report, stating that it could not verify his identity. Id. ¶ 25. EIS requested additional identifying documents, including driver's license, state ID card, utility bill, and bank or insurance statement. Id.

Unable to obtain his free credit report, DeVries visited EIS's website, www.experian.com, on September 2, 2014. Id. ¶ 27. After providing "his first and last name, middle initial, current address, date of birth, any generational information, and Social Security name," he purchased an "Experian credit report" for $10. Id.¶¶ 27-28; Declaration of David Williams ("First Williams Decl.") (Dkt. No. 34), Ex. E (Dkt. No. 34-1). He alleges that EIS "requires consumers to provide more detailed information than is required by statute to frustrate consumers into believing they cannot obtain a free Credit Report, and thus inducing them to purchase a Credit Report." Compl. ¶ 31.

**B. 2014 Terms and Conditions**

"At all times in 2014, ordering an Experian credit report over the www.experian.com website required the consumer's acceptance of the Terms and Conditions." First Williams Decl. ¶ 4. When DeVries made his September 2014 purchase, "every consumer was required to complete a two-step order process comprised of order page 'Step 1 of 2' and order page 'Step 2 of 2.' " Id. ¶ 4. After providing a name, email, and

DeVries v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 733096

address on the first order page, a consumer then proceeded to order page "Step 2 of 2." *Id.* ¶¶ 5-6.

**\*2** On order page "Step 2 of 2," a consumer was required to enter his or her Social Security Number, birthdate, login information, and payment information. First Williams Decl., Ex. C. At the bottom of this page is the following:

Click "Submit Secure Order" to accept the Terms and Conditions above, acknowledge receipt of our Privacy Notice and agree to its terms, confirm your authorization for Consumerinfo.com, Inc., an Experian company, to obtain your credit report and submit your secure order.


SUBMIT SECURE ORDER

*Id.* Both the "Terms and Conditions" and "Privacy Notice" were in blue, indicating that they were active hyperlinks that the consumer could click to be directed to another webpage. First Williams Decl. ¶ 7. When a consumer clicked on the "Terms and Conditions" hyperlink, "an additional window would open within the consumer's web browser containing the entire text of the Terms and Conditions." *Id.* ¶ 8.

The Terms and Conditions at the time of DeVries's purchase contained the following arbitration provision:

### DISPUTE RESOLUTION BY BINDING ARBITRATION

PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.

[...]

(a) CIC [1] and you agree to arbitrate all disputes and claims between us, except any disputes or claims which under governing law are not subject to arbitration. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us subject to arbitration to the fullest extent permitted by law.

[...]

For the purposes of this arbitration provision, references to "CIC," "you," and "us" shall include our respective parent entities, subsidiaries, affiliates, agents, employees, predecessors in interest, successors and assigns, websites of the foregoing, as well as all authorized or unauthorized users of beneficiaries of services, products or information under this or prior Agreements between us ... You agree that, by entering into this Agreement, you and CIC are each waiving the right to a trial by jury or to participate in a class action ... This arbitration provision shall survive termination of this Agreement.

[...]

(f) YOU AND CIC AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

First Williams Decl., Ex. D.

The Terms and Conditions also contain the following delegation clause:

> All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement, including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable.

*Id.*

Lastly, the Terms and Conditions state that its terms "may be updated from time to time" and "[e]ach time you order, access, or use any of the Products, Product Websites, and/or Content, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." *Id.*

### C. 2016 Terms of Use

**\*3** By April 5, 2016, before this lawsuit was filed in June 2016, EIS's website Terms of Use provided:

> You agree that by creating an account with ECS ..., or accessing

DeVries v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 733096

or using our ... website(s) (such as this website, https://usa.experian.com, or any affiliated website (including, but not limited to, **Experian.com**, **FreeCreditReport.com**, **FreeCreditScore.com**, **CreditReport.com, and CreditScore.com**)) ..., as well as any content provided or accessible in connection with the website(s) ..., you represent to ECS that you have read, understood, and expressly consent and agree to be bound by this Terms of Use Agreement, and the terms, conditions, and notices contained or referenced herein ("Agreement") whether you are a "Visitor" (which means that you simply browse or access a Website), or a "Customer" (means that you have created an account with ECS, or enrolled or registered with a Website, or are accessing or using a Service).[2]

Declaration of Michael R. Reese (Dkt. No. 43-1), Ex. G (Dkt. No. 43-9). DeVries accessed www.experian.com and its accompanying subpages on approximately May 18, 2016, and September 16, 2016. Declaration of Sean DeVries (Dkt. No. 43-11) ¶ 2.

The 2016 Terms of Use Agreement contains an arbitration provision, but includes the following carve-out:

[F]or the avoidance of doubt, any dispute you may have with us arising out of the Fair Credit Reporting Act ("FCRA") relating to the information contained in your consumer disclosure or report, including but not limited to claims for alleged inaccuracies, shall not be governed by this agreement.

Reese Decl., Ex. G. Outside of this carve-out provision, the agreement to arbitrate includes "claims that arose before this or any prior Agreement." *Id.* The Terms of Use also provide:

This Agreement ... constitute[s] the entire Agreement between ECS and you in connection with your account with ECS, or access or use of any Service or Website, and supersede[s] any prior versions of the terms and conditions, if applicable ... In the event of a conflict between this Agreement, or any other notice, policy, disclaimer or other term contained in the Websites or otherwise, this Agreement will control.

*Id.* The 2016 Terms of Use contain the same delegation clause as the 2014 Terms and Conditions.

In addition to the Terms of Use, the arbitration provision carve-out for disputes arising out of the FCRA relating to information in consumer disclosures or reports is also included in an updated version of CIC's Terms and Conditions. *See* Reese Decl., Ex. H; Declaration of Edward S. Chang (Dkt. No. 46-2). The Terms and Conditions were updated in September 2015 and published on the American Arbitration Association's (AAA) online Consumer Clause Registry on December 23, 2015. Chang Decl. ¶¶ 3-4.

## II. PROCEDURAL BACKGROUND

**\*4** On June 2, 2016, DeVries filed this class action suit asserting five causes of action under: (1) the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681g(a); (2) the FCRA, 15 U.S.C. § 1681j; (3) the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (4) the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; and (5) the California Consumer Credit Reporting Agencies Act, Cal. Civ. Code § 1785.1 *et seq.* Complaint (Dkt. No. 1). On August 16, 2016, EIS filed its answer, asserting 14 affirmative defenses (not including arbitration) and reserving its right to assert additional defenses "as may become available or apparent during the course of discovery." Answer (Dkt. No. 26) at 17. I issued an order governing the treatment of confidential discovery. Dkt. No. 28. EIS now moves to compel arbitration (Dkt. No. 31) and stay the action (Dkt. No. 33). I granted EIS's request to stay discovery pending the resolution of this motion. Dkt. No. 38.[3]

DeVries v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 733096

## LEGAL STANDARD

### I. MOTION TO COMPEL ARBITRATION

The Federal Arbitration Act ("FAA") governs the motion to compel arbitration. 9 U.S.C. §§ 1 *et seq.* Under the FAA, a district court determines (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.,* 363 F.3d 1010, 1012 (9th Cir. 2004). "To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts." *Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks and citation omitted). If the court is "satisfied that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25 (U.S. 1983).

### II. MOTION TO STAY

Under § 3 of the FAA, "[i]f any suit or proceeding is brought in a court of the United States upon any issue referable to arbitration under such an agreement ..., the court ... shall ... stay the trial of the action." 9 U.S.C. § 3; *see also AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 344 (2011). Where plaintiffs assert both arbitrable and nonarbitrable claims, district courts have "discretion whether to proceed with the nonarbitrable claims before or after the arbitration and have authority to stay proceedings in the interest of saving time and effort for itself and litigants." *Nitsch v. DreamWorks Animation SKG Inc.,* 100 F. Supp. 3d 851, 870 (N.D. Cal. 2015) (internal quotation marks and citations omitted); *see also Leyva v. Certified Grocers of California, Ltd.,* 593 F.2d 857, 863-64 (9th Cir. 1979). "A stay is not a matter of right, even if irreparable injury might otherwise result[, but] is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder,* 556 U.S. 418, 433 (2009) (internal quotation marks and citations omitted). "The party requesting the stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34.

## DISCUSSION

**\*5** EIS moves to compel arbitration on an individual basis and stay this action. DeVries presents four arguments against compelling arbitration: (1) he did not consent to the 2014 Terms and Conditions; (2) even if he did consent, his claims fall within the carve-out to the superseding 2016 Terms of Use arbitration provision; (3) EIS waived its right to compel arbitration; and (4) the arbitration agreement is a violation of public policy. EIS argues that DeVries did consent to the 2014 Terms and Conditions and that his remaining three arguments are for the arbitrator to decide.

### I. EXISTENCE OF AN AGREEMENT

#### A. 2014 Terms and Conditions

DeVries contends that he did not agree to the arbitration provision contained in the 2014 Terms and Conditions when he purchased his credit report online and, therefore, the required element of mutual assent is missing. "[M]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1175 (9th Cir. 2014) (citing *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 29 (2d Cir. 2002)). "Mutual assent may be manifested by written or spoken words, or by conduct, and acceptance of contract terms may be implied through action or inaction." *Knutson v. Sirius XM Radio Inc.,* 771 F.3d 559, 565 (9th Cir. 2014) (internal citations and quotation marks omitted) (applying California law). [4] Without mutual assent, there is no agreement to arbitrate. EIS, "as the party seeking to compel arbitration, has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Id.* at 565.

In general, "[c]ontracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen,* 763 F.3d at 1175-76.

Here, on order page "Step 2 of 2," directly above the "Submit Secure Order" button, EIS stated:

Click "Submit Secure Order" to accept the Terms and Conditions above, acknowledge receipt of our Privacy Notice and agree to its terms, confirm your authorization for ConsumerInfo.com, Inc., an Experian company, to obtain your credit report and submit your secure order.

First Williams Decl., Ex. C. The phrases "Terms and Conditions" and "Privacy Notice" were in blue, a different color than the rest of the text, indicating that they were active hyperlinks that the consumer could click to be directed to another webpage. First Williams Decl. ¶ 8. When a consumer clicked on the "Terms and Conditions" hyperlink, "an additional window would open within the consumer's web browser containing the entire text of the Terms and Conditions," including the arbitration provision. *Id.* Thus, the Terms and Conditions "are somewhat like a browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else—click ["Submit Secure Order"]—to assent to the hyperlinked terms." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 838 (S.D.N.Y. 2012).

The Ninth Circuit has held that "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Nguyen*, 763 F.3d at 1178–79. However, "[c]ourts have also been more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website." *Id.* at 1176. A court may find that an individual assented to an electronic agreement if "a reasonably prudent user" would have been put "on inquiry notice of the terms of the contract." *Id.* at 1177.

**\*6** DeVries argues that he did not consent to or have notice of the arbitration provision "by clicking on a button that did not mention, display, link to, or otherwise reference the Terms and Conditions." Oppo. at 4. This argument is unpersuasive.

The text containing the Terms and Conditions hyperlink was located directly above that button and indicated that clicking "Submit Secure Purchase" constituted acceptance of those terms. In *Tompkins v. 23andMe, Inc.*, the court found that the plaintiffs had received adequate notice of the Terms of Service ("TOS") where "during the account creation and registration processes, each named Plaintiff clicked a box or button that appeared near a hyperlink to the TOS to indicate acceptance of the TOS." No. 13-cv-05682-LHK, 2014 WL 2903752, at \*8 (N.D. Cal. June 25, 2014), *aff'd*, No. 14-16405, 2016 WL 6072192 (9th Cir. Oct. 13, 2016). The court explained that "[t]he fact that the TOS were hyperlinked and not presented on the same screen does not mean that customers lacked adequate notice. *Id.* (citing *Fteja*, 841 F. Supp. 2d 829).

Similarly, in *Graf v. Match.com, LLC*, the court held that a plaintiff assented to an arbitration clause where evidence showed that all website users "were required to affirmatively agree to the Terms of Use when they clicked on a 'Continue' or other similar button on the registration page where it was explained that by clicking on that button, the user was affirming that he would be bound by the Terms of Use, which were always hyperlinked and available for review." No. CV 15-3911 PA (MRWx), 2015 WL 4263957, at \*4 (C.D. Cal. July 10, 2015). *See also Crawford v. Beachbody, LLC*, No. 14-cv-1583–GPC (KSC), 2014 WL 6606563, at \*3 (S.D. Cal. Nov. 5, 2014) (noting that "[c]ourts have held that a modified or hybrid clickwrap/browsewrap agreement constitutes a binding contract where the user is provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I Accept' button and clicks that button," and enforcing such an agreement in that case).

DeVries relies on two out of circuit cases, *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016) and *Meyer v. Kalanick*, No. 15 CIV. 9796, 2016 WL 4073071 (S.D.N.Y. July 29, 2016). Both are distinguishable.[5] In *Nicosia*, Amazon's order page included a "Place your order button" on the right side of the page. 834 F.3d at 236. The top of the page stated, "By placing your order, you agree to Amazon.com's privacy notice and conditions of use." *Id.* The "privacy notice" and "conditions of use" appeared in blue as hyperlinks. *Id.* The court found that "[n]othing about the 'Place your order' button alone suggests that additional terms apply, and the presentation of terms is not directly adjacent to the 'Place your order' button so as to indicate that a user should construe clicking as acceptance." *Id.* at 236-37. Additionally, the court noted that "there appear to be between fifteen and twenty-five links on the Order Page,

DeVries v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 733096

and various text is displayed in at least four font sizes and six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements. Further, the presence of customers' personal address, credit card information, shipping options, and purchase summary are sufficiently distracting so as to temper whatever effect the notification has." *Id.* at 237. In contrast, the notice here is located "directly adjacent" to the "Submit Secure Order" button. Nor did the order page contain a multitude of hyperlinks or other distracting content. [6] *Nicosia* would not preclude a finding of mutual assent here.

**\*7** In *Meyer*, the court found no mutual assent where an Uber registration screen "did not adequately call users' attention to the existence of the Terms of Service, let alone to the fact that, by registering to use Uber, a user was agreeing to them." 2016 WL 4073071, at \*9. Below fields to enter credit card information, a "Register" button, a "PayPal" button, and a "Google Wallet" button, the registration screen provided, "By creating an Uber account, you agree to the Terms of Service & Privacy Policy" in small font. *Id.* at \*4. Although the "Register" button was "very user-friendly and obvious," the "statement about 'Terms of Service' appears far below and in much smaller font,"—indeed, in "a font that was barely legible on the smartphone device that a would-be Uber registrant could be expected to use." *Id.* at \*6, 8. Here, the relevant language's proximity to the "Submit Secure Order" button and font size adequately call a reasonably prudent user's attention to the existence of the Terms and Conditions.

For these reasons, I conclude that DeVries accepted the 2014 Terms and Conditions when he purchased his credit report from EIS, and I reject DeVries's argument that no arbitration agreement exists with EIS. [7]

**B. 2016 Terms of Use**
DeVries argues that even if he did agree to the arbitration provision in the 2014 Terms and Conditions, that agreement has been superseded by EIS's Terms of Use in effect by April 5, 2016. Oppo. at 10. The 2016 Terms of Use arbitration provision contains a carve-out for disputes "arising out of the [FCRA] relating to the information contained in your consumer disclosure or report, including but not limited to claims for alleged inaccuracies." Reese Decl., Ex. G. The Terms of Use also provide:

> This Agreement ... constitute[s] the entire Agreement between ECS and you in connection with your account with ECS, or access or use of any Service or Website, and supersede[s] any prior versions of the terms and conditions, if applicable ... In the event of a conflict between this Agreement, or any other notice, policy, disclaimer or other term contained in the Websites or otherwise, this Agreement will control.

Reese Decl., Ex. G. Notably, the 2014 Terms and Conditions contained a change-in-terms provision, stating that its terms "may be updated from time to time by posting revised Terms and Conditions on the Product Websites" and that "[e]ach time you order, access, or use any of the Products, Product Websites, and/or Content, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." First Williams Decl., Ex. D. DeVries asserts that because he visited EIS's website on approximately May 18, 2016, and September 16, 2016 (once before he filed this lawsuit, and once after), the 2016 Terms of Use is the operative agreement governing his claims with EIS. DeVries Decl., ¶ 2. Neither party argues that DeVries did not assent to this agreement.

In general, courts have enforced new terms where prior agreements included change-in-terms provisions. For instance, in *Daugherty v. Experian Information Solutions, Inc.*, the defendant bank mailed to credit cardholders a written change-in-terms notice to inform cardholders that it "was making certain changes to the cardholder agreement, including changes regarding binding arbitration of disputes and the law governing their credit cards" in 2003. 847 F. Supp. 2d 1189, 1191 (N.D. Cal. 2012) (Armstrong, J.). The notice also included a change of terms provision, allowing defendant to make changes to the agreement at any time and providing that such changes are binding unless the cardholder notifies the defendant that he or she does not agree within 25 days. *Id.* at 1192. In 2006, the defendant notified the plaintiff of changes to the terms governing his agreement, including the arbitration provision. *Id.* More than 25 days later, the defendant received a letter from the plaintiff, requesting that his account be cancelled. *Id.* In 2011, the plaintiff filed

2017 WL 733096

suit under the FCRA and California state law against the defendant bank, as well as several credit reporting agencies, for alleged inaccuracies in his 2008 and 2009 credit reports. *Id.* at 1192-93. The defendant moved to compel arbitration under the 2006 cardholder agreement. *Id.* at 1193. Granting the motion to compel, the court found that the defendant had expressly reserved its right to change the terms of the credit card agreement and that plaintiff had failed to cancel his account before the new agreement became effective. *Id.* at 1195-96. *See also Cayanan v. Citi Holdings, Inc.*, 928 F. Supp. 2d 1182, 1188, 1200 (S.D. Cal. 2013) (granting motion to compel based on arbitration provision contained in notice of change of terms where the credit cardholder did not opt-out).

**\*8** Courts have also consistently applied arbitration agreements retroactively where the agreements explicitly subsume prior agreements or facially apply to disputes arising prior to the agreement. *In re Verisign, Inc., Derivative Litigation* is instructive. *See* 531 F. Supp. 2d 1173 (N.D. Cal. 2007) (Hamilton, J.). There, shareholders brought a derivative action on behalf of VeriSign against several defendants, including VeriSign's independent auditor, KPMG, for violations related to alleged backdating of stock option grants. *Id.* at 1179, 1181. KPMG audited VeriSign's financial statements for fiscal years 1998 through 2005. *Id.* at 1223. A separate engagement letter governed KPMG's services to VeriSign for each fiscal year. *Id.* The 2005 engagement letter contained an arbitration clause, but all previous engagement letters did not. *Id.* The arbitration provision applied to "any dispute or claim arising out of or relating to the engagement between the parties, the services provided thereunder, or any other services provided by or on behalf of KPMG." *Id.* The court rejected plaintiffs' argument that the arbitration provision did not apply because the events underlying their claims occurred before the parties executed the 2005 engagement letter. *Id.* at 1224. In particular, the court emphasized that the engagement letter covered not just disputes arising out of that agreement, but also "any other services provided by or on behalf of KPMG." *Id.*

EIS argues that these cases are distinguishable because they involved continuing business relationships but cites no law in support of this proposition. If EIS argued that the provision was unenforceable because of the nature of DeVries's visits in 2016, I might be more sympathetic. But EIS contends that DeVries's credit report order underlying this lawsuit (along with the 2014 Terms and Conditions, with the exception of the arbitration provision) expired after 30 days, and so there

is nothing for the 2016 Terms of Use to supersede. Reply at 10. The 2014 Terms and Conditions provide only that a consumer could access his or her credit report or score for 30 days from the date of payment; it does not say that the Terms and Conditions expire in 30 days. First Williams Decl., Ex. D. Instead, the final section of the Terms and Conditions, entitled "Entire Agreement," provides that the "Terms and Conditions are effective until terminated by CIC." *Id.* Moreover, the 2016 Terms of Use are broadly written to include any visit, whether it resulted in a transaction or not. Reese Decl., Ex. G.

Equally unpersuasive is EIS's argument that the Terms of Use govern only claims that DeVries may assert arising from his 2016 visits to the website. Reply at 10. The Terms of Use explicitly include in its agreement to arbitrate "claims that arose before this or any prior Agreement," unless such claims fall within the carve-out provision. Reese Decl., Ex. G. Therefore, I find that the 2016 Terms of Use is the operative agreement.

## II. DELEGATION OF ARBITRABILITY DETERMINATIONS

DeVries offers three additional arguments against the motion to compel arbitration: (1) the claims fall within the 2016 Terms of Use arbitration carve-out; (2) EIS waived its right to enforce the arbitration provision; and (3) the arbitration provision is a violation of public policy. However, EIS asserts that I cannot decide these issues because the arbitration provision delegates questions of arbitrability to the arbitrator. Reply at 8.

"The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-25. Nevertheless, "so-called 'question[s] of arbitrability' [—] which include certain gateway matters, such as whether parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a [particular] controversy [—] are presumptively for courts to decide." *Oxford Health Plans LLC v. Sutter*, 133 S.Ct. 2064, 2068 n.2 (2013) (some internal quotation marks omitted); *see also Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011) (issues that "contracting parties would likely have expected a court to have decided" are "gateway questions of arbitrability" to be determined by the court, not the arbitrator). This rule flows from the "principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995).

Case 3:22-cv-02077-MEM   Document 13-2   Filed 03/20/23   Page 20 of 102

DeVries v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 733096

**\*9** "Although gateway issues of arbitrability presumptively are reserved for the court, the parties may agree to delegate them to the arbitrator." *Momot*, 652 F.3d at 987. In other words, parties can "agree to arbitrate" questions of arbitrability. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010) (internal quotation marks omitted). For arbitration agreements governed by the FAA, courts considering whether the parties have agreed to arbitrate questions of arbitrability "should apply federal arbitrability law absent clear and unmistakable evidence that the parties agreed to apply nonfederal arbitrability law." *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 921 (9th Cir. 2011) (internal quotation marks omitted). Under federal arbitrability law, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts ... should apply ordinary state law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944. Because questions of arbitrability are presumptively for courts to decide, however, courts "apply a more rigorous standard in determining whether the parties have agreed to arbitrate [such] question[s]." *Momot*, 652 F.3d at 987. "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options*, 514 U.S. at 944 (internal quotations marks and alterations omitted).

The Ninth Circuit has found certain language to be "clear and unmistakable evidence" of parties' intent to arbitrate questions of arbitrability. For instance, in *Momot*, the delegation clause provided:

> If a dispute arises out of or relates to this Agreement, the relationships that result from this Agreement, the breach of this Agreement *or the validity or application of any of the provisions of this Section 4,* and, if the dispute cannot be settled through negotiation, the dispute shall be resolved exclusively by binding arbitration.

*Momot*, 652 F.3d at 988 (original emphasis). The court held that the italicized language delegating to arbitrators the authority to decide "the validity or application of any provisions of" the arbitration clause constituted a clear

and unmistakable agreement to arbitrate the question of arbitrability. *Id.*

In *Mohamed v. Uber Technologies, Inc.*, the relevant arbitration provisions stated:

> Such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision.

No. 15-16178, 2016 WL 7470557, at *3 (9th Cir. Dec. 21, 2016). The Ninth Circuit, noting that this language was "more expansive" than that in *Momot*, held that this delegation provision "also clearly and unmistakably indicates the parties' intent for the arbitrators to decide the threshold question of arbitrability." *Id.* at *4 (internal quotation marks omitted).

I find that the delegation provision here resembles that in *Mohamed* and constitutes clear and unmistakable evidence that the parties agreed that the arbitrator will decide the questions of arbitrability. The 2016 Terms of Use state:

> All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement, including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable.

Case 3:22-cv-02077-MEM   Document 13-2   Filed 03/20/23   Page 21 of 102

DeVries v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 733096

Reese Decl., Ex. G.[8] The parties have not identified any conflicting terms in the remainder of the agreement that would make the issue of delegation ambiguous.

In regards to DeVries's argument about the carve-out provision, there is no question that claims within the carve-out provision are for the court, rather than the arbitrator, to decide. But the delegation clause reserves for the arbitrator the issues of scope and enforceability. Therefore, the determination of which, if any, of DeVries's claims fall within the carve-out is an issue that the parties clearly and unmistakably delegated to the arbitrator to decide in the first instance. *See Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1076 (9th Cir. 2013) (holding that the determination of whether claims fell within the arbitration provision carve-out was delegated to the arbitrator). Similarly, the issue of whether the arbitration agreement violates public policy goes to whether the arbitration agreement is enforceable, void, or voidable and is, therefore, also for the arbitrator to decide.

**\*10** However, the parties did not clearly and unmistakably delegate to the arbitrator the issue of waiver by litigation conduct. In *Cox v. Ocean View Hotel Corp.*, the arbitration agreement provided that "[a]ny controversy ... involving the construction or application of the terms, provisions, or conditions of this Agreement or otherwise arising out of or related to this Agreement shall likewise be settled by arbitration." 533 F.3d 1114, 1117 (9th Cir. 2008). Evaluating this language, the Ninth Circuit found that the court, not the arbitrator, should decide the issue of waiver. *Id.* at 1121. In *Martin v. Yasuda*, the Ninth Circuit similarly found that an agreement providing that "[a]ll determinations as to the scope, enforceability and effect of this arbitration agreement shall be decided by the arbitrator, and not by a court" was "insufficient to show intent that an arbitrator decide the waiver by litigation conduct issue and to overcome the presumption to the contrary." 829 F.3d 1118, 1120, 1124 (9th Cir. 2016). Because the delegation provision at issue here resembles that at issue in *Martin*, I should resolve the issue of waiver.[9]

EIS argues that the issue of waiver is left to the arbitrator because the Terms and Conditions incorporate the American Arbitration Association's (AAA) Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes. Rule 7(a) of the Commercial Rules states that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any

objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Reply at 9 n.6. Evaluating the same language, the Ninth Circuit has held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

Although *Brennan* stated that it did "not foreclose the possibility that this rule could also apply to unsophisticated parties or to consumer contracts," the court limited its holding to the facts of its case involving an arbitration agreement between sophisticated parties. *Id.* at 1130-31. The Ninth Circuit "has *not* determined whether incorporation of the AAA rules can be clear and unmistakable evidence of delegation of arbitrability where one party is an unsophisticated consumer." *Ingalls v. Spotify USA, Inc.*, No.16-cv-3533-WHA, 2016 WL 6679561, at \*3 (N.D. Cal. Nov. 14, 2016) (original emphasis). However, "[e]very district court decision in our circuit to address the question since *Brennan* has held that incorporation of the AAA rules was insufficient to establish delegation in consumer contracts involving at least one unsophisticated party." *Id.* (collecting cases). EIS has not argued that DeVries is a sophisticated party rather than an ordinary consumer. And "[e]ven in circuits that have concluded that incorporation of the AAA rules constitutes a clear and unmistakable agreement that the parties will arbitrate arbitrability, courts have properly addressed the question of waiver through litigation conduct despite incorporation of the AAA rules." *Money Mailer, LLC v. Brewer*, No. C15-1215RSL, 2016 WL 1393492, at \*3 (W.D. Wash. Apr. 8, 2016) (citing *Plaintiff's Shareholders Corp. v. S. Farm Bureau Life Ins. Co.*, 486 Fed. Appx. 786, 789-90 (11th Cir. 2012)); *see also Cox*, 533 F.3d at 1117, 1121 (court resolving waiver by litigation issue despite delegation clause and where the arbitration provision incorporated the AAA Model Employment Arbitration Procedures). Incorporation of the AAA Rules here does not require that the issue of waiver be decided by the arbitrator.

**\*11** In sum, the issues of whether DeVries's claims fall within the arbitration carve-out and whether the arbitration agreement violates public policy are for the arbitrator. I will resolve the issue of waiver below.

### III. WAIVER

"A determination of whether the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring enforcement of arbitration

DeVries v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 733096

agreements." *Martin*, 829 F.3d at 1124 (internal quotation marks omitted). A party arguing waiver of the ability to arbitrate "bears a heavy burden of proof" and must demonstrate three factors: "(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." *Id.* (citing *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986)). [10]

**A. Knowledge**

DeVries asserts that EIS knew of its right to arbitrate because it drafted the Terms and Conditions of the arbitration provision. Oppo. at 14. He also argues that EIS had all the necessary information to determine whether it could arbitrate DeVries's claims because the Complaint provided Devries's name and city of residence. Oppo. at 15. Every person who purchased an Experian credit report in 2014—when DeVries bought his report—had to accept the Terms and Conditions, which included an arbitration provision. Oppo. at 15 (citing First Williams Decl. ¶ 4). DeVries contends that EIS "could easily have checked its accounting records to determine whether DeVries made a purchase." Oppo. at 15.

EIS contends that it did not have the information it needed to determine whether DeVries had entered into a contract with an arbitration provision. Reply at 12. "In order to verify that a particular consumer purchased products from CIC, CIC needs additional identifying information beyond a consumer's name, such as the address, date of birth or social security number entered in the order process." First Williams Decl. ¶ 16. Despite repeated requests from EIS starting June 17, 2016, DeVries's counsel did not provide this information until September 13, 2016. Declaration of Kerry C. Fowler (Dkt. No. 31-1) ¶¶ 3-12. Once EIS received this information, it was able to determine that DeVries had agreed to arbitrate its claims. *Id.* ¶ 13.

**B. EIS Did Not Engage in Acts Inconsistent with the Right to Arbitrate**

*12  DeVries filed his Complaint on June 2, 2016. EIS filed its answer on August 16, 2016, asserting 14 affirmative defenses and reserving its right to assert additional defenses "as may become available or apparent during the course of discovery." Answer at 17. It did not plead arbitration as an affirmative defense. The parties have also engaged in meet and confer discussions on several occasions concerning discovery and case management scheduling. Reese Decl. ¶

3. I issued an order governing the treatment of confidential discovery (Dkt. No. 28). On September 8, 2016, DeVries served its First Set of Interrogatories and First Set of Requests for Production of Documents. Reese Decl. ¶ 5. On September 13, 2016, DeVries's counsel responded to EIS's requests for his identifying information in a document titled "Plaintiff's Response to Defendant's Discovery Request (Interrogatory No. 1). Reese Decl. ¶ 4; Fowler Decl., ¶¶ 3-12. On September 19, 2016, the parties served their respective initial disclosures pursuant to Federal Rule of Civil Procedure 26(a). Reese Decl. ¶¶ 8-9. EIS filed its motion to compel arbitration on September 21, 2016, and I granted its request to stay discovery pending the resolution of this motion.

DeVries argues that EIS acted inconsistently with its right to arbitrate because EIS: (1) failed to plead arbitration as an affirmative defense, and (2) took advantage of the litigation process. Oppo. at 16. EIS responds that it could not have pleaded arbitration as an affirmative defense in good faith without first verifying the existence of an arbitration agreement with DeVries. To do so, it needed DeVries's identifying information, which it did not receive until September 13, 2016. Because EIS was waiting for DeVries's identifying information, I agree with EIS that its failure to plead arbitration as an affirmative defense does not amount to waiver. Absent a showing of prejudice, the fact that EIS "failed to raise an affirmative defense is inadequate by itself to support a claim of waiver of arbitration." *Fisher v. A.G. Becker Paribas, Inc.*, 791 F.2d 691, 698 (9th Cir. 1986).

Additionally, I find that EIS did not take advantage of the litigation process. Courts have found waiver through litigation conduct where a party unreasonably delayed moving to compel arbitration and actively litigated the case. For instance, in *Martin*, the Ninth Circuit found defendants engaged in conduct inconsistent with their right to arbitrate where they spent 17 months litigating the case, including "devoting 'considerable time and effort' to a joint stipulation structuring the litigation, filing a motion to dismiss on a key merits issue, entering into a protective order, answering discovery, and preparing for and conducting a deposition." 829 F.3d at 1126.

In contrast, EIS did not unreasonably delay filing its motion to compel arbitration; rather, the motion was filed less than four months after the complaint, and just one week after obtaining DeVries's identifying information and confirming the existence of an arbitration agreement. Nor has EIS taken advantage of judicial discovery procedures not

2017 WL 733096

available in arbitration. At this point, EIS has not served any interrogatories or requests for production. It has only received DeVries's identifying information and his initial disclosure. Further, the parties have not litigated any other motion. EIS's conduct is not inconsistent with its right to arbitrate.

#### C. Prejudice to Plaintiffs
A plaintiff seeking to show waiver of the right to arbitrate must demonstrate that he was prejudiced by litigation conduct inconsistent with the right to arbitrate. The Ninth Circuit has explained:

> To prove prejudice, plaintiffs must show more than "self-inflicted" wounds that they incurred as a direct result of suing in federal court contrary to the provisions of an arbitration agreement. Such wounds include costs incurred in preparing the complaint, serving notice, or engaging in limited litigation regarding issues directly related to the complaint's filing, such as jurisdiction or venue. In contrast, in order to establish prejudice, the plaintiffs must show that, as a result of the defendants having delayed seeking arbitration, they have incurred costs that they would not otherwise have incurred, that they would be forced to relitigate an issue on the merits on which they have already prevailed in court or that the defendants have received an advantage from litigating in federal court that they would not have received in arbitration.

*13 *Martin*, 829 F.3d at 1126 (internal citations omitted).

DeVries contends that he is prejudiced because he and his counsel "have expended a significant amount of time and resources." Oppo. at 18. However, he has failed to show that any expenses are more than just "self-inflicted wounds" from suing in federal court. *See Martin*, 829 F.3d at 1126. DeVries also argues that he is prejudiced because EIS "has used the litigation to receive discovery that it would not receive in arbitration, as well as have court orders and other procedures set in place that it would not be entitled to in arbitration." Oppo. at 18. Not so. EIS has only received DeVries's intial disclosure and his identifying information (his date of birth, address, and Social Security number). DeVries has not shown that EIS received an advantage from this basic information. And there have not been any orders going to the merits of DeVries's claims such that arbitration would prejudice him. DeVries has not met his "heavy burden" to show that EIS waived its right to arbitration.

