# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DAN GOLUBIEWSKI and STEVEN CHECCHIA, individually and on behalf of all others similarly situated, | No.: 3:22-CV-02077-MEM<br><br>Hon. Malachy E. Mannion |
| Plaintiffs, | |
| v. | |
| DAVE INC., | |
| Defendant. | |

## DAVE INC.'S RESPONSE TO PLAINTIFFS' SUR-REPLY

Daniel T. Brier
Richard L. Armezzani
**MYERS BRIER KELLY**
425 Biden Street, Suite 200
Scranton, PA  18503

Edward D. Totino (*Pro Hac Vice*)
Benjamin W. Turner (*Pro Hac Vice*)
**BAKER & McKENZIE LLP**
10250 Constellation Blvd., Suite 1850
Los Angeles, CA  90067

*Attorneys for Defendant, DAVE INC.*

I.      SUMMARY OF ARGUMENT

Defendant Dave Inc. ("Dave") respectfully submits this response to Plaintiffs' sur-reply to Dave's Motion To Compel Arbitration.

In their sur-reply, Plaintiffs assert that Dave did not argue actual notice in its moving papers. Not so. Plaintiffs made the same assertion in their Opposition, and Dave cited the specific pages of its moving papers arguing actual notice, which state: "Plaintiffs received and repaid dozens of Advances, paid express fees, and tipped Dave, evidencing a long-term, contractual relationship and **both actual** and constructive knowledge of Dave's Terms." (emphasis added). Mot. at 12. In a further attempt to cite supposedly "new arguments" made in Dave's reply, Plaintiffs pluck statements from Dave's reply and argue these are entirely new thematic arguments warranting a sur-reply. But, in fact, all of the arguments Plaintiffs reference either address specific assertions made in Plaintiffs' opposition, or simply underscore the central arguments raised in Dave's moving papers.

Plaintiffs' sur-reply changes nothing. The Court should compel Plaintiffs to arbitrate their claims against Dave. In the alternative, the Court should order a trial on all genuine issues of fact regarding whether Plaintiffs agreed to arbitrate their claims.

## II.    ARGUMENT

### A.    Plaintiffs Had Actual Notice, And Dave Argued And Submitted Evidence In Support Of Actual Notice In Its Opening Papers.

As explained in Dave's reply, Page 12 of Dave's memorandum in support of its motion to compel arbitration (ECF 13) argues: "Plaintiffs received and repaid dozens of Advances, paid express fees, and tipped Dave, evidencing a long-term, contractual relationship and **both actual** and constructive knowledge of Dave's Terms." (emphasis added). Page 13 of Dave's memorandum then goes on to cite *Selden v. Airbnb, Inc.*, 2016 WL 6476934 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021), for the proposition that "[a]ny reasonably-active adult consumer" such as Plaintiffs "will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider." Page 13 of Dave's opening papers further argues that this basis to find actual notice is particularly strong here, because Plaintiffs "have filed repeated actions and sought to evade arbitration agreements into which they entered online."

Dave's argument on actual notice in its opening moving papers was clear and straightforward. Plaintiffs are experienced mobile phone users who create accounts on mobile apps. As experienced mobile phone users, Plaintiffs certainly knew the accounts they were creating were subject to agreements. This is particularly true for mobile apps like Dave's, where financial information is exchanged and acted upon. Consumers create long-term relationships, send and receive funds, and link bank

2

accounts. The notion that a consumer would not have actual notice that their use of the app was governed by an agreement is implausible. For Plaintiffs, this is confirmed by the judicially-noticeable fact that they repeatedly file lawsuits arguing they are not bound by such agreements. *See* Request for Judicial Notice Exs. 1-3 (ECF 14). Plaintiffs avoid any effort to confront these facts or the conclusions that follow from them. Instead, they argue — despite having been given a second opportunity to file another brief — that they do not have to "disprove" actual notice. Sur-Reply at 2.

Plaintiffs' assertion on burdens of persuasion and proof is based on the erroneous premise that "Dave produced no evidence concerning Plaintiffs' actual notice." Sur-Reply at 3. The Hernandez Declaration filed by Dave (ECF 13-1) with Dave's opening moving papers establishes both that users like Plaintiffs could not have missed the explicit advisory that joining Dave meant agreeing to the Terms, and the long-term, financially-involved relationship between Dave and its members. These facts — undisputed by Plaintiffs — make clear that they had actual notice, a fact that they do not even attempt to deny in their sur-reply. Instead, Plaintiffs argue that Dave is not allowed to argue that Plaintiffs did have actual notice, and ignore all of the evidence Dave submitted in its moving papers.

## B.   Plaintiffs Failed To Rebut — Or Even Address — The Evidence Establishing Actual Notice.

Plaintiffs' argument that they are "not required to disprove actual notice"

(Sur-Reply at 2) is a red herring. Dave never contended that Plaintiffs must "disprove actual notice." Dave submitted evidence and argument in support of actual notice. Plaintiffs made no attempt to controvert that evidence or argument. They do not argue, as a legal matter, that they lacked actual notice. They do not argue, as an evidentiary matter, that they in fact were unaware that their use of the Dave App was governed by agreement. The most Plaintiffs could do was submit declarations saying they do not "recall" what they saw when they created their Dave accounts. This proves or disproves nothing. Even on sur-reply, Plaintiffs offer no evidence or argument.

The Court can and should grant Dave's motion under the Rule 12(b)(6) standard because the defense of arbitrability is apparent on the face of the complaint and the documents relied therein. *See Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764, 773-76 (3d Cir. 2013). Even if the Court relies on the summary judgment standard to resolve actual notice, *see id.*, Dave has done enough to place the burden on Plaintiffs to present argument and evidence. Dave submitted evidence and argument in support of actual notice. Plaintiffs can hardly argue to the contrary, given that one of the central bases for their need to file a sur-reply was that Dave supposedly argued actual notice for the first time on Reply. That is not true — Dave presented this argument and the evidence in support thereof in its moving papers. But regardless, Dave has made the argument and Plaintiffs have now had two

opportunities to respond. The burden shifted to Plaintiffs to controvert the evidence and argument. They fail to meet that burden.

Summary judgment "requires the nonmoving party to go beyond the pleadings" and point to "'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Plaintiffs failed to do so. Further, if Plaintiffs wished to avoid a trial on this matter and seek an outright denial of Dave's motion to compel arbitration, they stood in the position of the moving party on summary judgment, in which case they would bear the burden of presenting evidence to establish the absence of a triable issue of fact on actual notice. Again, despite now having had two opportunities to do so, they failed to even try.

### C.   Plaintiffs' Newly-Minted Argument That Dave Failed To Raise A Triable Issue Of Fact Is Meritless.

Plaintiffs' sur-reply refers to "Dave's new request for a trial." Proposed Sur-Reply at 3. But Dave repeatedly argued in its moving papers that, at a minimum, the Court should conduct a trial on the making of an arbitration agreement if it cannot conclude as a matter of law that Plaintiffs agreed to the Terms. *See* Mot. at 1, 6, 18.

In their sur-reply, Plaintiffs assert that "[t]here is no evidence to prove Plaintiffs actually knew they agreed to the Terms of Service." Proposed Sur-Reply at 3. But as explained above, in Dave's moving papers, and again in Dave's reply brief, a reasonable trier of fact could not possibly find that Plaintiffs lacked actual notice of an agreement between them and Dave. If there were any doubt on this

matter —and there is none — Dave is entitled to a trial on the issue pursuant to 9 U.S.C. § 4.

### D. Plaintiffs' Newly-Minted Arguments On Constructive Notice Are Meritless.

Plaintiffs also argue for the first time in their sur-reply that Dave did not submit sufficient evidence to show the link to the Terms was in the same field of vision as the "Join Dave" button. Sur-Reply at 4.

As Dave explained in its moving papers, "[i]n the context of an electronic consumer transaction, the occurrence of mutual assent ordinarily turns on whether the consumer had reasonable notice of the merchant's terms of service agreement." Mot. at 10 (quoting *Dobbs v. Health IQ Ins. Servs., Inc.,* No. 21-5276, 2022 WL 2974713, at *3 (E.D. Pa. July 27, 2022)). Dave went on to explain that Plaintiffs had reasonable notice because the advisory was in close proximity to the "Join Dave" button, such that a user pressing the button would necessarily have also seen the advisory. *See* Mot. at 11-12.

Further, Plaintiffs' sur-reply argument is wrong. The screenshots Dave attached to its moving papers speak for themselves — by definition the screen is in the field of vision when using a smart phone. The screenshots depict the entirety of the sign-up screen as they would have appeared on the screens of Plaintiffs' mobile devices, including the relative positioning of the advisory and the "Join Dave" button. Like most mobile-device sign-up screens, the entirety of the sign-up screen

6

for Plaintiffs was a fixed-screen interface, and all of the visual elements were displayed on the user's mobile device screen simultaneously. Plaintiffs could not scroll up or down or navigate to other pages (other than by clicking on links to pages displaying the full Terms and other agreements, exiting the sign-up process, or entering their phone number and pressing "Join Dave" to assent to the Terms).

