1          IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
   DAN GOLUBIEWSKI and              :
3  STEVEN CHECCHIA,                 :
   individually and on behalf of :
4  all others similarly situated,:
                                    :
5            v.                     :
   DAVE INC.,                       :  CASE NO. 3:22-CV-02077
6

7

                   TRANSCRIPT OF PROCEEDINGS
8
      Oral Argument on Defendant's Motion to Compel Arbitration
9                 and Stay or Dismiss Proceedings

10      Held before the Honorable Karoline Mehalchick, Thursday,
   March 28, 2024, commencing at 1:06 p.m., via Zoom conference
11 call.

12

13 APPEARANCES:

14 KEVIN ABRAMOWICZ, ESQUIRE
   EAST END TRIAL GROUP, LLC
15 6901 Lynn Way, Suite 215
   Pittsburgh, PA 15208
16 412-223-5740
   Kabramowicz@eastendtrialgroup.com
17      For the Plaintiffs

18

19 EDWARD TOTINO, ESQUIRE
   BAKER & MCKENZIE, LLP
20 10250 Constellation Blvd., Suite 1850
   Los Angeles, CA 90067
21 310-201-4728
   Edward.totino@bakermckenzie.com
22      For the Defendant

23 Proceedings recorded by machine shorthand; transcript produced
   by computer-aided transcription.
24 _____
                   Colleen V. Wentz, RMR, CRR
25                   Official Court Reporter
                 colleen_wentz@pamd.uscourts.gov

1              (Proceedings commenced at 1:06 p.m.)

2              THE COURT:  Defendant, this is your Motion, so take

3    it away.

4              MR. TOTINO:  Thank you, Your Honor.  I've prepared

5    a PowerPoint that I would like to put up with the argument.

6    So if I can do that now?

7              THE COURT:  Absolutely.

8              MR. TOTINO:  Thank you.  Are you able to see that,

9    Your Honor?

10             THE COURT:  I am.  Thank you.

11             MR. TOTINO:  Great.  Thanks.  Thank you for taking

12   the time for this argument, Your Honor.  Ed Totino

13   representing Dave, Inc.

14             Dave is a financial technology company that, among

15   other things, provided its members with no-interest,

16   non-recourse cash advances through the Dave app.  The whole

17   point of the advances was to stop people from getting

18   overdraft fees, to save them money.

19             Just so the record's clear, Dave no longer offers

20   these advances.  They now offer a new extra cash product that

21   Plaintiff Checchia signed up for.  It's a different product,

22   but we can discuss that later.

23             So Mr. -- Plaintiff Golubiewski --

24             (The Zoom Recording announced that the recording

25              was in progress.)

1        THE COURT:  I'm sorry.  Go ahead.  We just hit

2   record on it.  I'm sorry.

3        MR. TOTINO:  No problem.  No problem.  Thanks.

4        So Mr. Golubiewski, Plaintiff Dan Golubiewski, he

5   downloaded the Dave app to his smart phone in June of 2019 and

6   created an account with Dave.  To do that, he had to subscribe

7   to Dave, agreeing to a $1 per month membership fee.  He had to

8   provide his e-mail address, telephone number, first and last

9   name, and create a password, and confirm his identity through

10  two-factor authentication.  And then he had to connect an

11  external bank account to Dave and give Dave access to the

12  historic transaction level detail on the bank account so the

13  Dave app can work and let him know when he was running short

14  on cash.

15       If you take a look up on the screen there, and this

16  is all on the record, is that the screenshot of what -- what

17  the screen looked like when Mr. Golubiewski signed up for

18  Dave.  It's always been substantially similar to that.  So

19  when he downloaded that app, it came up on the screen.  It has

20  a big button that says Join Dave.  It says cost $1 per month.

21  And under it, it says, By joining, I agree to Dave's privacy

22  policy, TOS, E-sign, and electronic communication consent.

23  And those hyperlinks are all underlined there.

24       Now Dave's terms of use, TOS, or terms of service

25  always included an arbitration -- an agreement to arbitrate.

1    It's always been in there, Your Honor.

2         So in order to sign up, Mr. Golubiewski had to go

3    through the process I spoke about earlier, put his phone

4    number in there, hit Join Dave, and agree.  And if you notice,

5    the Join Dave button is a call-to-action because underneath,

6    it says, By joining, I agree.

7         So after Mr. Golubiewski joined Dave, he paid Dave

8    $21 in monthly subscription fees; he received 41 cash

9    advances; he repaid 40 of those advances, but not the last

10   one; he tipped Dave 39 times; and he received regular e-mails

11   from Dave with links to Dave's terms.

12        Now let's talk about Plaintiff Steven Checchia

13   because his facts are a little different.

14        So he downloaded the Dave app to his smart phone in

15   November of 2017 and created an account with Dave.  So to do

16   so, he had to do the same thing that Mr. Golubiewski did.

17   Subscribe to Dave, agreeing to pay the $1 monthly membership

18   fee, provide his e-mail address, telephone number, and first

19   and last name, create a password, confirm his identity through

20   two-factor authentication.  And then he had to connect an

21   external bank account, just like Mr. Golubiewski did, so Dave

22   could see what was going on with the finances and give him an

23   alert that he's going to have an overdraft or may need cash.

24        Again, there's the screen that Mr. Golubiewski --

25   or Mr. Checchia signed up on.  It's substantially similar,

1    much like the screen that Mr. Golubiewski signed up on.  And

2    again, it says, Join Dave, and underneath it, it says, By

3    joining, I agree.

4              THE COURT:  So -- but, Counsel, let me just, for

5    clarification and so I fully understand it for the record, the

6    court reporter.  Those links state -- indicate privacy policy

7    TOS, which I assume would stand for terms of service --

8              MR. TOTINO:  Yes.

9              THE COURT:  -- E-sign and electronic verification

10   consent.  There's nothing there that says anything, at least

11   on the title of those links, related to arbitration, on the

12   face of that.

13             MR. TOTINO:  That's correct.  If you click on the

14   TOS link, it does, right at the top, I think in all caps, you

15   agree to arbitrate.  But there's nothing -- nothing right

16   there because, as you can see, it doesn't say it there.