### CONCLUSION

For the reasons discussed above, EIS's motions to compel arbitration and stay are GRANTED. This action will be stayed pending completion of the arbitration. Should the arbitrator determine that some or all of DeVries's claims fall within the carve-out provision, the parties shall notify the Court within seven days. Otherwise, the parties shall file a Status Report six months from the date of this Order, and every six months thereafter, briefly indicating the progress of the arbitration.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 733096

### Footnotes

1   CIC refers to ConsumerInfo.com, Inc. "CIC is an affiliate of [EIS]," the defendant here. First Williams Decl. ¶ 2. "CIC and [EIS] are both wholly-owned subsidiaries of Experian Holdings, Inc., and the parent company is Experian plc." *Id.* The parties do not dispute that EIS has standing to enforce this arbitration provision.

DeVries v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 733096

2    The Terms of Use Agreement defines "ECS" as "ConsumerInfo.com, Inc., an Experian® company (also known as Experian Consumer Services), and referred to as 'Experian' on the Websites, its predecessors in interest, successors and assigns, and any of its third party service providers ... who ECS uses in connection with the provision of the Services to you." Reese Decl., Ex. G. Also, "[f]or the purposes of the arbitration provision, references to 'ECS,' 'you,' and 'us' shall include our respective parent entities, subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, websites of the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites or information under this or prior Agreements between us relating to Services and/or Websites." *Id.*

3    EIS objects to certain evidence submitted by DeVries. The Reese Declaration, paragraph 4, states that Exhibit A is a copy of "Plaintiff's Response to Defendant's Discovery Request (Interrogatory No. 1)." Dkt. No. 48. EIS contends that this statement lacks foundation and is an impermissible legal conclusion because EIS did not serve any formal discovery on DeVries, but asked informally for his identifying information. *Id.* Additionally, EIS objects to the DeVries Declaration paragraphs 1 and 3 for lack of foundation and containing impermissible legal conclusions. Dkt. No. 49. EIS also objects to DeVries's response to its evidentiary objections as untimely and an improper surreply. These objections are all OVERRULED as moot because I do not rely on any of the information underlying these objections.

4    Both parties' briefs apply California law, and I do as well.

5    DeVries also submitted a Statement of Recent decision, citing *Norcia v. Samsung Telecommunications America, LLC,* 845 F.3d 1279 (9th Cir. 2017) and *Dang v. Samsung Electronics Co., Ltd.,* No. 15-16768, 2017 WL 218896 (9th Cir. Jan. 19, 2017). Statement of Recent Decision (Dkt. No. 57). Neither involved an Internet agreement. Rather, the relevant arbitration provision was provided to consumers through a warranty brochure contained in the packaging box for smartphones. Also, unlike in *Norcia* and *Dang* where the plaintiffs did not expressly agree or "otherwise act in a manner that would show '[their] intent to use silence, or failure to opt out, as a means of accepting the arbitration agreement,'" DeVries affirmatively clicked the "Submit Secure Order" button. *Norcia,* 845 F.3d at 1287; *see also Dang,* 2017 WL 218896, at *1.

6    DeVries points to Exhibit F-2, which paragraph 10 of the Reese Declaration states is a true and correct copy of "the Legal Terms & Conditions that appear above the Submit Secure Order button." These terms do not contain an arbitration provision, but provide that they "are in addition to, and do not override, the specific terms and conditions that apply to the products or services offered by Experian and otherwise through this site." Reese Decl., Ex. F-2. DeVries contends that these terms also appeared on the 2014 order pages, thus causing confusion for a consumer. Oppo. at 5. EIS objects to the Reese Declaration paragraph 10 as lacking foundation for this exhibit. Dkt. No. 48. Moreover, EIS submitted a declaration providing that "[t]he 'Legal Terms and Conditions' have never been linked or displayed on the order pages that a consumer must complete to place an order." Second Williams Decl. ¶ 2. Rather, the hyperlinked "Terms and Conditions" above the "Submit Secure Order" button at the time DeVries purchased his credit report are those attached as Exhibit D to the First Williams Declaration. Nor was Exhibit F-2 to the Reese Declaration "contained in the website that was in effect at the time Mr. DeVries transacted with CIC on September 2, 2014." *Id.* Additionally, Exhibit F-2 shows that it was accessed online on October 14, 2016, and the order pages as they appeared in 2014 do not show any hyperlinks to "Legal Terms & Conditions." First Williams Decl., Exs. B, C. On this record, there is no evidence that Exhibit F-2 to the Reese Declaration appeared on the order pages in 2014 or that it could have caused confusion to a consumer.

7    EIS requested judicial notice of multiple decisions by the Central District of California finding mutual assent to EIS's arbitration provision where the relevant terms appeared in a scroll box, rather than by hyperlink. *See* EIS's Request for Judicial Notice in Support of Motion to Compel (Dkt. No. 32), EIS's Request for Judicial Notice in Support of Reply (Dkt. No. 47). A court may take judicial notice of "proceedings in other courts,"

DeVries v. Experian Information Solutions, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 733096

and I will do so here. *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cit. 1992). That said, I do not rely on these decisions.

8   The 2014 Terms and Conditions contain the same delegation clause. First Williams Decl., Ex. D.

9   This finding is not inconsistent with *Mohamed*, where the Ninth Circuit noted, without deciding, that the "arbitration agreements may not have clearly and unmistakably delegated to the arbitrator the authority to decide the question of waiver by litigation conduct." 2016 WL 7470557, at *4 n.4.

10   The Ninth Circuit has also expressed the test for waiver under California law as a six-factor inquiry:

> In determining waiver, a court can consider (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing party.

> *Cox*, 533 F.3d at 1124 (citing *St. Agnes Med. Ctr. v. PacifiCare of Cal.*, 31 Cal.4th 1187 (2003)) (alteration in original). EIS argues that this is the appropriate test to apply, rather than the three-factor test applied in *Martin*. Under either test, I find that EIS did not waive its right to arbitration.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

4

Dobbs v. Health IQ Insurance Services, Inc., Slip Copy (2022)

2022 WL 2974713

2022 WL 2974713
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Ryan DOBBS, Plaintiff,

v.

HEALTH IQ INSURANCE
SERVICES, INC., Defendant.

CIVIL ACTION NO. 21-5276
|
Filed July 27, 2022

**Attorneys and Law Firms**

Jacob U. Ginsburg, Kimmel & Silverman, Ambler, PA,
Christopher Elisha Roberts, Butsch Roberts & Associates
LLC, Clayton, MO, for Plaintiff.

Paul A. Rosenthal, Fox Rothschild LLP, Morristown, NJ,
Jonathan A. Cass, Cohen, Seglias, Pallas, Greenhall &
Furman, P.C., Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION

Schmehl, District Judge

## I. INTRODUCTION

*1 Before the Court is the motion to compel arbitration
filed by Health IQ Insurance Services ("Defendant").
Plaintiff, Ryan Dobbs, filed a class action Complaint against
Defendant, asserting Defendant's telemarketing calls to be
a violation of his privacy rights under the Telephone
Consumer Protection Act. Upon consideration of the parties'
submissions and arguments, I will grant Defendant's motion
to compel arbitration, and stay this action in its entirety.

## II. BACKGROUND

Defendant, Health IQ, is in the business of selling insurance
plans and services. (Compl., ¶ 15.) On May 8, 2019, Plaintiff
clicked an ad that Health IQ had placed on Facebook and
was directed to Health IQ's website. (Declaration of Raj
Vavilala ("Vavilala Decl."), ¶ 4.) After landing on Defendant's
website, Plaintiff completed a multi-page form requesting
information about insurance products. (Vavilala Decl., ¶ 5.)
As he completed the web form, clicking next several times,
Plaintiff provided Health IQ with his name, address, email
address, telephone number, age, gender, height, and weight.

(Vavilala Decl., ¶ 6.) The last page of the form included
the following relevant language immediately below the green
"SUBMIT" button: "By clicking 'SUBMIT', you agree to our
Privacy Policy and Terms of Use." (Vavilala Decl., ¶ 7.) Setoff
from the rest of the text in blue, underlined font, the words
"Terms of Use" were an active hyperlink to the full text of the
Terms of Use. Plaintiff provided his contact information and
clicked "SUBMIT." (Vavilala Decl., ¶ 9.) The phone number
that Plaintiff provided to Defendant matches the number that
Plaintiff identifies as his own in the Complaint. (Compare
Vavilala Decl., ¶ 10 with Compl., ¶ 18.) Plaintiff alleges that
starting in June 2021, he received at least four unsolicited
phone calls and two text messages from Defendant. (Compl.,
¶¶ 24-25.) According to Plaintiff, his cell phone number had
been registered on the National Do Not Call Registry and the
calls and texts that he received from Defendant violated the
Telephone Consumer Protection Act ("TCPA") (Compl., ¶¶
18, 20, 21, 62.) Pursuant to the TCPA, registration with the
Do Not Call Registry allows an individual to avoid receiving
unwanted telemarketing calls and to recover penalties should
his or her privacy rights be willfully or knowingly violated.
(Compl., ¶ 2-3.)

Defendant argues that Plaintiff assented to its Terms
of Use when he provided his contact information and
clicked "SUBMIT" after following Defendant's Facebook ad.
Defendant's Terms of Use contain an arbitration provision that
requires users to submit claims against Defendant to binding
arbitration on an individual basis. (Vavilala Decl., Ex. A, p.
1.) The arbitration provision reads as follows:

A. Arbitration. The parties shall use their best efforts
to settle any dispute, claim, question, or disagreement
directly through good-faith negotiations, which shall be
a precondition to either party initiating a lawsuit or
arbitration. All claims arising out of or relating to
this Agreement and your use of the Service shall be
finally settled by binding arbitration administered by the
American Arbitration Association ("AAA") in accordance
with the provisions of its Commercial Arbitration Rules
and of its supplementary procedures for consumer-related
disputes, excluding any rules or procedures governing
or permitting class actions. The arbitrator, and not any
court or agency, shall have exclusive authority to resolve
all disputes arising out of or relating to this Agreement,
including, but not limited to, any claim that all or any part
of this Agreement is void or voidable. The arbitrator shall
be empowered to grant whatever relief would be available
in a court. The arbitrator's award shall be binding on the
parties and may be entered as a judgment in any court of

Dobbs v. Health IQ Insurance Services, Inc., Slip Copy (2022)

2022 WL 2974713

competent jurisdiction. To the extent the filing fee for the arbitration exceeds the cost of filing a lawsuit, [Defendant] will pay the additional cost.

*2 The parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial. They further understand that, in some instances, the costs of arbitration could exceed the costs of litigation and that the right to discovery may be more limited in arbitration than in court.

(Vavilala Decl., Ex A, § 20(A)). Furthermore, the Terms of Use allow users to opt out of the arbitration provisions by sending written notice to Defendant within 30 days. *Id.* § 20(C). Plaintiff did not send any opt out to Defendant. *Id.*

## III. LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that a federal court must compel arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. Arbitration agreements are governed by ordinary state-law principles governing contract formation, and they "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 402 (3d Cir. 2020). On the other hand, courts decide questions about the formation or existence of an arbitration agreement, namely the element of mutual assent. 9 U.S.C. § 4.

A motion to compel arbitration requires a court to determine "(1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that agreement." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). A party can dispute the existence of an arbitration agreement by arguing that the arbitration clause itself is invalid. *MZM Constr.*, 974 F.3d at 397. A claim directed at the arbitration clause itself, such as a challenge that the clause lacked consideration, would go to the court. *Id.* at 398 n.7.

However, when parties have delegated certain issues to the arbitrator, such as the issue of whether the parties have agreed to arbitrate at all, the Court need only decide the validity of the assent. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("Just as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties

have delegated to an arbitrator."); *Singh v. Uber Technologies, Inc.*, 939 F.3d 210, 228 (3d Cir. 2019) (holding that where the FAA applies, all questions must be reserved for an arbitrator unless the court determines the question is not subject to an enforceable delegation clause). So, "unless the party opposing arbitration challenges 'the delegation provision specifically,' the district court 'must treat it as valid' and 'must enforce it' by sending 'any challenge to the validity' of the underlying arbitration agreement to the arbitrator." *MZM Constr.*, 974 F.3d at 399 (quoting *Rent-A-Center West, Inc. v. Jackson*, 561 U.S. 63, 72 (2010)). The "arbitrability issue" presumptively includes "allegations of waiver, delay, or a like defense to arbitrability." *Howsam*, 537 U.S. at 84 (*quoting Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983)). Additionally, a delegation clause may delegate the issue of whether a particular dispute falls within the scope of the agreement to the arbitrator. *See Singh v. Uber Technologies, Inc.*, 939 F.3d 210, 228 (3d Cir. 2019) (holding that all questions subject to delegation clause were for arbitrator to decide, including whether parties' dispute fell within scope of arbitration agreement).

*3 If a party challenges the whole contract, the claim must go to arbitration, unless the challenge is about mutual assent. *Id.* at 397–98. An arbitration clause is severable from the contract that contains it, and a party claiming that the whole contract lacked consideration must first adjudicate that claim in arbitration. *Id.*

A motion to compel arbitration is judged under a Rule 56 summary judgment standard when arbitrability is not apparent on the face of the complaint. *Shelton v. Comcast Corp.*, 2021 WL 214303, at *2 (E.D. Pa. Jan. 21, 2021). Under this standard, Defendant must show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the instant matter, arbitrability is not apparent on the face of the complaint and Defendant's motion is therefore evaluated under the Rule 56 standard.

## IV. DISCUSSION

In analyzing the instant set of facts, I must first determine whether the parties entered into a valid arbitration agreement. If so, I must then determine whether the arbitration agreement delegated issues such as arbitrability to the arbitrator. Plaintiff argues that the agreement to delegate issues of arbitrability and to arbitrate is invalid because it is illusory, because the Terms of Use can be changed at the will of Defendant. Plaintiff further argues that even if I conclude that the

agreement is not illusory, the motion to compel arbitration should be denied because there is a material issue of fact as to whether the parties entered into an agreement to delegate certain issues to an arbitrator. I do not find Plaintiff's arguments to be persuasive, and accordingly, I will grant Defendant's motion and send this matter to arbitration.

### A. Plaintiff Assented to Defendant's Terms and Conditions and Entered into a Valid Arbitration Agreement

As agreements to arbitrate are matters of contract, a valid arbitration agreement requires mutual assent. In the context of an electronic consumer transaction, the occurrence of mutual assent ordinarily turns on whether the consumer had reasonable notice of the merchant's terms of service agreement. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Notice of an online merchant's terms either occurs through "clickwrap" agreements, which require website users to click on an "I agree" box after being presented with a list of terms and conditions of use, or "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen. *Nguyen*, 763 F.3d at 1176. Courts have also recognized a "modified clickwrap" agreement, where terms of use are presented as part of some other transaction, such that completing the transaction also accepts the terms of use. *See Weimin Chen v. Sierra Trading Post, Inc.*, 2019 WL 3564659, at *2 (W.D. Wash. Aug. 6, 2019) (distinguishing "clickwrap," "browsewrap," and "modified clickwrap" agreements); *see also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (finding Facebook's terms of use fell somewhere in between a pure browsewrap agreement and a pure clickwrap agreement because, although users were required to take an affirmative action by clicking "Sign Up" to agree to the terms of use, the terms were available only via a hyperlink below the "Sign Up" button).

*4 Clickwrap agreements are evaluated with " 'traditional principles of contract law and focus on whether the plaintiff had reasonable notice of and manifested assent to the clickwrap agreement.' " *Coulter v. Experian Info. Sols., Inc.*, 2021 WL 735726, at *5 (E.D. Pa. Feb. 25, 2021). Further, courts have held that "clickwrap" agreements manifest sufficient agreement to the terms in the contract. *See Zabokritsky v. JetSmarter, Inc.*, 2019 WL 2563738, at *3 n.30 (E.D. Pa., 2019).

In the instant matter, Plaintiff received notice of the hyperlinked Terms of Use, including the agreement to arbitrate potential claims, and manifested assent by clicking the "SUBMIT" button. The Terms of Use included a hyperlink, and the letters were purposely and conspicuously set off from the remaining text in a blue, underlined font. (Vavilala Decl., ¶ 8); *see Margulis v. HomeAdvisor, Inc.*, 2020 WL 4673783, at *5 (E.D. Mo. Aug. 12, 2020) (holding that website provided "constructive notice" of the Terms and Conditions when a hyperlink to the Terms and Conditions was conspicuously displayed in blue font). Further, the last page of Defendant's online information request form informed Plaintiff that "[b]y clicking 'SUBMIT', you agree to our Privacy Policy and Terms of Use." (Vavilala Decl., ¶ 7.) Plaintiff thus had notice that he would be bound by the Terms of Use and assented to those same terms when he clicked submit. *See Zabokritsky*, 2019 WL 2563738 at *3 (holding that sliding a button to indicate agreement to the Terms of Use is sufficient to indicate agreement).

In response, Plaintiff submits an affidavit in which he states that in May of 2019, he was "not in the market for health insurance," that he had a general practice of not filling out online forms, and that his cell phone's browser data does not currently show a visit to Defendant's website. (Dobbs Decl., ¶ 13-16.) However, Plaintiff does not state that he never visited Defendant's website. Nor does he deny that he submitted the online form on Defendant's website to obtain information about insurance products. Plaintiff's conclusory statement that he did not enter into any agreement with Defendant (Dobbs Decl., ¶ 18) is insufficient to create an issue of material fact. *See Dicent v. Kaplan Univ.*, 2018 WL 4171600, at *4 (M.D. Pa. June 15, 2018), *report and recommendation adopted*, 2018 WL 4169072 (M.D. Pa. Aug. 30, 2018), *aff'd*, 758 F. App'x 311 (3d Cir. 2019). "Plaintiff's naked assertions that he never [signed the arbitration agreement] are insufficient to lead the Court to conclude otherwise." *Schrock v. Nomac Drilling, LLC*, 2016 WL 1181484, at *4 (W.D. Pa. Mar. 28, 2016). Accordingly, despite Plaintiff's attempts to create a factual issue, I find that he assented to Defendant's Terms of Use.

Having found that Plaintiff assented to Defendant's Terms of Use, I must next decide whether the Terms of Use contain a valid arbitration agreement. As set forth above, the Terms of Use contain a provision that states, *inter alia*, "[a]ll claims arising out of or relating to this Agreement and your use of the Service shall be finally settled by binding arbitration administered by the American Arbitration

Dobbs v. Health IQ Insurance Services, Inc., Slip Copy (2022)

2022 WL 2974713

Association ("AAA") ..." (ECF No. 2, Ex A, § 20(A)). When Plaintiff clicked submit and assented to Defendant's Terms of Use, he assented to the arbitration provision contained in the agreement as well. Accordingly, the parties entered into a valid arbitration agreement.

**B. Plaintiff Agreed to Delegate Issues of Arbitrability to the Arbitrator**

**\*5** The Terms of Use in this matter specifically state that "[t]he arbitrator, and not any court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable." (ECF No. 2, Ex A, § 20(A)). Parties may delegate resolution of gateway issues to the arbitrator, so long as they clearly and unmistakably evidence their intent to do so. *See Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 1685 (2021).

The Terms of Use require disputes between Plaintiff and Defendant to be submitted to "binding arbitration administered by the [AAA] in accordance with the provisions of its Commercial Arbitration Rules." (ECF No. 2, Ex. A, § 20(A).) Rule 7 of the AAA's Commercial Arbitration Rules provides that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *See* American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, at Rule 7(a). As stated by the Third Circuit, "[t]hat provision is about as 'clear and unmistakable' as language can get.' " *Richardson*, 811 F. App'x at 103 (*quoting Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 11 (1st Cir. 2009)); *see also Carrone v. UnitedHealth Grp. Inc.*, 2020 WL 4530032, at \*3 (D.N.J. Aug. 6, 2020) ("Numerous courts have found that, by incorporating the AAA rules, which need not be appended to the arbitration agreement, the parties have clearly and unmistakably committed to delegating the question of arbitrability to the arbitrator." (collecting cases)), *aff'd sub nom. Carrone v. UnitedHealth Grp. Inc.*, 2021 WL 3520809 (3d Cir. Aug. 11, 2021). Accordingly, by incorporating the AAA rules, the parties in this matter clearly delegated threshold questions such as the question of arbitrability to the arbitrator.

In an attempt to circumvent this delegation, Plaintiff argues that the Terms of Use, including the delegation provision, are illusory and unenforceable because a provision in the Terms

of Use give Defendant the right to modify them. Plaintiff argues that the Terms of Use give Defendant the unfettered right to "change" the delegation provision "at any time," "for any reason," "with or without cause" and "without prior notice." ECF No. 11, pp. 1-2.

Plaintiff claims that he is challenging the delegation provision and argues that the terms of that provision can be changed at any time and are therefore illusory and unenforceable. However, he clearly is in fact challenging the agreement as a whole, as the terms he challenges come from other parts of the contract, not from the delegation provision, and apply to the entire agreement. The challenged terms state, *inter alia*,:

1. Changes to this Agreement

   We reserve the right to, at any time, with or without cause:

   • Change the terms and conditions of this Agreement....

   Any changes we make will be effective immediately upon our making such changes available on the Applications or otherwise providing notice thereof ...

13. Term & Termination

   ... [Defendant] may immediately terminate this Agreement ... or any portion thereof, at any time and for any reason, with or without cause, without prior notice.

ECF No. 2, Ex. A. These terms regarding changes and termination apply to the **entire agreement**, not just its delegation provision. In *Rent-A-Center, West, Inc. v. Jackson*, the Supreme Court found that unless a party "challenge[s] the delegation provision specifically," courts must enforce the delegation and "leav[e] any challenge to the validity of the [a]greement as a whole for the arbitrator." 561 U.S. 63, 72 (2010). Consistent with that precedent, this Court has confirmed that arguments that are not "levied specifically towards the delegation clause" are for the arbitrator. *See Colon v. Conchetta, Inc.*, 2017 WL 2572517, at \*4 (E.D. Pa. June 14, 2017) (Kelly, J.).

**\*6** In determining whether a party is specifically challenging a delegation provision or not, courts look beyond a party's "statement that it is challenging the delegation provision" to "the substance of the challenge." *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 885 (6th Cir. 2021). A challenge to the delegation provision that "recycles the same

2022 WL 2974713

arguments that pertain to the enforceability of the agreement as a whole" is insufficient. *Id.* at 886.

A review of Plaintiff's brief shows that he clearly takes issue with the entire agreement and not with the delegation provision specifically. Plaintiff bases his challenge to the delegation clause (contained in Section 20(A) of the Terms of Use) on the modification provision which is contained in a separate section of the Terms (Section 1). Plaintiff has not made any arguments specific to the delegation clause. Although Plaintiff's section heading asserts that the delegation provision is illusory, the substantive argument that he makes in his brief does not support his heading. Rather, Plaintiff recycles the same arguments that apply to the contract as a whole, which is insufficient to challenge the delegation clause. *See Galvez v. JetSmarter, Inc.*, 2019 WL 4805431, at *6 (S.D.N.Y. Sept. 30, 2019) ("Although the relevant section headers in Plaintiff's brief refer to the illusory

quality and unconscionability of the 'arbitration provision' specifically, Plaintiff's arguments clearly attack the validity of the [Agreement] as a whole."). Therefore, Plaintiff's argument that the delegation provision and the agreement as a whole is illusory due to Defendant's ability to change the terms is not an issue to be addressed by this Court. Rather, this issue is one for the arbitrator, as contemplated by the valid delegation provision that was entered into between Plaintiff and Defendant.

**V. CONCLUSION**

For all of the reasons set forth above, Defendant's Motion to Compel Arbitration is granted and this matter is stayed.

**All Citations**

Slip Copy, 2022 WL 2974713

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

5

2021 WL 2621197
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

IN RE: RING LLC PRIVACY LITIGATION

Case No. CV 19-10899-MWF (RAOx)
|
Filed 06/24/2021

**Proceedings (In Chambers):** ORDER RE:
MOTION TO COMPEL ARBITRATION [83];
STAY PENDING RESOLUTION OF RING'S
MOTION TO COMPEL ARBITRATION [112]

MICHAEL W. FITZGERALD, U.S. District Judge

**\*1** Before the Court are two motions:

The first is Defendant Ring LLC's ("Ring") Motion to Compel
Arbitration (the "Motion"), filed on February 5, 2021.
(Docket No. 83). On March 8, 2021, Plaintiffs representing
the putative class filed an opposition. (Docket No. 89). On
March 29, 2021, Ring filed a reply. (Docket No. 99). On
March 24, 2021, Ring filed a supplemental opening brief
with respect to Plaintiff Catherine Foster, who joined the
consolidated action on March 23, 2021. (Docket Nos. 95, 96).
Plaintiff Foster filed a supplemental opposition on March 26,
2021. (Docket No. 97).

The second is Ring's Motion to Stay Pending Resolution of
Ring's Motion to Compel Arbitration (the "Motion to Stay"),
filed on June 18, 2021. (Docket No. 112).

The Court has read and considered the papers filed in
connection with the Motions and held a telephonic hearing on
April 12, 2021, pursuant to General Order 21-03 arising from
the COVID-19 pandemic. The Court now rules as follows:

- The Motion is **GRANTED** *in part* and **DENIED** *in part*.
  The Purchaser Plaintiffs who made a Ring account using
  the Ring App or Website were on inquiry notice of Ring's
  Terms of Service. Therefore, the arbitration clause with
  respect to these Plaintiffs is enforceable. Because the
  Terms contained a delegation provision, the Court does
  not address Plaintiffs' arguments that the arbitration
  clause is unconscionable or otherwise unenforceable.
  However, the Non-Purchaser Plaintiffs are not bound by

the agreement. They are not "Authorized Users" under
the Terms of Service and their guardians' assent to the
Terms' arbitration clause does not bind them.

- The Motion to Stay is **DENIED** *as moot*.

## I. BACKGROUND

On February 11, 2020, the Court granted the stipulation
of various parties to consolidate numerous related cases
into this putative class action. (Docket No. 19). Plaintiffs
filed a consolidated First Amended Complaint ("FAC") on
December 17, 2020. (Docket No. 69).

Ring manufactures and sells home security and smart home
devices. (Declaration of John Modestine ("Modestine Decl. ")
¶ 3 (Docket No. 83-2)). Such devices include video doorbells,
security cameras, and alarms (the "Devices"). (*Id.*). Ring also
sells a subscription service, known as the Ring Protect Plan,
through which customers may purchase additional services
and benefits related to their devices. (*Id.*).

The FAC alleges that Ring's security systems were defectively
designed without sufficient security protocols, leaving
Plaintiffs who used the systems vulnerable to cyberattack,
identity theft, and physical harm. (FAC ¶¶ 3-8). The
FAC also alleges that Ring actively shared users' sensitive
personal identifying information with third parties without
first obtaining users' authorization or consent, which allowed
third parties to track and surveil Plaintiffs. (*Id.* ¶ 9).

Unless otherwise noted, the following details and descriptions
represent the material features of the packaging, terms,
Websites, applications, and clauses at all times relevant to this
action (*i.e.*, from July 2017 to December 2019, when Plaintiffs
purchased and/or used the Devices).

**\*2** For the purposes of the Motion, the parties distinguish
between those Plaintiffs who purchased the Ring devices
themselves (the "Purchaser Plaintiffs"), and those who were
allegedly harmed by Ring devices but did not personally
purchase them (the "Non-Purchaser Plaintiffs," twelve minor
children and an elderly woman who lived in a nursing home).
(*See* Motion at 1-2; Opposition at 1 n.1, 4).

The exterior packaging of the Ring video doorbell and camera
products stated either that "[u]se of the product is subject
to your registration with Ring and your agreement to the
Terms of Service found at www.ring.com" or that "[u]se of
the product is subject to your registration with Ring and your

In re Ring LLC Privacy Litigation, Slip Copy (2021)

2021 WL 2621197

agreement to the Terms of Service found at www.ring.com/ terms." (Modestine Decl. ¶¶ 4-5, Ex. A).

To set up and manage the Device, the user must download the Ring mobile application ("Ring App") and register for a Ring account, either through the Ring App or Ring's Website. (*Id.* ¶¶ 21-25).

From May 2017 until June 2018, a user was required to check a box during the account registration process to indicate agreement to the Terms before moving on to the next step of the registration process. (*See* Appendix (citing *id.*, Ex. L (May 2017 - Nov. 2017: "I agree to Ring's Privacy Notice, Terms of Service, and Guidelines for Installation and Use."); *id.*, Ex. M (Nov. 2017-June 2018: "I agree to Ring's Privacy Notice and Terms of Services [sic]."))).

From June 2018 through January 2020, the user was required to create a password at the last step of the account registration process, and was notified that by completing account registration they agreed to the Terms. (*See* Appendix (citing *id.*, Exs. N, O (June 2018-May 2019: "By signing up, you agree to our Terms of Service"); *id.*, Ex. P (May 2019-Jan. 2020: "By continuing you agree to Ring's Terms of Service."))). The user was then required to click a button that appeared below the text notifying the user that by continuing with account registration, the user indicated assent to the Terms. (*Id.*).

The user also had the option of registering for a Ring account via Ring's Website. (Modestine Decl. ¶ 24).

From February 2018 until April 2019, the user was required to check a box agreeing to the Terms to proceed in creating an account on the Website. (*See* Appendix (citing *id.*, Ex. Q)). From April 2019 through January 2020, the text "[b]y continuing you agree to Ring's Terms of Service" appeared directly above a large "Create Account" button. (*See* Appendix (citing *id.*, Ex. R)).

Plaintiff does not contest that Exhibits L through R are fair and accurate depictions of the Ring App and Website on the dates stated above. (*See generally* Opposition).

Since August 18, 2017, all iterations of the Terms included an arbitration clause and class waiver. (Modestine Decl. ¶¶ 6-20, Exs. G at 15-19, B at 10-13, C at 11-14, D at 11-14, E at 10-13, F at 15-19, H at 11-14, I at 12-14, J at 15-19, K at 12-15). The section entitled "Dispute Resolution" states that "[t]he

Federal Arbitration Act (the 'FAA') ... and federal arbitration law apply to this Agreement and govern all questions as to whether a dispute is subject to arbitration." (*Id.*, Ex. G at 16). The section further states that the parties "agree that any dispute, controversy, or claim arising out of, or relating to your use of the services and products, to this agreement, or to the content, any relationship between us and/or any recording on the services and/or products shall be resolved only by final and binding, bilateral arbitration." (*Id.*, Exs. G at 16, B at 10-13, C at 11-14, D at 11-14, E at 10-13, F at 15-19, H at 11-14, I at 12-14, J at 15-19, K at 12-15).

**\*3** The Terms also state that " [d]isputes' shall include, but are not limited to, any claims or controversies between you and Ring against each other related in any way to or arising out of in any way from this Agreement, the Services, the Products, and/or the Content[.]" (*Id.*, Exs. G at 16, B at 11, C at 11, D at 11-12, E at 11, F at 16, H at 12, I at 12, J at 16, K at 13).

In addition, the Terms provide that "[t]he term 'you,' as used in these Terms, includes any person or entity who is the owner of the Product and creates an account associated with the Product ('Owner'), as well as any person or entity authorized to access or use the Owner's Products and Services ('Authorized Users')." (*Id.*, Exs. G at 2, B at 1, C at 1, D at 1, E at 1, F at 2, H at 1, I at 1, J at 2, K at 1-2).

Since August 18, 2017, the Terms have also contained a delegation clause stating the arbitrator "shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms, including, but not limited to any claim that all or any part of these Terms are void or voidable, or whether a claim is subject to arbitration." (*Id.*, Ex. G at 18; *see also id.*, Exs. C at 13, D at 13, E at 12, F at 18, H at 13, I at 14, J at 18, K at 14).

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") "requires federal district courts to stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citing 9 U.S.C. § 3). The FAA also "limits the district court's role to determining whether a valid arbitration agreement exists, and whether the agreement encompasses the disputes at issue." *Id.* (citation omitted). "[E]xcept where the parties *clearly* and *unmistakably* provide otherwise, it is the court's duty" — as opposed to an

arbitrator's duty — "to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter." *SEIU Local 121RN v. Los Robles Reg'l Med. Ctr.*, 976 F.3d 849, 855 (9th Cir. 2020) (emphasis in original) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010)).

"In determining whether a valid arbitration agreement exists, federal courts 'apply ordinary state law principles that govern the formation of contracts.' " *Nguyen*, 763 F.3d at 1175 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). "Federal courts sitting in diversity look to the law of the forum state — here, California — when making choice of law determinations." *Id.* (citation omitted).

The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence that an agreement to arbitrate exists. *Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017).

### III. DISCUSSION

Ring argues that, because each Plaintiff purchased a Ring product, created a Ring account, and/or used Ring's services, each Plaintiff also consented to Ring's Terms of Service, which require individual arbitration for all disputes arising out of or relating to Ring's products or services. (Motion at 10-23). Ring contends that all Plaintiffs must now be compelled to arbitrate their claims individually pursuant to Ring's Terms of Service. (*Id.*). The parties agree that California law applies here. (*See* Motion at 10; Opposition at 12).

*4 Because Ring makes different arguments with respect to the Purchaser Plaintiffs and the Non-Purchaser Plaintiffs, the Court addresses each in turn.