      **E.**      **Dave Did Not Cite "Several" New Cases And The Additional Cases It Cited Underscore That Plaintiffs Had Inquiry Notice.**

Plaintiffs also complain that Dave cited "several" new cases. Sur-Reply at 5. Dave cited in its opening moving papers two of the cases Plaintiffs complain about: *B.D. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931 (2022) and *Selden v. Airbnb, Inc*., 4 F.4th 148 (D.C. Cir. 2021). Dave cited in reply a few additional cases applying the inquiry notice standard to underscore the same argument made in its moving papers, *i.e.,* that the Dave App's uncluttered sign-up screen provide reasonably conspicuous notice that Plaintiffs were assenting to the Terms. *See* Mot. at 11-12, 15-18; Reply at 8-9. Dave cited these cases in direct response to Plaintiffs' argument in their opposition concerning the "size, color, and placement" of the advisory. *See* Opp. at 7.

In any event, Plaintiffs barely attempt to address the additional cases cited by Dave. *See* Sur-Reply at 6. Plaintiffs argue that, in *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825 (S.D.N.Y. 2020), the disclaimer was placed above rather than below the join button. But there is no requirement that an advisory be placed above rather

than below a join button on a mobile app. The relevant question is whether the sign-up screen provides "reasonable notice" and so long as the advisory is in close visual proximity to the join button, that standard is satisfied. Plaintiffs further argue that in *Feld*, the link to the terms was bolded. But in the Dave App, the link to the Terms was underlined (an equivalent form of emphasis as bold), set off in a different colored font from the rest of the visual elements, placed against a stark white background, and was the same font size as the text in the speech bubble next to the illustrated bear at the top of the screen.

Plaintiffs recognize that in *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580 (N.D. Cal. 2020), and *Selden v. Airbnb, Inc.*, 4 F.4th 148 (D.C. Cir. 2021), the advisories were placed below the join buttons. Plaintiffs claim, however, that the links to the terms were "brightly highlighted . . . atop a white background." But just as with the placement of the advisory below or above the join button, there is no strict requirement that the link to an app's terms be a particular color. Indeed, in *Feld*, the links were not "brightly highlighted" but simply black. Again, the relevant question is not what color was used but whether the screen provided reasonably conspicuous notice. This is made clear by comparing the AirBnB sign-up screen to the Dave sign-up screen. The crisper, more intuitive sign-up screen used by Dave provides even greater notice to users of the Terms, without needing to add additional, distracting colors.

The AirBnB sign-up screen made every textual link, including the "Log In" link, red to match AirBnB's color scheme. Even the "sign up with email" button was in red. *See* 4 F.4th at 152. This was an aesthetic choice — common in interface design for mobile apps — to maintain a uniform color for interactive elements. It did not, and was not intended to, accentuate the link to the terms, **because** every link in the sign-up screen was red. By contrast, the "Join Dave" button is in green, and the grey color scheme is used for only one visual element — the advisory and underlined link to the Terms and other agreements. Thus, the link to the Terms stands out far more.

The sign-up screen in *AirBnB* also contains multiple calls to action — three different buttons, in three different colors, for three different ways to "sign up" that distract the user, and a separate link to log in for existing members. Two of the sign-up buttons are not in close visual proximity to the advisory.

By contrast, the Dave sign up screen contains a single call to action — "Join Dave" — and first requires the user to enter their phone number before the "Join Dave" button will even function. The "Join Dave" button is in close visual proximity to the advisory, such that it is impossible for a user to press "Join Dave" without seeing the advisory. There are no additional distracting buttons to take users' focus away. Instead, the user's options are limited to logging in, entering their mobile number and pressing "Join Dave," or pressing the hyperlinks to relevant agreements

9

identified below "Join Dave."

Thus, as the screenshots below make clear, the link to the Terms in Dave is even more conspicuous than the link in *AirBnB*, which the D.C. Circuit found sufficient:



*See AirBnB*, 4 F.4th at 152.

Requiring a multitude of colors in a single-screen interface — as Plaintiffs apparently insist — would cause visual confusion, cognitive overload, frustrate users, and make it more challenging and unlikely for users to read advisories or

access the full terms of the agreements governing the use of the app. By contrast, a simple, clean design like the Dave App makes it easier for users to process the information presented to them. As the screenshots above make clear, Dave's underlined grey on white font, set off against a single green button, provides users with that clarity, making it easier for users to notice and understand that they are agreeing to the Terms by joining Dave. What is critical for achieving such clarity is not adding yet another color to the screen to disorient users. Rather, creating an accessible design that improves readability turns on typography, whitespace, and placement.

These basic principles helped drive the decision in *DoorDash*. There, the court enforced an arbitration agreement contained in terms displayed "as a gray font on a lighter-shade of gray background" and cited other decisions "in which courts have enforced agreements with substantially similar forms of notice." 445 F. Supp. 3d at 586. The court further noted that, "[d]espite Plaintiff's characterization of the font as gray-on-gray, the text contrasts clearly with the background and is plainly readable." ECF No. 17-1 at 14. In *DoorDash*, the hyperlinks were in blue but not underlined. This sufficed to make clear to a reasonably prudent smartphone user that these words were "clickable; a user would not need to 'click on every word of the sentence in case one of them is actually a link.'" *See id.* at 587 (citation omitted). In the Dave App, the hyperlink to the Terms is in grey but underlined, capitalized, and

set off against a white background. This as well makes clear the Terms were "clickable" and, significantly, made the advisory that users were assenting to the Terms impossible to ignore.

Plaintiffs argue that inquiry notice is "fact intensive." Sur-Reply at 7. To the extent there are any factual issues regarding clarity, readability and whether Dave's sign-up screen provided reasonably conspicuous notice, this would require a trial and would not provide a basis for the outright denial of Dave's motion. While Dave believes the Court can and should resolve inquiry notice in Dave's favor as a matter of law, Dave is also prepared to demonstrate at trial that the design of the sign-up screen adequately draws attention to the advisory, that the advisory cannot be missed by a user pressing the tactile "Join Dave" button, and that Plaintiffs' criticisms regarding coloring and placement would introduce clutter, confuse users, and reduce notice.

**F.     Plaintiffs' Arguments About Dave's Deposit Account And ExtraCash Agreements Continue To Be Meritless.**

As Dave pointed out in its moving papers, Dave's Deposit Account Agreement and ExtraCash Account Agreement both contain delegation clauses, and parties "may delegate gateway questions to the arbitrator so long as the delegation is "clea[r] and unmistakabl[e]." Mot. at 7 and 9 (quoting *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 944 (1995)).

A delegation clause may delegate the issue of whether a particular dispute

falls within the scope of the agreement to the arbitrator. *See Singh v. Uber Technologies, Inc.*, 939 F.3d 210, 228 (3d Cir. 2019) (holding that all questions subject to delegation clause were for arbitrator to decide, including whether parties' dispute fell within scope of arbitration agreement). And if the delegation clause includes the enforceability of the arbitration provision, a court cannot consider the question of enforceability "unless a party challenged the delegation clause and the court concludes that the delegation clause is not enforceable." *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 237 (3d Cir. 2020).

To the extent the Court finds the delegation clause enforceable as to Checchia — and it should — the Court must compel arbitration of Plaintiffs' arguments about what the arbitration clause means. The delegation clauses in the Deposit Account and ExtraCash Account Agreements require Checchia to arbitrate "any disagreements about the meaning, application or enforceability of this Arbitration Provision." *See* Hernandez Decl. Ex. H, J at § VII.K. Plaintiffs' argument that Dave cannot enforce the arbitration clause is based on their erroneous reading of the language of that clause. In particular, Plaintiffs argue that the following language does not apply to Dave: "If you have a dispute with us or Dave, and we are not able to resolve the dispute informally, you and we agree that upon demand by either you or us, the dispute will be resolved through the arbitration." Sur-Reply at 8-9. Plaintiffs' extended legal argument about the meaning of "we," "us," and "service

13

provider" is precisely one about the "meaning, application or enforceability of this Arbitration Provision." It is therefore subject to the delegation clause.

While Plaintiffs argue that Dave asserted "for the first time" that it was a "service provider" in its Reply, Dave was merely responding to, and providing an additional basis to reject, Plaintiffs' assertion that Dave could not enforce the agreement. Further, the language in the agreements making clear that Dave is a "service provider" is set forth in the preamble and included in Dave's moving papers. There is no prejudice to Plaintiffs from pointing out the obvious based upon evidence submitted with the opening papers, and Plaintiffs were free to make arguments (subject to the delegation clause) about the meaning of "service provider" in their opposition. They did not.