17             THE COURT:  Right.  Thank you.

18             MR. TOTINO:  So after Mr. Checchia signed up for

19   Dave this way, the legacy -- I'll call it the legacy Dave

20   product, then in -- he paid $6 in monthly subscription fees;

21   he received 20 advances; repaid 19 of those, and didn't pay

22   the last one back; tipped Dave 12 times, and received regular

23   e-mails from Dave with links to Dave's terms.

24             Then in November of 2022, Mr. Checchia signed up

25   for and began using a new service offered by Dave called Extra

1  Cash.  And to do that, he had to link a debit card, provide a

2  home address, provide his date of birth, and provide a Social

3  Security number.

4          Here's a screenshot of the screen for signing up

5  for the Extra Cash.  And to sign up for that, you can see

6  Mr. Golubiewski would have to check the box there, and next to

7  it, it says, By checking this, you agree to the deposit

8  account agreement, Extra Cash account agreement, and Evolve

9  privacy policy, and it also has a reference there to Dave's

10 terms and conditions, which were the ones that Mr. Checchia

11 previously agreed to and Mr. Golubiewski, as well.  So that's

12 referenced there, as well.

13         Now these hyperlinks, instead of being underlined,

14 are in blue.

15         So -- now neither Mr. Golubiewski nor Mr. Checchia

16 deny any of this.  The only evidence they've submitted to the

17 record is that they both say they don't remember being

18 presented with or agreeing to the terms.  They don't say what

19 happened; they don't say what they did; they don't say

20 anything.  They don't deny getting the multiple e-mails that

21 were sent.  So there's no evidence in the record on that

22 point, that they didn't get the e-mails.

23         So, you know, our position, Your Honor, is first of

24 all, Plaintiffs had actual notice of the terms.  They agreed

25 to the terms when signing up for Dave.  They used Dave's app

1    to receive dozens of cash advances.  Any reasonable consumer
2    is going to know if you're receiving cash advances, there are
3    some terms governing your agreement.  They gave Dave access to
4    their bank accounts.  I mean who is going to do that without
5    terms.  They received e-mails linking the terms.  They don't
6    deny that.  And they had to know -- any reasonable consumer is
7    going to know that if you're -- if you're entering into a
8    financial relationship with a company, an ongoing financial
9    relationship, there's terms and conditions governing that
10   relationship.

11           Now, Plaintiff also had inquiry notice of the
12   terms.  Under the standard, you have -- Plaintiffs are on
13   inquiry notice of the terms.  If -- if the app put a
14   reasonably prudent user on inquiry notice of the terms,
15   importantly to consider, there is a case from California,
16   which I think both sides agree that California law governs and
17   is not different than other law.

18           THE COURT:  Let me pause that for one second and
19   just --

20           MR. TOTINO:  Sure.

21           THE COURT:  -- Mr. Abramowicz, on behalf of the
22   Plaintiff, do you agree?  Is there any dispute that California
23   law would apply here?

24           MR. ABRAMOWICZ:  So I think -- well, let me give
25   two answers to that question.

1          So I think that the Court doesn't need to reach

2   whether Pennsylvania law applies because even under California

3   law, the notice inquiry fails.  But I think if the Court needs

4   to reach that question, Pennsylvania law would apply.

5          THE COURT:  Okay.  And we can -- we'll hear more --

6   we'll hear more from you on that after Defendants get through

7   with their presentation.  But go ahead.

8          MR. TOTINO:  Thank you, Your Honor.

9          So for California law, there's BD versus Blizzard

10  Entertainment case.  It talks about the full context that a

11  transaction has to be examined to see what -- what would put

12  the consumer on an inquiry notice of the terms.  And then we

13  also have the Edmundson versus Klarna case from the Second

14  Circuit of a -- a very recent case, actually, end of last

15  year.  And in that case, the Court noted that, you know,

16  California -- it talked about California law; it talked about

17  New York law; it talked about Connecticut law; and it said the

18  laws in all the states are pretty much in agreement as to what

19  constitutes sufficient notice.  And they also talked about the

20  totality of the circumstances.

21          So it's the same as the full context transaction

22  that California law discusses.

23          Now in the Dave app, it did put Plaintiffs on

24  inquiry notice on unclear screens.  We looked at the screen

25  before.  There wasn't much on them.  And it said at the

1    bottom, By joining, I agree to Dave's privacy policy, TOS,

2    E-sign, and electronics communications consent.  And for Extra

3    Cash, the app says next to a cash box, as we saw, that by

4    checking this, you agree.

5            But those apps both notified the Plaintiffs that --

6    that they were agreeing when they joined Dave.  Each of them

7    had links to various agreements.  And, you know, Courts in

8    California and elsewhere have enforced agreements with similar

9    layouts.  Here's the Blizzard case agreement here -- agreement

10   from the Blizzard case I just mentioned.  If you notice, this

11   is much more sort of less apparent, less reasonably

12   conspicuous than the Dave app.  I mean it's got all this

13   legalese here that you can't even really tell, and that was

14   enforced.  In fact, it was enforced against a minor who signed

15   up for the game.

16           THE COURT:  But that's also -- Counsel, that's also

17   -- that's what they have to agree to.  They have to go through

18   that.  And do you happen to know if that is a -- is that an

19   agreement where you have to actually scroll through to the end

20   of it, albeit, whatever, you should do that in order to hit

21   continue, or is it it just pops up like that?

22           MR. TOTINO:  I don't believe it's is a scroll wrap

23   agreement.  I'm not 100 percent certain on that.  I can maybe

24   look while -- for Mr. Abramowicz's argument.  But I don't

25   think it was a scroll wrap agreement.  It was a click wrap, I

1   guess you'd call it.

2          THE COURT:  Okay.  But regardless, it actually has,

3   at least the start of the terms of the -- under the appearance

4   to you, as opposed to just saying here's a link to them.

5          MR. TOTINO:  That -- that is true, although --

6   yeah.  I mean I guess there is a link in there.

7          THE COURT:  Right.

8          MR. TOTINO:  Yeah.  I think that's accurate.

9          So if we take a look at the Selden versus Airbnb

10  case, this is from the D.C. Circuit.  This screenshot looks

11  quite a bit like the Dave one.  It's actually less clear

12  because there are three separate buttons to sign up --

13         THE COURT:  Um-hum.

14         MR. TOTINO:  -- and the Court enforced this

15  agreement and enforced the arbitration clause.  And you'll

16  notice, Your Honor, it doesn't say -- it doesn't say by

17  signing up, I agree to arbitration.  It says terms of service.