#### A. Purchaser Plaintiffs

Ring contends that the Purchaser Plaintiffs assented to the arbitration clause in the Terms of Service by purchasing and using Ring's products. (Motion at 10-15). Specifically, Ring asserts that each of the Purchaser Plaintiffs was put on constructive notice of the arbitration clause by one or more of the following: (1) the Devices' packaging; (2) the Ring App or Website when signing up for and creating a Ring account; and (3) this litigation. (Motion at 10-15).

There is no evidence that the Purchaser Plaintiffs had actual knowledge of the arbitration clause. (*See* Purchaser Plaintiff

Declarations (Docket Nos. 89-1 through 89-27)). As a result, the validity of the arbitration clause "turns on whether the [packaging, App, or Website] put[ ] a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177. Whether the mutual assent necessary for contract formation exists "is determined under an objective standard applied to the outward manifestations or expressions of the parties, *i.e.*, the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Deleon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813, 143 Cal. Rptr. 3d 810 (2012). "Although mutual consent is a question of fact, whether a certain or undisputed state of facts establishes a contract is a question of law for the court." *Id.* (internal quotation marks and citations omitted).

#### 1. Creating an account on the Ring App or Website

Ring asserts that the Purchaser Plaintiffs agreed to the Terms by creating a Ring account on the Ring App or Website. (Motion at 12-14). The Court agrees.

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract[,]" including the "requirement of mutual manifestation of assent, whether by written or spoken word or by conduct[.]" *Nguyen*, 763 F.3d at 1175 (citations and internal alterations omitted).

Internet users can form contracts online in a variety of different ways, for example, by clicking on an "I agree" box after being presented with the website's list of terms and conditions of use ("clickwrap" agreements), by using a website that has its terms and conditions of use posted on the website via hyperlink at the bottom of the screen ("browsewrap" agreements), or by signing up for a website account or service in which the user is told that continued use will act as a manifestation of the user's intent to be bound by various terms ("hybrid design" or "modified clickwrap" agreements). *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 763 (N.D. Cal. 2019).

To determine whether a user has inquiry notice of the contract terms, courts assess "the design and content of the website and the agreement's webpage[,]" including "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design." *Nguyen*, 763 F.3d at 1177.

**\*5** Courts are "more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement — that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website." *Id.* at 1176 (citing *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 451-52 (E.D.N.Y. 2013) (enforcing forum selection clause where users had to check box confirming they read and agreed to the website's terms of service to obtain an account); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 838-40 (S.D.N.Y. 2012) (enforcing forum selection clause in website's terms of service where a notice below the "Sign Up" button stated, "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service," and user had clicked "Sign Up")). Courts have also been more amenable to enforcing browsewrap agreements "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound[.]" *Id.* at 1176 (listing cases).

In *Dohrmann v. Intuit*, a recent unpublished decision, the Ninth Circuit considered whether the TurboTax Website provided notice of its terms of use through its account sign-in page. 823 F. App'x 482, 484 (9th Cir. 2020) (reversing district court's denial of motion to compel arbitration). To sign into a TurboTax account, the user was required to enter her user ID and password, and click a "Sign In" button, directly under which the following language appeared: "By clicking Sign In, you agree to the Turbo Terms of Use, TurboTax Terms of Use, and have read and acknowledged our Privacy Statement." *Id.* These terms were light blue hyperlinks which, if clicked, directed the user to a new page containing the terms of use in which the arbitration clause was located. *Id.* The Ninth Circuit held that this sign-in page provided sufficient notice to a reasonably prudent internet user of its Terms of Use, and therefore the arbitration clause, because "[t]he relevant warning language and hyperlink to the Terms of Use were conspicuous — they were the only text on the webpage in italics, were located directly below the sign-in button, and the sign-in page was relatively uncluttered." *Id.*

Similarly, *Lee v. Ticketmaster LLC* involved a website which, directly below the "Sign In" button, displayed the phrase: "By continuing past this page, you agree to our Terms of Use." 817 F. App'x 393, 394 (9th Cir. 2020). In addition, when placing an order for tickets, directly above the "Place Order" button, the website displayed the phrase: "By clicking 'Place Order,' you agree to our Terms of Use." *Id.* The phrase "Terms of Use" was displayed in blue font and contained a hyperlink to Ticketmaster's Terms. *Id.* at 394-95. The *Lee* court reasoned

that, because the website required users to "affirmatively acknowledge the agreement before proceeding," and "the website contained an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound," the website provided sufficient notice for constructive assent to Ticketmaster's terms. *Id.* at 395 (quoting *Nguyen*, 763 F.3d at 1176-77) (internal quotation marks and alterations omitted).

While other persuasive authorities are all over the map in terms of what website features are sufficient to provide inquiry notice, it appears that the majority of California district courts take the *Dohrmann* and *Lee* approach.

These courts hold that a modified or hybrid clickwrap/browsewrap agreement constitutes a binding contract where the user is provided with an opportunity to review the terms of service in the form of a hyperlink immediately above or below a button that must be clicked to affirmatively acknowledge the terms, place an order, or register for an account. *See, e.g., Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 904, 911-12 (N.D. Cal. 2011) (user assented to terms where website provided an opportunity to review the terms of service in the form of a hyperlink immediately under the "I accept" button, which user clicked); *Crawford v. Beachbody, LLC*, 2014 WL 6606563 (S.D. Cal. 2014) (user assented to terms by clicking "PLACE ORDER" button appearing immediately below disclaimer informing user that by clicking the button, user was agreeing to the site's terms); *Rodriguez v. Experian Serv. Corp.*, 2015 WL 12656919, at \*2 (C.D. Cal. Oct. 5, 2015) (user assented to terms where the "Website contained a hyperlink to the Terms of Use at the bottom of every page and included an express disclosure and acknowledgement, which stated 'By clicking the button above ... you agree to our Terms of Use,' " which were hyperlinked); *Graf v. Match.com, LLC*, CV 15-3911-PA (MRWx), 2015 WL 4263957, at \*4 (C.D. Cal. July 10, 2015) (finding assent to terms where "all users of the Match.com website during the relevant time period were required to affirmatively agree to the Terms of Use when they clicked on a 'Continue' or other similar button on the registration page where it was explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use, which were always hyperlinked and available for review"); *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1166 (N.D. Cal. 2016) (user assented to terms by clicking "Sign Up" box with language immediately below it stating, "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Use and Privacy Policy," with the terms of use hyperlinked); *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d

985, 990-91 (N.D. Cal. 2017) (user assented to terms when he created an account on the Uber app by clicking "DONE" above disclaimer: "By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy"); *Nevarez v. Forty Niners Football Co., LLC*, 16-CV-07013, 2017 WL 3492110, at *8 (N.D. Cal. Aug. 15, 2017) (user assented to terms in purchasing their tickets and parking passes on the Ticketmaster website which included a disclaimer below the "Accept and Continue" button stating: "By continuing past this past, you agree to our terms of use," where the terms were hyperlinked and in blue text); *Maynez v. Walmart, Inc.*, 479 F. Supp. 3d 890, 895-97 (C.D. Cal. 2020) (user assented to terms by clicking "Place Order" button below disclaimer with hyperlinks to terms of use: "By clicking Place Order, you agree to Walmart's Updated Privacy Policy and Terms of Use").

**\*6** At least four versions of Ring's account sign-up page resemble a clickwrap agreement in that they required the user to affirmatively acknowledge the agreement before the user could create the account. (*See* Appendix, Modestine Decl., Exs. L, M, Q). Ring's Terms of Service in these four versions of the Ring App and Website are even more conspicuous than the terms of use in *Dohrmann* and *Lee* because they required users to check a box affirmatively indicating that they agreed with Ring's Terms of Service before users could proceed to creating an account. As in *Dohrmann* and *Lee*, the warning statement also hyperlinked the Terms of Service containing the arbitration clause. These four versions of the Ring account signup page provided sufficient notice to a reasonably prudent internet user of Ring's Terms of Service and arbitration clause.

Three other versions of the Ring App and Website contain an explicit textual notice that creating an account will act as a manifestation of the user's intent to be bound by the Terms of Service. (*Compare* Appendix, Modestine Decl., Exs. N, O, P, R) *with Arena v. Intuit Inc.*, 444 F. Supp. 3d 1086, 1088 (N.D. Cal. 2020), *rev'd and remanded sub nom. Dohrmann*, 823 F. App'x 482. These versions of the Ring App and Website are arguably more conspicuous than the sign-in page in *Dohrmann* because the pages are less cluttered. In at least in two versions (Exs. P and R), the warning text likewise appears directly above or below the create account button, and hyperlinks the Terms of Service, as denoted by the blue text. These two versions of the App and Website (Exs. P and R) provided sufficient notice to a reasonably prudent internet user of Ring's Terms of Service and arbitration clause.

Although the version of the Ring App depicted in Exhibits N and O does not hyperlink the Terms in blue text, the warning text appears immediately below where the user enters her password, the Terms are underlined, and there are hardly any other words on the page. While it is a much closer call, the Court determines that this version of the Ring App also provided sufficient constructive notice of the Terms.

Plaintiffs contend that *Dohrmann* is distinguishable because TurboTax users received notice of the terms of use every time they signed in to their accounts, whereas here, Ring notified users of the Terms of Service only once at the time of sign up. (Opposition at 16-17). The problem with this argument is that the Ninth Circuit's determination in *Dohrmann* did not turn on the fact that users received notice of the terms of use multiple times, but that the location and color of the hyperlinks, as well as the uncluttered design of the Website, made the warnings and terms of use sufficiently conspicuous.

Accordingly, the Motion with respect to the Purchaser Plaintiffs who made accounts on the App or Website is **GRANTED**.

### 2. Scope and enforceability of the arbitration clause

Plaintiffs contend that, even if an arbitration agreement exists, it is unconscionable and unenforceable under *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 216 Cal. Rptr. 3d 627 (2017). (Opposition at 19-23).

All Purchaser Plaintiffs who created an account after August 18, 2017, are subject to the same delegation provision in the Terms, which states that the arbitrator "shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms, including, but not limited to any claim that all or any part of these Terms are void or voidable, or whether a claim is subject to arbitration." (Modestine Decl., Ex. C at 13).

Because this clause clearly and unmistakably delegates threshold arbitrability issues to an arbitrator, including enforceability, the Court may not decide whether the arbitration agreement is unconscionable or unenforceable. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (explaining that, before referring a dispute to an arbitrator, a court must first determine whether a valid arbitration agreement exists; if the agreement does exist, and

"if it delegates the arbitrability issue to an arbitrator, the court may not decide the arbitrability issue").

**\*7**  Plaintiffs assert that many of the Purchaser Plaintiffs created their Ring accounts before the delegation provision was added to the Terms, and therefore, those Plaintiffs cannot be bound by the provision. (Opposition at 17). Ring admits that Plaintiffs Jason Ball, Lue Mayora, and Jerathen and Corrina Tillman created their Ring accounts prior to August 18, 2017, the date that the delegation provision was added to the Terms. (Reply at 21). However, Ring argues that these Plaintiffs are nonetheless bound by the delegation provision because they have continued to use the Devices during this litigation, conduct which Ring contends constitutes assent to the current Terms and delegation provision. (Reply at 21) (citing Motion at 24 n.18).

The Court agrees with Ring. Courts have held that plaintiffs will be bound by a product's terms of use if they learn of the terms' existence during pending litigation and continue to use the product — "conduct that a reasonable person would understand to constitute assent." *Nicosia v. Amazon.com, Inc.*, 815 F. App'x 612, 614 (2d Cir. 2020) (citation and internal quotation marks omitted) (holding that the plaintiff received notice of the defendant's conditions of use when the defendant raised the conditions' arbitration clause as a ground for dismissal in the litigation because the plaintiff had admitted to making several purchases from the defendant since that date). The Court agrees that these Plaintiffs' continued use of the Devices after being on constructive notice of the Terms through this lawsuit constitutes assenting conduct.

The Court concludes that the delegation provision applies to all Purchaser Plaintiffs who were on inquiry notice of the Terms, including those who created a Ring account before August 18, 2017. Accordingly, Court does not decide whether the Purchaser Plaintiffs' claims fall within the scope of the arbitration agreement or whether the agreement is enforceable or unconscionable. Because the parties agreed to delegate gateway arbitrability issues, those issues must be reserved for the arbitrator to resolve. For the same reason, the Court does not address Ring's argument that each Plaintiff should be compelled to arbitrate his or her claims on an individual basis consistent with the Terms. (*See* Motion at 22-23).

## B. Non-Purchaser Plaintiffs
Ring makes three arguments as to why the Non-Purchaser Plaintiffs — the twelve minor children and one elderly woman — are also bound by the arbitration clause: (1) the Purchaser

Plaintiffs agreed to the arbitration clause on behalf of the Non-Purchaser Plaintiffs; (2) the Non-Purchaser Plaintiffs' preexisting relationship with a Purchaser Plaintiff makes it equitable to enforce the Terms; and (3) the Non-Purchaser Plaintiffs are equitably estopped from accepting the benefits while avoiding the burdens of the Terms. (*See* Motion at 15-22).

Ring asserts that the Non-Purchaser Plaintiffs are bound by the Terms as "Authorized Users." (*See* Motion at 16). The Terms define an Authorized User as "any person or entity authorized to access or use the Owner's Products and Services." (Modestine Decl., Ex. G at 2). While the Non-Purchaser Plaintiffs allege that they were passively exposed to the Devices that their guardians purchased and used, Ring puts forth no evidence showing that the Non-Purchaser Plaintiffs were ever authorized by their guardians to "**access or use**" the Devices. The Court agrees with Plaintiffs that extending Ring's definition of Authorized User to anyone who is knowingly or unknowingly surveilled by a Ring device — which is essentially what Ring proposes — would lead to absurd and unjust results. (*See* Opposition at 5 n.3).

Ring also argues that it is equitable to compel the Non-Purchaser Plaintiffs to be bound by the Terms because of their preexisting relationship with the Purchaser Plaintiffs, who had the implied authority to contract on their behalf. (Motion at 15-18).

**\*8**  Ring points to case law upholding agreements to arbitrate made by a parent on behalf of a child who is to receive services under the contract, reasoning that parents have the implied authority to contract on behalf of their children. (*See* Motion at 16-17). These cases are inapposite because they involve a parent or spouse's ability to enter into a contract on behalf of her child or spouse for medical care or school activities. *See Doyle v. Giuliucci*, 62 Cal. 2d 606, 610, 43 Cal. Rptr. 697 (1965) (holding that a parent's "power to enter into a contract for medical care that binds the child to arbitrate any dispute arising thereunder is implicit in a parent's right and duty to provide for the care of his child"); *Hawkins v. Superior Court*, 89 Cal. App. 3d 413, 419, 152 Cal. Rptr. 491 (1979) (holding that because spouses have a mutual obligation to care for and support the other, one spouse had the power to contract for medical care on behalf of the other spouse, and "implicit in that power is the implied authority to agree for himself and his wife to arbitrate claims arising out of medical malpractice"); *Hohe v. San Diego Unified School District*, 224 Cal. App. 3d 1559, 1564-65, 274 Cal. Rptr. 647

In re Ring LLC Privacy Litigation, Slip Copy (2021)

2021 WL 2621197

(1990) (holding that liability waiver for school activity could be enforced against student because the waiver was signed by the parent on student's behalf); *County of Contra Costa v. Kaiser Foundation Health Plan, Inc.*, 47 Cal. App. 4th 237, 242-43, 54 Cal. Rptr. 2d 628 (1996) (listing cases in support of rule that "a person who has authority to contract for medical services on behalf of another may, in the exercise of that authority, bind that person to an agreement to arbitrate his or her medical malpractice claims" and recognizing that "a preexisting relationship between the nonsignatory and one of the parties to the arbitration agreement is a common factor in these cases").

The Court is unconvinced that the authority to contract for goods beyond necessities like education or medical care is implicit in a parent or guardian's duty to provide for the care of her child or dependent. Although Ring cites to two district court opinions binding non-signatory family members to adhesion contracts for consumer goods, these decisions are not binding on this Court. (*See* Motion at 18; Reply at 16) (citing *Chan v. Charter Communications Holding Co.*, EDCV 15-886-JGB (KKx), 2015 WL 12655701, at *5 (C.D. Cal. Aug. 6, 2015), *Tice v. Amazon, Inc.*, EDCV 19-1311-SVW (KKx), 2020 WL 1625782, at *3 (C.D. Cal. Mar. 25, 2020), *rev'd and remanded on other grounds*, 845 F. App'x 535 (9th Cir. 2021)). Further, both courts relied upon California authorities such as *County of Contra Costa* without addressing the distinction between contracts for medical services and adhesion contracts for consumer goods.

The doctrine of equitable estoppel may also apply where a nonsignatory to a contract "knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (citation and internal quotation marks omitted); *see also Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009) (explaining that there are two types of equitable estoppel in the arbitration context, one based on the "close relationship between the entities involved," and the other "where the nonsignatory 'knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement' "). However, here, there is no evidence that any of the Non-Purchaser Plaintiffs **knowingly exploited** Ring's Terms here.

Accordingly, Ring has failed to meet its burden of proving by a preponderance of the evidence that the Non-Purchaser Plaintiffs agreed to arbitrate their claims. *See Norcia*, 845 F.3d at 1283.

The Motion with respect to the Non-Purchaser Plaintiffs is **DENIED**.

## IV. CONCLUSION

For the reasons stated above, the Motion with respect to the Purchaser Plaintiffs who made a Ring account using the Ring App or Website is **GRANTED**. The Motion with respect to the Non-Purchaser Plaintiffs is **DENIED**. The action shall proceed as to the Non-Purchaser Plaintiffs.

IT IS SO ORDERED.

## APPENDIX



(Ring App., May-Nov. 2017, Ex. L)

In re Ring LLC Privacy Litigation, Slip Copy (2021)
2021 WL 2621197





**\*9**  (Ring Website, Sept. 2018, Ex. Q)

(Ring App., Nov. 2017-June 2018, Ex. M).



(Ring Website, Feb. 2018, Ex. Q)

In re Ring LLC Privacy Litigation, Slip Copy (2021)

2021 WL 2621197



(Ring App., Jun. 2018-May 2019, Exs. N, O)



(Ring App., May 2019-Jan. 2020, Ex. P)

In re Ring LLC Privacy Litigation, Slip Copy (2021)

2021 WL 2621197



(Ring Website, April 2019-Jan. 2020, Ex. R)



*Compare to Dohrmann* agreement on right, *Arena v. Intuit Inc.*, 444 F. Supp. 3d 1086, 1088 (N.D. Cal. 2020), *rev'd and remanded sub nom. Dohrmann*, 823 F. App'x 482.

**All Citations**

Slip Copy, 2021 WL 2621197

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

6

2018 WL 6694923

2018 WL 6694923
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Lisa KIM, Individually and on Behalf of
all Others Similarly Situated, Plaintiff,

v.

TINDER, INC., a Delaware Corporation; Match Group,
LLC, a Delaware Limited Liability Company; Match
Group, Inc., a Delaware Corporation; and Does 1
through 10, inclusive, and each of them, Defendants.

Case No. CV 18-03093 JFW (AS)
|
Signed 07/12/2018

**Attorneys and Law Firms**

John P. Kristensen, Christina M. Le, David Levi Weisberg,
Kristensen Weisberg LLP, Los Angeles, CA, Adrian Robert
Bacon, Todd M. Friedman, Law Office of Todd M. Friedman
PC, Woodland Hills, CA, for Plaintiff.

Alexandra Hill, Donald R. Brown, Robert H. Platt, Manatt
Phelps and Phillips LLP, Los Angeles, CA, for Defendants.

**STATEMENT OF DECISION**

John F. Walter, United States District Court Judge

**STATEMENT OF DECISION**

**I. FACTUAL AND PROCEDURAL HISTORY**

**A. Factual Background**
**\*1** Defendants Tinder, Inc., Match Group, LLC, and Match
Group, Inc.'s (collectively, "Tinder") own and operate a free,
smartphone-based dating app called Tinder. (Declaration of
Jonathan Badeen ("Badeen Decl."), ¶¶ 2-3.) The app displays
profiles of other users and allows a user to swipe right on
another user's profile to express interest or left to express
disinterest. (*Id.*, ¶ 2.) In March 2015, Tinder released a suite
of premium features called Tinder Plus that is available for a
monthly fee. (*Id.*)

Tinder requires a user to create an account before accessing
any feature of the app. (Badeen Decl., ¶ 4.) Permission to
create an account and use the app has, in turn, always been

conditioned on the user's agreement to the Terms of Use
("TOU"). (*Id.*) The TOU has always been available for review
any time within the app. (*Id.*)

Since 2014, the TOU has included an arbitration agreement
that requires all disputes (except small-claims matters) arising
out of or relating to the TOU or Tinder's services to be
resolved through binding arbitration, and waives any right to
participate in a class or representative action:

> **Arbitration      Agreement.** The
> exclusive means of resolving any
> dispute or claim arising out of or
> relating to this Agreement (including
> any alleged breach thereof) or
> the Service shall be BINDING
> ARBITRATION administered by the
> American Arbitration Association.
> The one exception to the exclusivity
> of arbitration is that you have the
> right to bring an individual claim
> against the Company in a small-
> claims court of competent jurisdiction.
> But whether you choose arbitration
> or small-claims court, you may not
> under any circumstances commence
> or maintain against the Company any
> class action, class arbitration, or other
> representative action or proceeding.

(Badeen Decl., ¶ 5 and Ex. 1, ¶ 18, Ex. 2, ¶ 19 (emphasis in
original).)

Plaintiff created a Tinder account on October 10, 2013.
(Badeen Decl., ¶ 7.) On April 13, 2015, Plaintiff created
a second account. (*Id.*) On July 31, 2015, Tinder added a
disclosure to its login screen that informed users that by
continuing to use the service, they were agreeing to Tinder's
TOU. (*Id.*, ¶ 6.) The screen stated that by tapping Log In, the
user agrees to the TOU. The disclosure was directly above the
Log In button and provided a clear hyperlink in the disclosure
to the then-current TOU. (*Id.*, Ex. 3.)

On February 21, 2017, Plaintiff purchased a subscription to
Tinder Plus. (Badeen Decl., ¶ 7.) On February 23, 2017 and
March 4, 2017, Plaintiff tapped to log in to her account. (*Id.*)

Kim v. Tinder, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 6694923

**B. Procedural History**

On April 12, 2018, Plaintiff filed her Complaint, alleging a single cause of action for violation of the Unruh Civil Rights Act, Cal. Civ. Code §§ 51 *et seq.* [Dkt. No. 1.] On June 11, 2018, Tinder filed its Motion to Compel Arbitration or Stay Under *Colorado River* Abstention ("Motion"). [Dkt. No. 24.] On June 22, 2018, Plaintiff filed a First Amended Complaint ("FAC"), which added a cause of action for violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* [Dkt No. 30.] On June 25, 2018, Plaintiff filed an Opposition to Tinder's Motion, and Tinder filed a Reply on July 2, 2018. [Dkt. Nos. 32 and 33.]

## II. LEGAL STANDARD

**\*2** Tinder's arbitration agreement -- addressed in detail below -- provides that it is governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"). (Badeen Decl., Ex. 1, ¶ 18, Ex. 2, ¶ 19.) An FAA choice-of-law provision in an arbitration agreement is enforceable. *Brennan v. Opus Bank*, 796 F.3d 1125, 1129-31 (9th Cir. 2015). Moreover, the FAA governs this case even without a choice-of-law provision because Tinder's TOU "evidenc[es] a transaction involving commerce." 9 U.S.C. § 2; *see Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

"The FAA provides that any arbitration agreement within its scope 'shall be valid, irrevocable, and enforceable.' " *Chiron*, 207 F.3d at 1130 (quoting 9 U.S.C. § 4). On a motion to compel arbitration, a district court's role is limited to determining whether a valid agreement to arbitrate exists and—unless the question is contractually delegated to the arbitrator -- determining whether the agreement encompasses the parties' dispute. *See id.*; *Brennan*, 796 F.3d at 1132 ("a court must enforce an agreement that ... clearly and unmistakably delegates arbitrability questions to the arbitrator"). The FAA "leaves no place for the exercise of discretion by the district court." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985). Rather, "the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron*, 207 F.3d at 1130.

## III. DISCUSSION

### A. Plaintiff Consented to the TOU, and Her Consent Is Binding.

There are three generally recognized methods of obtaining consent to terms of use: clickwrap, browsewrap, and a hybrid known as "browsewrap-that-resembles-clickwrap" or "sign-up wrap." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014). In a sign-up wrap agreement, the consumer must click an "I agree" box or otherwise clearly manifest consent to the terms of use, while the terms themselves are accessible via hyperlink. *Id.* at 1176-77. Tinder uses a sign-up wrap. Plaintiff consented to the TOU by tapping the Tinder Log In button directly below a disclosure that clearly explained that doing so constituted agreement to the TOU, which itself was accessible via a hyperlink in the disclosure. (*See* Badeen Decl., ¶ 6.)

This method of consent is fully enforceable. *See Nguyen*, 763 F.3d at 1177; *Graf v. Match.com, LLC*, 2015 WL 4263957, at \*4 (C.D. Cal. July 10, 2015). In addition, Tinder provided sufficient evidence that Plaintiff consented to the TOU (and thus, the TOU's arbitration agreement) through this method. Tinder provided a declaration with documentary exhibits establishing that, on multiple occasions after July 31, 2015, Plaintiff logged in to her Tinder account through a login screen on her phone which stated that tapping the Log In button would constitute consent to the TOU (and thus the TOU's arbitration agreement). On each occasion, the screen provided a prominent hyperlink to the TOU, which Plaintiff was free to review if she desired.

In light of Tinder's evidence that Plaintiff consented to the arbitration agreement, the burden shifted to Plaintiff to affirmatively rebut such evidence. *See Sundquist v. Ubiquity, Inc.*, 2017 WL 3721475, at \*\*2-3 (S.D. Cal. Jan. 17, 2017). Plaintiff failed to do so. Instead, Plaintiff argued that Tinder should be required to provide additional evidence regarding her login, and made a vague request for unspecified discovery. However, vague requests to pursue unspecified discovery are insufficient as a matter of law to defeat a motion to compel arbitration. *See, e.g., Hodsdon v. DirecTV, LLC*, 2012 WL 5464615, at \*8 (N.D. Cal. Nov. 8, 2012)

**\*3** Accordingly, the Court concludes that Plaintiff accepted, and is bound by, the arbitration agreement.

### B. Issues of Arbitrability Were Delegated to the Arbitrator.

The arbitration agreement states that claims or disputes between the parties shall be determined in arbitration administered by the American Arbitration Association ("AAA"). (Badeen Decl., Ex. 1, ¶ 18, Ex. 2, ¶ 19.) The AAA Rules state that the question of arbitrability is for the arbitrator -- and, thus, not for the court. (*See* Request for

Case 3:22-cv-02077-MEM   Document 13-2   Filed 03/20/23   Page 46 of 102

Kim v. Tinder, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 6694923

Judicial Notice ("RJN"), Ex. 1, R-14(a).)[1] Where, as in this case, an arbitration agreement incorporates AAA Rules, a provision in the Rules delegating the question of arbitrability to the arbitrator is enforceable. *Brennan*, 796 F.3d 1125.

Accordingly, the Court need not, and should not, determine questions of arbitrability, such as whether Plaintiff's claims are within the scope of the parties' arbitration agreement[2] because those determinations have been properly delegated to the arbitrator for determination.

**C. This Case Is Subject To Arbitration.**

In her Opposition, Plaintiff, relying heavily on *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), argues that this dispute is not subject to arbitration. The Court disagrees for three reasons: (i) Plaintiff is seeking a private, not public, injunction; (ii) the arbitration agreement does not bar claims for injunctive relief, public or otherwise; and (iii) the so-called *Broughton-Cruz rule* is invalid.

**1. Plaintiff Is Not Seeking a Public Injunction.**

In *McGill*, the California Supreme Court held that a provision in a contract that waives the statutory remedy of public injunctive relief is unenforceable. A public injunction affects the public as a whole, whereas a private injunction affects only an individual or a limited section of the public. *McGill*, 2 Cal. 5th at 955. The dispute in this case concerns whether Tinder may charge a higher price for access to its optional premium features of its app to users who are at least thirty years of age. In the UCL claim alleged in her FAC, Plaintiff seeks an injunction that would prevent Tinder from basing the price for those features, known as Tinder Plus, on this age distinction. An injunction that purports to control only the price charged to users of Tinder's dating app who wish to subscribe to Tinder Plus and are age 30 or over is clearly one that would not affect the public at large and, therefore, would only qualify as a private injunction. *See, e.g., Croucier v. Credit One Bank, N.A.*, 2018 WL 2836889 (S.D. Cal. June 11, 2018).

**2. The Arbitration Agreement Does Not Bar Claims for Injunctive Relief, Public or Otherwise.**

Plaintiff argues that the parties' arbitration agreement is unenforceable, in whole or in part, because it would preclude her from seeking a public injunction. The Court disagrees. Plaintiff is free to pursue her claim for UCL injunctive relief -- whether it qualifies as public or private -- in arbitration.

**\*4** The arbitration agreement here, unlike in *McGill*, does not deprive Plaintiff of any statutory remedy. Tinder's agreement states that an arbitrator may award *any* relief available in a court of law -- including a public injunction. (*See* Badeen Decl., Ex. 1, § 18.b; Ex. 2 § 19 ("The arbitrator can grant any relief that a court can ...").) The fact that Plaintiff may not seek a public injunction (or any other relief) as part of a class or representative action is irrelevant.

**3. The So-Called *Broughton-Cruz* Rule Is Invalid.**

Plaintiff argues she cannot be compelled to seek public injunctive relief in arbitration because the so-called *Broughton-Cruz* rule entitles her to seek such relief in a court of law.[3] However, the *Broughton-Cruz* rule was rendered invalid by the U.S. Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), which held that a state-law rule that specifically restricts the scope of arbitration agreements is preempted by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"). *See Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 937 (9th Cir. 2013) ("We therefore hold that the FAA preempts the *Broughton–Cruz* rule."); *Nelsen v. Legacy Partners Residential, Inc.*, 207 Cal. App. 4th 1115, 1136 (2012), *as modified on denial of reh'g* (Aug. 14, 2012).

**IV. CONCLUSION**

For all the foregoing reasons, the Court **GRANTS** Tinder's Motion and orders the parties to arbitration.[4] The Court also **STAYS** this action pending the outcome of the arbitration. The parties shall file a joint status report with the Court every 120 days regarding the status of the arbitration, with the first joint status report to be filed on November 8, 2018. The Scheduling Conference set for July 23, 2018, at 1:15 p.m. is **VACATED**.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6694923

2018 WL 6694923

## Footnotes

1    The Court grants Tinder's Request for Judicial Notice.

2    It is nonetheless clear that the arbitration agreement encompasses the claims at issue in this case because
     Plaintiff agreed to arbitrate "any dispute or claim arising out of or relating to this Agreement (including any
     breach thereof) or the Service .... " (Badeen Decl., ¶ 5 and Ex. 1 at ¶ 19.)

3    *Broughton* refers to *Broughton v. Cigna Healthplans of Calif.*, 21 Cal. 4th 1066 (1999), and *Cruz* refers to
     *Cruz v. PacifiCare Health Sys., Inc.*, 30 Cal. 4th 303 (2003).

4    Because the Court has ordered the parties to arbitration, the Court need not address the issue of a stay
     under *Colorado River* abstention.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

7

Kubischta v. Schlumberger Tech Corp, Not Reported in Fed. Supp. (2016)

2016 WL 3752917, 2016 Wage & Hour Cas.2d (BNA) 226,672

KeyCite Yellow Flag - Negative Treatment

Disagreed With by   Hall v. U.S. Cargo and Courier Service, LLC,
S.D.Ohio,   March 9, 2018

2016 WL 3752917

United States District Court, W.D. Pennsylvania.

Jonathan KUBISCHTA, Individually and on
Behalf of all Others Similarly Situated, Plaintiff,

v.

SCHLUMBERGER TECH CORP, Defendant.

Civil Action No. 15-1338
|
Signed 07/14/2016

**Attorneys and Law Firms**

Joshua P. Geist, Goodrich & Geist, P.C., Pittsburgh, PA,
Andrew W. Dunlap, Michael A. Josephson, Fibich Leebron
Copeland Briggs & Josephson, James A. Jones, Richard J.
Burch, Bruckner Burch PLLC, Houston, TX, for Plaintiff.

Rachel E. Linzy, Robert P. Lombardi, Samuel Zurik, III,
Alexander Landin, Kullman Firm, New Orleans, LA, for
Defendant.

**MEMORANDUM OPINION**

Nora Barry Fischer, United States District Judge

**I. Introduction**

**\*1** This wage and hour case arises out of the former
oil and gas activities of Defendant Schlumberger Tech
Corp. ("Defendant") in Washington County, Pennsylvania
and parts of Ohio. (Docket Nos. 25 at 6; 59 at ¶¶ 1, 8).
The dispute before the Court involves the enforceability
of certain provisions contained in a severance agreement
(the "Agreement") between Plaintiff Jonathan Kubischta
("Plaintiff") and Defendant which included, among other
things, a class action waiver clause and a corresponding
release of a lengthy list of potential causes of action. (Docket
No. 55-1). The Court issued a series of show cause orders
directing the parties to brief issues related to the import
of the Agreement, (Docket Nos. 41, 58, 71), to which all
parties have responded. (Docket Nos. 43, 45, 54, 55, 65,
66, 79, 80). Counsel for the parties also provided oral
argument at the Hearing held before this Court on March

22, 2016. (Docket No. 46). After careful consideration of all
of the parties' submissions and for reasons that will follow,
the Court finds that the class action waiver clause of the
Agreement is enforceable. The Court will therefore enter
summary judgment in favor of Defendant and against Plaintiff
as to the class action wage and hour claims that he has
asserted as class representative. However, the Court's Order is
without prejudice to Plaintiff submitting a Second Amended
Complaint setting forth his individual wage and hour claims
against Defendant. The Court expressly declines to rule on
the enforceability of the release provision in the Agreement
at this time.