In any event, Plaintiffs cannot claim prejudice given they have filed a sur-reply with more than nine pages of additional legal argument and more than thirty additional pages of unpublished cases and filings downloaded from PACER in other cases. Nowhere in this additional briefing do Plaintiffs dispute that Dave is a "service provider." Instead, Plaintiffs reassert the same erroneous interpretation of the language in the arbitration agreements, that they "only allow those persons that meet the definition of 'us' to enforce the delegation or arbitration clauses," and "service providers" is not included in that definition. Sur-Reply at 8-9.

This argument misreads the express language of the clauses however, which

14

states: "As solely used in this Arbitration Provision, 'we' or 'us' shall **include** Evolve, its affiliates and their successors, employees, directors, officers and agents." Dkt. 13-1 at 97, 154 (emphasis added). The clauses, by using the term "include," do not limit the right to enforcement to Evolve, but instead expand the right to Evolve. The plain intent of using the word "include" was to ensure that Evolve could compel arbitration in addition to Dave, not to eliminate Dave's right to compel arbitration of a "claim" or "dispute," which is specifically defined to include "any unresolved disagreement between you, us and/or Dave." *See* Dkt. 13-1 at 97, 154. If the arbitration causes were intended to exclude Dave and limit enforceability to users and Evolve, they could easily have been written that way, such as by stating instead "'we' or 'us' shall **mean** Evolve" rather than "shall **include** Evolve." Dave can compel arbitration under the agreements.

## III.   CONCLUSION

The Court should grant the motion to compel arbitration and, if it does not, set the issue of whether Plaintiffs agreed to arbitrate for trial pursuant to 9 U.S.C. § 4.

Dated:  May 24, 2023    Respectfully submitted,

**MYERS BRIER KELLY**

/s/ Daniel T. Brier
Daniel T. Brier
dbrier@mbklaw.com
Richard L. Armezzani
rarmezzani@mbklaw.com
**MYERS BRIER KELLY**
425 Biden Street, Suite 200
Scranton, PA  18503
Telephone: (570) 324-6100 Ext. 106
Facsimile: (570) 342-6147

Edward D. Totino (Pro Hac Vice)
Edward.totino@bakermckenzie.com
Benjamin W. Turner (SBN 256092)
Ben.turner@bakermckenzie.com
**BAKER & McKENZIE LLP**
10250 Constellation Blvd., Suite 1850
Los Angeles, California 90067
Telephone: (310) 201 4728
Facsimile: (310) 201 4721

*Attorneys for Defendant, DAVE INC.*

**<u>CERTIFICATE OF SERVICE</u>**

I, Daniel T. Brier, hereby certify that I served the foregoing Response

to Plaintiff's Sur-Reply upon all counsel record via the Court's ECF system

on this 24th day of May 2023.

/s/ Daniel T. Brier
Daniel T. Brier

## APPENDIX OF UNPUBLISHED OPINIONS

1.  *Dobbs v. Health IQ Ins. Servs., Inc.*, No. 21-5276, 2022 WL 2974713 (E.D. Pa. July 27, 2022)

2.  *Selden v. Airbnb, Inc.*, 2016 WL 6476934 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021)

1

Dobbs v. Health IQ Insurance Services, Inc., Slip Copy (2022)

2022 WL 2974713

2022 WL 2974713
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Ryan DOBBS, Plaintiff,

v.

HEALTH IQ INSURANCE
SERVICES, INC., Defendant.

CIVIL ACTION NO. 21-5276
|
Filed July 27, 2022

**Attorneys and Law Firms**

Jacob U. Ginsburg, Kimmel & Silverman, Ambler, PA, Christopher Elisha Roberts, Butsch Roberts & Associates LLC, Clayton, MO, for Plaintiff.

Paul A. Rosenthal, Fox Rothschild LLP, Morristown, NJ, Jonathan A. Cass, Cohen, Seglias, Pallas, Greenhall & Furman, P.C., Philadelphia, PA, for Defendant.

### MEMORANDUM OPINION

Schmehl, District Judge

## I. INTRODUCTION

*1  Before the Court is the motion to compel arbitration filed by Health IQ Insurance Services ("Defendant"). Plaintiff, Ryan Dobbs, filed a class action Complaint against Defendant, asserting Defendant's telemarketing calls to be a violation of his privacy rights under the Telephone Consumer Protection Act. Upon consideration of the parties' submissions and arguments, I will grant Defendant's motion to compel arbitration, and stay this action in its entirety.

## II. BACKGROUND

Defendant, Health IQ, is in the business of selling insurance plans and services. (Compl., ¶ 15.) On May 8, 2019, Plaintiff clicked an ad that Health IQ had placed on Facebook and was directed to Health IQ's website. (Declaration of Raj Vavilala ("Vavilala Decl."), ¶ 4.) After landing on Defendant's website, Plaintiff completed a multi-page form requesting information about insurance products. (Vavilala Decl., ¶ 5.) As he completed the web form, clicking next several times, Plaintiff provided Health IQ with his name, address, email address, telephone number, age, gender, height, and weight.

(Vavilala Decl., ¶ 6.) The last page of the form included the following relevant language immediately below the green "SUBMIT" button: "By clicking 'SUBMIT', you agree to our Privacy Policy and Terms of Use." (Vavilala Decl., ¶ 7.) Setoff from the rest of the text in blue, underlined font, the words "Terms of Use" were an active hyperlink to the full text of the Terms of Use. Plaintiff provided his contact information and clicked "SUBMIT." (Vavilala Decl., ¶ 9.) The phone number that Plaintiff provided to Defendant matches the number that Plaintiff identifies as his own in the Complaint. (Compare Vavilala Decl., ¶ 10 with Compl., ¶ 18.) Plaintiff alleges that starting in June 2021, he received at least four unsolicited phone calls and two text messages from Defendant. (Compl., ¶¶ 24-25.) According to Plaintiff, his cell phone number had been registered on the National Do Not Call Registry and the calls and texts that he received from Defendant violated the Telephone Consumer Protection Act ("TCPA") (Compl., ¶¶ 18, 20, 21, 62.) Pursuant to the TCPA, registration with the Do Not Call Registry allows an individual to avoid receiving unwanted telemarketing calls and to recover penalties should his or her privacy rights be willfully or knowingly violated. (Compl., ¶ 2-3.)

Defendant argues that Plaintiff assented to its Terms of Use when he provided his contact information and clicked "SUBMIT" after following Defendant's Facebook ad. Defendant's Terms of Use contain an arbitration provision that requires users to submit claims against Defendant to binding arbitration on an individual basis. (Vavilala Decl., Ex. A, p. 1.) The arbitration provision reads as follows:

A. Arbitration. The parties shall use their best efforts to settle any dispute, claim, question, or disagreement directly through good-faith negotiations, which shall be a precondition to either party initiating a lawsuit or arbitration. All claims arising out of or relating to this Agreement and your use of the Service shall be finally settled by binding arbitration administered by the American Arbitration Association ("AAA") in accordance with the provisions of its Commercial Arbitration Rules and of its supplementary procedures for consumer-related disputes, excluding any rules or procedures governing or permitting class actions. The arbitrator, and not any court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable. The arbitrator shall be empowered to grant whatever relief would be available in a court. The arbitrator's award shall be binding on the parties and may be entered as a judgment in any court of

Dobbs v. Health IQ Insurance Services, Inc., Slip Copy (2022)

2022 WL 2974713

competent jurisdiction. To the extent the filing fee for the arbitration exceeds the cost of filing a lawsuit, [Defendant] will pay the additional cost.

*2 The parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial. They further understand that, in some instances, the costs of arbitration could exceed the costs of litigation and that the right to discovery may be more limited in arbitration than in court.

(Vavilala Decl., Ex A, § 20(A)). Furthermore, the Terms of Use allow users to opt out of the arbitration provisions by sending written notice to Defendant within 30 days. *Id.* § 20(C). Plaintiff did not send any opt out to Defendant. *Id.*

## III. LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that a federal court must compel arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. Arbitration agreements are governed by ordinary state-law principles governing contract formation, and they "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 402 (3d Cir. 2020). On the other hand, courts decide questions about the formation or existence of an arbitration agreement, namely the element of mutual assent. 9 U.S.C. § 4.

A motion to compel arbitration requires a court to determine "(1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that agreement." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). A party can dispute the existence of an arbitration agreement by arguing that the arbitration clause itself is invalid. *MZM Constr.*, 974 F.3d at 397. A claim directed at the arbitration clause itself, such as a challenge that the clause lacked consideration, would go to the court. *Id.* at 398 n.7.