18         THE COURT:  Right.

19         MR. TOTINO:  In fact, there is no law, that I'm

20  aware of, that says you have to note the arbitration agreement

21  in the -- on the signup screen, as long as the terms of

22  service are referenced.

23         Now, we have this -- this is the Edmundson versus

24  the Klarna app, from the Second Circuit, just recently, last

25  November.  And as you can see there, it -- the button says

confirm and continue.  And it says above it, I agree to the

payment terms.  This is even less -- less apparent that you're

agreeing to terms, I think, than the Dave app.  And it was

enforced by the Second Circuit.  Again, it was sent to

arbitration, even though the -- it just says payment terms

there.  It's a hyperlink.  It's underlined.  It's not a

different font color.  It's just an underlined link like what

Dave used, and it doesn't say anything about arbitration there

until you click on the agreement and get to it.  And that was

enforced recently by the Second Circuit.

So what -- I think what -- we do have this case

Berman versus Freedom Financial Network.  And that's a Ninth

Circuit case.  It talks about font color preferences in an

app, and it talks about you have to have blue font; and in our

case, the font wasn't blue; it was underlined.  But that --

you know, that case involved a specific situation with a honey

pot kind of website that lured people in to receive marketing

text.  It wasn't a financial app.  It wasn't someone entering

into a long-term relationship with -- a financial relationship

with the app -- with the company.  And it -- it really doesn't

cite California law or any other state's law.  It's just the

preferences from this Ninth Circuit panel decision.

Now District Courts in the Ninth Circuit, I guess,

have to follow that because it says you have to use blue font.

But, you know, it's not California law, which I think is what

1    this Court should follow.  And it's also contrary to the

2    Second Circuit Edmundson versus Klarna decision we just looked

3    at because that -- that app didn't use blue font, and it

4    enforced the agreement.  It really didn't look at the full

5    context, which -- in the totality of the circumstances, which

6    is what I believe the law is.

7          Now, Plaintiffs make a number of arguments to avoid

8    the arbitration clause.  One of them is that they say the

9    scope of the arbitration clause doesn't cover dispute or

10   doesn't cover Dave.  That's mainly directed on behalf of

11   Mr. Checchia to the Extra Cash agreement.  But the Extra Cash

12   agreement actually has in there that the arbitrator decides

13   the scope of the arbitration agreement, and -- it's in there

14   twice, I believe.  The other agreement also has that.

15         So if -- if -- if they were unreasonably

16   conspicuous notice of the terms by signing up in the app, it's

17   really for the arbitrator and not Your Honor to decide that.

18   But even if Your Honor looked at it, the -- the account -- the

19   spending account agreement and the deposit account agreement,

20   if you click -- if you look at them in the record, they

21   actually say -- they're called the Dave spending account

22   deposit agreement and the Dave Extra Cash agreement.  They say

23   in there, Disputes between the consumer, Evolve Bank and/or

24   Dave -- so it covers all three.  And the case that the

25   Plaintiffs rely on to avoid these -- these -- or to say this

1    -- that the account agreement doesn't apply to them was a case

2    where Plaintiff sues Sunoco, the gas station company.  And

3    Sunoco tried to enforce a Citibank card agreement that didn't

4    mention Sunoco once in it.  And so that's why that was -- that

5    case is totally distinguishable.

6          So in this case, we look at the agreements, they

7    all mention Dave repeatedly in them.  And again, that would be

8    an issue for the arbitrator, we believe.

9          THE COURT:  What about -- what about the case that

10   was filed by Plaintiff in mid December as the totalitory --

11   that was actually a case against Dave, Inc., the Locust case

12   out of the Ninth Circuit.

13         MR. TOTINO:  Yeah.  So what happened in that case

14   is that case followed the Berman blue font rule that the Ninth

15   Circuit had -- had.  The Ninth Circuit decision, it's an

16   unpublished memorandum, so it's not precedential.  It followed

17   the Berman -- like I said, the blue font standard from Berman.

18   It also is -- a couple of the facts were a little different in

19   that case for a couple of reasons.  One is there wasn't any

20   evidence in the record that Plaintiffs received e-mails

21   linking the terms, which we have in the record here.  And

22   second, it didn't involve the second account agreement, the

23   second sign-up process with the Extra Cash that Mr. Checchia

24   did here.

25         I don't think that case is binding at all on this

1    court.  Like I said, it's a panel -- it's an unpublished

2    memorandum panel decision from the Ninth Circuit.  Nothing in

3    California law says you need to have blue font when you do a

4    hyperlink.  You know, here Dave used the underlined -- the

5    underlined hyperlinks, which people are generally familiar

6    with.

7         If you have any other questions, I'm happy to

8    answer them.  I will bring up one other case that Plaintiffs

9    relied on.  It's this Cullinane versus Uber Technologies case.

10        Yeah.  So that one -- I'll stop sharing, maybe make

11   it a little clearer here.  Sorry.

12        So in the Cullinane versus Uber Technologies case,

13   first of all, that was a Pennsylvania law case.  All the

14   agreements here say that California law or Tennessee law.

15   So it shouldn't apply for that reason.  Second, that case

16   involved personal injuries, and it implicated the Pennsylvania

17   Supreme Court rule and decision guaranteeing a right to jury

18   trial in personal injury cases.  That's not indicated here at

19   all because we don't have a personal injury case.

20        In that case, the hyperlinks weren't underlined, by

21   the way, like they were here.  Also, another -- another point

22   in that case is that the Plaintiff submitted substantial

23   evidence that they didn't click on the hyperlinks or view the

24   documents.  All we have in this case is that the Plaintiffs

25   didn't -- don't remember what they did.  And then finally, I

1    would say that that case -- and I believe it's a petition to

2    file further review in that case.  But that case, it seems to

3    say that if it's a personal injury case in Pennsylvania, you

4    have to have an explicit jury waiver in a certain way.

5           Now since all arbitration agreements obviously

6    involve jury waivers, I would argue that case treats the

7    arbitration agreement differently and more harshly than a

8    normal contract, and by because of that, it violates the

9    Federal Arbitration Act.  I'm sure that will be brought on the

10   -- in the Petition that's filed for review in this case.