**II. Background**

Plaintiff brings this action against his former employer,
Defendant, to recover unpaid overtime wages and other
damages, individually and on behalf of other Measurement
While Drilling employees ("MWD Class Members"),
alleging violations of the Pennsylvania Minimum Wage
Act ("PMWA"), 43 P.S. §§ 333.101 *et seq*, the Ohio
Minimum Fair Wage Standards Act, O.R.C. §§ 4111 *et
seq.*, ("the Ohio Wage Act"), and the Ohio Prompt Pay
Act ("OPPA"), Ohio Rev. Code § 4113.15 (collectively,
"the Ohio Acts"). (Docket No. 59). Plaintiff also asserts an
individual claim against Defendant to recover for alleged
violations of the Fair Labor Standards Act ("FLSA"), 29
U.S.C. § 201 *et seq. Id.* Neither Plaintiff nor the Defendant
is a citizen of Pennsylvania, as Plaintiff is a resident of
Cleveland, Cuyahoga County, Ohio, and Defendant maintains
its headquarters in Texas. (*Id.* at ¶ 3). Plaintiff brought
this action in the Western District of Pennsylvania because
he allegedly worked substantial overtime for Defendant in
Washington, Pennsylvania. (Docket No. 59 at ¶ 7). Plaintiff
also allegedly worked for Defendant, at times, in Ohio.
(Docket No. 25 at 6).

According to the First Amended Complaint, Plaintiff worked
as a Measurement While Drilling ("MWD") employee for
Defendant. (Docket No. 59 at ¶ 17). Plaintiff alleges that,
although he and the MWD Class Members were regularly
scheduled to work eighty-four (84) hours per work week,
Defendant did not pay any members of the MWD Class
overtime for any hours worked in excess of forty (40) hours
in a work week. (*Id.* at ¶¶ 25, 26). Instead, Defendant paid its
MWD employees a base salary plus a day-rate. *Id.* Plaintiff
contends that, because the MWD work involves manual labor
duties that constitute *non*-exempt work, Defendant owes back
overtime wages to Plaintiff and the MWD Class Members.
(*Id.* at ¶ 27).

**\*2** Plaintiff's employment with Defendant ended on or about September 25, 2015. (Docket No. 55-1 at ¶ 1). As consideration for participating in the Schlumberger Technology Corporation Severance Plan (the "STCPS"), Plaintiff was required to execute the Agreement. (*Id.* at ¶ 2). In return, Defendant was to: pay Plaintiff $924.00; pay Plaintiff an amount representing his applicable monthly COBRA premium payment for a period of three (3) months; and provide Plaintiff with outplacement counseling for three (3) months. *Id.* The Agreement contains a class action waiver, which provides that "[Plaintiff] waives participation, to the extent permitted by law, in any class or collective action, as either a class or collective action representative or participant as to those claims not released, by signing this Agreement prior to the conditional certification of a class or collective action." (*Id.* at ¶ 5). The Agreement also includes a choice of law provision stating that the Agreement "shall be governed and conformed in accordance with the laws of the State of Texas..." (*Id.* at ¶ 9). Plaintiff was presented with the Agreement on September 25, 2015, and was informed that he had until November 9, 2015 to consider and execute the Agreement. (*Id.* at 11). Following Plaintiff's receipt of the Agreement, but before he signed and agreed to it, "[Plaintiff] contacted [his current] attorneys to inquire about potential wage claims he may have against [Defendant.]" (Docket No. 25 at 7). After consulting with his counsel, on October 5, 2015, Plaintiff executed the Agreement and returned the signed copy to Defendant. (Docket No. 55-1 at 8). Defendant purports to have fulfilled all of its obligations under the Agreement, (Docket No. 45 at 2), which Plaintiff has not refuted.

Nevertheless, with the assistance of essentially the same counsel, Plaintiff proceeded to file this class action lawsuit on October 14, 2015, asserting claims under the PMWA and the Ohio Acts in his own right and on behalf of MWD Class Members. (Docket No. 1). The next day, Plaintiff filed a consent to opt-in to an FLSA collective action in *Boudreaux v. Schlumberger Tech Corp.*, Case No. 6:14-cv-02267, which is still pending in the U.S. District Court for the Western District of Louisiana. (Docket No. 18-4). He then sought leave to withdraw his opt-in from that lawsuit one day later, which was eventually granted by the District Court in Louisiana over the objections of Defendant. (*See* Docket No. 30). In light of this ruling, Defendant withdrew its previously filed motion to dismiss, (Docket No. 18), in this Court and then filed its Answer to Plaintiff's initial Complaint on February 22, 2016. (Docket No. 32).

The Court scheduled a case management conference for March 22, 2016. In advance of the conference, on March 18, 2016, this Court ordered the parties to show good cause as to why this case should not be dismissed due to the Agreement, which indicates that the Plaintiff had settled his state law claims as of October 5, 2015. [1] (Docket No. 41). Plaintiff filed his response to the Show Cause Order on March 21, 2016, (Docket No. 43), to which Defendant responded on March 22, 2016 by filing a brief in opposition. (Docket No. 45).

The Court held a case management conference/oral argument on March 22, 2016. (Docket No. 46). At Hearing and Oral Argument, this Court notified the parties that the above-discussed issues may be dispositive to the case, and that Mr. Kubischta may have released or waived many of his claims by entering into the Agreement. Subsequently, and with leave of Court, both parties filed supplemental briefs on April 8, 2016. (Docket Nos. 54, 55). Then, on April 11, 2016, this Court ordered the Plaintiff to respond to Defendant's Supplemental Memorandum at Section C entitled, "Under the *Erie* Doctrine, Kubischta's Right to Proceed with a Class Action Is a Procedural Right, and Not a Substantive Right, And, As a result, Can Be Waived." (Docket Nos. 54, 58). Plaintiff, on that same date, filed his First Amended Class Action Complaint, (Docket No. 59), in which he inserted an individual claim under the FLSA. [2] Defendant answered Plaintiff's Amended Complaint on April 25, 2016. (Docket No. 70). On the following day, this Court ordered the parties to submit supplemental briefing on the Agreement under Texas law, (Docket No. 71), which was submitted on May 17, 2016 (Docket Nos. 79, 80). The matter is now ripe for disposition.

### III. Legal Standard

**\*3** Heeding the directives in Rule 1 of the Federal Rules of Civil Procedure to "secure the just, speedy, and inexpensive determination of every action and proceeding," this Court will address the enforceability of the class action waiver at this time, in accordance with Rule 56. To this end, Federal Rule of Civil Procedure 56(f)(1) provides that "[a]fter giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant." The Third Circuit has held that, "[u]nder our cases, a district court may not grant summary judgment *sua sponte* unless the court gives notice and an opportunity to oppose summary judgment." *Gibson v. Mayor and Council of City of Wilmington*, 355 F.3d 215, 223 (3d Cir. 2004) (quoting *Otis Elevator Co. v. George Washington Hotel Corp.*, 27 F.3d 903 (3d Cir. 1994)). In the

context of *sua sponte* summary judgment, the First Circuit has defined "notice" to mean "that the targeted party 'had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.' " (*Id.* at 223-24) (quoting *Leyva v. On the Beach, Inc.*, 171 F.3d 717, 720 (1st Cir. 1999) (internal citations omitted)).

It is well-established that summary judgment is appropriately entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (citation omitted). In deciding a motion for summary judgment, the Court should not weigh the evidence, determine the truth of the matters, or evaluate credibility. *See Montone v. City of Jersey City, et al.*, 709 F.3d 181 (3d Cir. 2013). Rather, the Court should only determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id.* In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-movant. *Watson v. Abington Twp.*, 478 F. 3d 144, 147 (3d Cir. 2007).

## IV. Discussion

Defendant argues that the class action waiver is enforceable and that Plaintiff should not be permitted to proceed as the representative plaintiff in this class action lawsuit on behalf of similarly situated workers employed by Defendant in Pennsylvania and Ohio. (Docket No. 45 at 13-16; 54 at 7-11; 70 at Affirmative Defense No. 27). Plaintiff counters that the class action waiver clause is unenforceable under Pennsylvania law and that the Court should permit him to proceed in a representative capacity on behalf of the proposed class. (Docket No. 55 at 13). Accordingly, the Court begins its analysis with the text of the class action waiver set forth in the Agreement, which provides:

> This Agreement is not intended to release any claims, such as FLSA claims, that the employee is not free to release on his own accord. **Employee waives participation, to the extent permitted by law, in any class or collective action, as either a class or collective action**

> **representative or participant as to those claims not released, by signing this Agreement prior to the conditional certification of a class or collective action.** This Agreement does not waive participation in a class or collective action certified prior to the date of the Employee's signature if the Employee meets the requirements for the defined class or collective action.

(Docket No. 55-1 at ¶ 5 (emphasis added)). To reiterate, Plaintiff executed this Agreement after consulting with his counsel and then proceeded to file the instant class action lawsuit against Defendant a mere nine (9) days later, despite the quoted language of the Agreement.[3] (*See* Docket No. 1; 55-1).

### A. Choice of Law

**\*4** As noted, the parties' Agreement provides that Texas law governs their contract. (Docket No. 55-1 at ¶ 9). In considering the class action waiver contained within the Agreement, the Court must first determine the appropriate state law governing the issue of whether and to what extent the class action waiver is enforceable. "In federal diversity cases, a federal court must apply the conflict-of-law rules of the forum state in which it sits, in this case, Pennsylvania." *Cincinnati Insurance Company v. Jerry Ellis Construction*, 2016 WL 3211991 at \*3 (W.D. Pa. Jun. 9, 2016) (citing *Garcia v. Plaza Oldsmobile LTD.*, 421 F.3d 216, 219 (3d Cir. 2005)). "As the Third Circuit has noted, Pennsylvania courts generally honor the intent of the contracting parties and enforce choice-of-law provisions in contracts executed by them if that state bears a reasonable relationship to the contract." *Id.* (citing *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994)). Further, "Pennsylvania courts will only ignore a contractual choice of law provision if that provision conflicts with strong public policy interests." *Id.* In order to determine whether the class action waiver conflicts with strong public policy interests, rendering it unconscionable, the Court now considers Pennsylvania and Texas[4] law regarding unconscionability.[5]

### B. Unconscionability Standard under Pennsylvania Law

2016 WL 3752917, 2016 Wage & Hour Cas.2d (BNA) 226,672

Plaintiff asserts that the class action waiver contained within the Agreement is unconscionable and, therefore, unenforceable. (Docket No. 55 at 13). Pursuant to Pennsylvania law, "[u]nconscionability is a 'defensive contractual remedy which serves to relieve a party from an unfair contract or from an unfair portion of a contract.' " *Harris v. Green Tree Financial Corp.*, 183 F.3d 173, 181 (3d Cir. 1999) (citing *Germantown Mfg. Co. v. Rawlinson*, 341 Pa. Super. 42 (1985)). "The party challenging a contract provision as unconscionable generally bears the burden of proving unconscionability." *Harris*, 183 F.3d at 181 (citing *Bishop v. Washington*, 331 Pa. Super. 387 (1984)). To prove unconscionability under Pennsylvania law, Plaintiff must show the contract was substantively and procedurally unconscionable. *Korea Week, Inc. v. Got Capital, LLC*, 2016 WL 3049490, at *6 (E.D. Pa. May 27, 2016) (internal citations omitted). "In determining unconscionability, the Court of Appeals for the Third Circuit directs [that the Court] apply a 'sliding scale approach;' 'where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required.' " *Id.* (quoting *Quilloin v. Tenet Health System Phila., Inc.*, 673 F.3d 221, 230 (3d Cir. 2012)).

"Procedural unconscionability pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language." *Harris*, 183 F.3d at 181 (citing E. ALLAN FARNSWORTH, CONTRACTS § 4.28 (2d ed. 1990)). "Under Pennsylvania law, a contract is considered procedurally unconscionable if it is a contract of adhesion; one that is a 'standard form contract prepared by one party, to be signed by the party in a weaker position, usually a consumer, who adheres to the contract with little choice about the terms.' " *Korea Week*, 2016 WL 3049490 at *7 (internal citations omitted). "Factors to be considered in determining procedural unconscionability include: the take-it-or-leave-it nature of the standardized form of the document, the parties' relative bargaining positions, and the degree of economic compulsion motivating the adhering party." *Id.* (internal quotations and citations omitted).

**\*5** "Substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Harris*, 183 F.3d at 181 (citing *Germantown*, 491 A.2d at 145-47). "Thus, '[u]nconscionability requires a two-fold determination: that the contractual terms are unreasonably favorable to the drafter and that there is no meaningful choice

on the part of the other party regarding acceptance of the provisions.' " *Harris*, 183 F.3d at 181 (quoting *Bensalem Township v. International Surplus Lines Ins. Co.*, 38 F.3d 1303, 1312 (3d Cir. 1994)).

### C. Unconscionability Standard Under Texas Law

Given that the Agreement contains a choice of law provision applying Texas law, the Court briefly summarizes Texas' law of unconscionability which is substantially similar to Pennsylvania law.

A citizen's freedom of contract is a paramount public policy of Texas. *Provencher v. Dell, Inc.*, 409 F. Supp. 2d 1196, 1204 (C.D. Cal. 2006) (citing *Wood Motor Co. v. Nebel*, 150 Tex. 86, 238 S.W.2d 181, 185-86 (1952)). Under Texas law, a court is not permitted to interfere with the parties' contract just because the court believes the contract is unwise and unfair, or because one of the parties to the contract now wishes a provision did not exist. *Id.* The Texas Supreme Court gave Texas courts clear direction on how to approach legal challenges to contracts in *Wood Motor Co. v. Nebel*:

> if there is one thing which more than another public policy requires is that men of full age and competent understanding shall have the utmost liberty of contracting, and their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by courts of justice. Therefore you have this paramount public policy to consider – that *you are not lightly to interfere with this freedom of contract.*

238 S.W.2d at 185-86 (emphasis in original). An individual's freedom of contract, however, is not limitless under Texas law. If the complaining party can show that the contract is unconscionable, a Texas court will not enforce it. *Provencher,* 409 F. Supp. 2d at 1204. But, this showing is a difficult one for the complaining party to make. *Id.* (citing *AutoNation U.S.A. Corp. v. Leroy*, 105 S.W.3d 190, 198 (Tex. App. 2003)). To be unenforceable under Texas law, the contract must be both procedurally and substantively unconscionable. *Provencher,* 409 F. Supp. 2d at 1204 (citing *In re Halliburton Co.*, 80 S.W.3d 566, 571 (Tex. 2002)). A contract is procedurally

2016 WL 3752917, 2016 Wage & Hour Cas.2d (BNA) 226,672

unconscionable if a party has "no real choice" but to enter into the contract. *Provencher*, 409 F. Supp. 2d at 1204 (citing *Dillee v. Sisters of Charity*, 912 S.W.2d 307, 309 (Tex. App. 1995)). "A contract is substantively unconscionable if it is so one-sided that 'no man in his senses and not under a delusion would enter into [it] and which no honest and fair person would accept.' " *Provencher*, 409 F. Supp. 2d at 1204 (quoting *Blount v. Westinghouse Credit Corp.*, 432 S.W.2d 549, 554 (Tex. Civ. App. 1968)).

### D. The Class Action Waiver is Enforceable Under Pennsylvania and Texas Law

In light of the above authority, and because there are no genuine disputes of material fact between the parties as to the interpretation of the class action waiver, and the factual circumstances related thereto, the Court finds as a matter of law that the class action waiver is enforceable under both Pennsylvania and Texas law.[6] Accordingly, summary judgment will be entered in Defendant's favor and against Plaintiff on this issue. The Court's analysis of the enforceability of the class action waiver follows.

*6 Review of the circumstances surrounding execution of the Agreement illustrates that the Agreement was not a contract of adhesion, and Plaintiff did not lack any meaningful choice in entering into the Agreement. Therefore, the Agreement is not procedurally unconscionable. First, Plaintiff was not required to enter into the Agreement at the beginning of his employment; instead, Plaintiff was provided with the Agreement on or about September 25, 2015, his last day of employment. (Docket No. 55-1 at 11). As such, Plaintiff was not presented with a take-it-or-leave it contract at the beginning of his relationship with Defendant, as were plaintiffs in *Thibodeau*, discussed *infra*. Second, the Agreement contains a revocation provision, which permitted Plaintiff to revoke the Agreement for a period of seven (7) calendar days following the execution of the Agreement. (Docket No. 55-1 at ¶ 4). The Agreement was not to become effective until the revocation period had expired. *Id.* Third, the Agreement contains a notice advising that Plaintiff had forty-five (45) days to consider the Agreement and to consult with an attorney prior to execution of the Agreement. (Docket No. 55-1 at 8). All three of these factors persuade the Court that the contract was not a contract of adhesion because Plaintiff did not lack any meaningful choice in entering into the Agreement. Under its terms there is no "oppression" of or "unfair surprise" to Plaintiff. Plaintiff was given ample time to review the Agreement, familiarize himself with its terms, and

was even encouraged in writing to consult with an attorney before signing and returning the Agreement. The Court notes that Plaintiff did in fact consult with counsel after receipt of and prior to execution of the Agreement.[7] (Docket No. 25 at 7).

With regards to substantive unconscionability, this Court finds no evidence that the terms of the Agreement were unreasonably or grossly favorable to Defendant. In return for entering into the Agreement containing the class action waiver, Plaintiff was to receive: a lump sum payment; three (3) months of COBRA payments; and outplacement counseling, compensation and benefits to which Plaintiff was not previously entitled. (Docket No. 55-1 at ¶ 2). As the Court declines to opine on the validity of Plaintiff's waiver of his state law claims at this time, Plaintiff does not lose any statutory right to pursue his damages under the FLSA, the PMWA, or the Ohio Acts by virtue of the class action waiver. These statutes provide for attorneys' fees to the prevailing party in related litigation and therefore, the costs of proceeding individually will not effectively deny redress. Additionally, the First Amended Complaint asserts that Plaintiff's individual damages exceed $75,000.00, which is a far-cry from the small amount at issue for each individual plaintiff in *Thibodeau*. (Docket No. 59 at ¶ 3). In sum, the Agreement is not substantively unconscionable.

Plaintiff's main argument in opposition to the class action waiver is that "Pennsylvania's Supreme Court has consistently held that class action waivers are unenforceable under circumstances like this one." (Docket No. 65 at 1) (citing *Thibodeau v. Comcast Corp.*, 912 A.2d 874, 884 (Pa. Super. 2006)). Plaintiff contends that where "the cost of lawyers, fees, and expert witnesses makes [an] individual lawsuit ... completely impractical[,]" a class action waiver will not be enforced. *Id.* Defendant counters that *Thibodeau* does not undermine the provision in the present Agreement. (Docket No. 54 at 7-9). This Court agrees.

Plaintiff's reliance on the non-binding decision in *Thibodeau* is unpersuasive as the facts underlying that decision are readily distinguishable from the instant case. *See Thibodeau*, 912 A.2d 874. Additionally, as is more fully discussed below, a more recent decision, *Korea Week Inc. v. Got Capital, LLC*, upheld a class action waiver in a contract between the parties that did not include a corresponding arbitration provision, akin to the Agreement here. 2016 WL 3049490 (E.D. Pa. May 27, 2016). The Court turns first to its analysis of *Thibodeau*.

Case 3:22-cv-02077-MEM   Document 13-2   Filed 03/20/23   Page 54 of 102

Kubischta v. Schlumberger Tech Corp, Not Reported in Fed. Supp. (2016)

2016 WL 3752917, 2016 Wage & Hour Cas.2d (BNA) 226,672

In *Thibodeau*, plaintiff and other cable subscribers were mailed a customer agreement containing terms unilaterally imposed by Comcast following its buyout of their previous cable provider. *Thibodeau*, 912 A.2d at 876. The agreement mandated individual arbitration and precluded class actions by aggrieved customers. *Id.* at 876-77. Thibodeau filed suit on behalf of a putative class of Comcast customers, averring they had been improperly billed. *Id.* at 877. The court found that the subject agreements were contracts of adhesion, as customers had no opportunity to negotiate or assent to the mandated individual arbitration and preclusion of class action litigation provisions, and customers were forced to accept every word of the agreement or be without cable television. *Id.* at 885. As the allegedly unlawful charge was only $9.60 per month, Thibodeau and his class members were claiming minimal damages. *Id.* The court in *Thibodeau* found that such claims would never be arbitrated on an individual basis, as no individual would expend the time, fees, costs and other expenses necessary for individual litigation or individual arbitration. *Id.* at 885-86. Thus, *Thibodeau* appears to stand for the proposition that "if the costs associated with arbitrating a single claim effectively deny consumer redress, prohibiting class action litigation or class action arbitration is unconscionable." *Id.* at 883.

**\*7** As Defendant cites in its submissions, courts have refused to follow *Thibodeau* in relation to employment agreements that include both an arbitration provision and a class action waiver. (Docket No. 54 at 7). In *Brown v. Trueblue, Inc.*, the U.S. District Court for the Middle District of Pennsylvania upheld employment agreements including arbitration and waiver of jury clauses, as well as provisions requiring pursuit of any relief individually, rather than on a class basis. *Brown v. Trueblue, Inc.*, 2012 WL 1268644 (M.D. Pa. Apr. 16, 2012). In doing so, the court noted that it had relied on *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) in granting defendants' motion to compel arbitration, which held that state rules requiring the availability of classwide arbitration were preempted by the Federal Arbitration Act. *Id.* at \*7. The court also found that *Thibodeau* was no longer good law. *Id.*

Plaintiff concedes that no court considering the Pennsylvania Superior Court's ruling in *Thibodeau* has held that class action waivers *outside of the arbitration context* are *per se* unenforceable, yet maintains that his class action waiver is unconscionable under Pennsylvania law. (Docket No. 65 at 8). Plaintiff cites to a decision of the Sixth Circuit Court of Appeals, *Killion v. KeHE Distributors, LLC. Killion v.*

*KeHE Distributors, LLC*, 761 F.3d 574 (6th Cir. 2014), *cert denied*, 135 S.Ct. 1745 (2015). In *Killion*, the Sixth Circuit Court of Appeals found that a class action waiver in the absence of an arbitration provision was unenforceable because, without an arbitration clause, the waiver offered no countervailing federal policy to outweigh the FLSA's policy allowing employees to bring actions to recover unpaid overtime pay on behalf of themselves and other employees similarly situated. *Id.* Applying that logic here, Plaintiff suggests that the absence of countervailing federal policy renders the class action waiver unconscionable. (Docket No. 65 at 8, 9).

This Court is not persuaded by the reasoning of the Sixth Circuit Court of Appeals in *Killion*. Instead, the Court looks to *Korea Week*, where the U.S. District Court for the Eastern District of Pennsylvania found class action waivers outside of an arbitration agreement to be enforceable, thereby rendering plaintiffs inadequate class representatives. 2016 WL 3049490 (E.D. Pa. May 27, 2016). There, the plaintiffs had entered into merchant cash advance financing arrangements with defendants which allegedly violated the Racketeer Influenced Corrupt Organizations Act ("RICO"). *Id.* at \*1. Plaintiffs brought suit on behalf of a putative class of small businesses that had obtained similar financing arrangements. *Id.* at \*2. Each of the plaintiffs' arrangements with defendants included a class action waiver. *Id.* at \*2-4. In ruling that these waivers prohibited plaintiffs from serving as adequate class representatives, the court rejected plaintiffs' arguments that class action waivers outside of an arbitration clause are substantively unconscionable. *Id.* at \*8-10. The court found the Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant*, 133 S.Ct. 2304 (2013) supported its conclusion that class action waivers outside of arbitration are enforceable. *Id.* at \*9. In reaching this decision, the court found that the class action waivers were enforceable, as they were not unconscionable under the applicable state law, nor was there evidence of "legislative intent or policy reasons weighing against enforcement" of the waivers. *Id.* at \*10. The *Korea Week* plaintiffs' motion for class certification was denied. *Id.* at 11.

As the court in *Korea Week* was unable to find any legislative intent in RICO weighing against the enforcement of the class action waiver, this Court is unable to locate any "legislative intent or policy reasons weighing against enforcement" of the class action waiver as to the wage and hour claims brought pursuant to the PMWA and the Ohio Acts. Plaintiff maintains that "Pennsylvania state law governs the enforceability of

Kubischta v. Schlumberger Tech Corp, Not Reported in Fed. Supp. (2016)

2016 WL 3752917, 2016 Wage & Hour Cas.2d (BNA) 226,672

contracts related to rights created under Pennsylvania state law," (Docket No. 65 at 5), but cites to no statutory provisions or case law prohibiting class action waivers in the context of the PMWA and Ohio Acts' claims. As this Court finds the class action waiver is not unconscionable under Pennsylvania law, and there is no evidence of legislative intent under the PMWA or the Ohio Acts to prohibit the class action waiver, this Court will follow the ruling in *Korea Week* and enforce the class action waiver.

**\*8** Any argument by Plaintiff that the class action waiver contained within the Agreement is unenforceable under Texas law fails as well. Texas courts have expressly held that class action waivers are permissible and are not *per se* unconscionable. See *AutoNation USA Corp. v. Leroy*, 105 S.W.3d 190 (Tex. App. 2003) (finding that class actions are procedural devices, and "may 'not be construed to enlarge or diminish any substantive rights or obligations of any parties to any civil action.' " (citation omitted)). Federal courts in Texas also have held that class action waivers may be enforceable under both Texas and federal law. *See, e.g., Carter v. Countrywide Credit Industries, Inc.*, 362 F.3d 294 (5th Cir. 2004) (rejecting appellants' claim that their inability to proceed collectively deprived them of substantive rights available under the FLSA); *In re Online Travel Co. (OTC) Hotel*, 953 F. Supp. 2d 713, 721-22 (N.D. Tex. 2013) (antitrust case finding class arbitration waiver was enforceable, even if high fees for expert witnesses would make individual arbitration economically irrational). Consequently, this Court holds that the class action waiver is not unconscionable under Texas law for the same reasons that the waiver is not unconscionable under Pennsylvania law.

**V. Conclusion**

Plaintiff seeks to be appointed as a class representative even though he agreed to waive "participation, to the extent permitted by law, in any class or collective action, as either a class or collective action representative or participant as to those claims not released, by signing this Agreement prior to the conditional certification of a class or collective action." (Docket No. 55-1 at ¶ 5). Despite consulting with counsel regarding potential state law claims following the receipt of the Agreement, and prior to its execution, Plaintiff now seeks to void the class action waiver as unconscionable. As set forth above, Plaintiff has not shown procedural nor substantive unconscionability of the waiver provision under Pennsylvania or Texas law. Hence, summary judgment is entered against Plaintiff as to any class action claims he has asserted. The case may proceed in this Court as to Plaintiff's individual claims upon his filing of a Second Amended Complaint. An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3752917, 2016 Wage & Hour Cas.2d (BNA) 226,672

**Footnotes**

1    The Agreement, under "General Release of Claims," explicitly disclaims waiver of any claims under the FLSA that Plaintiff may have. (Docket No. 55-1 at ¶ 5).

2    Although the original Complaint states that "[t]his Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the FLSA," (Docket No. 1 at ¶ 3), it did not contain any count asserting a FLSA claim.

3    Plaintiff also submitted the opt-in form in the FLSA collective action in the Western District of Louisiana ten (10) days after signing the agreement, although his opt-in was later withdrawn with the consent of that Court. (*See* Docket No. 30).

4    Because Pennsylvania courts generally honor the intent of the contracting parties and enforce choice-of-law provisions in contracts, the Court need not address the unconscionability of the waiver under Ohio law. In any event, as Defendant argues, the waiver is not unconscionable under Ohio law. (*See* Docket No. 45 at 14-16). At oral argument, Plaintiff's counsel suggested that the Ohio constitution was amended to prohibit

such clauses to which the Court directed counsel to provide such authority in the supplemental briefing. (Docket No. 46). However, Plaintiff has failed to support this argument and does not even address it in the many subsequently filed briefs related to this matter. (Docket Nos. 55, 65, 79).

5    The Court notes that "unconscionability is a question of law for the court" to decide. *Stanley A. Klopp, Inc. v. John Deere Co.,* 510 F. Supp. 807, 810 (E.D. Pa. 1981).

6    Despite the Court's Order of April 26, 2016 that the parties submit supplemental briefing on the Agreement under Texas law, (Docket No. 71), Plaintiff failed to address class action waivers under Texas law. The supplemental briefing provided by Defendant, (Docket No. 80), as well as the Court's independent research, indicates that the class action waiver is not unconscionable and is enforceable under Texas law.

7    "Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains." *Simeone v. Simeone,* 525 Pa. 392 (1990).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

8

Lloyd v. Retail Equation, Inc., Slip Copy (2022)

2022 WL 18024204

2022 WL 18024204
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

LLOYD, et al., Plaintiffs,

v.

The RETAIL EQUATION, INC., et al., Defendants.

Civil No. 21-17057
|
Signed December 29, 2022

**Attorneys and Law Firms**

Bradley Keith King, Ahdoot & Wolfson, PC, Burbank, CA, for Plaintiffs.

Stephen Steinlight, Troutman Pepper Hamilton Sanders LLP, Tyler Baker, Sheppard Mullin Richter & Hampton LLP, New York, NY, Mark Albert Fiore, Morgan, Lewis & Bockius LLP, Princeton, NJ, for Defendants.

**OPINION**

Joseph H. Rodriguez, United States District Judge

**\*1** Presently before the Court is the motion by defendant TJX Companies, Inc. seeking an order (i) compelling arbitration of all claims asserted by plaintiff Carol Lloyd, individually and on behalf of a putative class, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., and (ii) dismissing without prejudice Counts One, Three and Five in the Complaint asserted by plaintiff Carol Lloyd or, in the alternative, staying these causes of action and claims [Dkt. 15]. The Court is in receipt of the opposition filed by plaintiff Carol Lloyd [Dkt. 22] as well as the reply of TJX Companies, Inc. [Dkt. 27]. For the reasons set forth herein, the motion will be granted in part and denied in part.

**I. Background**
This matter is a putative class action concerning the alleged unlawful collection of consumer data and its use in approving or denying consumers returns or exchanges at certain retail stores. Plaintiff Carol Lloyd ("Lloyd"), on behalf of herself and the putative class(es) she seeks to represent, initiated this suit on September 16, 2021 against defendants The Retail Equation, Inc. ("TRE") and The TJX Companies, Inc. ("TJX") (among other defendants).

Lloyd is a New Jersey resident who purchased merchandise from TJX through the TJ Maxx [1] website (the "Website") on April 6, 2019, May 21, 2019, July 31, 2020, November 11, 2020, May 20, 2021, and October 21, 2021. *Mot.* at \*5. On or about May 9, 2019, Lloyd attempted a return or exchange of certain of the previously purchased merchandise at a TJ Maxx retail store. *Compl.* ¶ 35, [Dkt. 1] ("Complaint"). At the time of the attempted return or exchange, the sales associate allegedly "communicated to [Lloyd] ... that the return or exchange was flagged as potentially fraudulent and that future attempts by [Lloyd] ... to return or exchange merchandise without a receipt would be declined based upon the recommendation of TRE ..." *Id.* ¶¶ 43-44.

TRE is a corporate defendant named in this action but not a party to this instant motion whom TJX contracted with in an effort to combat retail fraud. TRE provides a "software-as-a-service" that uses statistical modeling and analytics to detect fraudulent behavior when returns are processed at a retailer's return counter. *Compl.* ¶¶ 15, 28. Using its patented software, TRE generates "risk scores" for individual customers attempting to return or exchange items and makes recommendations to the Retail Defendants about whether to approve or deny the processing of same. *Id.* ¶¶ 14, 28. These risk scores are calculated with a mix of data collected by retailers, both Consumer Commercial Activity Data and Consumer ID Data. *Id.* ¶ 2. Consumer Commercial Activity Data includes purchase and return history as well as the contents, method, and frequency of consumer purchases. *Id.* ¶ 18 Consumer ID Data contains information available on various forms of identification and includes "name, date of birth, race, sex, photograph, complete street address, and zip code." *Id.* ¶ 19.

**\*2** Lloyd alleges she was harmed by: (a) the sharing of her Consumer Commercial Activity Data and Consumer ID Data by TJX; (b) the receipt of her Consumer Commercial Activity Data and Consumer ID by TRE; and (c) the use of her Consumer Commercial Activity and Consumer ID Data. *Id.* ¶ 19. Lloyd claims that as a result of these practices, she is prevented from making future returns or exchanges without a receipt. *Id.* ¶ 45. The Complaint pleads the following causes of action against TJX stemming from the alleged conduct: invasion of privacy (Count One); violation of the New Jersey Consumer Fraud Act N.J. Stat. Ann. § 56:8-1, et seq. ("NJCFA") (Count Three); and, unjust enrichment (Count Five). *See* Dkt. 1.

On January 28, 2022, TJX filed the instant motion to compel Lloyd's claims to arbitration on the asserted basis that "she agreed to arbitrate all disputes with TJX – including any dispute related to TJX's collection, use, or transmission of customer information." *Mot.* at *1. In support of the motion, TJX introduces a declaration made on the personal knowledge of Caitlin Kobelski, Vice President, Digital Experience and Site Operations ("Kobelski"), containing exhibits purporting to be screenshots showing the "checkout flow" process "as it would have appeared to Lloyd[.]" *Kobelski Decl.* ¶ 3, Exhibit B. TJX maintains that Lloyd agreed to arbitrate any dispute with TJX each time she made a purchase through TJX's TJ Maxx website by clicking an icon displaying the words "PLACE ORDER" appearing on the final page of the Website's "checkout flow" process. The screenshot shows the "PLACE ORDER" icon displayed directly below a notice appearing in black font against a white background and comparatively smaller in size. The notice provides that "By placing your order, you agree to the T.J. Maxx terms of use[.]" The underlined phrase "terms of use" was a hyperlink that, when selected, caused the Terms Of Use ("TOU") to appear in a new browser window.