However, when parties have delegated certain issues to the arbitrator, such as the issue of whether the parties have agreed to arbitrate at all, the Court need only decide the validity of the assent. *See* *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("Just as

a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator."); *Singh v. Uber Technologies, Inc.*, 939 F.3d 210, 228 (3d Cir. 2019) (holding that where the FAA applies, all questions must be reserved for an arbitrator unless the court determines the question is not subject to an enforceable delegation clause). So, "unless the party opposing arbitration challenges 'the delegation provision specifically,' the district court 'must treat it as valid' and 'must enforce it' by sending 'any challenge to the validity' of the underlying arbitration agreement to the arbitrator." *MZM Constr.*, 974 F.3d at 399 (quoting *Rent-A-Center West, Inc. v. Jackson*, 561 U.S. 63, 72 (2010)). The "arbitrability issue" presumptively includes "allegations of waiver, delay, or a like defense to arbitrability." *Howsam*, 537 U.S. at 84 (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983)). Additionally, a delegation clause may delegate the issue of whether a particular dispute falls within the scope of the agreement to the arbitrator. *See* *Singh v. Uber Technologies, Inc.*, 939 F.3d 210, 228 (3d Cir. 2019) (holding that all questions subject to delegation clause were for arbitrator to decide, including whether parties' dispute fell within scope of arbitration agreement).

*3 If a party challenges the whole contract, the claim must go to arbitration, unless the challenge is about mutual assent. *Id.* at 397–98. An arbitration clause is severable from the contract that contains it, and a party claiming that the whole contract lacked consideration must first adjudicate that claim in arbitration. *Id.*

A motion to compel arbitration is judged under a Rule 56 summary judgment standard when arbitrability is not apparent on the face of the complaint. *Shelton v. Comcast Corp.*, 2021 WL 214303, at *2 (E.D. Pa. Jan. 21, 2021). Under this standard, Defendant must show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the instant matter, arbitrability is not apparent on the face of the complaint and Defendant's motion is therefore evaluated under the Rule 56 standard.

## IV. DISCUSSION

In analyzing the instant set of facts, I must first determine whether the parties entered into a valid arbitration agreement.

2022 WL 2974713

If so, I must then determine whether the arbitration agreement delegated issues such as arbitrability to the arbitrator. Plaintiff argues that the agreement to delegate issues of arbitrability and to arbitrate is invalid because it is illusory, because the Terms of Use can be changed at the will of Defendant. Plaintiff further argues that even if I conclude that the agreement is not illusory, the motion to compel arbitration should be denied because there is a material issue of fact as to whether the parties entered into an agreement to delegate certain issues to an arbitrator. I do not find Plaintiff's arguments to be persuasive, and accordingly, I will grant Defendant's motion and send this matter to arbitration.

**A. Plaintiff Assented to Defendant's Terms and Conditions and Entered into a Valid Arbitration Agreement**

As agreements to arbitrate are matters of contract, a valid arbitration agreement requires mutual assent. In the context of an electronic consumer transaction, the occurrence of mutual assent ordinarily turns on whether the consumer had reasonable notice of the merchant's terms of service agreement. *See* *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Notice of an online merchant's terms either occurs through "clickwrap" agreements, which require website users to click on an "I agree" box after being presented with a list of terms and conditions of use, or "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen. *Nguyen*, 763 F.3d at 1176. Courts have also recognized a "modified clickwrap" agreement, where terms of use are presented as part of some other transaction, such that completing the transaction also accepts the terms of use. *See* *Weimin Chen v. Sierra Trading Post, Inc.*, 2019 WL 3564659, at *2 (W.D. Wash. Aug. 6, 2019) (distinguishing "clickwrap," "browsewrap," and "modified clickwrap" agreements); *see also* *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (finding Facebook's terms of use fell somewhere in between a pure browsewrap agreement and a pure clickwrap agreement because, although users were required to take an affirmative action by clicking "Sign Up" to agree to the terms of use, the terms were available only via a hyperlink below the "Sign Up" button).

**\*4** Clickwrap agreements are evaluated with " 'traditional principles of contract law and focus on whether the plaintiff had reasonable notice of and manifested assent to the clickwrap agreement.' " *Coulter v. Experian Info. Sols., Inc.*, 2021 WL 735726, at *5 (E.D. Pa. Feb. 25, 2021). Further, courts have held that "clickwrap" agreements manifest sufficient agreement to the terms in the contract. *See* *Zabokritsky v. JetSmarter, Inc.*, 2019 WL 2563738, at *3 n.30 (E.D. Pa., 2019).

In the instant matter, Plaintiff received notice of the hyperlinked Terms of Use, including the agreement to arbitrate potential claims, and manifested assent by clicking the "SUBMIT" button. The Terms of Use included a hyperlink, and the letters were purposely and conspicuously set off from the remaining text in a blue, underlined font. (Vavilala Decl., ¶ 8); *see* *Margulis v. HomeAdvisor, Inc.*, 2020 WL 4673783, at *5 (E.D. Mo. Aug. 12, 2020) (holding that website provided "constructive notice" of the Terms and Conditions when a hyperlink to the Terms and Conditions was conspicuously displayed in blue font). Further, the last page of Defendant's online information request form informed Plaintiff that "[b]y clicking 'SUBMIT', you agree to our Privacy Policy and Terms of Use." (Vavilala Decl., ¶ 7.) Plaintiff thus had notice that he would be bound by the Terms of Use and assented to those same terms when he clicked submit. *See* *Zabokritsky*, 2019 WL 2563738 at *3 (holding that sliding a button to indicate agreement to the Terms of Use is sufficient to indicate agreement).

In response, Plaintiff submits an affidavit in which he states that in May of 2019, he was "not in the market for health insurance," that he had a general practice of not filling out online forms, and that his cell phone's browser data does not currently show a visit to Defendant's website. (Dobbs Decl., ¶ 13-16.) However, Plaintiff does not state that he never visited Defendant's website. Nor does he deny that he submitted the online form on Defendant's website to obtain information about insurance products. Plaintiff's conclusory statement that he did not enter into any agreement with Defendant (Dobbs Decl., ¶ 18) is insufficient to create an issue of material fact. *See* *Dicent v. Kaplan Univ.*, 2018 WL 4171600, at *4 (M.D. Pa. June 15, 2018), *report and recommendation adopted*, 2018 WL 4169072 (M.D. Pa. Aug. 30, 2018), *aff'd*, 758 F. App'x 311 (3d Cir. 2019). "Plaintiff's naked assertions that he never [signed the arbitration agreement] are insufficient to lead the Court to conclude otherwise." *Schrock v. Nomac Drilling, LLC*, 2016 WL 1181484, at *4 (W.D. Pa. Mar. 28, 2016). Accordingly, despite Plaintiff's attempts to create a factual issue, I find that he assented to Defendant's Terms of Use.

Dobbs v. Health IQ Insurance Services, Inc., Slip Copy (2022)
2022 WL 2974713

Having found that Plaintiff assented to Defendant's Terms of Use, I must next decide whether the Terms of Use contain a valid arbitration agreement. As set forth above, the Terms of Use contain a provision that states, *inter alia*, "[a]ll claims arising out of or relating to this Agreement and your use of the Service shall be finally settled by binding arbitration administered by the American Arbitration Association ("AAA") ..." (ECF No. 2, Ex A, § 20(A)). When Plaintiff clicked submit and assented to Defendant's Terms of Use, he assented to the arbitration provision contained in the agreement as well. Accordingly, the parties entered into a valid arbitration agreement.

**B. Plaintiff Agreed to Delegate Issues of Arbitrability to the Arbitrator**

**\*5** The Terms of Use in this matter specifically state that "[t]he arbitrator, and not any court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable." (ECF No. 2, Ex A, § 20(A)). Parties may delegate resolution of gateway issues to the arbitrator, so long as they clearly and unmistakably evidence their intent to do so. *See* *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 1685 (2021).

The Terms of Use require disputes between Plaintiff and Defendant to be submitted to "binding arbitration administered by the [AAA] in accordance with the provisions of its Commercial Arbitration Rules." (ECF No. 2, Ex. A, § 20(A).) Rule 7 of the AAA's Commercial Arbitration Rules provides that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *See* American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, at Rule 7(a). As stated by the Third Circuit, "[t]hat provision is about as 'clear and unmistakable' as language can get.' " *Richardson*, 811 F. App'x at 103 (*quoting* *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 11 (1st Cir. 2009)); *see also Carrone v. UnitedHealth Grp. Inc.*, 2020 WL 4530032, at \*3 (D.N.J. Aug. 6, 2020) ("Numerous courts have found that, by incorporating the AAA rules, which need not be appended to the arbitration agreement, the parties have clearly and unmistakably committed to delegating the question of arbitrability to the arbitrator." (collecting cases)), *aff'd sub nom. Carrone v. UnitedHealth Grp. Inc.*, 2021 WL 3520809

(3d Cir. Aug. 11, 2021). Accordingly, by incorporating the AAA rules, the parties in this matter clearly delegated threshold questions such as the question of arbitrability to the arbitrator.