11          If you have any other questions, I'm happy to

12   answer them, Your Honor.

13          THE COURT:  Yeah.  No, not right now.  Thank you.

14   I appreciate that.

15          Counsel, you can respond.  But why don't we start

16   with the question I have is why wouldn't California law apply

17   here?

18          MR. ABRAMOWICZ:  Sure.  This is Kevin Abramowicz

19   for the Plaintiffs.

20          So I think if the Court's going to go into the

21   choice-of-law analysis, Pennsylvania law would apply.  And the

22   reason why I believe that is, so in -- and this is -- this is

23   actually in White versus Sunoco; we cited it.  Obviously we

24   didn't address this proposition because Cullinane hadn't come

25   out yet, and that really is the case that matters for whether

1    Pennsylvania law is different than California law.

2           But in White versus Sunoco, basically what that

3    case says is that federal courts have to apply the form

4    state's choice-of-law rules in diversity cases.  Then we have

5    Gay versus CreditInform.  That's 511 F.3d, 369.  It says that

6    federal courts have to apply the state -- the form state's

7    choice-of-law rules in federal question cases.

8           The reason that matters is we have federal claims

9    here and we also have state law claims.  But it doesn't

10   matter.  For both of those, we have to apply Pennsylvania's

11   choice-of-law rules because it's filed in Pennsylvania.

12          So in Pennsylvania, the choice-of-law analysis

13   turns on if there's a conflict between two laws, it turns on

14   what state has a materially-greater interest in resolving that

15   conflict, in resolving the issue before the Court.  And for

16   that, I'm citing McDonald versus Whitewater.  The cite for

17   that is 116 A.3d, 99.  That's a 2015 case from the

18   Pennsylvania Superior Court.

19          So the reason I think Pennsylvania has some

20   material -- materially-greater interests in this case because

21   Plaintiffs resided here, they got their advances from here,

22   and they repaid them to Pennsylvania.  So because of that,

23   Pennsylvania would have the stronger interest than California

24   in resolving this case.

25          Now I do know that Dave -- I believe what they

1    would argue is that the choice-of-law clauses and the

2    contracts would prohibit the Court from engaging in that

3    choice-of-law analysis.  So what I would point the Court to

4    for that proposition would be Kaneff versus Delaware Title

5    Loans.  The cite for that is 587, F.3d, 616.  That's a Third

6    Circuit case from 2009.  It's published, so it's binding.  And

7    what it says is that choice-of-law clauses do not apply when

8    either the law of the chosen state has no substantial

9    relationship to the parties or the transaction, and there is

10   no other reasonable basis for applying that law or application

11   of the law of the chosen state is contrary to a fundamental

12   policy of a state with a materially-greater interest in a

13   particular issue.

14            So here, I think after applying that choice-of-law

15   clause or to require California law in this case would violate

16   that second -- that second statement in Kaneff, because if we

17   apply the California law -- choice -- the California

18   choice-of-law clause here, what we would be doing, given

19   Cullinane is we would be applying a lesser standard of assent

20   for contracts that seek to waive Constitutional rights than

21   Pennsylvania Courts would apply.

22            In Kaneff, this is also important to note.  Kaneff

23   actually dealt with a use -- it was a usury case.  So there,

24   the challenge was to an unconscionable -- it was an

25   unconscionabilty challenge.  So it wasn't a formation

1    challenge to an arbitration contract.  But the Court found

2    that Pennsylvania's antipathy high interest rates, and that's

3    in cite 624 for that case, meant that Pennsylvania law should

4    apply to that unconscionability challenge.

5           So, you know, I think there's really two

6    fundamental policies that would be frustrated here.  One is

7    our policy to high interest rates and high fees, and then the

8    second would be our -- our higher burden of assent to

9    contracts that seek to waive Constitutional rights.

10          THE COURT:  Thank you, Counsel.  And before I --

11   before you go into your response to the other arguments on the

12   Motion to Compel, Mr. Totino, can you respond to that, the

13   choice-of-law arguments?

14          MR. TOTINO:  Yeah.  I would say I -- I agree that

15   the Court would have to look at who has a materially-greater

16   interest.  I don't -- I think the point about the policy

17   against the high fees or high interest doesn't really apply

18   because the evidence in the record is there's no interest and

19   there's no -- no high fees.  It's $3 a month or some minor

20   couple of dollars.  So I think that interest wouldn't apply.

21          As far as the interest on waiving the jury trial,

22   as I mentioned, the interest in that comes from the Supreme

23   Court -- Pennsylvania Supreme Court case about waiving a jury

24   trial in connection with personal injury cases.  That's not

25   what we have here.

1          And then again, I would just emphasize that the

2     Federal Arbitration Act, you know, would preempt treating

3     arbitration clauses differently, which, you know, applying a

4     different contract formation rules to the arbitration clauses

5     because there's a jury trial waiver in every one of them, I

6     think, would violate the FAA.  Thank you.

7          THE COURT:  Thank you.  Mr. Abramowicz, you can

8     continue.

9          MR. ABRAMOWICZ:  Thank you.  Before I continue, I

10    just wanted to respond to two things.  One, with the interest

11    rate limitations, So even if -- so I think we dispute that the

12    fees aren't actually interest.  So the definition of interest

13    is just something that compensates someone for loaning money.

14    So that's what the charges are here, the monthly fee, the

15    express fee and the tips are compensation for lending money.

16    So they'd be defined as interest.  But I mean I think the

17    broader point is that the CDCA, so that's 7 P.S. §6203, it

18    applies to not just interest, but it applies to fee discount

19    bonus.  I mean it really -- just anything that is charged in

20    connection with an advance.

21          And I would like just -- if the Court looks to, for

22    example -- and it's cited at paragraph 38 of our Complaint,

23    the Department of Banking versus NCAS of Delaware.  That's

24    948, A.2D, 752.  That's a Pennsylvania Supreme Court case from

25    2008.  That applied the CDCA to a monthly participation fee.

1    So, you know, it's -- our law is much broader than just being

2    interest, even if -- even assuming that the charges here can't

3    be qualified -- can't be characterized as interest.  So that's

4    the one point.