TJX also introduces copies of the TOU as it would have appeared on various dates corresponding to Lloyd's purchases. *Kobelski Decl.* ¶¶ 4-7, Exhibits C, D, E, F. Since at least January 2019, the TOU have provided, in relevant part

> Arbitration Agreement & Waiver Of Certain Rights You and the TJX Businesses agree that we will resolve any disputes between us through binding and final arbitration instead of through court proceedings. You and the TJX Businesses hereby waive any right to a jury trial of any Claim. All controversies, claims, counterclaims, or other disputes arising between you and the TJX Businesses relating to these Terms or the Website (each a "Claim") shall be submitted for binding arbitration in accordance with the Rules of the American Arbitration Association ("AAA Rules"). The arbitration will be heard and determined by a single arbitrator. The arbitrator's decision in any such arbitration will be final and binding upon the parties and may be enforced in any court of competent jurisdiction

> * * *

> Neither you nor the TJX Businesses may act as a class representative or private attorney general, nor participate as a member of a class of claimants, with respect to any Claim. Claims may not be arbitrated on a class or representative

> basis. The arbitrator can decide only your and/or the TJX Businesses' individual Claims. The arbitrator may not consolidate or join the claims of other persons or parties who may be similarly situated.

> * * *

> THIS SECTION LIMITS CERTAIN RIGHTS, INCLUDING THE RIGHT TO MAINTAIN A COURT ACTION, THE RIGHT TO A JURY TRIAL, THE RIGHT TO PARTICIPATE IN ANY FORM OF CLASS OR REPRESENTATIVE CLAIM, THE RIGHT TO ENGAGE IN DISCOVERY EXCEPT AS PROVIDED IN AAA RULES, AND THE RIGHT TO CERTAIN REMEDIES AND FORMS OF RELIEF. OTHER RIGHTS THAT YOU OR THE TJX BUSINESSES WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

**\*3** *Id.*

In the same location on the "checkout flow" interface where the hyperlink to the TOU appear, the website presents a separate hyperlink to its Privacy Policy, which the TOU purport to "incorporate[ ] ... by reference[.]" *Id.* The Privacy Policy addresses

> 1. the information TJX "may collect ... from [a consumer] in connection with [his or her] activities at T.J. Maxx, such as when [the consumer] shop[s] on [its] websites or in [its] stores;

> 2. how TJX uses the information it collects from consumers including, inter alia, to (a) "[p]rocess, manage, complete and account for transactions, including purchases and refund, exchange and layaway requests," (b) "[p]rovide [its] products and services to [consumers] and fulfill [their] orders," (c) "[v]erify [a consumer's] identity in certain instances (such as when [the consumer] pay[s] by check, return[s] merchandise, or request[s] a refund)," and (d) "[s]ecure [its] operations and protect against, identify and help prevent fraud, unauthorized activity, claims and other liabilities and minimize credit risk"; and

> 3. how and with whom TJX may share consumer information including "with partners or third parties who perform services for [TJX] or with [TJX] contract[s] for the purposes described in th[e] Privacy Notice."

> *Id.*

Lloyd v. Retail Equation, Inc., Slip Copy (2022)

2022 WL 18024204

In opposition to the motion, Lloyd argues that when she made her purchases TJX failed to provide adequate notice that she would be contractually bound to the TOU by making those purchases and, therefore, she could not have assented to the TOU. *Opp.* at *1. Further, Lloyd contends that when she made her purchases, she was not informed that the TOU to which she was purportedly agreeing included a mandatory arbitration provision and her waiver of her right to a jury trial in the event of a dispute, and thus she never entered into an agreement to arbitrate. *Id.* Finally, Lloyd submits that the Kobelski declaration and the exhibits thereto are inaccurate and contain inconsistencies rendering them unreliable and inadmissible. *Id.*

## II. Legal Standard

The Federal Arbitration Agreement ("FAA") "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983); *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 179 (3d Cir. 1999). Section 2 of the FAA provides that "[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The "saving clause" in Section 2 indicates that the purpose of Congress "was to make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967). Under Section 3 of the FAA, a party may apply to a federal court for a stay of the trial of an action "upon any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. Section 4 of the FAA directs courts to compel parties to arbitration so long as "the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. As such, under these provisions a federal court may compel arbitration if one party has failed to comply with an agreement to arbitrate and stay proceedings in any matter subject to arbitration. *Romanov v. Microsoft Corp.*, No. CV 21-03564, 2021 WL 3486938, at *3 (D.N.J. Aug. 9, 2021).

*\*4* On a motion to compel arbitration, the Court must determine: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the dispute at issue falls within the scope of the arbitration agreement. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 522-23 (3d Cir. 2009). If the response is affirmative

on both counts, the FAA requires the court to enforce the arbitration agreement in accordance with its terms. *LoMonico v. Foulke Mgmt. Corp.*, No. CV1811511, 2020 WL 831134, at *3 (D.N.J. Feb. 20, 2020); *see also* 9 U.S.C. § 4. "It is well established that the [FAA] reflects a 'strong federal policy in favor of the resolution of disputes through arbitration.' " *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (quoting *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003)). "But this presumption in favor of arbitration 'does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.' " *Id.* (quoting *Fleetwood Enters. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)); *see also Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 n.3 (3d Cir. 2014) (the presumption in favor of arbitrability "applies only when interpreting the scope of an arbitration agreement, and not when deciding whether a valid agreement exists."); *Jaludi v. Citigroup*, 933 F.3d 246, 255 (3d Cir. 2019) ("The presumption of arbitrability enters at the second step—it applies to disputes about the scope of an existing arbitration clause.").

To determine whether the parties have agreed to arbitrate, courts apply "ordinary state-law principles that govern the formation of contracts." *Century Indem. Co.*, 584 F.3d at 524; *see also Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 289 (3d Cir. 2017). When "applying the relevant state contract law, a court may also hold that an agreement to arbitrate is unenforceable based on a generally applicable contractual defense, such as unconscionability." *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 276 (3d Cir. 2004) (internal citations and quotations omitted).

The Third Circuit has established a two-tiered framework for assessing motions to compel arbitration. *See Guidotti v. Legal Helpers Debt Resolution*, L.L.C., 716 F.3d 764, 776 (3d Cir. 2013). Where it is apparent on the face of the complaint, or in documents relied upon in the complaint, that the claims at issue in the case are subject to arbitration, the case is considered pursuant to the motion to dismiss standard as applied under Fed. R. Civ. P. 12(b)(6). *Id.* at 774–76. However, where the complaint does not establish on its face that the parties have agreed to arbitrate, or where the party opposing arbitration has come forward with reliable evidence that it did not intend to be bound by an arbitration agreement, then the parties are entitled to limited discovery on the question of arbitrability before a renewed motion to compel arbitration is decided on a summary judgment standard as under Fed. R. Civ. P. 56. *Id.*

Lloyd v. Retail Equation, Inc., Slip Copy (2022)

2022 WL 18024204

In sum, "the legal standard is simply that [courts] apply the relevant state contract law to questions of arbitrability, which may be decided as a matter of law only if there is no genuine issue of material fact when viewing the facts in the light most favorable to the nonmoving party." *Aliments Krispy Kernels, Inc.*, 851 F.3d at 288–89 (3d Cir. 2017).

### III. Discussion

#### a. Choice of Law

The FAA "reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Accordingly, "courts should generally look to the relevant state contract law to determine whether a valid agreement to arbitrate exists." *Aliments Krispy Kernels, Inc.*, 851 F.3d at 288.

"In a diversity case filed in New Jersey, New Jersey choice of law rules govern." *See Lebegern v. Forman*, 471 F.3d 424, 428 (3d Cir. 2006); see also Aliments Krispy Kernels, Inc., 851 F.3d at 289. New Jersey uses the most-significant-relationship test, which consists of two prongs. *Maniscalco v. Brother Int'l Corp.* (USA), 793 F. Supp. 2d 696, 704 (D.N.J. 2011), aff'd sub nom. *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202 (3d Cir. 2013). First, the court must determine whether a conflict actually exists between the potentially applicable laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143, 962 A.2d 453 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). "If no conflict exists, the law of the forum state applies." *Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011) (citing *P.V.*, 197 N.J. at 143, 962 A.2d 453). If the difference between the substantive laws presents a nonexistent or "false conflict," wherein "the laws of the ... jurisdictions would produce the same result on the particular issue presented," the forum state's law will govern. *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997). When a conflict exists, the court moves to the second prong, which requires determining "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws. *P.V.*, 197 N.J. at 143, 962 A.2d 453.

**\*5** Here, the parties concede that the states with relationships to this action apply the same legal standard regarding formation. *See Reply* at \*3 n.2 ("Massachusetts, Delaware,

and New Jersey apply the same standard for determining if an online agreement exists."); *Opp.* at \*14 ("New Jersey, Massachusetts, and Delaware all apply the same standards[.]"). Lloyd and TJX both agree that under New Jersey, Massachusetts, and Delaware law, online agreements are enforceable if there exists: (1) reasonable notice of the terms; and (2) manifestation of assent to those terms. *See, e.g., Mucciariello v. Viator, Inc.*, No. 18-cv-14444, 2019 WL 4727896, at \*7 (D.N.J. Sept. 27, 2019) (finding online agreement binding under New Jersey law where there was reasonable notice and manifestation of assent); *Holdbrook Pediatric Dental, LLC v. Pro Computer Serv., LLC*, No. 14-cv-6115, 2015 WL 4476017, at \*4 (D.N.J. July 21, 2015) (finding that for party to be bound by online agreement under New Jersey law it "must have had reasonable notice of and manifested assent to the ... terms"); *Tantillo v. CitiFinancial Retail Servs., Inc.*, No. 12-cv-511, 2013 WL 622147, at \*7 (D.N.J. Feb. 19, 2013) ("Delaware law concerning the formation and validity of arbitration agreements accords with New Jersey law"); *Kauders v. Uber Techs., Inc.*, 486 Mass. 557, 572, 159 N.E.3d 1033, 1049 (2021) (finding online agreement enforceable under Massachusetts law if there was "reasonable notice of the terms" and "reasonable manifestation of assent to those terms ..."); *Newell Rubbermaid Inc. v. Storm*, No. CV 9398-VCN, 2014 WL 1266827, at \*6 (Del. Ch. Mar. 27, 2014) (online "contract formation" under Delaware law requires "reasonable notice, either actual or constructive, of the terms of the putative agreement and ... manifest[ation of] assent to those terms").

Because the law of the states having interests in this matter accord, the Court will resolve the motion without making a choice of law determination and will apply the law of New Jersey, the forum state. *See Tantillo*, No. CIV.A. 12-511, 2013 WL 622147, at \*7 (D.N.J. Feb. 19, 2013).

#### b. Formation of Web-Based Agreements

As discussed, for a contract to be binding under New Jersey law each party must have "reasonable notice" of and "mutually agreed" upon the contract term. *Hoffman v. Supplements Togo Mgmt., LLC*, 419 N.J. Super. 596, 606-08 18 A.3d 210, 216 (App. Div. 2011); *see also Bacon v. Avis Budget Grp.*, Inc., 959 F.3d 590, 602 (3d Cir. 2020).

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). "Courts around the country

have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract," and "[t]here is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016).

Web-based agreements are often distinguished as "clickwrap" or "browsewrap" agreements. *Mucciariello*, 2019 WL 4727896, at *3. Clickwrap agreements require a user to "consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction." *Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 236 (E.D.Pa. 2007). Browsewrap agreements are typically presented in a hyperlink on the bottom of the homepage of a website and purport to bind users to the terms by virtue of simply visiting or "browsing" the site. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014); *see also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) ("in a pure-form browsewrap agreement, the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service." (internal citation and quotations omitted).

Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking "I agree." *See Fteja*, 841 F.Supp.2d at 837 (collecting cases). Unlike clickwrap agreements, "where users must click on an acceptance after being presented with terms and conditions ... browsewrap agreements do not require users to expressly manifest assent." *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 331 (W.D. Pa. 2020). Thus, browsewrap agreements are not automatically deemed valid where it is not shown that the user had *actual* notice of the agreement. *Nguyen*, 763 F.3d at 1176–77 (9th Cir. 2014) (emphasis added). As the Third Circuit has explained, "[t]here is an evolving body of caselaw regarding whether the terms and conditions in browsewrap agreements are enforceable, often turning on whether the terms or a hyperlink to the terms are reasonably conspicuous on the webpage." *James v. Glob. TelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017); *see also Hoffman*, 419 N.J. Super. at 608, 611, 18 A.3d 210 (assessing the enforceability of a forum selection clause in an internet website on the basis of "fundamental standards of reasonable notice," which involves examining "the style or mode of presentation, or the placement of the provision"). In other words, when evaluating whether a plaintiff assented to the terms of a web-based contract, courts look to the "design and content of the relevant interface" to determine if the contract terms were presented to the offeree in a way that would put it on inquiry notice of such terms. *Aminoff & Co. LLC v. Parcel Pro, Inc.*, No. 21CV10377, 2022 WL 987665, at *3 (S.D.N.Y. Apr. 1, 2022). "When terms are linked in obscure sections of a webpage that users are unlikely to see, courts have refused to find constructive notice." *James*, 852 F.3d at 267. However, "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements." *Id.* quoting *Nguyen*, 763 F.3d at 1177 (internal quotations omitted).

**\*6** Here, Lloyd contends that the TOU represent a browsewrap agreement. *Opp.* at *19. TJX maintains that the agreement was neither a clickwrap nor a browsewrap agreement but rather something of a hybrid of the two. *Mot.* at *16-17. A purchaser using the TJ Maxx website's checkout process was not required to click an "I agree" dialogue box upon being presented with the hyperlink to the Terms of Use. Nor was a purchaser simply left to "browse" the page or told he or she has assented to the TOU by simply passively viewing one screen. Instead, a notice was presented on the final page of the checkout flow process indicating that by taking the action of clicking "Submit Order" the purchaser was assenting to the hyperlinked Terms of Use. Thus, for purposes of this motion, the Court finds that the agreement represented a hybrid between the clickwrap and browsewrap varieties.[2] In making this finding, the Court does not opine on the sufficiency of hybrid or modified or hybrid browsewap/ clickwrap agreements generally. Regardless of the precise label given, though, the pertinent inquiry is whether the user was provided with reasonable notice of the applicable terms, based on the design and layout of the website. *See Hoffman*, 419 N.J. Super. at 611, 18 A.3d 210.

### c. Existence of a Valid Agreement to Arbitrate

Lloyd contests the existence of a valid agreement to arbitrate, arguing that TJX did not provide adequate notice of its terms and conditions when Lloyd made her purchases and that she did not assent to the arbitration provision.

### i. Applicable Legal Standard and Factual Disputes

"To determine whether there is a valid agreement to arbitrate ... [courts] must initially decide whether the

*Lloyd v. Retail Equation, Inc.*, Slip Copy (2022)

2022 WL 18024204

determination is made under Fed. R. Civ. P. 12(b)(6) or 56" and thus, what materials may be considered. *Sanford v. Bracewell & Guiliani, LLP*, 618 F. App'x 114, 117 (3d Cir. 2015).

The Third Circuit has held that a motion to compel arbitration will be reviewed under the Rule 12(b)(6) standard "when it is apparent, 'based on the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause ...' " *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F.Supp.2d 474, 481 (E.D.Pa. 2011); *see also MZM Construction Co., Inc. v. N.J. Building Laborers Statewide Benefits Fund*, Nos. 18-3791 & 19-3102, 2020 WL 5509703, at *14 (3d Cir. Sept. 14, 2020). Conversely, the Rule 56 standard will apply "when either the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to establish on its face that the parties agreed to arbitrate," or when "the opposing party has come forth with reliable evidence that is more than a naked assertion ... that it did not intend to be bound by the arbitration agreement[.]" *Guidotti*, 716 F.3d at 774 (internal citations and quotations omitted). Stated differently, *Guidotti* provides two pathways to reach summary judgment on the issue of arbitrability: either the parties' agreement to arbitrate the dispute is not clear on the face of the complaint (or incorporated documents), or the non-movant comes forward with additional facts that put an otherwise facially-apparent agreement to arbitrate at issue. *Horton v. FedChoice Fed. Credit Union*, 688 F. App'x 153, 156 (3d Cir. 2017).

**\*7** While "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" in deciding a motion to dismiss, *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), "an exception to the general rule is that a document integral to or explicitly relied upon in the complaint' may be considered without converting the motion into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citation and quotations omitted); *see also In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426.* "[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426. Further, "[w]hen the merit, or lack thereof, in the affirmative defense of arbitrability can be discerned from the face of a complaint or

documents that the complaint relies on, a motion to compel arbitration can be resolved under the same kind of standard applicable to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Noble v. Samsung Elecs. Am., Inc.*, 682 F. App'x 113, 115 (3d Cir. 2017).

TJX advocates for the application of Rule 56. On the other hand, Lloyd does not state a position as to which standard —Rule 12(b)(6) or Rule 56—is proper here. The Court finds this motion is appropriately governed under the Rule 12(b)(6) standard.

Here, the arbitration agreement (and the TOU in which it appears) is not attached to, affirmatively incorporated into, or specifically mentioned in the Complaint. [3] Nevertheless, the practices of TJX concerning the return of the purchased merchandise and its use of customer information are foundational to Lloyd's allegations. The TOU containing the agreement to arbitrate at issue incorporates by reference a Privacy Policy specifically addressing the collection and use of personal customer information – the conduct at the crux of this matter. Among other claims, Lloyd alleges in the Complaint that TJX acted unlawfully in violation of the NJCFA when it "intended to mislead consumers and induce them to rely on their misrepresentations and omissions, and Plaintiffs and Class Members did rely on their misrepresentations and omissions relating to their use, sharing, and security of their data, and the return and/ or exchange process." *Compl.* ¶ 103. Lloyd's theory of liability therefore necessarily implicates these provisions incorporated in the TOU, and the TOU contains the subject arbitration agreement. These circumstances weigh decidedly in favor of applying the standard under Rule 12(b)(6). Moreover, Lloyd has not produced any affidavits denying having received, viewed, understood or assented to the TOU containing the arbitration agreement. *See, e.g., Sorathia v. Fidato Partners*, 2020 WL 5121473, at *3 (E.D. Pa. Aug. 31, 2020) (applying the Rule 12(b)(6) standard where defendants attached agreement containing arbitration clause to the motion to compel arbitration, plaintiff did not dispute receiving it, and "the crux of the dispute between the parties center[ed] on the scope and enforceability of that arbitration agreement."). Under the circumstances where these matters have not been contested with evidence, Lloyd has not placed the issue of arbitrability sufficiently at issue to trigger the Rule 56 standard by simply challenging the *validity* of the agreement to arbitrate. Indeed, "that interpretation would render the Rule 12(b)(6) standard a nullity; if a party has filed a motion to compel arbitration, then the other party

necessarily questioned arbitrability." *Silfee v. Automatic Data Processing, Inc.*, 696 F. App'x 576, 578 (3d Cir. 2017); *see also Benedict v. Guess, Inc.*, No. 5:20-CV-4545, 2021 WL 37619, at \*4 (E.D. Pa. Jan. 5, 2021) ("The purposes of the Act would be frustrated if plaintiffs could avoid having their claims quickly compelled to arbitration simply by failing to mention the existence of clearly applicable arbitration agreements in their complaints.") (internal citation and quotations omitted).

**\*8** Turning then to the second *Guidotti* scenario, the Court considers whether Lloyd has come forward with enough evidence to put the question of arbitrability at issue in light of the record. *See Horton v. FedChoice Fed. Credit Union*, 688 F. App'x 153, 156 (3d Cir. 2017). In opposition to the motion, Lloyd challenges the admissibility and sufficiency of the screenshots depicting the "checkout flow" process and the TOU as well related statements introduced in the Kobeski declaration made by TJX's Vice President of Digital Experience and Site Operations.

As an initial matter, the Court recognizes that the appearance and presentation of the "checkout flow" process and the TOU bear on the question of whether Lloyd had notice of and properly assented to the terms of use. *See Hite v. Lush Internet Inc.*, 244 F.Supp.3d 444, 451 (D.N.J. 2017) (examining whether a website gave reasonable notice of the terms of use and recognizing that New Jersey courts apply a reasonable notice standard to the manner in which contract terms are displayed in determining whether they are enforceable, including looking to the style or mode of presentation, and the placement of the provision); *see also Stacy v. Tata Consultancy Servs., Ltd.*, No. CV1813243, 2019 WL 1233081, at \*6 (D.N.J. Mar. 14, 2019). If Lloyd was not given reasonable notice of the TOU, then she could not have assented to them and thus would not be bound by any arbitration provision found therein. It follows that if the evidence presented by TJX concerning the checkout flow process or the TOU is inadmissible or otherwise insufficient, the Court may lack a proper basis to find there was a valid agreement to arbitrate. Each of the asserted factual disputes are addressed, in turn.

First, Lloyd challenges the admissibility and sufficiency of the screenshots depicting the "checkout flow" process. Because the screenshots of the "checkout flow" process were printed on January 10, 2022, Lloyd challenges whether they accurately reflect the process as it would have appeared on the purchase dates of April 6, 2019, May 21, 2019, July 31, 2020,

May 20, 2021, and October 21, 2021. Lloyd also disputes the veracity of Kobelski's statements purporting to describe how the hyperlink to the terms of use appeared at the time of purchase. Lloyd contends that these statements are unreliable considering the absence of further documentary evidence and where Kobelski failed to explain the basis for her supposed knowledge of how the hyperlink was presented.

Contrary to Lloyd's argument, the Court may properly consider the proffered declaration and exhibits in determining whether there existed reasonable notice and assent to the arbitration agreement in the TOU. Courts confronted with this same issue have regularly relied on the same type of evidence provided by TJX and consider statements by those with personal knowledge about what "would have appeared" on a user's screen. *See, e.g., Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 70-72 (2d Cir. 2017) (relying on screenshots and a declaration that represented that Uber maintained records from which the company could see what a user had seen and done); *Cordas v. Uber Technologies, Inc.*, 228 F. Supp. 3d 985, 988-989 (N.D. Cal. 2017) (relying on testimony about what a prospective user would have seen and had to do to create an account); *Fteja*, 841 F. Supp. 2d at 834-35 (allowing declarations with testimony and screenshots of what a user did and would have seen); *Maynez v. Walmart, Inc.*, No. CV200023, 2020 WL 4882414 (C.D. Cal. Aug. 14, 2020) ("The Court is satisfied that the checkout process for the Walmart app described in the Deverkonda Declaration accurately reflects the process that Plaintiff encountered in April of 2019."); *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17CV04570, 2017 WL 7309893, at \*7 (S.D.N.Y. Nov. 20, 2017), report and recommendation adopted as modified, No. 17-CV-4570, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018) (B&N has offered the sworn testimony of the person responsible for overseeing the implementation of a change to its website that required certain notice language to be added directly beneath the "Submit Order" button. Bernardino offered no evidence whatsoever to suggest that the website on February 3, 2017 did not look the way declarant stated.). Further, Lloyd has not produced any affidavits denying that the "checkout flow" process appeared as depicted in the dated screenshots introduced by the Kobelski declaration. Because courts regularly rely on the type of evidence presented in the Kobelski declaration, and in the absence of any affidavit or other evidence contradicting that the screenshots reflect the "checkout flow" process as it would have appeared on the dates of purchase, Lloyd's challenge in this regard is speculation insufficient to create a genuine dispute regarding

Lloyd v. Retail Equation, Inc., Slip Copy (2022)

2022 WL 18024204

the existence or authenticity of the subject agreement to arbitrate.

**\*9** Second, Lloyd attempts to add another dimension to the parties' factual dispute over whether she agreed to arbitrate by challenging the authenticity of the TOU screenshots introduced in the Kobelski declaration. Specifically, Lloyd presents screenshots from the Wayback Machine purporting to represent an alternative version of the terms of use that would have appeared on the May 9, 2019 date of attempted return or exchange and on other various dates. Lloyd argues that:

> Although Ms. Kobelski states that Exhibit C is an accurate reflection of the Terms as they appeared on between January 17, 2019 and April 24, 2019, its appearance differs significantly from the versions that appear on the Wayback Machine for the dates most closely preceding and following the period for which Exhibit C (of unknown provenance) is offered. Exhibits A and B to the Kelston Declaration, versions of the terms obtained from the Wayback Machine for October 4, 2018, and May 9, 2019, are consistent: the background is white, the headers are lowercase, the spacing is consistent, and bullet points are used in various sections. Kobelski Exhibit C, on the other hand, which supposedly appeared between January 17, 2019 and April 24, 2019, has a grey background, the headers are uppercase, the spacing is different, and there are no bullet points in any sections.

*Opp.* at \*10. Lloyd contends that "these differences are not insignificant" because "the appearance and readability of the Terms impact the adequacy of the notice provided to Plaintiff of the content of the Terms, including the arbitration provision." *Id.*

The Court finds these matters insufficient to create a genuine dispute regarding the existence or authenticity of the subject agreement to arbitrate. First, as with the screenshots of the checkout flow process, the TOU screenshots are based on the personal knowledge of Kobelski. *See*, e.g. *Snow v. Eventbrite, Inc.*, No. 3:20-CV-03698, 2021 WL 3931995, at \*6 (N.D. Cal. Sept. 2, 2021) ("a sworn declaration authenticating the agreements is sufficient to meet [defendant's] burden. It is the type of evidence courts usually examine in these cases."). Second, it is unclear whether screenshots from the Wayback Machine are admissible in the Third Circuit absent authentication by an Internet Archive employee. *See United States v. Bansal*, 663 F.3d 634, 667 (3d Cir. 2011) ("This Court generally agrees that, to satisfy the requirements of Rule 901, screenshots from the Wayback Machine must be authenticated by an Internet Archive employee or another individual with experience in its operation and reliability."). Third, and most significantly, the Lloyd has not shown that the differences contained in the Wayback Machine version would render notice inadequate. Upon conducting a side-by-side review, the Court is unable to discern anything about the *de minimus* variations in the versions of the TOU presented that would create a dispute of fact material to the issue of reasonable notice of the agreement to arbitrate his claims and their intent to delegate arbitrability. *See Snow*, 2021 WL 3931995, at \*6 ("The plaintiffs also contend that there is no way to know precisely what the [terms of service] looked like without [metadata] ... but they offer no reason that a slight change in the look of the TOS itself ... would alter the analysis."). Both are titled "arbitration agreement & waiver of certain rights", both appear on page six of each ten pages exhibit, and both contain the same language. Because the arbitration clauses bear no material differences in terms of their visibility and conspicuousness and are otherwise substantively the same, the Court is not persuaded that the Wayback Machine screenshots would sway the issue of formation even if they were presented in admissible form. For these reasons, the Wayback Machine screenshots neither render TJX's evidence inadmissible, nor do they create a material dispute of fact.

**\*10** Upon review of the foregoing arguments and assertions of fact – which are presented in a vacuum without any sworn statement by Lloyd herself that she did not assent to the TOU – the Court concludes that Lloyd has not "come forth with reliable evidence that is more than a 'naked assertion ... that [she] did not intend to be bound' by the arbitration agreement[.]" *Guidotti*, 716 F.3d at 774 (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 55 (3d Cir. 1980)). Lloyd, therefore, has not triggered the application of the discovery and summary judgment

Lloyd v. Retail Equation, Inc., Slip Copy (2022)

2022 WL 18024204

review framework set forth in *Guidotti*. Because the facts and evidence permit the Court to determine whether or not Lloyd is entitled to arbitration at this juncture as a matter of law, the correct standard of review for this motion is under Rule 12(b)(6). In making that determination, the Court is permitted to "consider the substance of the contract[ ] that ostensibly compel[s] arbitration." *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 168 n.2 (3d Cir. 2014) (citation omitted); *see also Noble*, 682 F. App'x at 115 (3d Cir. 2017).

### ii. Reasonable Notice and Assent

The Court is satisfied that the design and content of the "checkout flow" process website and the agreement's webpage demonstrate that TJX presented the TOU in a manner sufficient to give Lloyd reasonable notice.[4] Specifically, the presentation of the TOU hyperlink in clear font in a relatively uncluttered location of the screen and its proximity to the "PLACE ORDER" button, coupled with the textual notification, is enough to place a reasonably prudent user on notice.

The "terms of use" hyperlink appears in legible, underlined, bolded black font against a white background. Given its placement in a relatively uncluttered location on the final screen of the "checkout flow" interface directly above the "PLACE ORDER" icon that Lloyd was required to click to make her purchase, the hyperlink was spatially and temporally proximate – not hidden in an area that she was unlikely to see or that required scrolling to view. Although it was possible for Lloyd to make the purchases without *clicking* the hyperlink, the likelihood of Lloyd completing them without *observing* the hyperlink is improbable.

The Court recognizes, however, that proximity or conspicuousness alone may not be enough to give rise to reasonable notice. In several cases where browsewrap agreements have been deemed invalid, the websites in question often failed to include a statement informing the user that, by clicking on a button, he or she was agreeing to be bound by hyperlinked terms. *Mucciariello*, 2019 WL 4727896, at *6 (string citing *Nguyen*, 763 F.3d 1171 at 1179 (refusing to enforce hyperlinked terms, where the defendant's website did not include text informing the user that, by clicking on a button, he or she was providing consent); *Holdbrook Pediatric Dental, LLC*, No. 14-6115, 2015 WL 4476017, at *6 (D.N.J. July 21, 2015) (holding that hyperlinked terms were invalid, because the hyperlink

was placed in "isolation," with "no statement that signing the agreement indicated acceptance of the" terms and conditions.); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) (finding insufficient notice where the hyperlinked terms were inconspicuously located at the bottom of a webpage, which did not include a statement advising assent)). Distinguishing cases in which hyperlinked terms were unaccompanied by a notification, the court in *Mucciariello* enforced a forum selection clause contained within hyperlinked terms upon finding that the website satisfied reasonable notice. *Mucciariello*, 2019 WL 4727896, at *6-7, 10 n.3 ("Significantly, unlike those cases, Viator's checkout page included a statement of notice, within close proximity to the 'Book Now' icon").

**\*11** Here, in addition to the hyperlink appearing directly above the "PLACE ORDER" button that Lloyd was required to click to complete the purchase, the page contained a textual notification in the same area indicating that "By placing your order, you agree to the TJ MAXX terms of use ..." *Kobelski Decl.* ¶ 3, Exhibit B. Where a website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, as in *Mucciariello*, courts have been more amenable to enforcing browsewrap agreements.[5]

Thus, the TJ Maxx website included precisely the type of textual notice capable of transforming an otherwise unenforceable arbitration agreement into an enforceable one. Specifically, the evidence pertaining to the "checkout flow" process introduced by TJX reflects that the TJ Maxx website set forth a conspicuous notification directly above the "PLACE ORDER" providing that "By placing your order, you agree to the T.J. Maxx terms of use[.]"

As a further matter, the location of the notice and hyperlink in TJ Maxx's "checkout flow" process above the "PLACE ORDER" icon differentiates this case from *Wollen* where that notice and hyperlink appeared below the "View Matching Pros" submission button. *See* n. 3, *supra*. The facts attendant to the instant motion are distinguishable from those of *Specht* for similar reasons. In *Specht*, the Second Circuit refused to enforce an arbitration provision in a website's licensing terms where the hyperlink to the terms was located at the bottom of the page, hidden below the "Download" button that users had to click to initiate the software download. *See Specht*, 306 F.3d at 30. The Second Circuit held that that "a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice

of those terms." *Id.* at 32. By contrast, here the hyperlink to the TOU appears directly above the "PLACE ORDER" button that a user must click on to complete his or her order and is viewable without the need to scroll. Moreover, unlike the plaintiff in *Specht*, Lloyd was not required to visit another webpage in order to understand that a binding contract was created upon confirming her purchase of the merchandise.

**\*12** In addition to the existence of reasonable notice, there is evidence that Lloyd had actual notice of the agreement to arbitrate. To the extent Lloyd completed the "checkout flow" process several times after TJX moved to compel her claims to arbitration in the Central District of California arising out of similar facts (*see* action entitled *Shadi Hayden, et al. v. The Retail Equation, Inc., et al.*, Case No. 8:20-cv-01203-DOC-DFM), and insofar as Lloyd's claims and/or alleged damages here arise from purchases and/or attempted returns post-dating that motion, Lloyd may have been on actual notice of the agreement to arbitrate.[6]

The Court must also disagree with Lloyd that there was no manifestation of assent because the arbitration clause was "buried in the Terms[.]" *See Opp.* at *21. Agreements similar to the one here – where the relevant terms and provisions are hyperlinked and the user is notified that he or she must perform an action to provide assent, such as, for example, clicking on a button – have been found enforceable under New Jersey law. *Betvre v. Samsung Elecs. Am., Inc.*, No. 17-5757, 2018 WL 4259845, at *5-6 (D.N.J. July 18, 2018) ("[M]odified browsewrap agreements are valid and enforceable under New Jersey law."); *Holdbrook Pediatric Dental, LLC*, 2015 WL 4476017, at *2-3 (D.N.J. July 21, 2015); *Mucciariello*, 2019 WL 4727896, at *6 (D.N.J. Sept. 27, 2019). This understanding comports with New Jersey law governing contract formation, which establishes that the element of assent exists when the parties "been fairly informed of the contract's terms before entering into the agreement." *Hoffman*, 419 N.J. Super. at 606, 18 A.3d at 210; *see also Mucciariello*, 2019 WL 4727896, at *3. Equally well-established under New Jersey law is the precept that "[n]o particular form of words is necessary to accomplish a clear and unambiguous waiver of rights," and the arbitration clause "will pass muster when phrased in plain language that is understandable to the reasonable consumer." *Atalese v. U.S. Legal Servs. Grp., L.P.*, 219 N.J. 430, 443 (2014). Applying New Jersey contract law, the Third Circuit has held that for a party to have reasonable notice, the writing must "appear to be a contract" and "be called to the attention of the recipient." *Noble*, 682 F. App'x at 116. Stated differently, "contractual

terms, including an arbitration clause, will only be binding when they are reasonably conspicuous rather than proffered unfairly, or with a design to de-emphasize its provisions." *Id.* Although Lloyd's expression of assent to arbitration was not separate from her assent to place the order, and therefore not as explicit as in a true clickwrap agreement, the Court is convinced that it was nevertheless unambiguous in light of the conspicuous and objectively reasonable notice of the terms, as discussed in detail above.