In an attempt to circumvent this delegation, Plaintiff argues that the Terms of Use, including the delegation provision, are illusory and unenforceable because a provision in the Terms of Use give Defendant the right to modify them. Plaintiff argues that the Terms of Use give Defendant the unfettered right to "change" the delegation provision "at any time," "for any reason," "with or without cause" and "without prior notice." ECF No. 11, pp. 1-2.

Plaintiff claims that he is challenging the delegation provision and argues that the terms of that provision can be changed at any time and are therefore illusory and unenforceable. However, he clearly is in fact challenging the agreement as a whole, as the terms he challenges come from other parts of the contract, not from the delegation provision, and apply to the entire agreement. The challenged terms state, *inter alia*,:

1. Changes to this Agreement

   We reserve the right to, at any time, with or without cause:

   • Change the terms and conditions of this Agreement....

   Any changes we make will be effective immediately upon our making such changes available on the Applications or otherwise providing notice thereof ...

13. Term & Termination

   ... [Defendant] may immediately terminate this Agreement ... or any portion thereof, at any time and for any reason, with or without cause, without prior notice.

ECF No. 2, Ex. A. These terms regarding changes and termination apply to the **entire agreement**, not just its delegation provision. In *Rent-A-Center, West, Inc. v. Jackson*, the Supreme Court found that unless a party "challenge[s] the delegation provision specifically," courts must enforce the delegation and "leav[e] any challenge to the validity of the [a]greement as a whole for the arbitrator." 561 U.S. 63, 72 (2010). Consistent with that precedent, this Court has confirmed that arguments that are not "levied specifically towards the delegation clause" are for the arbitrator. *See*

2022 WL 2974713

*Colon v. Conchetta, Inc.*, 2017 WL 2572517, at *4 (E.D. Pa. June 14, 2017) (Kelly, J.).

**\*6** In determining whether a party is specifically challenging a delegation provision or not, courts look beyond a party's "statement that it is challenging the delegation provision" to "the substance of the challenge." *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 885 (6th Cir. 2021). A challenge to the delegation provision that "recycles the same arguments that pertain to the enforceability of the agreement as a whole" is insufficient. *Id.* at 886.

A review of Plaintiff's brief shows that he clearly takes issue with the entire agreement and not with the delegation provision specifically. Plaintiff bases his challenge to the delegation clause (contained in Section 20(A) of the Terms of Use) on the modification provision which is contained in a separate section of the Terms (Section 1). Plaintiff has not made any arguments specific to the delegation clause. Although Plaintiff's section heading asserts that the delegation provision is illusory, the substantive argument that he makes in his brief does not support his heading.

Rather, Plaintiff recycles the same arguments that apply to the contract as a whole, which is insufficient to challenge the delegation clause. *See Galvez v. JetSmarter, Inc.*, 2019 WL 4805431, at *6 (S.D.N.Y. Sept. 30, 2019) ("Although the relevant section headers in Plaintiff's brief refer to the illusory quality and unconscionability of the 'arbitration provision' specifically, Plaintiff's arguments clearly attack the validity of the [Agreement] as a whole."). Therefore, Plaintiff's argument that the delegation provision and the agreement as a whole is illusory due to Defendant's ability to change the terms is not an issue to be addressed by this Court. Rather, this issue is one for the arbitrator, as contemplated by the valid delegation provision that was entered into between Plaintiff and Defendant.

## V. CONCLUSION

For all of the reasons set forth above, Defendant's Motion to Compel Arbitration is granted and this matter is stayed.

**All Citations**

Slip Copy, 2022 WL 2974713

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   5

2

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

KeyCite Yellow Flag - Negative Treatment
Distinguished by  Wilson v. Redbox  Automated Retail, LLC,   N.D.Ill.,
March 25, 2020

2016 WL 6476934
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

Gregory SELDEN, et al., Plaintiffs,

v.

AIRBNB, INC., Defendant.

Case No. 16-cv-00933 (CRC)
|
Signed 11/01/2016

**Attorneys and Law Firms**

Andrew Nyombi, Ikechukwu Emejuru, Emejuru and Nyombi, LLC, Silver Spring, MD, for Plaintiffs.

Ellen S. Kennedy, Sean Marotta, Hogan Lovells US LLP, Washington, DC, for Defendant.

## <u>MEMORANDUM OPINION</u>

CHRISTOPHER R. COOPER, United States District Judge

**\*1** All of us who have signed up for an online service recently will recall the experience. After entering the service provider's website, we were presented with a "sign up" or "create account" button prominently displayed on the screen. Next to the button—less prominent, no doubt—was the ubiquitous advisory that, by signing up, we would be accepting the provider's "terms of service." Perhaps there was a separate check-box prompting us to indicate our agreement to those terms. Regardless, eager to begin using the service and realizing that the provider's contractual terms are non-negotiable, most of us signed up without bothering to click the accompanying link to reveal the contractual terms. Those who did undoubtedly found numerous pages of legalese. The intrepid few who actually read all the terms almost certainly learned that one of them requires users to relinquish their right to have a jury resolve any dispute with the provider. And that another bars class actions. This experience, shared by countless people each day, gives rise to the dispute presently before the Court.

Plaintiff Gregory Selden, who is African American, signed up with the popular residential rental service Airbnb in advance of a weekend getaway to Philadelphia. He created the required user profile, including his photograph, and contacted an Airbnb "host" about a promising listing. The host allegedly responded that the residence was not available. Smelling a rat, Selden created a second account under a pseudonym, with a photograph of a white person in the user profile, and contacted the same host about the same accommodation. This time, Selden claims, the host was only too happy to rent the residence.

Selden filed suit against Airbnb for race discrimination on behalf of himself and fellow African-American travelers who have reported similar treatment on Airbnb. See, e.g., Elaine Glusac, <u>As Airbnb Grows, So Do Claims of Discrimination</u>, N.Y. Times (June 26, 2016), http://www.nytimes.com/2016/06/26/travel/airbnb-discrimination-lawsuit.html. Likening Airbnb to a hotel and its hosts to rental agents or hotel employees, Selden seeks to hold the company responsible under federal civil rights laws for the discriminatory conduct of those who offer accommodations on its website. Airbnb contests liability, although that issue is not before the Court because the company's standard Terms of Service—which it claims Selden accepted by signing up to use the site—contain a clause requiring all disputes to be resolved by an arbitrator. Civil lawsuits with a potential jury trial are prohibited. As are class actions.

Invoking this clause, Airbnb moves to compel arbitration of Selden's claims. Selden responds that no contract exists—and therefore the arbitration clause does not apply—because the sign-up process did not place him on adequate notice that he was agreeing to Airbnb's Terms of Service, including mandatory arbitration. He further argues that, even if a contract was formed, the arbitration provision does not apply to discrimination suits and is unconscionable in any event.

**\*2** The Court must grant Airbnb's motion. No matter one's opinion of the widespread and controversial practice of requiring consumers to relinquish their fundamental right to a jury trial—and to forego class actions—as a condition of simply participating in today's digital economy, the applicable law is clear: Mutual arbitration provisions in electronic contracts—so long as their existence is made reasonably known to consumers—are enforceable, in commercial disputes and discrimination cases alike. And Airbnb's sign-up procedures were sufficiently clear to place

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

Mr. Selden on notice that he was agreeing to the company's Terms of Service when he created an account. While that result might seem inequitable to some, this Court is not the proper forum for policy objections to mandatory arbitration clauses in online adhesion contracts. Such objections should be taken up with the appropriate regulators or with Congress.

I. Background & Procedural Posture

A. Selden's Use of Airbnb

Gregory Selden and a friend planned a trip to Philadelphia in March 2015. Second Amend. Compl. ¶¶ 28-35. To book their accommodations, Selden turned to Airbnb, which describes itself as "a trusted community marketplace for people to list, discover, and book unique accommodations all around the world." About Us, Airbnb, http://www.airbnb.com/about/aboutus (last visited Oct. 24, 2016). Airbnb allows property owners or their representatives—"hosts" in the company's parlance—to list their accommodations on the platform, where travelers then attempt to book them. Def.'s Mot. Compel Arbitration ("MCA"), Decl. of Kyle Miller ¶ 2. While Airbnb facilitates the transactions, the hosts, alone, are responsible for deciding to whom they will offer their homes for short-term stays. Id.