5         And then the point on the FAA, I don't want to

6    belabor this, because it was, I believe -- well, actually, we

7    might not have responded to the supplemental authority -- or

8    to Dave's response to our supplemental authority for

9    Cullinane.  But I'll just -- there are two cases that are

10   relevant to this point in the event we didn't.  Morgan versus

11   Sundance.  That's a Supreme Court case from 2022.  The cite

12   for that is 142, Supreme Court, 1708.

13        So what that case says is that Courts must apply

14   generally applicable rules, regardless if they disfavor

15   arbitration or not.  Here, we would argue that the rules set

16   forth in Cullinane is a rule that applies to any waiver of a

17   Constitutional right, regardless if it's a jury trial or

18   something else.  So it would fall within the scope of Morgan.

19        And I just also point the Court to Kernahan versus

20   Home Warranty.  That's a New Jersey Supreme Court case from

21   2019.  The cite for that is 199 A.3D, 766.  So that case dealt

22   with a rule that's very similar to Cullinane, and the

23   concurring opinion in that, I believe it was Justice Alvin

24   rejected the claim of FAA or would preempt that type of rule.

25        So we think the rules set forth in Cullinane is

similar to that role.  And I think the concurring opinion in

that case gives a good road map of why the FAA doesn't preempt

Cullinane.

THE COURT:  Thank you.

Do you have any response to the Edmundson case that

came out of the Second Circuit at the end of the year last

year?

MR. ABRAMOWICZ:  Yes.  Yes, I do.

So in Edmundson versus Klarna, as opposing Counsel

showed the Court on the PowerPoint, so that -- that dealt with

a notice that was above the button that users were directed to

click.  And the notice was in the area of focus that users

were directed to interact with.

So the reason that matters is when you have a

notice that's above a button, I think you can fairly assume

that because we read from top to bottom, that a consumer would

compass that and read it, especially because it was close to

the button that they were directed to click.

So our case is a lot different than that.  The

notice was placed below the button that users were directed to

click.  And not only was it placed below that button, but it

was displayed in small green font, which blended into the

background of the signup screen.  It was considerably smaller

than all the other fonts on that screen.

And I think it's important to note that a District

1    Judge in the Northern District of California agreed with me on

2    that point.  And then two Circuit Judges of the Ninth Circuit

3    agreed with me, and another District Judge, sitting by

4    designation, did agree with me on that Circuit.

5              And not only that -- not only was the -- so our

6    notice was placed below the button; it was placed outside the

7    user's area of focus; it was in gray font that blended into

8    the background.  It was smaller than all of the font on the

9    screen.  And the notice of the contract that Dave is trying to

10   bind my clients to was labeled TOS.  It was not labeled as a

11   contract.

12             So Edmundson doesn't have any of those problems.

13   It's placed above the button where users are directed to

14   click.  The font does not blend into the background.  The

15   payment terms are labeled payment terms.  They're not labeled

16   with letters.  And the payment terms are bolded and

17   underlined.  And again, it's directly above the button that

18   users are directed to click.  So I don't think that that case

19   is applicable here.

20             THE COURT:  What about -- wasn't -- and I don't --

21   I'm trying to find it now.  I know I have it somewhere and I

22   don't have it right in front of me.  It was on the PowerPoint.

23             With the second individual with which the -- not

24   his original signup, but when he had the Extra Cash signup,

25   wasn't that a box that he actually had to affirmatively click

1    to -- to accept the terms of service, as well, not just by

2    saying by accepting this, I -- if I miss-saw that, I could be

3    wrong.  And I don't know if --

4                MR. ABRAMOWICZ:  No.  You're correct, Your Honor.

5    That's -- so that's on paragraph 32 of -- it's paragraph 32 of

6    the Hernandez declaration.  And then it's, I believe, Exhibit

7    I for that declaration.

8                THE COURT:  Yes.

9                MR. ABRAMOWICZ:  So -- but yeah, we're not

10   challenging inquiry notice or -- or -- well, under California

11   law.  If you find California law applies, we would not be

12   challenging whether there was assent there.

13               THE COURT:  Okay.  So do you -- you would agree it

14   makes a difference because he checked that box.  That's

15   different there.

16               MR. ABRAMOWICZ:  I think that California law would

17   apply, yes.

18               THE COURT:  All right.  Go ahead.  I think I

19   interrupted you.  So I apologize.

20               MR. ABRAMOWICZ:  Oh, no.  You're fine.

21               No.  Actually, I think I was just -- I was just

22   going to -- if you don't have any other questions, I just --

23   there was just a few points that I just wanted to highlight.

24               THE COURT:  Yeah.  Please.

25               MR. ABRAMOWICZ:  Okay.  So I think the way that --

1    after looking at all of the briefing again, rereading the

2    cases, the way, at least, that I view the Motion is that Dave

3    claims that he can compel arbitration in two ways:  So one is

4    by enforcing the Dave's terms of service against both of my

5    clients; and then the second is by enforcing two deposit

6    account agreements that were entered into with Evolve against

7    Mr. Checchia.

8            So whether Dave can enforce those three agreements

9    I think comes down to three issues.  The first would be did

10   Plaintiffs actually know they were agreeing to Dave's terms of

11   service.  Did the sign-up screen that they produced provide

12   sufficient inquiry notice to bind my clients to Dave's terms

13   of service.  And then three, does the language of the deposit

14   account agreements entered into with Evolve authorize Dave to

15   enforce the delegation and arbitration clauses that are in

16   those contracts.

17           And I think even if the Court views the evidence in

18   the light most favorable to Dave, that it can answer all of

19   these questions as no.  And because of that, I think that the

20   Court should deny the Motion to Compel with prejudice, without

21   a trial, without discovery.

22           So on the actual notice point, the issue here is

23   that Dave claims Plaintiff agreed to its terms of service by

24   clicking a join Dave button when they signed up for Dave's

25   app.  So that's the method of assent.  It wasn't a signature;

1    it wasn't checking a box.  It was clicking a button.  The

2    purpose of that button was to join Dave.

3           So Dave -- the issue with actual assent, is Dave's

4    produced no evidence that Plaintiffs knew that by clicking

5    that button, they were agreeing to Dave's terms of service.

6           And I want to highlight that all of -- at least

7    from what I can tell, all of the evidence that Dave produced

8    has nothing to do with what Plaintiffs believed when they

9    clicked that button.  And that's what's necessary to show

10   actual offense.