**\*13** The Third Circuit's discussion in *Noble v. Samsung Electronics America* is instructive on the adequacy of notice issue for purposes of determining mutual assent. See *Noble v. Samsung Elec. Am., Inc.*, 862 F. App'x 113 (3d Cir. 2017). *Noble* involved consumer fraud claims brought in the context of a class action by the consumer of a smartwatch containing an alleged defect. *Id.* at 114. A motion to compel arbitration was filed by the defendant supplier of the product based on an arbitration agreement set forth in a booklet inserted in the product packaging. The district court denied the motion on the grounds that the arbitration clause was unreasonably hidden and thus the agreement was not enforceable. *Id.* at 115. The arbitration clause was set forth at page 97 of a 143-page booklet included in the smartwatch packaging, entitled "Health and Safety and Warranty Guide." *Id.* The key issue on appeal to the Third Circuit was whether the consumer plaintiff had assented to the arbitration clause set forth in the in-box booklet. *Id.* at 116-17. The Third Circuit determined he had not. *Id.* Distinguishing the agreement from enforceable agreements, the Third Circuit observed that "Here, the document in which the Clause was included did not appear to be a bilateral contract, and the terms were buried in a manner that gave no hint to a consumer that an arbitration provision was within ... More particularly, there was no indication on the outside of the Guide that it was a bilateral contract or included any terms or conditions." *Id.* at 116. The court concluded that, under those circumstances, a consumer would have no reasonable notice he was assenting to a bilateral contract, much less an agreement to arbitrate disputes. *Id.* at 117-18.

Here, it is much clearer that Lloyd knew or should have known the TOU was a bilateral contract where Lloyd was making a transaction for the sale of goods[7] and the hyperlink appearing directly above the "PLACE ORDER" button contained textual notifications indicating that by placing the order, Lloyd agreed to the TOU and Privacy Policy. Further distinguishing the instant motion from *Noble* where the arbitration clause was set forth at page 97 of a 143-page

Lloyd v. Retail Equation, Inc., Slip Copy (2022)

2022 WL 18024204

booklet, the evidence of record shows the TOU is *significantly* shorter in length and the provision titled "**Arbitration Agreement & Waiver Of Certain Rights**" much earlier in the document. Accordingly, the Court disagrees with Lloyd that there was no manifestation of assent because the arbitration clause was unreasonably hidden or "buried in the Terms[.]"[8]

#### d. Scope of Arbitration

Having determined that the parties entered into a valid agreement to arbitrate, the remaining issue is whether the dispute falls within the scope of the arbitration agreement. *See Century Indem. Co.*, 584 F.3d at 522-23 (on a motion to compel arbitration, the Court must determine: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the dispute at issue falls within the scope of the arbitration agreement.). Because it is not disputed that the language of the arbitration clause delegates questions encompassed by this action to the arbitrator,[9] and given the strong federal policy favoring arbitration for matters concerning the scope of arbitrability,[10] the Court concludes that this action should be referred to arbitration with a stay implemented for the pendency of that proceeding or until further order.

### IV. Conclusion

**\*14** For the reasons set forth herein TJX's motion will be granted in part and denied in part. The Motion will be granted to the extent it seeks an order compelling arbitration of all claims asserted by Lloyd and staying those claims for the pendency of that proceeding or until further order. The Motion will be denied insofar as it requests an order for dismissal of Count One, Count Three, and Count Five asserted by Lloyd in the Complaint. An appropriate order will follow.

### All Citations

Slip Copy, 2022 WL 18024204

---

## Footnotes

1    TJ Maxx and Marshalls together form the Marmaxx division of The TJX Companies, Inc.

2    The Court disagrees with Lloyd that *Wollen* compels the conclusion that the TOU represent a pure browsewrap agreement. A characteristic feature of browsewrap agreements is placement in a submerged and hidden area. In its decision in *Wollen*, the New Jersey Superior Court, Appellate Division, found instructive the Second Circuit's decision in *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002). *See Wollen v. Gulf Stream Restoration & Cleaning, LLC*, 468 N.J. Super. 483, 499, 259 A.3d 867, 876–77 (App. Div. 2021) ("we continue to find instructive the Second Circuit's nearly twenty-year-old decision in Specht[.]"). Paramount to the holding in *Specht* was the Second Circuit's view that the presentation of the hyperlink on a "submerged screen" rendered notice to the terms contained within insufficient. *Specht*, 306 F.3d at 32; *Wollen*, 468 N.J. Super. at 499, 259 A.3d at 877 ("the court concluded that where the arbitration clause was not visible before the users clicked the icon to download the program but was "submerged" elsewhere on the website, the users could not be said to have given consent."). Unlike in *Wollen* where the hyperlink to the subject terms appeared *below* the "View Matching Pros" submission button, in this case the evidence shows the TOU are directly above the "PLACE ORDER" icon. In other words, the placement of the hyperlink in this case was more closely approximated to ensure assent as it was not hidden below or "submerged." For this reason, the *Wollen* court's characterization of the terms and conditions in that case as a "browsewrap-type" agreement are not dispositive of the question here. In light of this relevant factual distinction, and considering the body of caselaw (discussed *infra*) treating web-based agreements similar to the one in this case as a modified or hybrid rather than a true browsewrap agreement, the Court finds Lloyd's comparison to *Wollen* less helpful.

3    Where a plaintiff's complaint "makes no mention of the [arbitration agreement], that fact does not foreclose operation of a Rule 12(b)(6) standard." *Benedict v. Guess, Inc.*, No. 5:20-CV-4545, 2021 WL 37619, at \*4

Lloyd v. Retail Equation, Inc., Slip Copy (2022)

2022 WL 18024204

(E.D. Pa. Jan. 5, 2021) (quoting *Sorathia v. Fidato Partners, LLC*, No. CV 19-4253, 2020 WL 5121473, at *3 (E.D. Pa. Aug. 31, 2020) (internal quotations omitted). "Precluding review of a complaint under the Rule 12(b)(6) standard simply because a plaintiff has avoided reference to an existing arbitration agreement would frustrate the purpose of the FAA: to facilitate expedited resolution of disputes where the parties to a contract have opted for arbitration." *Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) (observing "the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts.")).

4      The relevant inquiry for assessing reasonable notice is whether "the specifics surrounding [the] agreement revealed either that the user knew or should have known about the existence of the terms and conditions[.]" *Liberty Syndicates at Lloyd's v. Walnut Advisory Corp.*, No. 09-1343, 2011 WL 5825777, at *4 (D.N.J. Nov. 16, 2011) (applying New Jersey law).

5      *See, e.g.*, *Mucciariello*, 2019 WL 4727896, at *6 ("hyperlinked terms, such as the one in this case, amount to an enforceable agreement when 'reasonable notice' is provided and a button is designated to manifest assent, near a statement informing the user that, by clicking, he or she is agreeing to be bound by the hyperlinked terms"); *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04–04825, 2005 WL 756610, at *2, *4–5 (N.D.Cal. Apr. 1, 2005) (enforcing forum selection clause in website's terms of use where every page on the website had a textual notice that read: "By continuing past this page and/or using this site, you agree to abide by the Terms of Use for this site, which prohibit commercial use of any information on this site"); *Fteja*, 841 F. Supp. 2d at 835 (reasonable notice where users of a social networking website clicked a "Sign Up" button immediately above a sentence that read "[b]y clicking Sign Up, you are indicating that you have read and agree to the [hyperlinked] Terms of Service."); *Snap-On Bus. Solutions Inc. v. O'Neil & Assocs.*, 708 F. Supp. 2d 669, 682-83 (N.D. Ohio 2010) (finding sufficient notice, where the user "clicked on an 'Enter button' to proceed," underneath which the webpage stated: "[t]he use of ... this site is subject to the terms and conditions," which were viewable in "a green box with an arrow that users must click ..."); *5381 Partners LLC v. Shareasale.com, Inc.*, No. 12-4263, 2013 WL 5328324, at *7 (E.D.N.Y. 2013) (enforcing online agreement where defendant's reference to the hyperlinked terms were near an "activation button," and an accompanying statement which read, "[b]y clicking and making a request to Activate, you agree to the [hyperlinked] terms and conditions."); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 908, 912 (N.D. Cal. 2011) (enforcing online agreement where users clicked on an "allow" button, directly underneath which was a statement in "smaller grey font," indicating that clicking on the button constituted acceptance of the blue hyperlinked "terms of service"); *Bernardino*, 2017 WL 7309893, at *5 (upholding an online agreement where the user had to "click on a 'Submit Order' button with the language '[b]y making this purchase you are agreeing to out Terms of Use and Privacy Policy' immediately below it in order to complete her purchase.").

6      Courts frequently enforce web-based agreements where the user had actual notice of the agreement. *See, e.g.*, *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401-04 (2d Cir. 2004) (finding likelihood of success on the merits in a breach of browsewrap claim where the defendant "admitted that ... it was fully aware of the terms" of the offer); *Sw. Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-0891, 2007 WL 4823761, at *4-6 (N.D. Tex. Sept. 12, 2007) (finding proper contract formation where defendant continued its breach after being notified of the terms in a cease and desist letter); *Ticketmaster Corp. v. Tickets.Com, Inc.*, No. CV–997654, 2003 WL 21406289, at *2C (C.D.Cal. Mar. 7, 2003) (denying defendants' summary judgment motion on browsewrap contract claim where defendants continued breaching contract after receiving letter quoting the browsewrap contract terms).

7      This point similarly differentiates this motion from *Wollen. See Wollen*, 468 N.J. Super. 483, 259 A.3d 867.

8      Additionally, under New Jersey law " 'applying the "fundamental precepts" of contract law to determine the enforceability of contracts formed over the internet between companies and their users ... where a website provides reasonable notice of the hyperlinked agreement, users will be bound to it even if the party did not

2022 WL 18024204

review the terms and conditions of the hyperlinked agreement before assenting to them." *Hite v. Lush Internet Inc.*, 244 F. Supp. 3d 444, 451 (D.N.J. 2017) (internal citations and quotations omitted); *see also Singh v. Uber Tech., Inc.*, 235 F.Supp.3d 656, 2017 WL 396545, at *4 (D.N.J. Jan. 30, 2017).

9 *See AT&T Tech., Inc. v. Commc'n Workers*, 475 U.S. 643, 650 (1986) ("arbitration should only be denied where it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (internal quotations omitted").

10 *See Moses H. Cone Memorial Hosp.*, 460 U.S. 1, 24–25 ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

9

Case 3:22-cv-02077-MEM   Document 13-2   Filed 03/20/23   Page 72 of 102

Noonan v. Comcast Corp., Not Reported in Fed. Supp. (2017)

2017 WL 4799795

2017 WL 4799795
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Judith NOONAN, at al. Plaintiffs,

v.

COMCAST CORP. Defendant.

Civil Action No. 3:16–cv–00458 (PGS)
|
Signed 10/23/2017
|
Filed 10/24/2017

**Attorneys and Law Firms**

Paul Anthony Leodori, Medford, NJ, for Plaintiffs.

Michael P. Daly, Drinker, Biddle & Reath, LLP, Florham Park, NJ, Michael W. Mctigue, Jr., Drinker, Biddle & Reath, LLP, Katie Bailey Garayoa, Rinker Biddle & Reath LLP, Philadelphia, PA, for Defendant.

**MEMORANDUM AND ORDER**

PETER G. SHERIDAN, U.S.D.J.

**\*1** This matter comes before the Court on Defendant's Renewed Motion to Compel Arbitration and Stay Litigation. (ECF No. 31).

**Factual & Procedural Background**

On December 8, 2015, Plaintiffs initiated this class action in Superior Court, Ocean County. On January 27, 2016, Defendant removed the matter to this Court pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332 *et seq.* (ECF No. 1, Notice of Removal). Plaintiffs allege: (1) declaratory relief; (2) violations of the Plain Language Act, N.J.S.A. § 56:12–1 *et seq.*; (3) violations of the Consumer Fraud Act, N.J.S.A. § 56:8–1 *et seq.*; (4) breach of contract; (5) bad faith; and (6) prima facie tort, arising out of Comcast's allegedly arbitrary pricing, deficient telephone, television, and computer services, deficient equipment, and abandoned equipment and advertising material. (ECF No. 1, Compl.).

Plaintiffs allege that Defendant arbitrarily priced its equipment and services, provided deficient services and equipment, left promotional literature on door knobs, abandoned equipment, used confusing contractual and promotional language, and provided deficient customer service. (*Id.* ¶¶ 17–24).

Defendant seeks to compel arbitration and stay litigation. Defendant contends that Plaintiffs are bound by an arbitration agreement in their Comcast Agreement for Residential Services (the "Subscriber Agreement"). Comcast provided copies of the Subscriber Agreement to Plaintiffs as an insert in a monthly billing statement and as part of a welcome kit when services were installed. (*See* Def.'s Br. 4; ECF No. 18).

For the purposes of this motion, the parties have submitted a Stipulation as to which versions of the Subscriber Agreements were in place at the time the Plaintiff received services.[1] (*See* Stip. 1–2; ECF No. 23–1). The stipulation is significant because the language of the current Subscriber Agreement available on Defendant's website differs from those in dispute. (*See* Pl.'s Br. 4–5; ECF No. 36). In particular, the Defendant revised Section 13 which contains the arbitration provision. (*See* Def.'s Br. at Exhibit "A"; ECF No. 18–2).

All three Subscriber Agreements in dispute have nearly identical arbitration provisions made up of 11 paragraphs a–k, are approximately thirty pages, over 3,000 words, and single spaced with no table of contents. (ECF No. 23–1) (*See* Def.'s Br. 6; Opp. Br. 10). The sections in the arbitration provision are as follows: a. Purpose; b. Definitions; c. Right to Opt Out; d. Initiation of Arbitration Proceeding/Selection of Arbitrator; e. Arbitration Procedures; f. Restrictions; g. Location of Arbitration; h. Payment of Arbitration Fees and Costs; i. Severability; j. Exclusions from Arbitration; k. Continuation. (*See* Exhibit "B"; ECF No. 23–1 at 44–47.) The 2008 agreement has no page numbers while the 2011 and 2012 agreements have page numbers and a separate notice on customer privacy. The following memorandum refers to all three agreements, starting with Ex. B, the 2008 Agreement, and citing to the corresponding page numbers for Exhibits C and D when the language used is identical.[2] Any minor language differences present in relevant sections of the disputed versions of the agreements are quoted accordingly.

**\*2** On the first page of the 2008 Subscriber Agreement located three-quarters of the way down, in bold type (surrounded by other bold type) is the following language:

Noonan v. Comcast Corp., Not Reported in Fed. Supp. (2017)

2017 WL 4799795

> **Note: This Agreement contains a binding arbitration provision in Section 13 that affects your rights under this Agreement with respect to all Services.**

(ECF 23–1 Ex. B at 28; Ex. C at 69; Ex. D at 102). Section 13 is roughly three-and-a-half pages, the first section listed is the "Purpose":

### 13. BINDING ARBITRATION

**a. Purpose.** If you have a Dispute (as defined below) with Comcast that cannot be resolved through the informal dispute resolution process described in this Agreement, you or Comcast may elect to arbitrate that Dispute in accordance with the terms of this Arbitration Provision rather than litigate the Dispute in court. Arbitration means you will have a fair hearing before a neutral arbitrator instead of in a court by a judge or jury.

(ECF 23–1 Ex. B 43–44). The language of this section in the 2011 agreement states as follows:

### 13. BINDING ARBITRATION

**a. Purpose**. If you have a Dispute (as defined below) with Comcast that cannot be resolved through the informal dispute resolution with Comcast, you or Comcast may elect to arbitrate that Dispute in accordance with the terms of this Arbitration Provision rather than litigate the Dispute in court. Arbitration means you will have a fair hearing before a neutral arbitrator instead of in a court by a judge or jury.

(ECF 23–1 Ex. C at 80). The language of this section in the 2012 agreements states:

### 13. BINDING ARBITRATION

**a. Purpose**. If you have a Dispute (as defined below) with Comcast that cannot be resolved through the informal dispute resolution with Comcast, you or Comcast may elect to arbitrate that Dispute in accordance with the terms of this Arbitration Provision rather than litigate the Dispute in court. Arbitration means you will have a fair hearing before a neutral arbitrator instead of in a court by a judge or jury. Proceeding in arbitration may result in limited discovery and may be subject to limited review by courts.

(ECF 23–1 Ex. D at 115.) Plaintiff points to the permissive language in the above section and contends that a customer unacquainted with the law would not deduce that the provision is a waiver of the right to access the court system (*See* Pl.'s Br. 2).

Plaintiff compares the 2008 agreement to the current version on Defendant's website with a strengthened introductory note, underlined and capitalized, in addition to bold:

> **Note: <u>THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION IN SECTION 13 THAT AFFECTS YOUR RIGHTS UNDER THIS AGREEMENT WITH RESPECT TO ALL SERVICE(S).</u> These terms and conditions are subject to applicable tariffs and service guides.**

(*See* Def.'s Br. at Exhibit "A"; ECF No. 18–2). Section 13 has also been changed in Defendant's current version with more succinct and forceful language:

### 13. BINDING ARBITRATION

**a. Purpose.** Any Dispute involving you and Comcast shall be resolved through individual arbitration. In arbitration, there is no judge or jury and there is less discovery and appellate review than in court.

(*See* Def.'s Br. at Exhibit "A" ECF No. 18–2).

The disputed agreements continue with the "**b. Definitions**" and "**c. Right to Opt Out**" paragraphs. Of note is what the Supreme Court has called a delegation clause, *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010), which arguably exists in the "**b. Definitions**" paragraph, stating that any dispute will go to an arbitrator and that "includes the validity, enforceability or scope of this Arbitration Provision." The Defendant notes that the "**c. Right to Opt Out**" paragraph is a clear signal that arbitration is binding. (*See* Def.'s Br. 4).

**\*3 b. Definitions.** As used in this Arbitration Provision, the term "Dispute" means any dispute, claim or controversy between you and Comcast regarding any

Noonan v. Comcast Corp., Not Reported in Fed. Supp. (2017)

2017 WL 4799795

aspect of your relationship with Comcast that has accrued or may hereafter accrue, whether based in contract, statute, regulation, ordinance, tort (including, but not limited to, fraud, misrepresentation, fraudulent inducement, negligence or any other intentional tort), or any other legal or equitable theory, and includes the validity, enforceability or scope of this Arbitration Provision (with the exception of the enforceability of the class action waiver clause provided in paragraph F(2)). "Dispute is to be given the broadest possible meaning that will be enforced. As used in this Provision, "Comcast" means Comcast Cable Communications, LLC., its officers, directors, employees and agents, and all entities using the brand name "Comcast", including your local cable company, its employees, authorized agents, and its parents, subsidiaries and affiliated companies. As used in this Provision, the term "Arbitration Provision" means all the terms of this Section 13.

**c. Right to Opt Out.** IF YOU DO NOT WISH TO BE BOUND BY THIS ARBITRATION PROVISION, YOU MUST NOTIFY COMCAST IN WRITING WITHIN 30 DAYS OF THE DATE THAT YOU FIRST RECEIVE THIS AGREEMENT BY VISITING WWW.COMCAST.COM/ARBITRATIONOPTOUT, OR BY MAIL TO DEPARTMENT/ARBITRATION. YOUR WRITTEN NOTIFICATION TO COMCAST MUST INCLUDE YOUR NAME, ADDRESS AND COMCAST ACCOUNT NUMBER AS WELL AS A CLEAR STATEMENT THAT YOU DO NOT WISH TO RESOLVE DISPUTES WITH COMCAST THROUGH ARBITRATION. YOUR DECISION TO OPT OUT OF THIS ARBITRATION PROVISION WILL HAVE NO ADVERSE EFFECT ON YOUR RELATIONSHIP WITH COMCAST OR DELIVERY OF SERVICES TO YOU BY COMCAST. IF YOU HAVE PREVIOUSLY NOTIFIED COMCAST OF YOUR DECISION TO OPT OUT OF ARBITRATION, YOU DO NOT NEED TO DO SO AGAIN.

(*See* Exhibit "B"; ECF No. 23–1 at 43–44). The 2011 and 2012 versions of the agreement mentions the same with slight variation in wording:

**b. Definitions.** The term "Dispute" means any dispute, claim, or controversy between you and Comcast regarding any aspect of your relationship with Comcast, whether based in contract, statute, regulation, ordinance, tort (including, but not limited to, fraud, misrepresentation, fraudulent inducement, negligence, or any other intentional

tort), or Arbitration Provision (with the exception of the enforceability of the class action waiver clause provided in paragraph 13(f)(2)). "Dispute" is to be given the broadest possible meaning that will be enforced. As used in this Arbitration Provision, "Comcast" means Comcast and its parents, subsidiaries and affiliated companies and each of their respective officers, directors, employees and agents.

**c. Right to Opt Out.** IF YOU DO NOT WISH TO BE BOUND BY THIS ARBITRATION IF YOU DO NOT WISH TO BE BOUND BY THIS ARBITRATION

PROVISION, YOU MUST NOTIFY COMCAST IN WRITING WITHIN 30 DAYS OF THE DATE THAT YOU FIRST RECEIVE THIS AGREEMENT BY VISITING WWW.COMCAST.COM/ARBITRATIONOPTOUT, OR BY MAIL TO COMCAST 1701 JOHN F. KENNEDY BLVD., PHILADELPHIA, PA 19103–2838, ATTN: LEGAL DEPARTMENT/ARBITRATION. YOUR WRITTEN NOTIFICATION TO COMCAST MUST INCLUDE YOUR NAME, ADDRESS AND COMCAST ACCOUNT NUMBER AS WELL AS A CLEAR STATEMENT THAT YOU DO NOT WISH TO RESOLVE DISPUTES WITH COMCAST THROUGH ARBITRATION. YOUR DECISION TO OPT OUT OF THIS ARBITRATION PROVISION WILL HAVE NO ADVERSE EFFECT ON YOUR RELATIONSHIP WITH COMCAST OR THE DELIVERY OF SERVICES TO YOU BY COMCAST. IF YOU HAVE PREVIOUSLY NOTIFIED COMCAST OF YOUR DECISION TO OPT OUT OF ARBITRATION, YOU DO NOT NEED TO DO SO AGAIN.

(*See* ECF No. 23–1 Ex. C at 80; Ex. D at 116).

Paragraph "**f. Restrictions**," point 2, Defendant bars class actions in arbitration or litigation:

ALL PARTIES TO THE ARBITRATION MUST BE INDIVIDUALLY NAMED. THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED OR LITIGATED ON A CLASS ACTION OR CONSOLIDATED BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON

Noonan v. Comcast Corp., Not Reported in Fed. Supp. (2017)

2017 WL 4799795

BEHALF OF THE GENERAL PUBLIC (SUCH AS A PRIVATE ATTORNEY GENERAL), OTHER SUBSCRIBERS, OR OTHER PERSONS SIMILARLY SITUATED UNLESS THE STATUTE UNDER WHICH YOU ARE SUING PROVIDES OTHERWISE

**\*4** In the 2008 and 2011 version the paragraph also states in point 3 that "ALL PARTIES WAIVE ANY CLAIM TO INDIRECT, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR MULTIPLIED DAMAGES. (*Id.* at 45; *Id.* at 81.) The 2012 version states:

ALL PARTIES TO THE ARBITRATION MUST BE INDIVIDUALLY NAMED. THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED OR LITIGATED ON A CLASS ACTION OR CONSOLIDATED BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC (SUCH AS A PRIVATE ATTORNEY GENERAL), OTHER SUBSCRIBERS, OR OTHER PERSONS.

In point 3 of the same paragraph, Defendant bars class actions in arbitration or litigation: "ALL PARTIES TO THE ARBITRATION MUST BE INDIVIDUALLY NAMED." The paragraph also states that "ALL PARTIES WAIVE ANY CLAIM TO INDIRECT, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR MULTIPLIED DAMAGES ...." (*Id.* at 45; *Id.* at 81.) The 2012 version does not include point 3. (*Id.* at 117.)

In paragraph "**j. Exclusion from Arbitration**," Defendant allows for individual small claims to be brought that are "NOT AGGREGATED WITH THE CLAIM OF ANY OTHER SUBSCRIBER AND WHOSE AMOUNT IN CONTROVERSY IS PROPERLY WITHIN THE

JURISICDICTION OF A COURT WHICH IS LIMITED TO ADJUDICATING SMALL CLAIMS." (*Id.* at 46–47; *Id.* at 82; *Id.* at 117.)

The arbitration provision further provides for a convenient location, and a single neutral arbitrator with either party able to appeal a decision to a three-arbitrator panel. The provision also contains a severability clause. Defendant advances all fees and arbitration costs, but a customer must pay if he or she loses. (*Id.* at 45–47; *Id.* at 81–82; *Id.* at 117.)

#### Legal Standard

Motions to compel arbitration should be analyzed under a Rule 12(b)(6) standard when arbitrability is apparent on the face of the complaint and/or documents relied upon in the complaint. *Guidotti v. Legal Helpers Debt Resolution, LLC,* 639 Fed.Appx. 824, 826–27 (3d Cir. 2016) (*Guidotti II*). Where the complaint does not establish with clarity that the parties have agreed to arbitrate, or when the party opposing arbitration has come forward with reliable evidence that it did not intend to be bound by an arbitration agreement, a Rule 12(b)(6) standard is not appropriate because the motion cannot be resolved without consideration of evidence outside the pleadings, and, if necessary, further development of the factual record. *Id.* In such circumstances, the motion should be adjudicated under the Rule 56 standard for summary judgment. *Id.* at 827.

Beyond the parties' regarding the Subscriber Agreements in place at the time of the dispute, this motion presents no need to explore factual issues beyond the Complaint and the Exhibits attached. This Motion can be resolved without further development of the factual record, and thus the Court will apply the Rule 12(b)(6) standard of analysis to this Motion. To meet that standard, the Defendant must show, through the facts alleged, that it is entitled to the relief sought. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir. 2009).

On a motion to compel arbitration, the Court must inquire: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the dispute at issue falls within the scope of the arbitration agreement. *Century Indem. Co. v. Certain Underwriters at Lloyd's,* 584 F.3d 513, 523 (3d Cir. 2009). When performing this inquiry, courts apply "ordinary state-law principles that govern the formation of contracts," *Kirleis v. Dickie, McCamey & Chilcote,* 560 F.3d 156, 160 (3d Cir. 2009) (quotations and citations omitted), and, "when

Noonan v. Comcast Corp., Not Reported in Fed. Supp. (2017)

2017 WL 4799795

determining whether [a] particular dispute falls within a valid arbitration agreement's scope, 'there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *Century Indem. Co*, 584 F.3d at 524 (quoting *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650, 106 S. Ct. 1415, 89 L.Ed. 2d 648 (1986)).

**\*5** The purpose of the Federal Arbitration Act ("FAA") is "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Beery v. Quest Diagnostics*, 953 F.Supp.2d 531, 536–37 (D.N.J. 2013) (internal quotation and citation omitted). In order to achieve this end, the FAA provides that contracts containing arbitration clauses "shall be binding" and allows for a federal court to stay proceedings in any matter referable to arbitration. 9 U.S.C. §§ 2, 3, 4. Moreover, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Beery, supra*, 953 F.Supp.2d at 537. The Supreme Court confirmed that the FAA preempts state laws "that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

The Supreme Court has established two types of challenges to the validity of an arbitration provision pursuant to the "save upon" clause in § 2 of the FAA. *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010). "One type challenges specifically the validity of the agreement to arbitrate," and "[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Buckeye Check Cashing, Inc., v. Cardegna*, 546 U.S. 440, 444 (2006). The Supreme Court has held that only first type of challenge can be successful in stripping an arbitration provision of its enforceability. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–404 (1967); *Buckeye, supra*, at 444–446; *Preston v. Ferrer*, 552 U.S. 346, 353–354, (2008). If the contract is attacked as a whole, it must go to an arbitrator. *Preston, supra* at 353.

First, the Court must determine if the Subscription Agreement is in fact a valid agreement to arbitrate disputes between

Defendant and Plaintiffs. When performing an inquiry into a motion to compel arbitration, the court applies "ordinary state-law principles that govern the formation of contracts." *Kirleis v. Dickie, McCamey & Chilcote*, 560 F.3d 156, 160 (3d Cir. 2009). Contracts in New Jersey are enforceable where there is "a bargained for exchange of promises or performance that may consist of an act, a forbearance, or the creation, modification, or destruction of a legal relation." *Martindale v. Sandvik*, 173 N.J. 76, 88 (2002).

The Supreme Court of New Jersey held that an arbitration provision in a consumer contract must state in a clear and unambiguous way that arbitration is a substitute for a consumer's right to pursue relief in a court of law. *Atalese v. U.S. Legal Servs. Grp.*, 99 A.3d 306, 316 (2014), *cert. denied*, 135 S. Ct. 2804 (2015). In so holding, the court imposed no greater burden on an "arbitration agreement than on any other agreement waiving constitutional or statutory rights." *Id.* New Jersey contract law demands that any "wavier-of-rights provision must reflect that [the party] has agreed clearly and unambiguously" to its terms. *Leodori v. CIGNA Corp.*, 175 N.J. 293, 302 (2003), *cert. denied*, 540 U.S. 938 (2003); *see, e.g., Dixon v. Rutgers, the State Univ. of N.J.*, 110 N.J. 432, 460–61 (1988) (holding that collective bargaining agreement cannot deprive one of statutory rights to evidentiary materials in anti-discrimination case because "[u]nder New Jersey law[,] for a waiver of rights to be effective it must be plainly expressed"); *Red Bank Reg'l Educ. Ass'n v. Red Bank Reg'l High Sch. Bd. of Educ.*, 78 N.J. 122, 140 (1978) (explaining, in public-employment labor-relations context, that any waiver of statutory right to file grievances "must be clearly and unmistakably established").

## ARGUMENTS

**\*6** Comcast seeks to compel this dispute to arbitration because Plaintiffs knowingly and voluntarily agreed to arbitration. (*See* Def.'s Suppl. Br. 6). Defendant argues that their arbitration clause passes muster under the *Atalese* standard and, even if it did not, that *Atalese* should not be followed because the decision is "flawed as a matter of common law and preempted as a matter of federal law." (*Id.* at 8).

Pointing to *Atalese*, Defendant notes that "no particular form of words is necessary" for an arbitration clause to be enforceable so long as the clause explains that "arbitration is a waiver of the right to bring suit in a judicial forum." (*Id.*

at 6) (quoting *Atalese*, 99 A.3d at 313–314). Defendant finds its agreement distinguishable from the one in *Atalese* because Defendant's agreement states that disputes will be resolved in arbitration and that arbitration is well defined. (*Id.* at 8). The Subscriber Agreement defines arbitration under a bold heading "**13. BINDING ARBITRATION,**" and states at the end of the paragraph, "Arbitration means you will have a fair hearing before a neutral arbitrator instead of in a court by a judge or jury." (*See* ECF No. 23–1 at 43–44, *Id.* at 80; *Id.* at 115).

The arbitration provision also contains "**c. Right to Opt Out.** IF YOU DO NOT WISH TO ARBITRATE DISPUTES, YOU MAY DECLINE TO HAVE YOUR DISPUTES WITH COMCAST ARBITRATED BY NOTIFYING COMCAST IN WRITING, WITHIN 30 DAYS ...." (Def.'s Br. 4). The paragraph furthers that a decision to opt out will have no adverse effect on the customer's relationship with the company. Defendant contends that the aforementioned clauses put Plaintiffs on notice as to the definition of arbitration and that the arbitration is a substitute for a right to bring suit in court.

Defendant further argues that *Atalese* should not be followed. (Def.'s Suppl. Br. 8). The Third Circuit reversed a trial court decision that denied a motion to compel arbitration because the plaintiff could not read English. *Morales v. Sun Constructors, Inc.*, 541 F.3d 218 (3d Cir. 2008). Defendant urges this Court to apply the same logic to the current Plaintiffs who did not understand the word "arbitration." (Def.'s Suppl. Br. 8).

Defendant also cites the FAA and claims that Plaintiffs are asking this Court to apply a heightened standard of enforceability to arbitration agreements. Indeed, Defendant claims that the Supreme Court of New Jersey erred in *Atalese* because the decision applies a heightened standard to arbitration agreements over other areas of contract law, which the Supreme Court of the United States has ruled against. *Concepcion*, 563 U.S. at 339.

Plaintiffs argue that the Defendant's arbitration clause fails to explain that arbitration is a substitute for the time-honored right to sue in court and, therefore, no valid agreement to arbitrate exists. (*See* Pl.'s Suppl. Br. 6). Plaintiffs claim the arbitration clause does not satisfy the "clear and unambiguous" standard put forth in *Atalese* and *Leodori* for waiving access to the court system. The clause appears to give the customer an option to elect an arbitrator instead of

suing in court, but does not make clear that it is a waiver of a constitutional right.