Selden first created his Airbnb account in March 2015, using an iPhone mobile device. Pl.'s Opp'n MCA, Decl. of Gregory Selden ¶ 2; Supp. Decl. of Kyle Miller ¶¶ 2, 4. Airbnb's mobile sign-up screen, attached as an appendix to this Memorandum Opinion, presented Selden with three options in descending order: "Sign up with Facebook," "Sign up with Google," and "Sign up with Email." See Appendix. Below the "Sign up with Email" button was text that read: "By signing up, I agree to Airbnb's Terms of Service, Privacy Policy, Guest Refund Policy, and Host Guarantee Terms." Id. The text contained hyperlinks to these various agreements. Id. Airbnb's Terms of Service include, among other provisions, a mandatory arbitration clause. Def's MCA, Ex. B, 16-18. Selden clicked "Sign up with Facebook" at the top of the page, and proceeded to create his Airbnb profile in order to use the service. Decl. of Gregory Selden ¶ 6.

Selden's profile included a photograph of his face, along with other details like his name, age, and education. Shortly after creating his account, he inquired with a host about the availability of a listing that met his needs. Id. at ¶¶ 6-7. According to Selden, the host informed him that the accommodation was not available. Id. at ¶ 7. While browsing Airbnb later that day, however, Selden noticed that the listing was still posted. Id. at ¶ 8. Suspecting that he was denied accommodations due to his race, Selden created two fictitious Airbnb accounts with profile photos depicting white men. Id. He then used those accounts to apply to the same listing, and, he claims, the host accepted both. Id. Selden later took to social media with his claims of discrimination, and the hashtag "#airbnbwhileblack" quickly went viral. Second Amend. Compl. ¶ 50.

B. Airbnb's Terms of Service

Airbnb's Terms of Service at the time Selden signed up for Airbnb spanned seventeen single-spaced pages and began with the following statement:

> PLEASE READ THESE TERMS OF SERVICE CAREFULLY AS THEY CONTAIN IMPORTANT INFORMATION REGARDING YOUR LEGAL RIGHTS, REMEDIES AND OBLIGATIONS. THESE INCLUDE VARIOUS LIMITATIONS AND EXCLUSIONS, A CLAUSE THAT GOVERNS THE JURISDICTION AND VENUE OF DISPUTES, AND OBLIGATIONS TO COMPLY WITH APPLICABLE LAWS AND REGULATIONS.

**\*3** Pl.'s MCA, Ex. B, 2. The "Dispute Resolution" clause, by which Airbnb seeks to compel arbitration, appeared on page fifteen of the document:

> You and Airbnb agree that *any dispute, claim or controversy arising out of or relating to these Terms* or the breach, termination, enforcement, interpretation or validity thereof, or to the use of the Services or use of the Site or Application (collectively, "Disputes") will be settled by binding arbitration, except that each party retains the right to seek injunctive

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights. You acknowledge and agree that you and Airbnb are each waiving the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding. If this specific paragraph is held unenforceable, then the entirety of this "Dispute Resolution" section will be deemed void. Except as provided in the preceding sentence, this "Dispute Resolution" section will survive any termination of these Terms.

Def.'s MCA, Ex. B, 16 (emphasis added). The section continued that any arbitration proceedings shall be administered by the American Arbitration Association and offered general details about the arbitration process. Id. at 16-18.

### C. Procedural History

Selden filed a putative class action suit against Airbnb in this Court on May 17, 2016, and has since twice amended his Complaint. He is the sole named Plaintiff. See Second Amend. Compl. Selden alleges that Airbnb violated Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, which prohibits race discrimination in public accommodations; the Civil Rights Act of 1866, 42 U.S.C. § 1981, which prohibits race discrimination in the formation of contracts; and the Fair Housing Act, 42 U.S.C. § 3604, which prohibits race discrimination in the sale or rental of housing. Id. at ¶¶ 53-72. Airbnb moved to compel arbitration on July 13, 2016. See Def.'s MCA. The Court heard oral argument on the motion on October 12, 2016.

### II. Legal Standards

The Federal Arbitration Act ("FAA") provides that a provision in a contract requiring the arbitration of disputes

related to the contract "shall be valid." 9 U.S.C. § 2. The D.C. Circuit has held that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Wolff v. Westwood Mgmt., LLC, 558 F.3d 517, 520 (D.C. Cir. 2009). Notwithstanding a prior agreement to arbitrate, plaintiffs often attempt to resolve disputes in federal court. Section 4 of the FAA provides a remedy for the defendant: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

Such a petition is often called a motion to compel arbitration, and is properly resolved under the summary judgment standard. Aliron Intern., Inc. v. Cherokee Nation Indus., Inc., 531 F.3d 863, 865 (D.C. Cir. 2008). The Court may consider evidence outside of the Complaint and shall grant the motion if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And in making this determination, the Court shall view the facts "in the light most favorable to the nonmoving party." Chambers v. U.S. Dept. of Interior, 568 F.3d 998, 1000 (D.C. Cir. 2009).

### III. Analysis

**\*4** Airbnb's Motion to Compel Arbitration presents three questions: (1) did Selden agree to Airbnb's Terms of Service; (2) if so, does the mandatory arbitration clause apply to his claims of race discrimination; and (3) if the clause applies to his claims, is it enforceable? For the reasons explained below, the Court finds that Selden agreed to the Terms of Service, that those terms require the arbitration of unlawful race discrimination claims, and that the agreement is enforceable.

### A. Whether Selden Agreed to Airbnb's Terms of Service

#### 1. Online Adhesion Contracting

Arbitration is a matter of contract law. Thus, whether Selden agreed to arbitrate depends on whether a valid contract was formed.[1] Airbnb's Terms of Service agreement can be described as an online adhesion contract. Courts and commentators have identified a number of variations of these electronic agreements, including "browsewraps,"

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

"clickwraps," "scrollwraps," and "sign-in-wraps." See, e.g., Nguyen v. Barnes & Noble, Inc., 763 F.3d 1171, 1175-77 (9th Cir. 2014); Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 366-67 (E.D.N. Y 2015). A "browsewrap" agreement is one in which an internet user accepts a website's terms of use merely by browsing the site. A "clickwrap" agreement is one in which an internet user accepts a website's terms of use by clicking an "I agree" or "I accept" button, with a link to the agreement readily available. A "scrollwrap" agreement is like a "clickwrap," but the user is presented with the entire agreement and must physically scroll to the bottom of it to find the "I agree" or "I accept" button. Finally, many internet websites—including Airbnb during the relevant time period—now use "sign-in-wraps" (although "sign-*up*-wrap" is a more appropriate name). "Sign-in-wrap" agreements are those in which a user signs up to use an internet product or service, and the signup screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up. See Barnes & Noble, 763 F.3d at 1177-79; Cullinane v. Uber Technologies, 2016 WL 3751652 at *5-7 (D. Mass. July 11, 2016).

While the relevant terminology continues to evolve, the Court's inquiry into contract formation does not. See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."). "Mutual manifestation of assent"—the "touchstone of contract"—must still be present." Barnes & Noble, 763 F.3d at 1175 (quoting Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 29 (2d Cir. 2002) (applying California law)). But because this case concerns a type of "sign-in-wrap" agreement, the consumer's assent is "largely passive." Berkson, 97 F. Supp. 3d at 393 (applying California law). As a result, "the contract-formation question will often turn on whether a reasonably prudent offeree would be on inquiry notice of the terms at issue." Schnabel v. Trilegiant Corp., 697 F.3d 110, 126-27 (2d Cir. 2012) (holding that under California law, consumers were not on inquiry notice of an arbitration provision when the relevant terms were sent to them by e-mail following enrollment in an online service). As then-Judge Sotomayor explained in assessing online adhesion contracts

generally, "[c]larity and conspicuousness of [the] terms are important" in making this determination. Specht, 306 F.3d at 30 (applying California law).

**\*5** Applying these principles to sign-in-wrap agreements specifically, Judge Weinstein noted in an extensive discussion on the issue that district courts tend to uphold the agreements under three circumstances. Berkson, 97 F. Supp. 3d at 400-01. *First,* the agreements tend to be enforced if "the hyperlinked 'terms and conditions' is next to the only button that will allow the user to continue use of the website." Id. (citing Crawford v. Beachbody, LLC, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) (finding a forum selection clause binding when the "terms and conditions" statement was directly above the "Place Order" button)); Starke v. Gilt, 2014 WL 1652225, at *2-3 (S.D.N.Y. Apr. 24, 2014) (finding an arbitration clause binding when the "terms of use" statement was right next to the "Shop Now" button); Swift v. Zynga Game Network, Inc., 805 F. Supp. 2d 904, 908, 912 (N.D. Cal 2011) (finding an arbitration clause binding where the "terms of service" statement was directly below the "Accept" button). *Second,* courts tend to uphold sign-in-wrap agreements if "the user 'signed up' to the website and was presented with hyperlinks to the terms of use on subsequent visits." Berkson, 97 F. Supp. 3d at 401 (citing Nicosia v. Amazon.com, Inc., 84 F. Supp. 3d 142, 151-53 (E.D.N.Y. Feb. 4, 2015) (finding an arbitration clause binding when the user clicked a box acknowledging the terms at the initial signup to the website and was presented with a hyperlink at the top of the webpage to terms of use multiple times after making purchases)). And *third,* sign-in-wrap agreements are usually upheld if "notice of the hyperlinked terms and conditions is present on multiple successive webpages of the site." Berkson, 97 F. Supp. 3d at 401 (citing Major v. McCallister, 302 S.W.3d 227, 230-31 (Mo. Ct. App. 2009) (finding a forum selection clause binding when the hyperlink to the terms and conditions was presented on multiple successive webpages and on the final page of the website's sign-up process)).