11          So the first piece of evidence that I could -- I

12   could -- at least I thought Dave was trying to use was that

13   Plaintiffs received and repaid advances, and that they paid

14   express fees and tips.  I got that from Doc 33, page 33.

15          So whether Plaintiffs received advancements, paid

16   express fees, that has nothing to do with their knowledge of

17   when they actually signed up for Dave's app and clicked that

18   button, what they were thinking.

19          THE COURT:  Can't you, in the rule, though, assent

20   to the terms of the electronic agreement by -- through inquiry

21   notice?  Like, is there -- I mean isn't that at issue?

22          MR. ABRAMOWICZ:  I agree.  So here, I'm just

23   addressing the actual --

24          THE COURT:  I'm sorry about that.

25          MR. ABRAMOWICZ:  Yeah.  Yeah.  So I agree that

1    there's two roads -- two roads we can go down.  So one, you

2    can show actual notice, and then two, you can show inquiry

3    notice.  So even if Dave can't prove actual notice, it could

4    still show inquiry notice and bind -- bind my clients if it

5    can sufficiently show that.

6           But just on the actual notice part, I don't think

7    that Dave has submitted any evidence that placed that at

8    issue.  So a second piece of evidence that I could tell from

9    the briefing was that Plaintiffs are -- and this is quote,

10   Reasonably active adult consumers; that's from Doc 33, page

11   three.  Again, that has nothing to do with what they believed

12   when they clicked the Join Dave button, which is the method of

13   assent that Dave claims bound my clients to the terms of

14   service.

15          The third piece of evidence was that Plaintiffs

16   have filed other lawsuits.  I got that from Doc 33, page three

17   and page four.  So again, that has nothing to do with their

18   subjective mindset when they signed up for Dave's app.  And

19   the one thing I want to point out with that piece of evidence,

20   if anything, it actually helps my clients, because in Dave --

21   Dave cited two cases on that.  One was Checchia versus Solo

22   Funds.  The other was Golubiewski versus Activehours.  So

23   Checchia versus Solar Funds, the Court found that my client

24   did not assent to any arbitration contract.  And the cite to

25   that is -- it's only a district -- it's a Lexus cite, but it's

1   2023, US District, Lexus 98889.  And the docket number for

2   that is 23-CV-444.  I do want to, in all candor to the Court,

3   that case is currently on appeal and argument is tentatively

4   scheduled for May 20th.

5          But the District Court found that my client didn't

6   assent.  So that wouldn't have helped Dave.  And then in

7   Golubiewski versus active hours, there is no arguments that my

8   clients assented to an arbitration contract.

9          So the fourth piece of evidence that I could find

10  was that Plaintiffs are, quote, Experienced mobile phone users

11  who create accounts on mobile apps.  I got that from Doc 33,

12  page three and page four.  Again, that has nothing to do with

13  their subjective mindset on what they believed when they

14  clicked on the join Dave button.

15         And in today's presentation, I got two other pieces

16  of evidence that I think Dave claims shows actual notice.  One

17  is that my clients gave access to their bank accounts.  Again,

18  that's not relevant to what they believed when they clicked

19  the Join Dave button.  And the sixth piece of evidence would

20  be that they received e-mails.  The problem is that Dave

21  hasn't actually produced those e-mails.  So we don't know what

22  they said, what they reference, where the language of the

23  terms of service was.  So that's not helpful to understand

24  what they believed.

25         And we cited, I believe in our briefing, it was

1   Jackson versus Amazon.  That was a Ninth Circuit case that

2   dealt with a similar situation that said that type of evidence

3   is insufficient.  So -- and this is just a point that I wanted

4   to -- we addressed in our briefing, but I just wanted to

5   reiterate that, and this is still on the actual notice part,

6   is that a party -- and this is a quote from a Third Circuit

7   case.  I'll just give you the citation.  It's 110 F.3d, 222.

8   And then the Penn cite is 231, Note 36.  It's a Third Circuit

9   case from 1997.  And the quote is, A party does not become

10  entitled to a jury trial under the FAA merely by demanding

11  one.  Instead, the party must demonstrate that there is a

12  genuine issue of facts whether there was an agreement to

13  arbitrate.

14          So again, without producing any evidence on the

15  actual notice part, Dave has not placed that at issue, so

16  there's no need to have a trial on that issue.

17          THE COURT:  Were you going to turn to inquiry

18  notice next?

19          MR. ABRAMOWICZ:  I was.

20          THE COURT:  All right.  Let me -- why don't I hear

21  from Mr. Totino on the actual notice issue before we hear on

22  -- the argument on inquiry notice.

23          MR. TOTINO:  Thank you, Your Honor.  So actual

24  notice, we have in Ms. Hernandez's declaration, page 10, or

25  paragraph 10, it says, In addition, Dave sends regular e-mails

1   to customers which notify customers of Dave's terms and

2   provides links for customers to view the terms.

3          So that's in the record.  Plaintiffs rely on

4   Jackson versus Amazon dot com to get around that, but -- and

5   in that case, Jackson versus Amazon dot com, the issue was

6   whether new terms applied, not whether there was notice of any

7   terms -- actual notice of any terms, which is the issue here.

8          So I think Jackson is a -- what they were trying to

9   do is to bind the Plaintiff with the new terms, but the

10  Plaintiffs didn't get the e-mail, apparently, and they have

11  evidence saying that, as far as I remember.

12         And here, we're not saying -- we're saying the

13  e-mails put the Plaintiffs on actual notice that there are

14  terms.  And, by the way, the record -- there's no -- nothing

15  in the record with Plaintiffs saying they didn't get these

16  e-mails.  So the only evidence in the record is that these

17  e-mails were sent; things that are sent are presumed to be

18  received; and the Plaintiffs don't submit any evidence saying

19  they didn't get them.

20         Also on this actual notice, I don't believe that

21  actual notice is determined only at the time when the

22  Plaintiff first signs up the app and clicks on the Join Dave

23  button.  I do think there's actual notice there because it

24  says by joining Dave, you're agreeing.  But once you --

25                THE COURT:  Does it -- does it matter, as Counsel

1   say, whether the -- that language is above or below the click

2   of the button?

3            MR. TOTINO:  I don't think so.  If you look at a

4   smart phone and you're looking at the phone, it's all on one

5   screen.  You don't have to scroll.  And it's a screenshot.