Plaintiffs emphasize the permissive language in the clause and the use of the word "may." (*See* Pl.'s Suppl. Br. 2). The opening clause states "you or Comcast may elect to arbitrate [a] Dispute in accordance with the terms of this Arbitration Provision rather than litigate the Dispute in court. Arbitration means you will have a fair hearing before a neutral arbitrator instead of in a court by a judge or jury." Plaintiffs perceive this provision to be written as a choice and that a reasonable consumer, unaware of the difference between alternative dispute resolution and litigation, would not understand the repercussions of such an agreement. (*Id.* at 2).

**\*7** Plaintiffs compare this clause with Comcast's current provision available on its website: "Any Dispute involving you and Comcast shall be resolved through individual arbitration. In arbitration, there is no judge or jury and there is less discovery and appellate review than in court." Plaintiffs argue that the current company provision is clear in describing that arbitration is a binding substitute for a right to sue in court, as opposed to the provisions in dispute. (*Id.* at 5).

Plaintiffs also compare Defendant's arbitration clause with the one found to be unenforceable by the Supreme Court of New Jersey in *Atalese* and find the two clauses similar. Both provisions are found in consumer contracts over twenty pages in length. In *Atalese*, the arbitration clause is part of a legal services contract for debt-adjustment, and reads, "In the event of any claim or dispute between Client and USLSG related to this Agreement or related to any performance of any services related to this Agreement, the claim or dispute shall be submitted to binding arbitration upon the request of either party." The *Atalese* clause does not describe what arbitration means. (*Id.* at 7). "The meaning of arbitration is not self-evident to the average consumer, who will not know, 'without some explanatory comment[,] that arbitration is a substitute for the right to have one's claim adjudicated in a court of law.' " *Morgan v. Sanford Brown Inst.*, 137 A.3d 1168, 1180 (2016) (quoting *Atalese* 99 A.3d at 442).

Further, Plaintiffs point out the confusing nature of the small claims language. (*See* Pl.'s Br. 6; ECF No. 22). In paragraph "**j. Exclusions from Arbitration,**" which allows for an individual claim "NOT AGGREGATED WITH THE CLAIM OF ANY OTHER SUBSCRIBER AND WHOSE AMOUNT IN CONTROVERSY IS PROPERLY WITHIN THE JURISDICTION OF A COURT WHICH IS LIMITED

Noonan v. Comcast Corp., Not Reported in Fed. Supp. (2017)

2017 WL 4799795

TO ADJUDICATING SMALL CLAIMS." [3] (*See* ECF No. 23–1 at 43–44). Plaintiffs argue this exclusion serves to further confuse the consumer. (Tr. of Oral Arg. 7). By granting a claim in a certain court and excluding it from others, Defendant expects a reasonable consumer to understand the structure of small claims courts and regular courts, jurisdiction, exclusion, and arbitration, all at the time of attempting to complete a contract for wireless internet. (*See* Pl.'s Br. 6–7; ECF No. 22).

### Analysis

The Court finds the Plaintiffs' arguments unpersuasive. Plaintiffs do not deny that all the agreements were agreed to, and those agreements all contain valid arbitration provisions. Under *Atalese*, a contract must make clear that a consumer is waiving his or her constitutional right to sue in court when agreeing to arbitration. When read by a reasonable person, the arbitration provision is clear and unambiguous in its waiver of rights. The provision satisfies the *Atalese* requirement in defining what arbitration means, and goes on to describe the process in detail. The agreement's description includes eleven explanatory paragraphs. The court in *Atalese* acknowledges that "[n]o particular form of words is necessary to accomplish a clear and unambiguous waiver of rights." 99 A.3d at 444.

The Court does not elect to disregard *Atalese* as Defendant argues. Those concerns have been duly addressed in the case law. *Atalese* has been cited by the Third Circuit a number of times. *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283 (3d Cir. 2017); *James v. Global TelLink Corp.*, 852 F.3d 262 (3d Cir. 2017); *Noble v. Samsung Elecs. Am., Inc.*, No. 16–1903, 2017 WL 838269, at *1 (3d Cir. Mar. 3, 2017); *Guidotti v. Legal Helpers Debt Resolution, LLC*, 639 Fed.Appx. 824 (3d Cir. 2016). Rather, the Court finds that the arbitration provision satisfies the clear and unambiguous standard for a waiver of rights.

**\*8**  When comparing Defendant's provision with the one in *Atalese*, the Court finds that Defendant's provision is distinguishable. The provision in *Atalese* is only one paragraph, and never defines arbitration. Here, the provision adequately defines arbitration: "Arbitration means you will have a fair hearing before a neutral arbitrator instead of in a court by a judge or jury." (*See* ECF No. 23–1 at 43–44; *Id.* at 80; *Id.* at 115). The provision begins with the subheading "**BINDING ARBITRATION**." After two introductory paragraphs, the "**c. Right to Opt Out**" paragraph

provides for a reasonable avenue to decline arbitration as a form of dispute resolution. Plaintiffs do not dispute that they chose not to opt out. The provision is made of the following paragraphs detailing the terms of arbitration: a. Purpose; b. Definitions; c. Right to Opt Out; d. Initiation of Arbitration Proceeding/Selection of Arbitrator; e. Arbitration Procedures; f. Restrictions; g. Location of Arbitration; h. Payment of Arbitration Fees and Costs; i. Severability; j. Exclusions from Arbitration; k. Continuation. The actions of the parties and the provision as a whole, makes clear that the parties agreed to arbitrate.

Next, the Court inquires whether this dispute falls within the scope of the arbitration agreement. Plaintiffs do not make specific arguments as to the scope of the provision being insufficient to cover their claims against the Defendant. Under "**b. Definitions**," the provision provides that

> any dispute, claim or controversy between you and Comcast regarding any aspect of your relationship with Comcast that has accrued or may hereafter accrue, whether based in contract, statute, regulation, ordinance, tort (including, but not limited to, fraud, misrepresentation, fraudulent inducement, negligence or any other intentional tort), or any other legal or equitable theory.... Dispute is to be given the broadest possible meaning that will be enforced.

(*See* ECF No. 23–1 at 43–44; *Id.* at 80; *Id.* at 116). Plaintiffs' claims for breach of contract, bad faith and other tort claims fall under dispute as defined in the arbitration provision.

### Conclusion

For the foregoing reasons, Defendant's Motion to Compel Arbitration and Stay Litigation is granted.

### ORDER

This matter having come before the Court on Defendant's renewed motion to Compel Arbitration and Stay Litigation

(ECF No. 31); and the Court having fully considered the submissions of the parties;

It is on this 23rd day of October, 2017;

**ORDERED** that Defendant's motion to Compel Arbitration and Stay Litigation is granted; and it is further

**ORDERED** that this case is dismissed without prejudice.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4799795

## Footnotes

1   Plaintiffs' Subscriber Agreements are exhibits to the Supplemental Declaration of Claudia Salcedo. (ECF No. 23–1). Exhibit B is relevant to Plaintiffs Noonan and Stella Cristiano received in 2008, Exhibit C is relevant to Plaintiff Reinhard received in 2011, and Exhibit D is relevant to Plaintiff McGuinness received in 2012. (*See* Stip. ECF No. 23–1.)

2   The minor language differences in the agreements do not affect the general analysis, however, in the interest of comprehensiveness we include all different versions.

3   The 2011 and 2012 version include a slight wording variation that does not affect the overall meaning of the sentence. "NOT AGGREGATED WITH THE CLAIM OF ANY OTHER SUBSCRIBER AND WHOSE AMOUNT IN CONTROVERSY IS PROPERLY WITHIN THE JURISDICTION OF A COURT THAT IS LIMITED TO ADJUDICATING SMALL CLAIMS" (ECF No. 23–1 at 82; *Id.* at 117.)

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

10

2022 WL 16749033
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Michael PRICHARDA, Plaintiff,

v.

CHECKR, INC., Defendant.

No. 5:22-cv-3180
|
Signed November 7, 2022

**Attorneys and Law Firms**

Michael Pricharda, Reading, PA, Pro Se.

Kacie Elisabeth Kergides, John G. Papianou, Montgomery McCracken Walker & Rhoads LLP, Philadelphia, PA, for Defendant.

<u>**OPINION**</u>

**Defendant's Motion to Compel Arbitration
and Stay Proceedings, ECF No. 15 – Granted**

Joseph F. Leeson, Jr., United States District Judge

**I. INTRODUCTION**

*1  Plaintiff Michael Pricharda filed a Complaint in the Court of Common Pleas of Berks County against Defendant Checkr, Inc., a consumer reporting agency, for allegedly providing false information about Pricharda in a background check provided to prospective employers. Checkr removed the action to this Court based on federal question jurisdiction, maintaining its assertion that Pricharda agreed to the Terms of Service on Checkr's website, which included an Arbitration Clause. Defendant filed a Motion to Compel Arbitration and Stay Proceedings. Pricharda opposes the motion. For the reasons set forth below, the Motion to Compel Arbitration and Stay Proceedings is granted, and the matter is stayed pending arbitration.

**II. BACKGROUND**

In July 2022, Pricharda instituted this action against Checkr, for allegedly providing false information about Pricharda in a background check given to prospective employers in violation of the Fair Credit Reporting Act, among other

claims. [1]  *See* Not. Remov. at Ex. A (Compl.) ¶¶ 6, 7, & 17, ECF No. 1. Checkr removed the action to this Court, based on the alleged Fair Credit Reporting Act violation. Not. Remov. at p. 3. Defendant subsequently filed a Motion to Compel Arbitration and Stay Proceedings, arguing that Pricharda agreed to Checkr's Terms of Service, which included an Arbitration Clause, when using Checkr's website. Mot. Compel. Attached to the motion is the declaration of Jason Goodman, Checkr's Senior Staff Product Manager for Product & Engineering, stating that he reviewed and was familiar with Pricharda's consumer file and the Terms of Service as they existed at the time Pricharda used Checkr's website, and that Checkr identified Pricharda's use of Checkr's website through Pricharda's consumer file and IP address. Mot. Compel, Goodman Dec. ¶¶ 5-9, ECF No. 15. In his response, [2] Pricharda does not allege that he rejected the Arbitration Clause, but rather, asserts that the Terms of Service do not apply to him or, alternatively, are unconscionable and should not be enforced. *See* Pl. Resp. ¶ 5, 7, ECF No. 16.

In or around May 2022, Checkr prepared a background report on Pricharda at the request of Pricharda's prospective employer, Alliance Marketing Partners. *See* Compl. ¶¶ 5-7; Goodman Dec. ¶ 6. In connection with this report, Pricharda accessed Checkr's "Candidate Portal" through its website on two occasions. Goodman Dec. ¶ 6. On both occasions, before Pricharda was granted access to the portal, he was required to enter personal identifying information, including his Social Security Number and date of birth, and he was presented with Checkr's Terms of Service. *Id.* On May 20, 2022, and June 7, 2022, Pricharda consented electronically to the Terms of Service by clicking a box which read, "By checking this box, I agree to Checkr's Terms of Service (set forth above)." Goodman Dec. ¶¶ 6, 8-9.

*2  The Terms of Service contained an Arbitration Clause, providing the following:

> In exchange for the benefits of the speedy, economical, and impartial dispute resolution procedure of arbitration, You and Checkr mutually agree to give up our right to resolve disagreements in a court of law by a judge or jury, and, as described below, agree to binding and final arbitration

Pricharda v. Checkr, Inc., Slip Copy (2022)

2022 WL 16749033

pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*

Mot. Compel, Ex. 2 ("TOS") at p. 15,[3] § 14, ECF No. 15. In addition, a notice appeared in bold, all capital letters in the first paragraph of the Terms of Service advising users of a binding arbitration provision and class action waiver in the TOS. TOS at p. 7. A second paragraph also appeared in all capital letters advising users that Section 14 of the Terms of Service required all claims and disagreements to be resolved through binding arbitration. *Id.* The Arbitration Clause also included a delegation clause, which explained that "disagreement about the arbitrability of any Claim (including questions about the scope, applicability, interpretation, validity, and enforceability of this arbitration agreement) ... shall be delegated to the arbitrator (not a court) [,]" and "the arbitrator shall have initial authority to resolve such threshold disagreements." TOS at p. 15, § 14. The Terms of Service informed Prichada of his right to reject the Arbitration Clause within thirty days, the details the written rejection notice must contain, and the address to send the rejection notice. TOS at p. 17, § 14(H).

For the reasons set forth below, the Motion to Compel Arbitration and Stay Proceedings is granted.

## III. LEGAL STANDARDS

### A. Motion to Compel Arbitration – Review of Applicable Law

"It is well established that the Federal Arbitration Act (FAA), reflects a strong federal policy in favor of the resolution of disputes through arbitration." *Kirleis v. Dickie, McCamey & Chilcote, P.C.,* 560 F.3d 156, 160 (3d Cir. 2009) (internal quotations omitted). "Before compelling a party to arbitrate pursuant to the FAA, a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." *Century Indem. Co. v. Certain Underwriters at Lloyd's,* 584 F.3d 513, 522 (3d Cir. 2009).

"However, when an arbitration provision, by 'clear and unmistakable evidence,' contains a valid delegation clause, the court's inquiry is limited to the first step: determining whether a valid agreement to arbitrate exists." *Coulter v. Experian Info. Sols., Inc.,* No. 20-cv-1814, 2021 WL 735726, at *4, 2021 U.S. Dist. LEXIS 35175, at *9 (E.D. Pa. Feb. 25,

2021) (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.,* —— U.S. ——, 139 S. Ct. 524, 530, 202 L.Ed.2d 480 (2019)). *See also MXM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds,* 974 F.3d 386, 402 (3d Cir. 2020) ("[U]nder section [four] of the [Federal Arbitration Act], courts retain the primary power to decide questions of whether the parties mutually assented to a contract containing or incorporating a delegation provision."). Therefore, "if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc.,* 139 S. Ct. at 530. Additionally, "unless the party opposing arbitration challenges the delegation provision specifically, the district court must treat it as valid and must enforce it by sending any challenge to the validity of the underlying arbitration agreement to the arbitrator." *MXM Constr. Co.,* 974 F.3d at 399 (citing *Rent-A-Center, W., Inc. v. Jackson,* 561 U.S. 63, 72 (2010)) ("Think of a delegation provision as a mini-arbitration agreement within a broader arbitration agreement within a broader contract, something akin to Russian nesting dolls.") (cleaned up).

*3 A "clickwrap" agreement is one that "appears on an internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction." *Feldman v. Google, Inc.,* 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007) (citation omitted). "To determine whether a clickwrap agreement is enforceable, courts presented with the issue apply traditional principles of contract law and focus on whether the plaintiffs had reasonable notice of and manifested assent to the clickwrap agreement." *Lewis v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.,* No. 20-cv-4368, 2020 WL 7260747, at *4, 2020 U.S. Dist. LEXIS 232062, at *10-11 (E.D. Pa. Dec. 10, 2020) (internal quotation and citation omitted). Courts in this district have regularly held "that 'clickwrap' agreements manifest sufficient agreement to the terms in the contract." *Dobbs v. Health IQ Ins. Servs.,* No. 21-cv-5276, 2022 WL 2974713, at *4, 2022 U.S. Dist. LEXIS 133182, at *8 (E.D. Pa. July 27, 2022) (citing *Zabokritsky v. JetSmarter, Inc.,* No. 19-cv-273, 2019 WL 2563738, at *3 n.30 (E.D. Pa., 2019)). *See also Putt v. Tripadvisor Inc.,* No. 20-cv-3836, 2021 WL 242470, at *6, 2021 U.S. Dist. LEXIS 12997, at *15 (E.D. Pa. Jan. 25, 2021) ("Clickwrap agreements are 'routinely enforced by the courts.' " (internal citation omitted)). When reviewing these routine internet transactions, "the occurrence of mutual assent ordinarily turns on whether the consumer had reasonable notice of the merchant's terms of service agreement." *Dobbs,* 2022 WL

Pricharda v. Checkr, Inc., Slip Copy (2022)

2022 WL 16749033

2974713, at *3, 2022 U.S. Dist. LEXIS 133182, at *8 (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)).

### B. Motion to Compel Arbitration – Standard of Review

In deciding whether to compel arbitration, a district may either employ the motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) or the motion for summary judgment standard under Federal Rule of Civil Procedure 56. *See MacDonald v. Unisys Corp.*, 951 F. Supp. 2d 729, 732 (E.D. Pa. 2013). If arbitrability is not apparent on the face of the complaint or if the non-moving party has "come forth with reliable evidence that is more than a naked assertion ... that it did not intend to be bound by the arbitration agreement, ... the issue should be judged under the Rule 56 standard." *Guidotti v. Legal Helpers Debt Resolution L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (internal quotations omitted). The summary judgment standard is also applied if the parties rely on factual evidence outside the pleadings in arguing that arbitration is or is not appropriate. *See Smeck v. Comcast Cable Communs. Mgmt., LLC*, No. 19-cv-3625-JMY, 2020 WL 6940011 at *3, 2020 U.S. Dist. LEXIS 221526 at *8 (E.D. Pa. Nov. 25, 2020).

Here, arbitrability is not apparent on the face of the complaint and Checkr's motion is therefore evaluated under the summary judgment standard.

### C. Motion for Summary Judgment under Rule 56 – Review of Applicable Law

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 257, 106 S.Ct. 2505. The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S.

at 324, 106 S.Ct. 2548; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

*4 The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. *See also Antkowiak v. Taxmasters*, 455 F. App'x 156, 159 (3d Cir. 2011) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000)) ("A party opposing a motion to compel arbitration bears the burden of proving the arbitration clause unenforceable."). The court must consider the evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). *See also Antkowiak*, 455 F. App'x at 159 ("All reasonable inferences from the evidence are to be granted to the party opposing arbitration.").

### IV. DISCUSSION

For the following reasons, the Motion to Compel Arbitration is granted. First, the Court finds there was an agreement to arbitrate: the Terms of Service - a clickwrap agreement. Pricharda's assent to the clickwrap agreement is sufficient to indicate his intent to be bound by the Terms of Service. Although Pricharda argues that the Terms of Service did not apply to him or, in the alternative, were unconscionable, [4] Pricharda does not dispute using Checkr's website or manifesting assent to the Terms of Service by clicking "I agree." Moreover, Pricharda's "conclusory statement that he did not enter into any agreement with [Checkr] is insufficient to create an issue of material fact." *See Dobbs*, 2022 WL 2974713, at *4, 2022 U.S. Dist. LEXIS 133182, at *11. Most significantly, Pricharda was reasonably on notice of the Terms of Service when he assented to the clickwrap agreement, which alerted him to the presence of the Arbitration Clause in bold and all capital lettering at the very beginning of the Agreement. Accordingly, this Court finds that Pricharda assented to Checkr's Terms of Service and, in doing so assented to the Arbitration Clause contained within. As a result, the parties entered into a valid arbitration agreement, and this matter must be referred to arbitration.

Pricharda v. Checkr, Inc., Slip Copy (2022)
2022 WL 16749033

Second, the Court finds that Pricharda agreed to delegate issues of arbitrability to the arbitrator. Although Pricharda argues that the Terms of Service is unconscionable and challenges its validity as a whole, nowhere in his opposition to Checkr's motion does Pricharda mention the delegation provision, let alone specifically argue it is unenforceable or unconscionable. Therefore, without a specific challenge to the delegation provision, this Court is required to treat the provision as valid and enforce it pursuant to section four of the Federal Arbitration Act. Accordingly, pursuant to the language in the Terms of Service requiring questions of arbitrability to go to arbitration, Pricharda's unconscionability challenges are for the arbitrator to decide, not this Court.

Accordingly, this Court finds that Pricharda assented to Checkr's Terms of Service and, in doing so assented to the Arbitration Clause contained therein. As a result, the parties entered into a valid arbitration agreement, and this matter must be referred to arbitration.

## V. CONCLUSION

**\*5** Pricharda voluntarily assented to Checkr's clickwrap Terms of Service, which contained a valid arbitration agreement. Because of the enforceable delegation clause contained within the clickwrap agreement and Pricharda's failure to challenge the delegation clause itself, his arguments about arbitrability and unconscionability must also be arbitrated. Checkr's Motion to Compel Arbitration is therefore granted, and the above-captioned case is stayed pending resolution of arbitration.

A separate Order follows.

## All Citations

Slip Copy, 2022 WL 16749033

## Footnotes

1    Although the Fair Credit Reporting Act is not specifically mentioned as a cause of action in Pricharda's complaint, *pro se* pleadings are "liberally construed" by this Court. *See Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

2    Although titled a "Motion to Strike," *see* ECF No. 16, this Court views Pricharda's filing as a response in opposition to the motion to compel due to its substance.

3    This Court uses the pagination assigned by the Electronic Filing System.

4    Notably, Pricharda does not specifically mention the Terms of Service at issue, but argues that "[a]ny language that may exist by and between ShiftSmart app and Checkr Inc. are terms and conditions pertinent to their contract together, but that relationship does not extend to the consumer and if any language like that may exist in provisions extended to the consumer, that language must be found to be unconscionable[.]" Pl. Resp. ¶ 7. The Court interprets Pricharda's argument as one generally contesting the enforceability of the Terms of Service as to him.

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

11

Rodriguez v. Experian Services Corp., Not Reported in Fed. Supp. (2015)

2015 WL 12656919

2015 WL 12656919
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Sue RODRIGUEZ, et al., Plaintiffs,

v.

EXPERIAN SERVICES CORP., et al., Defendants.

Case No. CV 15–3553–R
|
Signed 10/05/2015

**Attorneys and Law Firms**

Edward H. Nicholson, Jr., Nicholson Law Firm PA, Andrew J. Schwaba, Schwaba Law Firm, Charlotte, NC, R. Kevin Fisher, Fisher and Krekorian, Los Angeles, CA, for Plaintiffs.

Levi William Heath, Jonathan Boustani, Barnes and Thornburg LLP, Los Angeles, CA, Mark W. Bayer, Barnes and Thornburg LLP, Dallas, TX, Jaclyn B. Stahl, John A. Vogt, Jones Day, Irvine, CA, for Defendants.

ORDER GRANTING DEFENDANTS'
MOTION TO COMPEL ARBITRATION

MANUEL L. REAL, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is Defendants' Motion to Compel Arbitration, which was filed on September 3, 2015. Having been thoroughly briefed by both parties, this Court took the matter under submission on September 29, 2015.

"The [Federal Arbitration Act ("FAA") ] provides that any arbitration agreement within its scope 'shall be valid, irrevocable, and enforceable,' and permits a party 'aggrieved by the alleged ... refusal of another to arbitrate' to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." *Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting Title 9 U.S.C. § 4). The FAA reflects both a "liberal federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract." *AT & T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1745 (2011). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Id.* The FAA "leaves no place for the exercise of discretion by a district court, but

instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985). "The court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.... If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron Corp.*, 207 F.3d at 1130.

The arbitration agreement subject to dispute here was found under the "Terms of Use" of the Defendants' website. Contracts formed on the Internet come primarily in two flavors: "clickwrap" agreements, in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014). The Defendants' website features the "browsewrap" agreement that does not require an express agreement to the "Terms and Conditions" of its website.

"The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Id.* at 1176 (quoting *Be In, Inc. v. Google Inc.*, 2013 WL 5568706, at \*6 (N.D.Cal. Oct. 9, 2013)). "Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Id.* (quoting *Van Tassell v. United Mktg. Grp., LLC*, 795 F.Supp.2d 770, 790 (N.D.Ill. 2011)).

**\*2** In *Nguyen*, there was no evidence that the website user had actual knowledge of the agreement; therefore, the validity of the browsewrap agreement turned on whether the website put a "reasonably prudent user on inquiry notice of the terms of the contract." *Id.* at 1177. The Ninth Circuit held that where a website makes its terms of use available via a conspicuous hyperlink on every page of the website, but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—*without more*—is insufficient to give rise to constructive notice. *Id.* at 1178–79 (emphasis added). The *without more*

Rodriguez v. Experian Services Corp., Not Reported in Fed. Supp. (2015)

2015 WL 12656919

refers to additional language found in other cases such as *Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829 (S.D.N.Y. 2012). In *Fteja*, a Southern District Court in New York enforced a forum selection clause in the website's terms of service where a notice below the "Sign Up" button stated, "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service." *Id.* at 838–40. Likewise in *Graf v. Match.com, LLC*, the court held that an arbitration clause was valid since all users of the Match.com website were required to affirmatively agree to the Terms of Use when they clicked on a "Continue" where it was explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use, which were always hyperlinked and available for review. 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015). These types of "browsewrap" agreements commonly used to bind a website user to a website's terms of use are "consistently enforced." *Nguyen*, 763 F.3d at 1176.

Like the disclosures in *Fteja* and *Graf*, the Defendants' website contains the exact disclosure that the Ninth Circuit found was missing in *Nguyen*. Their website contained a hyperlink to the Terms of Use at the bottom of every page and included an express disclosure and acknowledgment, which stated, "By clicking the button above ... you agree to our Terms of Use." This disclosure and acknowledgment is exactly the type of notice the Ninth Circuit in *Nguyen* required and approved of when it said that more than a conspicuous hyperlink was required.

Plaintiff also argues that the arbitration agreement contained in the Terms of Use is unenforceable because it is unconscionable. "Like other contracts, arbitration agreements can be invalidated for fraud, duress, or unconscionability." *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 921 (9th Cir. 2013). "Unconscionability under California law 'has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results.' " *Kilgore v. KeyBank Nat'l Ass'n*, 673 F.3d 947, 963 (9th Cir. 2012) (quoting *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83, 114 (2000)). California courts apply a 'sliding scale' analysis in determining unconscionability: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable and vice versa." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 996 (9th Cir. 2010). "Thus, although both procedural and substantive unconscionability must be present

for the contract to be declared unenforceable, they need not be present to the same degree." *Id.*

"In assessing procedural unconscionability, the court, under California law, focuses on the factors of surprise and oppression in the contracting process, including whether the contract was one drafted by the stronger party and whether the weaker party had an opportunity to negotiate." *Id.* Oppression arises "from an inequality of bargaining power [that] results in no real negotiation and an absence of meaningful choice." *Circuit City Stores, Inc. v. Mantor*, 335 F.3d 1101, 1106 (9th Cir. 2003) (quoting *Stirlen v. Supercuts, Inc.*, 51 Cal.App. 4th 1519, 1532 (1997)). Surprise "involves the extent to which the contract clearly discloses its terms as well as the reasonable expectations of the weaker party," *Chavarria*, 733 F.3d at 922, and "involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Stirlen*, 51 Cal.App. 4th at 1532.

The arbitration agreement is not procedurally unconscionable. It is not oppressive because Plaintiffs had plenty of alternative options to locate other debt relief providers. It cannot be said that these two parties had unequal bargaining power since Plaintiffs could have easily gone elsewhere for debt relief options. Plaintiffs cannot claim surprise. The Terms of Use during all relevant times were between three to four pages long. It contained normal size font and all the headings were bolded. In fact, the entire arbitration provision appears in all caps in the 2012 version. *See Graf*, 2015 WL 4263957 at *5 (finding that although the terms of use were drafted by defendant, the arbitration provision was presented as its own section of the Terms of Use, used bold type to draw the reader's attention to it, and its terms were clearly explained in the "Notice of Rights" section immediately following the arbitration provision).

**\*3** The arbitration agreement is also not substantively unconscionable. A contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be so one-sided as to shock the conscience. *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 246 (2012). Plaintiff argues that the arbitration clause is substantively unconscionable because the Defendants' Terms of Use allow the Defendants to change the arbitration clause at any time, without notice. While this provision does give the Defendants' side a greater benefit, California courts have rejected such an argument because the Defendants are still bound by the implied

Rodriguez v. Experian Services Corp., Not Reported in Fed. Supp. (2015)

2015 WL 12656919

covenant of good faith and fair dealing. *See Casas v. Carmax Auto Superstores Cal. LLC*, 224 Cal. App. 4th 1233, 1237 (2014); *24 Hour Fitness, Inc., v. Superior Court*, 66 Cal. App. 4th 1199, 1214 (1998) ("[W]here the contract specifies performance the fact that one party reserves the power to vary it is not fatal if the exercise of the power is subject to ... good faith and in accordance with fair dealings.").

Because Plaintiffs have failed to meet their burden, the Court finds that the provision is not procedurally or substantively unconscionable. *See Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 911 (2015) ("Because unconscionability is a contract defense, the party asserting the defense bears the burden of proof.").

**IT IS HEREBY ORDERED** that Defendants' Motion to Compel Arbitration is GRANTED. (Dkt. No. 24) Since Plaintiffs do not dispute that each of their claims plead in this case fall within the scope of the arbitration agreement, this action is dismissed. All remaining Motions are now moot. (Dkt. Nos. 26, 35, 36, and 37).

**All Citations**

Not Reported in Fed. Supp., 2015 WL 12656919

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

12

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Wilson v. Redbox Automated Retail, LLC,   N.D.Ill.,
March 25, 2020

2016 WL 6476934
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

Gregory SELDEN, et al., Plaintiffs,

v.

AIRBNB, INC., Defendant.

Case No. 16-cv-00933 (CRC)
|
Signed 11/01/2016

**Attorneys and Law Firms**

Andrew Nyombi, Ikechukwu Emejuru, Emejuru and Nyombi,
LLC, Silver Spring, MD, for Plaintiffs.

Ellen S. Kennedy, Sean Marotta, Hogan Lovells US LLP,
Washington, DC, for Defendant.

## MEMORANDUM OPINION

CHRISTOPHER R. COOPER, United States District Judge

**\*1** All of us who have signed up for an online service
recently will recall the experience. After entering the service
provider's website, we were presented with a "sign up"
or "create account" button prominently displayed on the
screen. Next to the button—less prominent, no doubt—was
the ubiquitous advisory that, by signing up, we would be
accepting the provider's "terms of service." Perhaps there was
a separate check-box prompting us to indicate our agreement
to those terms. Regardless, eager to begin using the service
and realizing that the provider's contractual terms are non-
negotiable, most of us signed up without bothering to click
the accompanying link to reveal the contractual terms. Those
who did undoubtedly found numerous pages of legalese. The
intrepid few who actually read all the terms almost certainly
learned that one of them requires users to relinquish their right
to have a jury resolve any dispute with the provider. And
that another bars class actions. This experience, shared by
countless people each day, gives rise to the dispute presently
before the Court.

Plaintiff Gregory Selden, who is African American, signed up
with the popular residential rental service Airbnb in advance
of a weekend getaway to Philadelphia. He created the required
user profile, including his photograph, and contacted an
Airbnb "host" about a promising listing. The host allegedly
responded that the residence was not available. Smelling a
rat, Selden created a second account under a pseudonym,
with a photograph of a white person in the user profile, and
contacted the same host about the same accommodation. This
time, Selden claims, the host was only too happy to rent the
residence.

Selden filed suit against Airbnb for race discrimination
on behalf of himself and fellow African-American
travelers who have reported similar treatment on Airbnb.
See, e.g., Elaine Glusac, As Airbnb Grows, So
Do Claims of Discrimination, N.Y. Times (June 26,
2016), http://www.nytimes.com/2016/06/26/travel/airbnb-
discrimination-lawsuit.html. Likening Airbnb to a hotel and
its hosts to rental agents or hotel employees, Selden seeks
to hold the company responsible under federal civil rights
laws for the discriminatory conduct of those who offer
accommodations on its website. Airbnb contests liability,
although that issue is not before the Court because the
company's standard Terms of Service—which it claims
Selden accepted by signing up to use the site—contain a
clause requiring all disputes to be resolved by an arbitrator.
Civil lawsuits with a potential jury trial are prohibited. As are
class actions.

Invoking this clause, Airbnb moves to compel arbitration of
Selden's claims. Selden responds that no contract exists—
and therefore the arbitration clause does not apply—because
the sign-up process did not place him on adequate notice
that he was agreeing to Airbnb's Terms of Service, including
mandatory arbitration. He further argues that, even if a
contract was formed, the arbitration provision does not apply
to discrimination suits and is unconscionable in any event.

**\*2** The Court must grant Airbnb's motion. No matter
one's opinion of the widespread and controversial practice
of requiring consumers to relinquish their fundamental
right to a jury trial—and to forego class actions—as a
condition of simply participating in today's digital economy,
the applicable law is clear: Mutual arbitration provisions
in electronic contracts—so long as their existence is
made reasonably known to consumers—are enforceable, in
commercial disputes and discrimination cases alike. And
Airbnb's sign-up procedures were sufficiently clear to place

Case 3:22-cv-02077-MEM   Document 13-2   Filed 03/20/23   Page 91 of 102

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

Mr. Selden on notice that he was agreeing to the company's Terms of Service when he created an account. While that result might seem inequitable to some, this Court is not the proper forum for policy objections to mandatory arbitration clauses in online adhesion contracts. Such objections should be taken up with the appropriate regulators or with Congress.

I. Background & Procedural Posture

A. Selden's Use of Airbnb

Gregory Selden and a friend planned a trip to Philadelphia in March 2015. Second Amend. Compl. ¶¶ 28-35. To book their accommodations, Selden turned to Airbnb, which describes itself as "a trusted community marketplace for people to list, discover, and book unique accommodations all around the world." About Us, Airbnb, http://www.airbnb.com/about/aboutus (last visited Oct. 24, 2016). Airbnb allows property owners or their representatives—"hosts" in the company's parlance—to list their accommodations on the platform, where travelers then attempt to book them. Def.'s Mot. Compel Arbitration ("MCA"), Decl. of Kyle Miller ¶ 2. While Airbnb facilitates the transactions, the hosts, alone, are responsible for deciding to whom they will offer their homes for short-term stays. Id.