Finally, courts that have assessed the validity of sign-in-wrap agreements since Berkson have cited factors such as the size of the font, the possibility that other visual elements on the screen might obscure the "terms and conditions" statement, and whether the user signed up for the agreement using a mobile device. Compare Meyer v. Kalanick, 2016

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 6476934

WL 4073012 at *4, *6 (S.D.N.Y. July 29, 2016) (Rakoff, J.) (finding Uber's terms-of-service agreement *not* binding when the terms-of-service statement "was in a font that was barely legible on [a] smartphone device ... [and] beneath two additional buttons") with ☐Cullinane, 2016 WL 3751652 at *7 (finding Uber's terms-of-service agreement binding because of the "prominent" placement of the terms-of-service statement).

### 2. Application of the Law to Airbnb's Terms of Service Agreement

The Court finds that Airbnb's mobile sign-up screen adequately placed Selden on notice of Airbnb's Terms of Service, and that he assented to those terms by clicking the sign-up box and using the service. The text "By signing up, I agree to Airbnb's Terms of Service" is conspicuous. See Appendix. It is placed in roughly the middle of the page, in close proximity to all three sign-up buttons. The text also appears in dark font, in sharp contrast to the white background. It is, moreover, clearly legible, appropriately sized, and unobscured by other visual elements. Although the text is not directly under the first or second alternative sign-up buttons, any reasonably-observant user would notice the text and accompanying hyperlinks. So even if Selden only clicked "Sign up with Facebook" at the top of the page, he would have seen the relevant text from a quick glance down the rest of the page. Thus, by choosing to sign up for Airbnb, Selden manifested his assent to the Terms of Service. [2]

There is also a wider point to be made, as illustrated at the outset of this opinion. The act of contracting for consumer services online is now commonplace in the American economy. Any reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider. Notifications to that effect—be they check boxes or hyperlinks—abound. To be sure, few people may take time to actually read the user agreements. But ignorance of the precise terms does not mean that consumers are unaware they are entering contracts by signing up for internet-based services. So, while the record is silent as to Mr. Selden's particular history with e-commerce, the prevalence of online contracting in contemporary society lends general support to the Court's conclusion that Selden was on notice that he was entering a contract with Airbnb in this case.

### B. Whether Airbnb's Arbitration Agreement Encompasses Selden's Discrimination Claims

**\*6** Having found that Selden agreed to Airbnb's Terms of Service, including the mandatory arbitration clause, the Court next turns to whether the arbitration provision encompasses Selden's claims. Again, the provision states that "[the user] and Airbnb agree that *any dispute, claim or controversy arising out of or relating to these Terms* or the breach, termination, enforcement, interpretation or validity thereof, or to the use of the Services or use of the Site or Application (collectively, 'Disputes') will be settled by binding arbitration." Def.'s MCA, Ex. B, 17 (emphasis added).

Courts applying California law interpret the language "arising out of or relating to" very broadly. [3] California, like most jurisdictions, "embrace[s] a judicial policy strongly in favor of enforcing arbitration contracts." ☐⚠Bos Material Handling, Inc. v. Crown Controls Corp., 137 Cal. App. 3d 99, 105 (Cal. Ct. App. 1982). Courts applying California law "have held such arbitration agreements sufficiently broad" to include claims that "have their roots in the relationship between the parties which was created by the contract." ☐⚠Id. at 105-06 (internal quotations omitted). This language "reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." ☐Rice v. Downs, 247 Cal. App. 4th 1213, 1224 (Cal. Ct. App. 2016). "To require arbitration, the factual matters need only touch matters covered by the contract containing the arbitration clause *and all doubts are to be resolved in favor of arbitrability.*" Id. (emphasis added).

Supreme Court precedent instructs federal courts to take the same approach. See ☐Dowley v. Dewey Ballantine, LLP, 2006 WL 1102768 at *8 (D.D.C. Apr. 26, 2006) (noting that "when an arbitration agreement contains the dual phrases 'arising out of or relating to,' it is proper to interpret the agreement broadly to cover matters that touch upon the contract to be arbitrable") (citing ☐Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 624 (1985)); see also ☐Prima Paint Corp. v. Flood & Conklin Mgf. Co., 388 U.S. 395, 406 (1967) (noting that the words "arising out

2016 WL 6476934

of or relating to" in an arbitration clause are "easily broad enough to encompass" the asserted claims).

Applying this broad interpretation, it is clear that Selden's claims of unlawful race discrimination "arise out of or relate to" his use of the Airbnb service. They therefore fall within the scope of the mandatory arbitration clause.

C. <u>Whether Airbnb's Arbitration Agreement is Enforceable</u>

Having concluded that Selden agreed to the mandatory arbitration clause and that the clause encompasses his claims of unlawful discrimination, the Court must next determine if the clause is enforceable in this suit. Selden's numerous objections to enforcing the arbitration clause can be boiled down to two main arguments: first, that federal civil rights claims are not subject to arbitration; and second, that the arbitration clause is unconscionable. Pl.'s Opp'n MCA 14-28. The Court rejects both arguments.

1. <u>Federal Civil Rights Laws and Arbitration</u>

Federal policy dictates that doubts about the applicability of an arbitration agreement should be resolved in favor of arbitration. Congress enacted the FAA in 1925 "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." <u>Gilmer v. Interstate/ Johnson Lane Corp.</u>, 500 U.S. 20, 24 (1991). There is no exception for statutory claims. The Supreme Court "has been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving [individuals] specific protection against discrimination prohibited by federal law." <u>Circuit City Stores, Inc. v. Adams</u>, 532 U.S. 105, 123 (2001). As then-Judge Roberts noted, courts will enforce an agreement to arbitrate a statutory claim "so long as the agreement does not require the claimant to forgo substantive rights afforded under the statute." <u>Booker v. Robert Half Intern., Inc.</u>, 413 F.3d 77, 79 (D.C. Cir. 2005).

**\*7**  "If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent will be deducible from the statute's text or legislative history, or from an inherent conflict between arbitration and the statute's

underlying purposes." <u>Shearson/American Exp., Inc. v. McMahon</u>, 482 U.S. 220, 227 (1987) (internal quotations omitted). Selden makes a specific argument that arbitration is inconsistent with the text of Title II, as well as a broader argument that none of his statutory civil rights claims can be arbitrated. Pl.'s Opp'n MCA 21-26 With respect to Title II, Selden emphasizes the following provisions of the statute concerning jurisdiction and remedies:

(a) The district courts of the United States *shall have jurisdiction* of proceedings instituted pursuant to this subchapter and shall exercise the same without regard to whether the aggrieved party shall have exhausted any administrative or other remedies that may be provided by law.

(b) The remedies provided in this subchapter *shall be the exclusive means of enforcing the rights based on this subchapter,* but nothing in this subchapter shall preclude any individual or any State or local agency from asserting any right based on any other Federal or State law not inconsistent with this subchapter, including any statute or ordinance requiring nondiscrimination in public establishments or accommodations, or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right.

42 U.S.C. § 2000a-6 (emphasis added). Selden argues that "the Congressional intent for 'where and how' [he] can bring his Title II suit is clearly codified" in this portion of the statute. Pl.'s Opp'n MCA 25. Not so.