6   You look at that, and if it says above or below, some -- some

7   cases do it -- companies do it one way, others do it the other

8   way.  You know, I -- I guess what I would say is the best

9   possible notice isn't required.  It just has to be a notice.

10  And here, it says Join Dave.  Anyone looking at the phone

11  there would see that there's language, By agreeing underneath

12  -- By joining, I agree underneath the button.  And I don't

13  think there's any case law that says that it has to be above

14  that I've seen.

15           Just on -- on one last point of his actual notice

16  is I don't think the notice has to be limited to just when

17  they first sign up for the app.  If you're going into a

18  relationship with the -- with a company, getting multiple

19  advances over a long period of time, paying that back, paying

20  tips, that's -- that gives you actual notice that you have

21  some type of an agreement with -- and loans through actual

22  notice of the agreement, it was their obligation to click on

23  the link in the app or otherwise take a look at the agreement,

24  because not reading the agreement is no excuse to not being

25  enforced against a person.  Thank you.

1          THE COURT:  Thank you.

2          Counsel, let's hear about inquiry notice.

3          MR. ABRAMOWICZ:  Yes.  That's a good segue,

4   actually, because I think really what the actual notice

5   argument here is that there was inquiry notice because what --

6   kind of the same that we can assume that a person knew that

7   contract governed because of X, Y, or Z really is -- they were

8   on constructive notice and they should have found out.

9          So I think that's really what the issue is here, is

10  that Dave is claiming that there's inquiry notice.  That's

11  really what all of their evidence goes to.  And I think, even

12  if you view that evidence in the light most favorable to Dave,

13  it shows that inquiry notice is lacking on here.

14          And I want to stress that I am not the only person

15  that's saying that.  Four judges from California have said

16  that, as well.  And I think those opinions are well-reasoned.

17  And in arguing that it gave notice, Dave is saying that those

18  judges got it wrong.  But if we just look at Dave's screen, I

19  think those judges got it right.

20          So, you know, even -- I mean even if we contrast

21  the notice here with the -- and just hold on one second.  Bear

22  with me.

23          THE COURT:  Yeah.  Sure.  Take your time.

24          MR. ABRAMOWICZ:  So if we look at -- and what I'm

25  looking at right now in front of me is Exhibit G and Exhibit F

1    to actually Hernandez's declaration.  It's for -- if anyone

2    has the pdf up, it would be page 16 -- or page 70 of Doc 13-1.

3    And then page 72 of Doc 13-1.

4            THE COURT:  Thank you.

5            MR. ABRAMOWICZ:  So for these -- if we look at

6    these two screens, one of the screens is designed, at least

7    under California law, to give someone notice of terms.  And

8    one of the screens is not.  And the screen that's not is the

9    one that my clients saw.

10           So I would also note that Exhibit G, unlike Exhibit

11   F is blown up.  So Exhibit F is more of the size that someone

12   would see.  Exhibit G is not -- is not the same size that

13   someone would see.  I would refer the Court back to Ashley

14   Hernandez's declaration.  If you actually look at the

15   paragraph where Exhibit G is discussed, you'll actually see

16   what's more like a cell phone size of what someone would have

17   seen.

18           So the -- and I kind of already went through this,

19   but the problem here is that -- so Exhibit G, if we're looking

20   at the notice, it's placed below the button.  In Exhibit F,

21   we're looking at the notice, it's placed above the button.

22   Exhibit G, if we're looking at the notice, it says TOS.

23   Exhibit F, if we are looking at the notice, it says terms of

24   use.  So it's clearly a contract in Exhibit F; Exhibit G, the

25   thing that my clients saw, is not.

1          And on top of that, Exhibit G, the screenshot that

2     my clients saw, the notice is in gray font that blends into

3     the background.   In Exhibit F, it is bolded, and it is

4     highlighted in blue.   And it contrasts directly with the

5     background.

6          So all of these things go to show how these two

7     screenshots really prove that assent inquiry notice is lacking

8     here, even under California law, the law that they claim

9     applies.

10          THE COURT:  Mr. Totino?

11          MR. TOTINO:  Yes.  So on that, Your Honor, like I

12    said, you know, the notice doesn't have to be the best

13    possible.  It just has to be reasonable notice.  If you look

14    at the Klarna screen, it's got the same kind of -- the same

15    color font, basically, which the Second Circuit enforced.

16          I think there's -- there's certainly enough here to

17    create an issue of fact as to whether Plaintiffs had inquiry

18    notice.  I will note that the Plaintiff mentioned the

19    different judges that reach the different conclusions.  In the

20    Lopez case, if you look at insight to the Lopez case, it says,

21    But there was no record of any attempt to communicate the

22    arbitration provision outside the initial language of the Dave

23    application signup screen.

24          But here, we do have evidence from Mr. -- from

25    Ms. Hernandez's declaration that they were sent periodic

1    e-mails with links to the terms.  So I think, at the very

2    least, that creates a triable issue of fact on whether

3    Plaintiffs had notice.  And although I think it's clear from

4    the record that, you know, Plaintiffs didn't, and the

5    arbitration motion should be granted.

6           Was Plaintiff finished with his whole argument or

7    does he want to respond?

8           THE COURT:  I'm not sure.  Counsel?

9           MR. ABRAMOWICZ:  Yes.  So -- so again, the -- they

10   didn't provide the e-mails, so we don't know what the e-mails

11   look like.  So I know that the argument is that the e-mails

12   contained hyper links, but, I mean even if you view the light

13   -- the evidence in the light most favorable to Dave, we don't

14   know what those e-mails look like.  So we don't actually know

15   what -- you know, what kind of notice they gave, if they gave

16   any notice at all.  I mean the hyperlink could have been

17   labeled Tuesday or Friday or Monday.  It could have been

18   something that has no -- no relation to a contract at all.

19          So the problem is is that the e-mails, themselves,

20   there's just no notice of what they said.  We need to see what

21   they said to be able to analyze inquiry notice.  And I think

22   Dave -- the Lopez, the Ninth Circuit case made clear that

23   inquiry notice is a question of law for the Court to decide.

24          So there's no, you know, again, if you're looking

25   at the evidence in the light most favorable today, and the

1  screens are what they are, they give the notice that they

2  give.  So that's not a triable issue of fact.  The Court can

3  decide whether the maker of that screen gives notice or not.