Selden first created his Airbnb account in March 2015, using an iPhone mobile device. Pl.'s Opp'n MCA, Decl. of Gregory Selden ¶ 2; Supp. Decl. of Kyle Miller ¶¶ 2, 4. Airbnb's mobile sign-up screen, attached as an appendix to this Memorandum Opinion, presented Selden with three options in descending order: "Sign up with Facebook," "Sign up with Google," and "Sign up with Email." See Appendix. Below the "Sign up with Email" button was text that read: "By signing up, I agree to Airbnb's Terms of Service, Privacy Policy, Guest Refund Policy, and Host Guarantee Terms." Id. The text contained hyperlinks to these various agreements. Id. Airbnb's Terms of Service include, among other provisions, a mandatory arbitration clause. Def's MCA, Ex. B, 16-18. Selden clicked "Sign up with Facebook" at the top of the page, and proceeded to create his Airbnb profile in order to use the service. Decl. of Gregory Selden ¶ 6.

Selden's profile included a photograph of his face, along with other details like his name, age, and education. Shortly after creating his account, he inquired with a host about the availability of a listing that met his needs. Id. at ¶¶ 6-7. According to Selden, the host informed him that the

accommodation was not available. Id. at ¶ 7. While browsing Airbnb later that day, however, Selden noticed that the listing was still posted. Id. at ¶ 8. Suspecting that he was denied accommodations due to his race, Selden created two fictitious Airbnb accounts with profile photos depicting white men. Id. He then used those accounts to apply to the same listing, and, he claims, the host accepted both. Id. Selden later took to social media with his claims of discrimination, and the hashtag "#airbnbwhileblack" quickly went viral. Second Amend. Compl. ¶ 50.

B. Airbnb's Terms of Service

Airbnb's Terms of Service at the time Selden signed up for Airbnb spanned seventeen single-spaced pages and began with the following statement:

PLEASE READ THESE TERMS OF SERVICE CAREFULLY AS THEY CONTAIN IMPORTANT INFORMATION REGARDING YOUR LEGAL RIGHTS, REMEDIES AND OBLIGATIONS. THESE INCLUDE VARIOUS LIMITATIONS AND EXCLUSIONS, A CLAUSE THAT GOVERNS THE JURISDICTION AND VENUE OF DISPUTES, AND OBLIGATIONS TO COMPLY WITH APPLICABLE LAWS AND REGULATIONS.

**\*3** Pl.'s MCA, Ex. B, 2. The "Dispute Resolution" clause, by which Airbnb seeks to compel arbitration, appeared on page fifteen of the document:

You and Airbnb agree that *any dispute, claim or controversy arising out of or relating to these Terms* or the breach, termination, enforcement, interpretation or validity thereof, or to the use of the Services or use of the Site or Application (collectively, "Disputes") will be settled by binding arbitration, except that each party retains the right to seek injunctive

Case 3:22-cv-02077-MEM   Document 13-2   Filed 03/20/23   Page 92 of 102

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights. You acknowledge and agree that you and Airbnb are each waiving the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding. If this specific paragraph is held unenforceable, then the entirety of this "Dispute Resolution" section will be deemed void. Except as provided in the preceding sentence, this "Dispute Resolution" section will survive any termination of these Terms.

Def.'s MCA, Ex. B, 16 (emphasis added). The section continued that any arbitration proceedings shall be administered by the American Arbitration Association and offered general details about the arbitration process. Id. at 16-18.

### C. Procedural History

Selden filed a putative class action suit against Airbnb in this Court on May 17, 2016, and has since twice amended his Complaint. He is the sole named Plaintiff. See Second Amend. Compl. Selden alleges that Airbnb violated Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, which prohibits race discrimination in public accommodations; the Civil Rights Act of 1866, 42 U.S.C. § 1981, which prohibits race discrimination in the formation of contracts; and the Fair Housing Act, 42 U.S.C. § 3604, which prohibits race discrimination in the sale or rental of housing. Id. at ¶¶ 53-72. Airbnb moved to compel arbitration on July 13, 2016. See Def.'s MCA. The Court heard oral argument on the motion on October 12, 2016.

### II. Legal Standards

The Federal Arbitration Act ("FAA") provides that a provision in a contract requiring the arbitration of disputes related to the contract "shall be valid." 9 U.S.C. § 2. The D.C. Circuit has held that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Wolff v. Westwood Mgmt., LLC, 558 F.3d 517, 520 (D.C. Cir. 2009). Notwithstanding a prior agreement to arbitrate, plaintiffs often attempt to resolve disputes in federal court. Section 4 of the FAA provides a remedy for the defendant: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

Such a petition is often called a motion to compel arbitration, and is properly resolved under the summary judgment standard. Aliron Intern., Inc. v. Cherokee Nation Indus., Inc., 531 F.3d 863, 865 (D.C. Cir. 2008). The Court may consider evidence outside of the Complaint and shall grant the motion if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And in making this determination, the Court shall view the facts "in the light most favorable to the nonmoving party." Chambers v. U.S. Dept. of Interior, 568 F.3d 998, 1000 (D.C. Cir. 2009).

### III. Analysis

**\*4** Airbnb's Motion to Compel Arbitration presents three questions: (1) did Selden agree to Airbnb's Terms of Service; (2) if so, does the mandatory arbitration clause apply to his claims of race discrimination; and (3) if the clause applies to his claims, is it enforceable? For the reasons explained below, the Court finds that Selden agreed to the Terms of Service, that those terms require the arbitration of unlawful race discrimination claims, and that the agreement is enforceable.

### A. Whether Selden Agreed to Airbnb's Terms of Service

#### 1. Online Adhesion Contracting

Arbitration is a matter of contract law. Thus, whether Selden agreed to arbitrate depends on whether a valid contract was formed. [1] Airbnb's Terms of Service agreement can be described as an online adhesion contract. Courts and commentators have identified a number of variations of these electronic agreements, including "browsewraps," "clickwraps," "scrollwraps," and "sign-in-wraps." See, e.g., Nguyen v. Barnes & Noble, Inc., 763 F.3d 1171, 1175-77 (9th Cir. 2014); Berkson v. Gogo LLC, 97 F. Supp. 3d 359,

Case 3:22-cv-02077-MEM   Document 13-2   Filed 03/20/23   Page 93 of 102

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 6476934

366-67 (E.D.N. Y 2015). A "browsewrap" agreement is one in which an internet user accepts a website's terms of use merely by browsing the site. A "clickwrap" agreement is one in which an internet user accepts a website's terms of use by clicking an "I agree" or "I accept" button, with a link to the agreement readily available. A "scrollwrap" agreement is like a "clickwrap," but the user is presented with the entire agreement and must physically scroll to the bottom of it to find the "I agree" or "I accept" button. Finally, many internet websites—including Airbnb during the relevant time period—now use "sign-in-wraps" (although "sign-*up*-wrap" is a more appropriate name). "Sign-in-wrap" agreements are those in which a user signs up to use an internet product or service, and the signup screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up. See Barnes & Noble, 763 F.3d at 1177-79; Cullinane v. Uber Technologies, 2016 WL 3751652 at *5-7 (D. Mass. July 11, 2016).

While the relevant terminology continues to evolve, the Court's inquiry into contract formation does not. See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."). "Mutual manifestation of assent"—the "touchstone of contract"—must still be present. Barnes & Noble, 763 F.3d at 1175 (quoting Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 29 (2d Cir. 2002) (applying California law)). But because this case concerns a type of "sign-in-wrap" agreement, the consumer's assent is "largely passive." Berkson, 97 F. Supp. 3d at 393 (applying California law). As a result, "the contract-formation question will often turn on whether a reasonably prudent offeree would be on inquiry notice of the terms at issue." Schnabel v. Trilegiant Corp., 697 F.3d 110, 126-27 (2d Cir. 2012) (holding that under California law, consumers were not on inquiry notice of an arbitration provision when the relevant terms were sent to them by e-mail following enrollment in an online service). As then-Judge Sotomayor explained in assessing online adhesion contracts generally, "[c]larity and conspicuousness of [the] terms are important" in making this determination. Specht, 306 F.3d at 30 (applying California law).

**\*5** Applying these principles to sign-in-wrap agreements specifically, Judge Weinstein noted in an extensive discussion on the issue that district courts tend to uphold the agreements

under three circumstances. Berkson, 97 F. Supp. 3d at 400-01. *First,* the agreements tend to be enforced if "the hyperlinked 'terms and conditions' is next to the only button that will allow the user to continue use of the website." Id. (citing Crawford v. Beachbody, LLC, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) (finding a forum selection clause binding when the "terms and conditions" statement was directly above the "Place Order" button)); Starke v. Gilt, 2014 WL 1652225, at *2-3 (S.D.N.Y. Apr. 24, 2014) (finding an arbitration clause binding when the "terms of use" statement was right next to the "Shop Now" button); Swift v. Zynga Game Network, Inc., 805 F. Supp. 2d 904, 908, 912 (N.D. Cal 2011) (finding an arbitration clause binding where the "terms of service" statement was directly below the "Accept" button). *Second,* courts tend to uphold sign-in-wrap agreements if "the user 'signed up' to the website and was presented with hyperlinks to the terms of use on subsequent visits." Berkson, 97 F. Supp. 3d at 401 (citing Nicosia v. Amazon.com, Inc., 84 F. Supp. 3d 142, 151-53 (E.D.N.Y. Feb. 4, 2015) (finding an arbitration clause binding when the user clicked a box acknowledging the terms at the initial signup to the website and was presented with a hyperlink at the top of the webpage to terms of use multiple times after making purchases)). And *third,* sign-in-wrap agreements are usually upheld if "notice of the hyperlinked terms and conditions is present on multiple successive webpages of the site." Berkson, 97 F. Supp. 3d at 401 (citing Major v. McCallister, 302 S.W.3d 227, 230-31 (Mo. Ct. App. 2009) (finding a forum selection clause binding when the hyperlink to the terms and conditions was presented on multiple successive webpages and on the final page of the website's sign-up process)).

Finally, courts that have assessed the validity of sign-in-wrap agreements since Berkson have cited factors such as the size of the font, the possibility that other visual elements on the screen might obscure the "terms and conditions" statement, and whether the user signed up for the agreement using a mobile device. Compare Meyer v. Kalanick, 2016 WL 4073012 at *4, *6 (S.D.N.Y. July 29, 2016) (Rakoff, J.) (finding Uber's terms-of-service agreement *not* binding when the terms-of-service statement "was in a font that was barely legible on [a] smartphone device ... [and] beneath two additional buttons") with Cullinane, 2016 WL 3751652 at *7 (finding Uber's terms-of-service agreement binding because of the "prominent" placement of the terms-of-service statement).

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

### 2. Application of the Law to Airbnb's Terms of Service Agreement

The Court finds that Airbnb's mobile sign-up screen adequately placed Selden on notice of Airbnb's Terms of Service, and that he assented to those terms by clicking the sign-up box and using the service. The text "By signing up, I agree to Airbnb's Terms of Service" is conspicuous. See Appendix. It is placed in roughly the middle of the page, in close proximity to all three sign-up buttons. The text also appears in dark font, in sharp contrast to the white background. It is, moreover, clearly legible, appropriately sized, and unobscured by other visual elements. Although the text is not directly under the first or second alternative sign-up buttons, any reasonably-observant user would notice the text and accompanying hyperlinks. So even if Selden only clicked "Sign up with Facebook" at the top of the page, he would have seen the relevant text from a quick glance down the rest of the page. Thus, by choosing to sign up for Airbnb, Selden manifested his assent to the Terms of Service. [2]

There is also a wider point to be made, as illustrated at the outset of this opinion. The act of contracting for consumer services online is now commonplace in the American economy. Any reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider. Notifications to that effect—be they check boxes or hyperlinks—abound. To be sure, few people may take time to actually read the user agreements. But ignorance of the precise terms does not mean that consumers are unaware they are entering contracts by signing up for internet-based services. So, while the record is silent as to Mr. Selden's particular history with e-commerce, the prevalence of online contracting in contemporary society lends general support to the Court's conclusion that Selden was on notice that he was entering a contract with Airbnb in this case.

### B. Whether Airbnb's Arbitration Agreement Encompasses Selden's Discrimination Claims

**\*6** Having found that Selden agreed to Airbnb's Terms of Service, including the mandatory arbitration clause, the Court next turns to whether the arbitration provision encompasses Selden's claims. Again, the provision states that "[the user] and Airbnb agree that *any dispute, claim or controversy arising out of or relating to these Terms*

*or the breach, termination, enforcement, interpretation or validity thereof, or to the use of the Services or use of the Site or Application (collectively, 'Disputes') will be settled by binding arbitration.*" Def.'s MCA, Ex. B, 17 (emphasis added).

Courts applying California law interpret the language "arising out of or relating to" very broadly. [3] California, like most jurisdictions, "embrace[s] a judicial policy strongly in favor of enforcing arbitration contracts." Bos Material Handling, Inc. v. Crown Controls Corp., 137 Cal. App. 3d 99, 105 (Cal. Ct. App. 1982). Courts applying California law "have held such arbitration agreements sufficiently broad" to include claims that "have their roots in the relationship between the parties which was created by the contract." Id. at 105-06 (internal quotations omitted). This language "reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." Rice v. Downs, 247 Cal. App. 4th 1213, 1224 (Cal. Ct. App. 2016). "To require arbitration, the factual matters need only touch matters covered by the contract containing the arbitration clause *and all doubts are to be resolved in favor of arbitrability.*" Id. (emphasis added).

Supreme Court precedent instructs federal courts to take the same approach. See Dowley v. Dewey Ballantine, LLP, 2006 WL 1102768 at *8 (D.D.C. Apr. 26, 2006) (noting that "when an arbitration agreement contains the dual phrases 'arising out of or relating to,' it is proper to interpret the agreement broadly to cover matters that touch upon the contract to be arbitrable") (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 624 (1985)); see also Prima Paint Corp. v. Flood & Conklin Mgf. Co., 388 U.S. 395, 406 (1967) (noting that the words "arising out of or relating to" in an arbitration clause are "easily broad enough to encompass" the asserted claims).

Applying this broad interpretation, it is clear that Selden's claims of unlawful race discrimination "arise out of or relate to" his use of the Airbnb service. They therefore fall within the scope of the mandatory arbitration clause.

### C. Whether Airbnb's Arbitration Agreement is Enforceable

Having concluded that Selden agreed to the mandatory arbitration clause and that the clause encompasses his claims of unlawful discrimination, the Court must next determine if the clause is enforceable in this suit. Selden's numerous

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

objections to enforcing the arbitration clause can be boiled down to two main arguments: first, that federal civil rights claims are not subject to arbitration; and second, that the arbitration clause is unconscionable. Pl.'s Opp'n MCA 14-28. The Court rejects both arguments.

### 1. Federal Civil Rights Laws and Arbitration

Federal policy dictates that doubts about the applicability of an arbitration agreement should be resolved in favor of arbitration. Congress enacted the FAA in 1925 "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991). There is no exception for statutory claims. The Supreme Court "has been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving [individuals] specific protection against discrimination prohibited by federal law." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 123 (2001). As then-Judge Roberts noted, courts will enforce an agreement to arbitrate a statutory claim "so long as the agreement does not require the claimant to forgo substantive rights afforded under the statute." Booker v. Robert Half Intern., Inc., 413 F.3d 77, 79 (D.C. Cir. 2005).

**\*7** "If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent will be deducible from the statute's text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes." Shearson/American Exp., Inc. v. McMahon, 482 U.S. 220, 227 (1987) (internal quotations omitted). Selden makes a specific argument that arbitration is inconsistent with the text of Title II, as well as a broader argument that none of his statutory civil rights claims can be arbitrated. Pl.'s Opp'n MCA 21-26 With respect to Title II, Selden emphasizes the following provisions of the statute concerning jurisdiction and remedies:

(a) The district courts of the United States *shall have jurisdiction* of proceedings instituted pursuant to this subchapter and shall exercise the same without regard to whether the aggrieved party shall have exhausted any administrative or other remedies that may be provided by law.

(b) The remedies provided in this subchapter *shall be the exclusive means of enforcing the rights based on this subchapter,* but nothing in this subchapter shall preclude any individual or any State or local agency from asserting any right based on any other Federal or State law not inconsistent with this subchapter, including any statute or ordinance requiring nondiscrimination in public establishments or accommodations, or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right.

42 U.S.C. § 2000a-6 (emphasis added). Selden argues that "the Congressional intent for 'where and how' [he] can bring his Title II suit is clearly codified" in this portion of the statute. Pl.'s Opp'n MCA 25. Not so.

The phrase "the district courts of the United States shall have jurisdiction" in the statute "neither guarantees a right to a federal court trial nor forbids arbitration as an alternate forum." Garrett v. Circuit City Stores, Inc., 449 F.3d 672, 678 (5th Cir. 2006); see also Gilmer, 500 U.S. at 29 (rejecting the argument that "compulsory arbitration is improper because it deprives claimants of the judicial forum provided by the [statute]"). Nor is arbitration precluded by the phrase "the remedies provided ... shall be the exclusive means of enforcing the rights [of Title II]." Plaintiffs may still vindicate their statutory rights in arbitration. Any arbitration agreement that prevents them from doing so is invalid. Booker, 413 F.3d at 79. The cited text therefore does not support Selden's argument that Title II claims are not subject to arbitration. [4]

Selden's broader argument is that there is an inherent conflict between arbitration and the anti-discrimination objectives of the civil rights statutes under which he brings his claims. He argues that arbitration is not a neutral proceeding, because businesses are "repeat-player[s]" who are familiar with arbitration. Pl.'s Opp'n MCA 26. The imbalance of knowledge and experience favors businesses in the selection of arbitrators, Selden claims, because employees and consumers "lack financial resources to research arbitrator[s'] past decisions." Id. (citing Lewis Maltby, Paradise Lost— How the Gilmer Court Lost the Opportunity for Alternative Dispute Resolution to Improve Civil Rights, 12 N.Y. L. Sch. J. Hum. Rts. 1 (1994)). The Supreme Court, however, has repeatedly rebuffed these arguments as insufficient to preclude arbitration. Mitsubishi, 473 U.S. at 634 ("We decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

retain competent, conscientious, and impartial arbitrators."); Gilmer, 500 U.S. at 30 (same).

**\*8** Moreover, while "judicial review of arbitral awards is extremely limited," Teamsters Local Union No.61 v. United Parcel Serv., Inc., 272 F.3d 600, 604 (D.C. Cir. 2001) (internal citation omitted), safeguards still exist. There are five grounds on which a federal court can vacate an arbitration award. The FAA itself provides the first four:

> (1) [W]here the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C.A. § 10(a). Courts have supplied the fifth: "In addition to the statutory grounds, arbitration awards can be vacated ... if they are in manifest disregard of the law." Kurke v. Oscar Gruss and Son, Inc., 454 F.3d 350, 354 (D.C. Cir. 2006) (internal citations omitted). The lack of judicial support for Selden's argument that arbitration inherently undermines the purpose of Title II, along with the existence of these safeguards, require the Court to enforce Airbnb's mandatory arbitration clause.

### 2. Unconscionability

Selden's argument of last resort is that the arbitration agreement is unconscionable. "Whether an arbitration agreement is unconscionable is primarily a question of state contract law." Ruiz v. Millennium Residential Association, 156 F. Supp. 3d 176, 180 (D.D.C. 2016) (citing Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987)). Under California

contract law, a court must find that a contract is both procedurally *and* substantively unconscionable in order to invalidate it. Armendariz v. Foundation Health Psychcare Services, Inc., 6 P.3d 669, 690 (Cal. 2000). A contract is procedurally unconscionable if "an inequality of bargaining power" precludes the chance for "real negotiation or a meaningful choice on the part of the weaker party." Kinney v. United HealthCare Services, Inc., 70 Cal. App. 4th 1322, 1329 (Cal. Dist. Ct. App. 1999). A contract is substantively unconscionable if its terms "are so one-sided as to *shock the conscience.*" Soltani v. Western & Southern Life Ins. Co., 258 F.3d 1038, 1043 (9th Cir. 2001) (applying California law) (emphasis in original) (quoting Kinney, 70 Cal. App. 4th at 1330).

Selden argues that the Airbnb agreement is procedurally unconscionable simply because it is an adhesion contract. But adhesion contracts are not *per se* unconscionable under California law. E.g., Serafin v. Balco Properties Ltd., 235 Cal. App. 4th 165, 179 (Cal. Dist. Ct. App. 2015) ("[T]he fact that the arbitration agreement is an adhesion contract does not render it automatically unenforceable as unconscionable."). Selden claims that the arbitration clause is substantively unconscionable because it "lack[s] mutuality." Pl.'s Opp'n MCA 17. Indeed, the California Supreme Court, and other courts applying California law, have held that mandatory arbitration clauses in adhesion contracts *are* unconscionable when only one party is required to arbitrate. See Armendariz, 6 P.3d at 769-70; Nyulassy v. Lockheed Martin Corp., 120 Cal. App. 4th 1267, 1282 (Cal. Dist. Ct. App. 2004) ("The employment agreement requires *plaintiff only* to arbitrate any and all of his employment claims."); Kinney, 70 Cal. App. 4th at 1332 ("Faced with the issue of whether a unilateral obligation to arbitrate is unconscionable, we conclude that it is."). Airbnb's Terms of Service, however, clearly subject both parties to arbitration. See Def.'s MCA, Ex. B, 16 ("You acknowledge and agree that you and Airbnb are each waiving the right to a trial by jury ...."). Seldon also argues that the arbitration clause is substantively unconscionable because the costs of arbitration are too high for the consumer. This argument, too, is without merit. Plaintiff's arbitration fees are paid for by Airbnb, unless the arbitrator "finds that either the substance of [the] claim or the relief sought ... was frivolous or was brought for an improper purpose." Def.'s MCA, Ex. B, 17. In sum, Airbnb's arbitration clause does not meet the high bar for unconscionability set by the case law.

### IV. Conclusion

Case 3:22-cv-02077-MEM   Document 13-2   Filed 03/20/23   Page 97 of 102

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

**\*9** For the foregoing reasons, the Court finds that Selden entered into a valid and enforceable arbitration agreement with Airbnb. The Court will therefore grant Airbnb's Motion to Compel Arbitration and stay the case.[5] A separate Order accompanies this Memorandum Opinion.

Date: <u>November 1, 2016.</u>

### APPENDIX

The screenshot below depicts Airbnb's sign-up screen as it would appear on an iPhone 5. Airbnb provided this image in a supplemental affidavit. <u>See</u> Supp. Decl. of Kyle Miller, Ex. 1. Airbnb's records indicate—and Selden does not dispute—that he used an Apple device to sign up for Airbnb. Supp. Decl. of Kyle Miller ¶ 4.

<u>iPhone 5</u>

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6476934

**Footnotes**

1    The Court will apply California law in deciding the issue of contract formation. Contrary to Airbnb's argument, Def.'s MCA 7, the California choice-of-law clause in Airbnb's Terms of Service does not govern this question, as the Court must assess whether Selden agreed to the Terms of Service in the first place. <u>See, e.g.,</u> <u>McMullen v. Synchrony Bank,</u> 164 F. Supp. 3d 77 (D.D.C. 2016) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established.") (internal quotations omitted). After considering the relevant choice-of-law rules, however, the Court is satisfied—and the parties agree—that California law applies to this threshold dispute.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

2    Airbnb further asserts that Selden also agreed to the Terms of Service when he created his two fictitious accounts. Def.'s MCA 9. Selden contends that because he created those accounts for test purposes only, they did not result in valid agreements. Pl.'s Opp'n MCA 14. Because the Court finds that Selden agreed to Airbnb's Terms of Service when he created his *initial* account in March 2015, the Court need not reach these arguments.

3    Since the Court finds that a valid agreement exists between Selden and Airbnb, the choice-of-law clause in Airbnb's Terms of Service becomes effective and governs the Court's interpretation of the agreement's terms. See Def.'s MCA, Ex. B, 16 ("These Terms will be interpreted in accordance with the laws of the State of California.").

4    As for Selden's remaining statutory claims, he does not identify—and the Court is not aware of—any case in which a court has found that Fair Housing Act or Section 1981 claims are not subject to arbitration. The sparse amount of case law on the matter actually holds otherwise. See Davis v. Fenton, 26 F. Supp. 3d 727, 742 (N.D. Ill. 2014) (ordering arbitration and noting that "even if the Court had doubts as to whether the arbitration clause includes Plaintiff's FHA claim, the Court would be required to resolve those doubts in favor of arbitration") (citing Moses H. Cone, 460 U.S. at 24-25); Fordjour v. Washington Mut. Bank, 2008 WL 295092 (ordering arbitration of plaintiff's FHA and § 1981 claim) (N.D. Cal. Feb. 1, 2008).

5    The Court has previously noted a circuit split on the issue of whether district courts must stay proceedings after all claims have been referred to arbitration, or whether they retain the discretion to dismiss such cases outright. See Goodrich v. Adtrav Travel Mgmt., Inc., 2016 WL 4074082 at *4 n. 3 (D.D.C. 2016). Several circuits have held that a stay must be entered. See, e.g., Katz v. Cellco Partnership, 794 F.3d 341,345-46 (2d Cir. 2015) (holding that a stay must be entered and noting that the Seventh, Tenth, and Eleventh Circuits have held so as well). Others have found that district courts enjoy the discretion to dismiss the action. See id. (noting that the First, Fifth, and Ninth Circuits provide discretion to the district courts to dismiss).

The D.C. Circuit appears not to have ruled on this issue. The Court will stay the proceedings, which is in line with our prior decision in Goodrich and recent cases in this district. E.g., Ruiz v. Millennium Square Residential Assoc., 156 F, Supp. 3d 176, 184 (D.D.C. 2016); White v. Four Seasons Hotels and Resorts, 999 F. Supp. 2d 250, 261-262 (D.D.C. 2013).

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

13

2021 WL 5494373
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

VR CONSULTANTS, INC. et al., Plaintiff,

v.

J.P. MORGAN CHASE & CO., Defendant.

Civil Action No. 20-cv-6110
|
Signed 11/23/2021

**Attorneys and Law Firms**

Javier Luis Merino, **Dann Law Firm**, North Brunswick, NJ, for Plaintiff.

Theodore James McEvoy, Greenberg Traurig LLP, Florham Park, NJ, for Defendant.

**OPINION**

CLAIRE C. CECCHI, District Judge

**\*1** This matter comes before the Court on the motion of Defendant J.P. Morgan Chase & Co. ("Defendant") to compel arbitration and stay the proceedings. ECF No. 15. Plaintiff VR Consultants, Inc. ("Plaintiff") filed an opposition (ECF No. 17) and Defendant replied (ECF No. 19). The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendant's motion to compel arbitration is **GRANTED**.

**I. BACKGROUND**

To mitigate financial damage caused by the coronavirus pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act. ECF No. 1 at ¶ 11. This law made loans, known as Paycheck Protection Program ("PPP") loans, available to small businesses so that such businesses could meet their financial obligations during the pandemic. *Id.* at ¶¶ 12–14. Due to its size, the PPP loan program was administered by private banks, including Defendant, that were compensated by receiving an origination fee calculated as a percentage of the disbursed loans. *Id.* at ¶¶ 16–17.

This dispute arises out of the disbursement of PPP loans. Plaintiff has used Defendant's banking services for businesses

for over ten years. *Id.* at ¶ 54. As a customer, Plaintiff agreed to abide by Defendant's Deposit Account Agreement (the "DAA") (ECF No. 15-4) and Online Services Agreement (the "Online Agreement") (ECF No. 15-5). Because of the financial hardship the pandemic imposed on Plaintiff, it applied to Defendant for a PPP loan on April 9, 2020. ECF No. 1 at ¶ 59. Plaintiff alleges that Defendant made representations to Plaintiff and other PPP loan applicants that loan applications would be processed, and, if those applications were approved, funds would be distributed on a "first come, first serve" basis, *Id.* at ¶¶ 18, 22–23. However, Plaintiff claims that Defendant instead implemented a loan disbursement policy that favored its wealthiest clients' applications over those of smaller, less wealthy clients to maximize Defendant's origination fee. *Id.* at ¶¶ 24, 30–32. Plaintiff alleges that, pursuant to this policy, wealthy clients received their PPP loans before less wealthy clients regardless of when the application was filed. *Id.* at ¶¶ 39–41. As a result of Defendant's conduct, Plaintiff avers it did not receive timely access to needed funds made available by the PPP program to its financial detriment because it was forced to wait for Defendant to process its wealthy client applications. *Id.* at ¶¶ 53, 73.

On May 5, 2020, Plaintiff filed a complaint alleging claims for consumer fraud violations under New Jersey Statue Annotated § 56:8-2, as well as claims for fraudulent concealment and tortious interference. *Id.* at 22–25. Defendant subsequently filed the instant motion seeking to compel Plaintiff to arbitration, arguing that questions of arbitrability are for the arbitrator to decide in the first instant. ECF No. 15. Plaintiff filed its opposition on November 2, 2020, objecting to arbitration on the grounds that the relevant arbitration provisions do not apply to Plaintiff's PPP loan. Defendant then replied, reasserting its position that an arbitrator should first decide this dispute. ECF No. 19.

**II. LEGAL STANDARD**

**\*2** The Federal Arbitration Act ("FAA") reflects the strong federal policy in favor of arbitration and " 'places arbitration agreements on equal footing with all other contracts.' " *Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 599 (3d Cir. 2020) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)). Under the FAA, courts "compel enforcement of claims covered by a written, enforceable arbitration agreement." *Bacon*, 959 F.3d at 599 (citing FAA, 9 U.S.C. §§ 3, 4). Yet despite the strong presumption of arbitrability, "[a]rbitration is strictly a matter of contract" and is thus governed by state law. *Bel-Ray Co. v. Chemrite (Pty) Ltd.*,

VR Consultants, Inc. v. J.P. Morgan Chase & Co., Slip Copy (2021)

2021 WL 5494373

181 F.3d 435, 441, 444 (3d Cir. 1999) ("If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so."). Accordingly, when deciding whether to compel arbitration under the FAA, the Court must determine "(1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement." *Flinkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (citation omitted). In conducting this inquiry, the Court applies state law principles of contract formation. *Torres v. Rushmore Serv. Ctr., LLC*, No. 18-9236, 2018 WL 5669175, at *2 (D.N.J. Oct. 31, 2018).

## III. DISCUSSION

Both the DAA and the Online Agreement contain arbitration clauses. ECF No. 15-6 at 25–26; ECF No. 15-4 at 7–8. The parties do not dispute that the clauses found in those documents form a valid agreement to arbitrate between the parties. ECF No. 23 at 5 (conceding that Plaintiff is subject to the arbitration provisions in the DAA and the Online Agreement); ECF No. 19 at 1; ECF No. 15-4; ECF No. 15-6. Thus, the Court must only decide whether the dispute here falls within the scope of the valid arbitration agreements—the DAA and Online Agreement.

Plaintiff principally argues that its claims regarding its PPP loan fall outside the scope of its existing agreements with Defendant to arbitrate certain disputes. ECF No. 17 at 5–9. Specifically, Plaintiff argues that arbitration clauses in the DAA and Online Agreement apply to disputes regarding a Chase deposit account, and do not apply to Chase's other financial products such as PPP loans. *Id.* In response, Defendant asserts that these agreements delegate any questions of scope and enforceability to the arbitrator to decide in the first instance, and in any event, Plaintiff's claims are covered by the relevant arbitration provisions.[1] ECF No. 15 at 10, 13–15.

The Supreme Court has instructed that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Car, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). Here, the agreements at issue—the DAA and the Online Agreement—state that a party filing a claim must do so before a Judicial Arbitration and Mediations Services ("JAMS") (ECF

No. 15-4 at 38) or an American Arbitration Association ("AAA") arbitrator (ECF No. 15-6 at 25), pursuant to those organizations' rules. In turn, each organization's own rules and procedures give the arbitrator the ability to decide whether the arbitrator has jurisdiction to hear the matter, including the scope of an arbitration agreement. *See* JAMS Comprehensive Arbitration Rule 11(b) ("[A]rbitrability disputes ... including disputes over the formation, existence, validity, interpretation or scope of the agreement ... shall be submitted and ruled on by the Arbitrator."); AAA Commercial Arbitration Rules, R-7(a) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including ... scope."). The inclusion of AAA or JAMS rules in the DAA and Online Agreement constitutes "clear and unmistakable evidence that the parties agreed to delegate arbitrability." *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020) (finding that scope is an issue of arbitrability for the arbitrator); *see also Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 846 (6th Cir. 2020) (collecting cases) (stating that all eleven circuits addressing this issue found that "incorporation of AAA rules (or similarly worded arbitral rules) provides clear and unmistakable evidence that the parties agreed to arbitrate 'arbitrability' ").

**\*3** Therefore, here, the parties' inclusion of AAA and JAMS procedures in the contested arbitration agreement is clear evidence that they intended the arbitrator to decide questions related to scope. *See Richardson*, 811 F. App'x at 103. Accordingly, Plaintiff must bring its claim before the arbitrator in the first instance, even if it contests the scope of arbitrability, *See KPA Promotions & Awards, Inc. v. JPMorgan Chase & Co.*, No. 20-cv-3910, 2021 WL 1317163 (S.D.N.Y. Apr. 8, 2021); *Sha-Poppin Gourmet Popcorn LLC v. JP Morgan Chase Bank, N.A.*, No, 20-cv-2523, 2021 WL 843429 (N.D. Ill. Mar. 5, 2021).

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion to compel arbitration is **GRANTED** and these proceedings are **ADMINISTRATIVELY STAYED** pending arbitration. An appropriate order accompanies this opinion.

**All Citations**

Slip Copy, 2021 WL 5494373

VR Consultants, Inc. v. J.P. Morgan Chase & Co., Slip Copy (2021)

2021 WL 5494373

## Footnotes

1   However, as discussed below, because this Court finds that an arbitrator must first decide whether the arbitration agreements cover PPP loans as a matter of scope, the Court need not address this argument.

End of Document                                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.