The phrase "the district courts of the United States shall have jurisdiction" in the statute "neither guarantees a right to a federal court trial nor forbids arbitration as an alternate forum." <u>Garrett v. Circuit City Stores, Inc.</u>, 449 F.3d 672, 678 (5th Cir. 2006); <u>see also</u> <u>Gilmer</u>, 500 U.S. at 29 (rejecting the argument that "compulsory arbitration is improper because it deprives claimants of the judicial forum provided by the [statute]"). Nor is arbitration precluded by the phrase "the remedies provided ... shall be the exclusive means of enforcing the rights [of Title II]." Plaintiffs may still vindicate their statutory rights in arbitration. Any arbitration agreement that prevents them from doing so is invalid. <u>Booker</u>, 413 F.3d at 79. The cited text therefore does not support Selden's argument that Title II claims are not subject to arbitration. [4]

Selden v. Airbnb, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 6476934

Selden's broader argument is that there is an inherent conflict between arbitration and the anti-discrimination objectives of the civil rights statutes under which he brings his claims. He argues that arbitration is not a neutral proceeding, because businesses are "repeat-player[s]" who are familiar with arbitration. Pl.'s Opp'n MCA 26. The imbalance of knowledge and experience favors businesses in the selection of arbitrators, Selden claims, because employees and consumers "lack financial resources to research arbitrator[s'] past decisions." Id. (citing Lewis Maltby, Paradise Lost— How the Gilmer Court Lost the Opportunity for Alternative Dispute Resolution to Improve Civil Rights, 12 N.Y. L. Sch. J. Hum. Rts. 1 (1994)). The Supreme Court, however, has repeatedly rebuffed these arguments as insufficient to preclude arbitration. Mitsubishi, 473 U.S. at 634 ("We decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious, and impartial arbitrators."); Gilmer, 500 U.S. at 30 (same).

**\*8** Moreover, while "judicial review of arbitral awards is extremely limited," Teamsters Local Union No.61 v. United Parcel Serv., Inc., 272 F.3d 600, 604 (D.C. Cir. 2001) (internal citation omitted), safeguards still exist. There are five grounds on which a federal court can vacate an arbitration award. The FAA itself provides the first four:

> (1) [W]here the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C.A. § 10(a). Courts have supplied the fifth: "In addition to the statutory grounds, arbitration awards can be vacated ... if they are in manifest disregard of the law." Kurke v. Oscar Gruss and Son, Inc., 454 F.3d 350, 354 (D.C. Cir. 2006) (internal citations omitted). The lack of judicial support for Selden's argument that arbitration inherently undermines the purpose of Title II, along with the existence of these safeguards, require the Court to enforce Airbnb's mandatory arbitration clause.

## 2. Unconscionability

Selden's argument of last resort is that the arbitration agreement is unconscionable. "Whether an arbitration agreement is unconscionable is primarily a question of state contract law." Ruiz v. Millennium Residential Association, 156 F. Supp. 3d 176, 180 (D.D.C. 2016) (citing Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987)). Under California contract law, a court must find that a contract is both procedurally *and* substantively unconscionable in order to invalidate it. Armendariz v. Foundation Health Psychcare Services, Inc., 6 P.3d 669, 690 (Cal. 2000). A contract is procedurally unconscionable if "an inequality of bargaining power" precludes the chance for "real negotiation or a meaningful choice on the part of the weaker party." Kinney v. United HealthCare Services, Inc., 70 Cal. 4th 1322, 1329 (Cal. Dist. Ct. App. 1999). A contract is substantively unconscionable if its terms "are so one-sided as to *shock the conscience*." Soltani v. Western & Southern Life Ins. Co., 258 F.3d 1038, 1043 (9th Cir. 2001) (applying California law) (emphasis in original) (quoting Kinney, 70 Cal. App. 4th at 1330).

Selden argues that the Airbnb agreement is procedurally unconscionable simply because it is an adhesion contract. But adhesion contracts are not *per se* unconscionable under California law. E.g., Serafin v. Balco Properties Ltd., 235 Cal. App. 4th 165, 179 (Cal. App. 2015) ("[T]he fact that the arbitration agreement is an adhesion contract does not render it automatically unenforceable as unconscionable."). Selden claims that the arbitration clause is substantively unconscionable because it "lack[s] mutuality." Pl.'s Opp'n MCA 17. Indeed, the California Supreme Court, and other courts applying California law, have held that mandatory

arbitration clauses in adhesion contracts *are* unconscionable when only one party is required to arbitrate. See Armendariz, 6 P.3d at 769-70; Nyulassy v. Lockheed Martin Corp., 120 Cal. App. 4th 1267, 1282 (Cal. Dist. Ct. App. 2004) ("The employment agreement requires *plaintiff only* to arbitrate any and all of his employment claims."); Kinney, 70 Cal. App. 4th at 1332 ("Faced with the issue of whether a unilateral obligation to arbitrate is unconscionable, we conclude that it is."). Airbnb's Terms of Service, however, clearly subject both parties to arbitration. See Def.'s MCA, Ex. B, 16 ("You acknowledge and agree that you and Airbnb are each waiving the right to a trial by jury ...."). Seldon also argues that the arbitration clause is substantively unconscionable because the costs of arbitration are too high for the consumer. This argument, too, is without merit. Plaintiff's arbitration fees are paid for by Airbnb, unless the arbitrator "finds that either the substance of [the] claim or the relief sought ... was frivolous or was brought for an improper purpose." Def.'s MCA, Ex. B, 17. In sum, Airbnb's arbitration clause does not meet the high bar for unconscionability set by the case law.

IV. Conclusion

*9  For the foregoing reasons, the Court finds that Selden entered into a valid and enforceable arbitration agreement with Airbnb. The Court will therefore grant Airbnb's Motion to Compel Arbitration and stay the case. [5]  A separate Order accompanies this Memorandum Opinion.

Date: November 1, 2016.

APPENDIX

The screenshot below depicts Airbnb's sign-up screen as it would appear on an iPhone 5. Airbnb provided this image in a supplemental affidavit. See Supp. Decl. of Kyle Miller, Ex. 1. Airbnb's records indicate—and Selden does not dispute—that he used an Apple device to sign up for Airbnb. Supp. Decl. of Kyle Miller ¶ 4.



**All Citations**

Not Reported in Fed. Supp., 2016 WL 6476934

**Footnotes**

1    The Court will apply California law in deciding the issue of contract formation. Contrary to Airbnb's argument, Def.'s MCA 7, the California choice-of-law clause in Airbnb's Terms of Service does not govern this question, as the Court must assess whether Selden agreed to the Terms of Service in the first place. See, e.g.,

McMullen v. Synchrony Bank, 164 F. Supp. 3d 77 (D.D.C. 2016) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established.") (internal quotations omitted). After considering the relevant choice-of-law rules, however, the Court is satisfied—and the parties agree—that California law applies to this threshold dispute.

2      Airbnb further asserts that Selden also agreed to the Terms of Service when he created his two fictitious accounts. Def.'s MCA 9. Selden contends that because he created those accounts for test purposes only, they did not result in valid agreements. Pl.'s Opp'n MCA 14. Because the Court finds that Selden agreed to Airbnb's Terms of Service when he created his *initial* account in March 2015, the Court need not reach these arguments.

3      Since the Court finds that a valid agreement exists between Selden and Airbnb, the choice-of-law clause in Airbnb's Terms of Service becomes effective and governs the Court's interpretation of the agreement's terms. See Def.'s MCA, Ex. B, 16 ("These Terms will be interpreted in accordance with the laws of the State of California.").

4      As for Selden's remaining statutory claims, he does not identify—and the Court is not aware of—any case in which a court has found that Fair Housing Act or Section 1981 claims are not subject to arbitration. The sparse amount of case law on the matter actually holds otherwise. See Davis v. Fenton, 26 F. Supp. 3d 727, 742 (N.D. Ill. 2014) (ordering arbitration and noting that "even if the Court had doubts as to whether the arbitration clause includes Plaintiff's FHA claim, the Court would be required to resolve those doubts in favor of arbitration") (citing Moses H. Cone, 460 U.S. at 24-25); Fordjour v. Washington Mut. Bank, 2008 WL 295092 (ordering arbitration of plaintiff's FHA and § 1981 claim) (N.D. Cal. Feb. 1, 2008).

5      The Court has previously noted a circuit split on the issue of whether district courts must stay proceedings after all claims have been referred to arbitration, or whether they retain the discretion to dismiss such cases outright. See Goodrich v. Adtrav Travel Mgmt., Inc., 2016 WL 4074082 at *4 n. 3 (D.D.C. 2016). Several circuits have held that a stay must be entered. See, e.g., Katz v. Cellco Partnership, 794 F.3d 341,345-46 (2d Cir. 2015) (holding that a stay must be entered and noting that the Seventh, Tenth, and Eleventh Circuits have held so as well). Others have found that district courts enjoy the discretion to dismiss the action. See id. (noting that the First, Fifth, and Ninth Circuits provide discretion to the district courts to dismiss).

The D.C. Circuit appears not to have ruled on this issue. The Court will stay the proceedings, which is in line with our prior decision in Goodrich and recent cases in this district. E.g., Ruiz v. Millennium Square Residential Assoc., 156 F, Supp. 3d 176, 184 (D.D.C. 2016); White v. Four Seasons Hotels and Resorts, 999 F. Supp. 2d 250, 261-262 (D.D.C. 2013).

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.