4          And on the point that, you know, they don't need to

5  give the best notice possible, they just need to give

6  reasonable notice.  I agree with that, but there has to be

7  some limit to that test.  And, you know, I think what the

8  arguments really are here is that there is no limits on that

9  site, because people know that contracts are going to govern.

10  So then the -- whatever contract the Defendant wants to apply

11  to that specific transaction will apply, regardless of what

12  they do.  And that's just not the standard.

13          There has to be some type of notice that they have

14  to give.  And this case just does not meet that standard.

15          THE COURT:  Thank you, Counsel.  Mr. Totino,

16  anything else?

17          MR. TOTINO:  Yeah.  Just in concluding,

18  Mr. Abramowicz just said there has to be some type of notice.

19  Here, it's clear there was some type of notice.  It was in the

20  app.  It was in the e-mail.  At the very least, I think it

21  creates a triable issue of fact on that point, and we should

22  -- we should try when the Plaintiffs had notice.

23          I had one other point that just slipped my mind.

24  Just one second.  I would just say, you know, if you look at

25  the screens, I think any reasonable consumer looking at that

1   screen would know there's some agreement governing the

2   relationship.  And actually, that was the point.

3        The fact of this long, ongoing financial

4   relationship doesn't mean that you have to -- that you can

5   just say there's terms that we never showed you and we never

6   give you any idea of, and those are binding.  It just affects

7   how much notice -- whether the notice is sufficient.  If you

8   have an ongoing financial relationship, you need less --

9   probably less explicit notice than if someone went to a

10   website to sign up for marketing texts because, you know --

11   you should know there's an agreement there.  And because of

12   that, the notice doesn't have to be conspicuous.  It doesn't

13   have to be perfect.  It's -- you know, it just has to be

14   reasonable.  And we think we've met that standard here.

15        THE COURT:  Do you say there's a triable issue --

16   if the Court were to find a triable issue has been met there,

17   are you saying there should be a trial on the issue of notice

18   prior to a decision on the Motion to compel arbitration?

19        MR. TOTINO:  No.  What I'm saying is that, Your

20   Honor, I think, can grant the Motion to Compel Arbitration

21   based on the record in front of you.  But at the very least, I

22   think there's -- if there's disputes of fact, things like, for

23   instance, whether these e-mails, Plaintiffs received them.  He

24   said they could have sent Monday or Tuesday.  They have them.

25   They could have brought that up.  If there's issues of fact, I

1    think the FAA requires a trial on whether or not an agreement

2    was ever entered.

3              THE COURT:  Okay.  Thank you.  Mr. Abramowicz,

4    anything else?

5              MR. ABRAMOWICZ:  Just two final points, Your Honor.

6              THE COURT:  Go ahead.

7              MR. ABRAMOWICZ:  So on the Evolve deposit account

8    agreements that -- that -- this is just for Mr. Checchia.  So

9    I think White versus Sunoco is pretty on point.  I'm not going

10   to go back over that case.  We cited it already.  But I

11   understand that Dave is trying to distinguish it because Dave

12   is saying that it's specifically named in the agreement.

13             So to the extent that Your Honor would like to look

14   at another case that involves that exact issue, it is

15   Cablovic, that's C-a-b-l-o-v-i-c, and that's versus JC Penney.

16   The cite for that is 884, F.3d, 1051.  That's a Tenth Circuit

17   case from 2018.  So in that case, the contract stated if

18   either you or we elect or make a demand for arbitration, you

19   and we must arbitrate any dispute or claim between you or any

20   other users of your account, and us, our affiliates, agents,

21   or JC Penney Corp., Inc, if it relates to your account.

22             So the we, the us was GE Bank, GE Capitol Bank; the

23   Defendant was JC Penney.  And despite the fact that claim was

24   defined specifically to include JC Penney, the Tenth Circuit

25   held that JC Penney could not compel arbitration because only

1    we, in quotes, GE Bank could compel arbitration, and JC Penney

2    could not qualify.  So that's directly on point here and

3    addresses the attempted distinction that Dave is making with

4    White.

5              I have -- and then just one final point on whether

6    a trial is necessary.

7              Again, if you look at the evidence in the light

8    most favorable to Dave, it still does not raise an issue of

9    fact on actual notice, and it still shows an inquiry notice is

10   lacking.  So there's no point to have a trial under that

11   standard.  I think the -- I believe we cited this case in our

12   -- in our briefing.  But Bazemore --

13             THE COURT:  Um-hum.

14             MR. ABRAMOWICZ:  -- that's -- versus Jefferson

15   Capital.  I think that was in there.  That was 827, F.3d,

16   1325.  That's an 11th Circuit case from 2016, and it cites a

17   Third Circuit case from 2013 for that point.

18             THE COURT:  Great.  Thank you.

19             All right.  Well, Counsel, thank you both very much

20   for the presentation and the arguments on this.  I think

21   they're helpful to clarify these issues.  Certainly this is --

22   these are Motions that are -- well, although a year old, not

23   the oldest I've recently inherited.  So I will -- we will be

24   looking at these as quickly as we can.  Argument was helpful

25   to me to clarify some of the issues here and -- and streamline

1   the argument.

2       So I appreciate you taking the time to do this with

3   me today, and I hope that you'll hear from me soon.

4       MR. ABRAMOWICZ:  Thank you, Your Honor.

5       MR. TOTINO:  Thank you, Your Honor.

6       THE COURT:  Have a good day.

7       (At 1:59, the proceedings were concluded.)

CERTIFICATION


        I, Colleen V. Wentz, Federal Official Realtime

Court Reporter, in and for the United States District Court

for the Middle District of Pennsylvania, do hereby certify

that pursuant to Section 753, Title 28, United States Code,

that the foregoing is a true and correct transcript of the

stenographically-reported proceedings held in the

above-entitled matter, and that the transcript page format is

in conformance with the regulations of the Judicial Conference

of the United Sates.


                        _____
                        /s/ Colleen V. Wentz
                        Colleen V. Wentz, RMR, CRR
                        U.S. Official Court Reporter
                        570.259.2258


    (The Foregoing of this transcript does not apply to any
reproduction of the same by any means unless under the direct
control and/or supervision of the certifying reporter.)